DANIEL G. BOGDEN
United States Attorney
PAUL L. PUGLIESE
Assistant United States Attorney
100 W. Liberty Street, Suite 600
Reno, Nevada 89501
Tel:  (775) 784-5438
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF: | ) | No. 3:06-CV-0263-BES-VPC |
| | ) | |
| The Residence Located at 12720 | ) | |
| Buckthorne Lane, Reno, Nevada, and | ) | DECLARATION OF SA MICHAEL A. WEST |
| Storage Units 136, 140, 141, 142, and 143, | ) | |
| Double R. Storage, 888 Maestro Drive, | ) | |
| Reno, Nevada | ) | |
| | ) | |

DECLARATION

I, MICHAEL A. WEST, do hereby say that:

1. I am a Special Agent with the Federal Bureau of Investigation.  As part of my regularly assigned duties, I investigate violations of federal statutes, to include theft of trade secrets and the unlawful retention of information relating to the national defense, which occur in Northern Nevada. The following facts are provided regarding the above-captions searches:

2. On March 1, 2006, Special Agent (SAs) Michael West and Glen A. Lovedahl attempted to interview Dennis Lee Montgomery at his residence of 12720 Buckthorn Lane, Reno, Nevada, in conjunction with a Federal Search Warrant authorized on February 28, 2006, by U.S. Magistrate Judge Valerie P. Cooke, U.S. District Court, District of Nevada, Reno, Nevada.  SAs West and Lovedahl were professionally dressed in suit and tie.

3. While parked in front of 12720 Buckthorn Lane, Reno, Nevada, SA West observed Mr. Montgomery arrive at 12720 Buckthorn Lane in a tan 2003 Chevrolet Extended-Cab Truck, at approximately 12:05 PM.  Mr. Montgomery began to pull into the driveway; however, upon observing SAs West and Lovedahl exit their vehicle, pulled his truck into the street.  SA West, having previously met Mr. Montgomery, greeted Mr. Montgomery from the passenger side of the

47

1   truck and made Mr. Montgomery aware of the Agents' identity showing Mr. Montgomery official

2   credentials. SA West asked Mr. Montgomery if he had a few minutes to speak with him about

3   eTreppid. Mr. Montgomery asked SA West if he could pull his vehicle in the garage and without

4   objection from SA West, Mr. Montgomery pulled his vehicle into the center garage space and exited

5   his vehicle. SA West did not instruct Mr. Montgomery to move his vehicle in the garage nor did SA

6   West threaten Mr. Montgomery in any manner to do so.

7       4. Mr. Montgomery immediately exited the garage where SA West again showed Mr.

8   Montgomery his official credentials and introduced SA Lovedahl to Mr. Montgomery. SA West told

9   Mr. Montgomery that he would like to talk to him about eTreppid Technologies. Mr. Montgomery

10  stated he would be willing to talk to Agents with his attorney present and would call his attorney.

11  Mr. Montgomery either attempted to re-enter the garage or asked to get his cellular phone from his

12  truck. To prevent Mr. Montgomery from becoming a safety concern for the Search Team Agents,

13  Mr. Montgomery was not allowed to enter the residence.

14      5. Mr. Montgomery was then made aware that SA West had a Search Warrant for his

15  residence and Mr. Montgomery was immediately provided a copy of the Search Warrant and

16  Attachments "A" and "B". Mr. Montgomery stated that the Agents were listening to the wrong

17  person and that Warren Trepp is a liar.

18      6. Mr. Montgomery advised SA West that he has dogs in the house that he would like to put

19  outside and needed his cell phone from his truck to call his attorney. SA West informed Mr.

20  Montgomery that SAs West and Lovedahl would be assisted by other Special Agents and that his

21  assistance in securing the dogs would be appreciated and this would be accomplished first. SA

22  Lovedahl requested the Search Team Agents, who were positioned around the corner from the

23  residence and wearing FBI markings, respond to the residence to execute the search warrant and that

24  Mr. Montgomery was cooperative.

25      7. Upon the arrival of the Search Team Agents, Mr. Montgomery was escorted into the

26  residence where he removed four dogs to the backyard area of the residence. SA West requested Mr.

27  Montgomery take a seat at the dining room table while Agents conducted a law enforcement clearing

28  of the residence to ensure that no other individuals were present in the residence and he (Mr.

Montgomery) would need to remain seated until the process was completed. Mr. Montgomery informed SA West that no one else was in the residence and it was unnecessary. SA West informed Mr. Montgomery that the search for other individuals was necessary for Agent safety.

        8.    While seated at the dining room table, Mr. Montgomery continued to state that Trepp is a "crook" and he (Mr. Montgomery) has information that would prove this. SA West again told Mr. Montgomery that he was very interested in hearing his information. Mr. Montgomery requested to retrieve his cell phone from his truck to call his attorney; however, SA West requested Mr. Montgomery remain seated until the law enforcement clearing was completed. Mr. Montgomery began to berate the Agents stating that Agents would "trash" his house and look at personal items. Mr. Montgomery was becoming visibly upset. SA West informed Mr. Montgomery that Agents would not "trash" his home and had no interest personal items. Mr. Montgomery again asked to get his cell phone from his truck which was refused as the law enforcement clearing was still in progress. Mr. Montgomery stated that Agents were refusing him the opportunity to call his attorney. SA West informed Mr. Montgomery that no questions were being asked of him and nothing would change in the next few minutes until the law enforcement clear was complete. Mr. Montgomery then suggested he be allowed to use a house phone to call his attorney and was then escorted to his bedroom where he retrieved a phone and at approximately 12:25 P.M., placed a call to his attorney. Mr. Montgomery was not allowed access to his vehicle as a matter of Agent safety as the law enforcement clearing was in progress and Mr. Montgomery's vehicle had not been check for weapons. Mr. Montgomery was not asked any additional questions by SA West or any other Agents, once he stated he would only speak to Agents with his attorney present.

        9. At the completion of the law enforcement clearing of the residence for other individuals, SA West informed Mr. Montgomery that he could remain in the residence but he would need to remain calm and stay seated in one area for safety reasons or he was free to leave the residence; however, if he chose to leave, he would not be allowed to come and go from the residence. Mr. Montgomery declined to remain in the residence and exited the residence to the street in front of the residence where he was observed to be yelling at someone on the telephone and pacing in the street.

\ \ \

3

10. Prior to beginning the search of the residence, one orange plastic case containing search supplies was placed in the garage of the residence and periodically accessed by Agents. No sealed boxes were brought into the residence.

11. At approximately 12:55 P.M., Mr. Montgomery informed SA West that he had a safe in the master bedroom closet and would open the safe for the Agents. SA West entered the residence to locate the safe and upon return observed SA Glenn Booth hold a sledgehammer. SA Booth informed SA West that Mr. Montgomery had recanted his offer to open the safe. SA West informed Mr. Montgomery that Agents would enter the safe using whatever means necessary, sledgehammer, locksmith, or removal. Mr. Montgomery stated he would open the safe and was escorted into the residence and opened the safe.

12. At approximately 1:03 P.M., an individual who identified himself as Eric Pulver, an attorney for Mr. Montgomery, arrived at the residence. Mr. Pulver having a copy of the Search Warrant and Attachment "A" and "B" in hand which was previously provided to Mr. Montgomery, requested a copies of the Affidavit in support of the Search Warrant and names of all Agents assisting with the search. SA West informed Mr. Pulver that the Affidavit was sealed and all reports of Agents present at the search would be made available at discovery. SA West further informed Mr. Pulver that Mr. Montgomery would be given a copy of the Search Warrant, Attachment "A" and "B", and a receipt for all property seized at the conclusion of the search warrant.

13. At approximately 1:17 P.M., Mr. Pulver, while receiving instructions from someone he was talking to on his cell phone,  voiced his objections to the Search Warrant, stating the Warrant was defective, due to no reference in Attachment "B" permitting the seizing of Attorney/Client privilege material and that Mr. Montgomery's computers contained Attorney/Client privilege material. Mr. Pulver continued to object to Agents seizing Montgomery's computers. SA West informed Mr. Pulver that the Search Warrant allows for the seizure of all magnetic media and there was no practical way to separate the Attorney/Client privilege material at the residence and maintain the integrity of the evidence. SA West asked Mr. Montgomery where the Attorney/Client privileged information was located to which Mr. Montgomery responded "everywhere." SA West further informed Mr. Pulver that all magnetic media will be seized pursuant to the Search Warrant and he

4

should file a motion with the court to address his concerns. Mr. Pulver made a request to photograph or videotape the search; however, neither Mr. Pulver nor Mr. Montgomery had the means to do so. SA West denied the request.

14. SA West overheard Mr. Pulver tell someone on his cell phone that he could not talk because the FBI was arresting his client. SA West informed Mr. Pulver that Mr. Montgomery was not being arrested. Mr. Pulver stated that he knew that and he was talking to his wife.

15. At approximately 1:26 P.M., Kathleen Montgomery arrived and removed four dogs from the backyard area of the residence with the assistance of Mr. Montgomery. Mr. Montgomery was also provided dog food from the residence.

16. At approximately 1:36 P.M., Mr. Montgomery requested medication from the residence and directed SA West to the night stand next to the master bed. SA West provided Mr. Pulver with two prescription bottles in the name of Dennis Montgomery labeled HCTZ Cap 12.5mg and MetoPro/HCTZ 100/25mg. Mr. Pulver and Mr. Montgomery were provided water from the residence.

17. Montgomery and Mr. Pulver remained outside the residence and Mr. Montgomery continuously berated the Agents executing the search.

18. Mr. Montgomery requested to use the bathroom and was escorted into the residence by SA West and Lovedahl where he was allowed to use the bathroom. Mr. Montgomery continued to berate Agents while in the bathroom. Mr. Montgomery commented to himself that he was being watched while he urinated. Mr. Montgomery was allowed to use the bathroom with the door open approximately one inch for safety purposes.

19. Mr. Montgomery requested his wife's migraine medication from the master bedroom and was escorted into the house to retrieve the medication by SA Lovedahl.

20. Mr. Montgomery continued to berate Agents who conducted the search and at approximately 2:15 P.M., Mr. Pulver was informed that Mr. Montgomery was being disruptive and would not be allowed back in the residence until the search was completed. Mr. Pulver commented that Agents had been very courteous to his client.

\ \ \

5

21. Mr. Pulver requested and was allowed to use the bathroom in the residence. Mr. Montgomery stated he also need to use the bathroom and commented that he would urinate on the side of the house. Mr. Montgomery was advised that he could also use the bathroom inside the house; however, Montgomery declined.

22. At approximately 3:20 P.M., Mr. Pulver was informed that the search of the area containing the safe was completed and he and/or Mr. Montgomery were welcome to count the U.S. Currency located in the safe as this money would not be seized. Mr. Pulver declined to count the money and stated he was sure the Agents knew how much was there and he trusted the Agents. A count of this U.S. Currency revealed there to be $32,400.00 in cash. The safe was closed at approximately 3:25 P.M.

23. During the Search Warrant briefing, SA West informed the Search Team Agents that witnesses had provided information that Mr. Montgomery may be receiving prescription drugs, without prescriptions, from India and if any quantities of prescription drugs were located during the search to bring them to SA West's attention. During the earlier stages of the search, SA Edward Duffer located a quantity of prescription drugs in a shoe box in the master bedroom closet. SA Booth, in an attempt to identify the drugs telephonically contacted a pharmacy and then contacted Drug Enforcement Administration Special Agent Justin Dillard and Task Force Officer David Kuzemchak for assistance in identifying the prescription drugs. SA Dillard and TFO Kuzemchak responded to the residence. SA Dillard informed SA West that Valium is a Schedule V Controlled Substance and without a prescription would be considered contraband. SA West informed Mr. Pulver that Agents would seize the drugs unless a doctor's prescription could be produced. Mr. Pulver stated that Mr. Montgomery had no comment on the matter. SA West further informed Mr. Pulver that if a valid prescription was produced, the FBI would return the drugs to the prescription holder.

24. All items of evidence removed from the tan 2003 Chevrolet Extended-Cab truck and the residence were staged in the garage area in paper bags where Mr. Pulver was standing. The Agents did not seize any photographic slides of Mr. Montgomery's daughter unless the photographs are contained on storage media seized from the residence which has not yet been reviewed by the FBI in

6

1 respect of the Attorney Client privilege asserted by Mr. Montgomery.

2       25. As a standard practice, the FBI Search Team Agents took entry photographs prior to

3 searching the residence, took photographs of significant items located during the search, and exit

4 photographs at the conclusion of the search. The purpose of these photographs are to show how the

5 residence was found and left by the FBI. The photographs taken during the search of 12720

6 Buckthorn Lane clearly show the condition of the residence at the conclusion of the search.

7       26. Mr. Pulver informed SA West that Agents were extremely tolerant of Mr. Montgomery

8 and acted professionally despite Mr. Montgomery's comments.

9       27. At approximately 4:00 P.M., Mr. Pulver was provided another copy of the Search

10 Warrant, Attachment "A" and "B" and a FD-597, "Receipt for Property" listing the items seized. At

11 no time while the seized items were being assembled did Mr. Pulver or Mr. Montgomery request to

12 examine the items or the packaging.

13       28. On March 3, 2006, SA West obtained five separate search warrants for Storage Units

14 136, 140, 141, 142, and 143 located at Double R Self Storage, 888 Maestro Drive, Reno, Nevada,

15 with each warrant describing each individual unit.

16       29. At the conclusion of the search of each Storage Unit, a copy of the Search Warrant,

17 Attachments "A" and "B", and a property receipt, where placed in each Storage Unit and secured

18 with a new padlock.

19       30. As a standard practice, the FBI Search Team Agents took entry photographs prior to

20 searching each storage unit, took photographs of significant items located during the search, and exit

21 photographs at the conclusion of the search. The purpose of these photographs are to show how the

22 storage units were found and left by the FBI. The photographs taken during the search of these

23 storage units clearly show the condition of the storage units at the conclusion of the search.

24       31. All boxes and items searched were placed back in a similar location or fashion as found,

25 although not exact, with no boxes left upended. The glass in a small picture frame broke when a

26 shelf was moved. The glass was cleaned up and the picture frame was returned to the shelf.

27       32. All items seized were listed on the property receipt with a copy being left at the opening

28 of the storage unit and photographed in place. These photographs clearly show the storage unit being

searched and the writing on the receipt. No cash was taken from the storage units.

33. In light of Mr. Montgomery's assertion that he is the only individual at eTreppid Technologies with the necessary security clearance to view or receive classified material, SA West spoke with Special Agent Jay Dixon, Defense Security Services, Phoenix, Arizona, on March 14, 2006, regarding which eTreppid Technologies employees have been granted access to classified material at eTreppid. SA Dixon stated that three employees have Secret clearances and six employees have Top Security clearances; however, in addition to a clearance each employee would have to have a "need to know" to have access to any particular classified information.

34. SA Dixon stated that all classified material at any level must be maintained or stored consistent with the National Industrial Security Program Operating Manual and at no time was Mr. Montgomery or any other employee authorized to maintain classified material at their residence or a commercial storage facility.

I Declare under Penalty of Perjury that the Foregoing is True and Correct.

Executed this  2  day of June, 2006, in Reno, Nevada

Michael A. West
Special Agent, Federal Bureau of Investigation