1  J. Stephen Peek, Esq. (NV Bar #1758)
   Jerry M. Snyder, Esq. (NV Bar #6830)
2  Hale Lane Peek Dennison and Howard
   5441 Kietzke Lane, Second Floor
3  Reno, NV  89511
   Tel: (775) 327-3000
4  Fax:  (775) 786-6179

5  Pillsbury Winthrop Shaw Pittman, L.L.P.
   David A. Jakopin, CA Bar No. 209950
6  Jonathan D. Butler, CA Bar No. 229638
7  2475 Hanover Street
   Palo Alto, CA 94304-1114
8  Tel: (650) 233-4500
   Fax: (650) 233-4545
9  Admitted *Pro Hac Vice* in related Federal Court Case No. *3:06-CV-0056-BES-VPC*

**FILED**

AUG    2006

U.S. MAGISTRATE JUDGE
DISTRICT OF NEVADA
BY_____DEPUT

10                 **UNITED STATES DISTRICT COURT**

11            **FOR THE DISTRICT COURT OF NEVADA**

12  IN THE MATTER OF THE SEARCH OF:

13  The Residence Located at 12720 Buckthorne          Case No. 3:06-MJ-0023-VPC
    Lane, Reno, NV and Storage Units 136, 140, 141,
14  142, and 143, Double R Storage, 888 Maestro
    Drive, Reno, Nevada
15

16  _____/

17             __**DECLARATION OF JERRY SNYDER**__

18     I, Jerry M. Snyder, declare under penalty of perjury under the laws of the State of Nevada:

19        1.     I am an attorney duly licensed to practice in the State of Nevada and am an associate

20  with the law firm of Hale Lane Peek Dennison and Howard.  I represent eTreppid Technologies,

21  L.L.C. ("eTreppid") and Warren Trepp ("Trepp") in the above-captioned matter.  I have personal

22  knowledge of and, if called, could competently testify as to the matters contained herein.

23        2.     On February 1, 2006, eTreppid filed its First Amended Complaint in the Second

24  Judicial District Court in and for Washoe County, alleging causes of action against Dennis

25  Montgomery, *et. al.* for misappropriation of trade secrets, breach of contract, conversion, breach of

26  fiduciary duty, bad faith – tortious and contractual, declaratory relief, and intentional interference with

27  contract.

28        3.     On February 7, 2006, Judge Perry conducted an extensive evidentiary hearing on

1   eTreppid's Motion for a Preliminary Injunction.   A true and correct copy of the transcript of this

2   hearing is attached hereto as **Exhibit 1**.  Notably, Judge Perry ordered at this hearing that the transcript

3   be kept under seal. Ex. 1, 18:14 to 19:11.

4        4.      On February 8, 2006, Judge Perry entered an Order granting eTreppid's request for a

5   preliminary injunction.  A true and correct copy of this Order is attached hereto as **Exhibit 2**.

6        5.      On May 11, 2006, this Court heard eTreppid's motion for a protective order in the civil

7   action that Montgomery brought against eTreppid.   This court did not grant eTreppid's motion, but

8   instead suggested that the parties attempt to resolve any concerns by agreeing to a stipulated protective

9   order.  At that time, this Court provided counsel for both parties with a sample two-tiered protective

10  order. Consequently, on that same day, eTreppid provided counsel for Montgomery with a draft

11  protective order based in large part on the sample provided by the Court.   A copy of this draft

12  protective order, as well as the correspondence enclosing the draft, is attached hereto as **Exhibit 3**.

13  Montgomery subsequently provided the draft protective order that he attached to his Application to

14  Enforce Subpoena.

15       6.      On July 26, 2006, Montgomery provided counsel for eTreppid with a list of documents

16  that Montgomery believed eTreppid was obliged to provide through its Rule 26(f) initial disclosures.

17  In this same letter, Montgomery confirmed the parties' agreement that each side would make initial

18  disclosures on August 7, 2006.  A true and correct copy of this letter is attached hereto as **Exhibit 4**.

19       7.      On August 7, 2006, eTreppid provided Montgomery with its initial disclosures,

20  identifying approximately 750 pages of relevant documents.  A true and correct copy of this index of

21  documents identified is attached hereto as **Exhibit 5**.

22       8.      On July 24, 2006, Montgomery sent eTreppid a letter to demand, as a "member" of

23  eTreppid, that he be allowed to inspect and copy a wide variety of business records.  A true and correct

24  copy of this letter is attached hereto as **Exhibit 6**.  eTreppid responded that Montgomery would be

25  allowed to inspect those records to which he is entitled under NRS 86.241, but only upon reasonable

26  notice and upon Montgomery's written agreement to maintain the confidentiality of those documents.

27  A true and correct copy of this letter is attached hereto as **Exhibit 7**.

28       9.      Montgomery apparently attempted to serve the subpoena at issue here on eTreppid on

Hale Lane Peek Dennison and Howard
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511

1   July 27, 2006.  A true and correct copy of this subpoena, together with a proof of service, is attached

2   hereto as **Exhibit 8.**  Montgomery apparently attempted to serve the subpoena by delivering it to a

3   residential address at 2080 McCloud Avenue, Reno, Nevada, an address which has no apparent

4   connection to eTreppid.   Montgomery further attempted service by delivering a copy to me.   I

5   informed the process server, as well as counsel for Montgomery, that I was not authorized to accept

6   service of process on behalf of eTreppid.

7         10.   Even though eTreppid was never served with the present subpoena, it obtained a copy

8   of the document and, on July 28, 2006, notified Montgomery of its objections. I also hand-delivered a

9   copy of its objections to Montgomery's counsel on July 31, 2006 immediately prior to the hearing on

10  this matter. A true and correct copy of this letter is attached hereto as **Exhibit 9.**

11        11.   Even though Montgomery apparently filed the present motion on July 30, 2006,

12  eTreppid was unaware of Montgomery's *Ex Parte* Application to Enforce Trial Subpoena (the

13  "Application to Enforce") until August 2, 2006, when the Court granted Montgomery's *Ex Parte*

14  Application for an Order Shortening Time.   After receipt of this order, I immediately contacted

15  counsel for Montgomery to request a copy of the Application to Enforce.  Montgomery's counsel

16  Michael Flynn promised to provide me a copy, but did not.  Instead, on August 4, Montgomery's

17  counsel informed eTreppid that because the matter was sealed, they would not provide eTreppid with a

18  copy of the Application to Enforce absent notification from the Court that eTreppid could review it. A

19  true and correct copy of this letter is attached hereto as **Exhibit 10.**

20        12.   Attached hereto as **Exhibit 11** is a true and correct copy of a letter from Michael Flynn

21  to me dated July 27, 2006.

22  DATED:  This 9th day of August, 2006.

23

24

25  Jerry M. Snyder

26

27

28

Hale Lane Peek Dennison and Howard
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511

**PROOF OF SERVICE**

I, Paul D. Cain, declare:

I am employed in the **City of Reno, County of Washoe, State of Nevada,** by the law offices of Hale Lane Peek Dennison and Howard.  My business address is: **5441 Kietzke Lane, Second Floor, Reno, Nevada 89511**.  I am over the age of 18 years and not a party to this action

I am readily familiar with Hale Lane Peek Dennison and Howard's practice for collection of mail,  delivery of its hand-deliveries, and its process of faxes.

On August 9, 2006, I caused the foregoing **DECLARATION OF JERRY SNYDER** to be delivered:

___X___        by hand-delivering a true copy thereof in a sealed envelope, addressed as follows:

Ronald J. Logar, Esq.
Eric A. Pulver, Esq.
The Law Offices of Logar & Pulver
225 S. Arlington Avenue, Suite A
Reno, NV 89501

Michael J. Flynn, Esq.
Philip H. Stillman, Esq.
Flynn & Stillman
224 Bermingham Dr., Ste. 1A4
Cardiff, CA  92007

___X___        by hand-delivering the original opposition to chambers (400 South Virginia Street, Room 404, Reno, Nevada  89501) per Judge Cooke's August 2, 2006 instructions

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed on August 9, 2006.

_Paul D. Cain_
Paul D. Cain

Hale Lane Peek Dennison and Howard
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511

1

SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

IN AND FOR THE COUNTY OF WASHOE

BEFORE THE HONORABLE ROBERT H. PERRY, DISTRICT JUDGE

-oOo-

ETREPPID TECHNOLOGIES, L.L.C., a
Nevada Limited Liability Company,

                    Plaintiff,

          vs.                          No. CV06-00114

                                       Dept. No. 9
DENNIS MONTGOMERY, an individual;
THE MONTGOMERY FAMILY TRUST;
DENNIS MONTGOMERY and BRENDA
MONTGOMERY, as trustees for THE
MONTGOMERY FAMILY TRUST, and
DOES 1 through 20,

                    Defendants.
_____/

S E A L E D

VOLUME I of II
TRANSCRIPT OF PROCEEDINGS
HEARING - PRELIMINARY INJUNCTION

Tuesday, February 7, 2006

RENO, NEVADA

Reported By:  LIZA CHAPEN, RMR, NV CCR #93
              California CSR #2065

LIZA CHAPEN, CCR, RMR    (775) 323-5492

---

# A P P E A R A N C E S

For the Plaintiff:

HALE, LANE, PEEK, DENNISON & HOWARD
BY:  STEPHEN J. PEEK, ESQUIRE
     --and--
JERRY M. SNYDER, ESQUIRE
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511

PILLSBURY WINTHROP SHAW PITTMAN
BY:  DAVID A. JAKOPIN, ESQUIRE
     2475 Hanover Street
Palo Alto, California 94304-1114

For the Defendants:

LAW OFFICES OF LOGAR & PULVER, APC
BY:  RONALD J. LOGAR, ESQUIRE
     --and--
ERIC A. PULVER, ESQUIRE
225 S. Arlington Avenue, Suite A
Reno, Nevada 89501

FLYNN & STILLMAN
BY:  MICHAEL J. FLYNN, ESQUIRE
     --and--
PHILIP H. STILLMAN, ESQUIRE
224 Birmingham Drive, Suite 1A4
Cardiff, California 92007

---

# I N D E X

WITNESSES FOR THE PLAINTIFF                                    PAGE

SLOAN VENABLES
  Direct Examination by Jakopin                                21
  Cross-Examination by Flynn                                   53
  Redirect Examination by Jakopin                             137
  Recross-Examination by Flynn                                154

ZEHANG SUN
  Direct Examination by Jakopin                               174
  Cross-Examination by Flynn                                  192

KENDALL ROMAN
  Direct Examination by Jakopin                               203
  Voir Dire Examination by Flynn                              212
  Continued Direct Examination by Jakopin                     214
  Cross-Examination by Flynn                                  218
  Redirect Examination by Jakopin                             222
  Recross Examination by Flynn                                223

WARREN TREPP
  Direct Examination by Jakopin                               226

---

# E X H I B I T S

| DESIGNATION | MARKED | ADMITTED |
|---|---|---|
| Exhibit 1 | 70 | -- |
| Exhibit 2 | 230 | 235 |
| Exhibit 3 | 238 | 240 |
| Exhibit 4 | 245 | 247 |
| Exhibit 5 | 247 | 248 |
| Exhibit 6 | 253 | 254 |
| Exhibit 7 | 254 | 256 |

**5**

1  RENO, NEVADA, Tuesday, February 7, 2006, 9:01 A.M.
2  -oOo-
3
4  THE COURT:  Good morning.
09:01 5  Please be seated.
6  All right.  We're in session for
7  CV06-00114.  We're here for a hearing on a
8  Preliminary Injunction.
9  Would counsel state your appearances for
09:02 10  the court reporter.
11  MR. PEEK:  Good morning, your Honor.
12  Stephen Peek on behalf of the Plaintiff,
13  eTreppid Technologies.
14  Also with me this morning, and you signed
09:02 15  the order on the pro hac vice, is David Jakopin
16  co-counsel; Doug Frye, manager of eTreppid; and
17  Warren Trepp, also manager and chief executive
18  officer of eTreppid.
19  THE COURT:  All right.  Thank you.
09:02 20  MR. LOGAR:  Your Honor, if it please the
21  Court, I'm Ronald Logar representing the Defendant,
22  along with Mr. Eric Pulver in my office.
23  I would like to introduce to you a Michael
24  J. Flynn.

LIZA CHAPEN, CCR, RMR    (775) 323-5492

**7**

1  MR. LOGAR:  And then I'd like to introduce
2  Mr. Philip Stillman.  Mr. Stillman is a member in
3  good standing of both the Massachusetts and the State
4  Bar of California.
09:04 5  He has made application to the State Bar
6  of Nevada for admission and approval pro hac vice.
7  His Certificate of Good Standing was sent to the
8  State Bar's office in Las Vegas yesterday by the
9  State of California.
09:04 10  It's expected that the State Bar of
11  Massachusetts will send the Certificate of Good
12  Standing to the Las Vegas office today, and then the
13  Las Vegas office will issue its approval and we
14  expect that within the next two days.
09:04 15  The delay on Mr. Stillman is due to the
16  fact that Mr. Stillman provided with his application
17  to the State Bar recent admission before a Federal
18  Court in the State of California; however, since it
19  was beyond 30 days' time of issuance from the date of
09:04 20  application, the State Bar said they needed something
21  more current, so that is the --
22  MR. PEEK:  Your Honor, absent the approval
23  by the State Bar, I would object to his admission
24  until the State Bar has at least had its opportunity

LIZA CHAPEN, CCR, RMR    (775) 323-5492

**6**

1  MR. FLYNN:  Good morning, your Honor.
2  MR. LOGAR:  Mr. Flynn is a member of the
3  Massachusetts Bar.  The application for admission to
4  pro hac vice has been made.
09:03 5  The Massachusetts Bar has sent a
6  Certificate of Good Standing to the State Bar of
7  Nevada.  The State Bar of Nevada has issued its
8  approval.
9  It was over-nighted yesterday to my
09:03 10  office.  It should be received by Federal Express
11  about 10:00 or 10:30 this morning, having complied
12  with the Supreme Court rule as to admission, and we
13  ask that Mr. Flynn be permitted to appear in this
14  matter on behalf of the Defendant.
09:03 15  MR. PEEK:  Your Honor, I would have no
16  objection based on that representation that it is
17  being over-nighted and should be here today.  I
18  accept Mr. Logar's representation as an officer of
19  this court.
09:03 20  So I certainly -- although I've not seen
21  the pro hac vice application, I expect the Bar to do
22  their job.
23  THE COURT:  All right.  On that basis,
24  that will be fine.  We'll allow that.

LIZA CHAPEN, CCR, RMR    (775) 323-5492

**8**

1  to vet and receive, if you will, and then approve.
2  I would object until that process has been
3  approved.
4  MR. STILLMAN:  Your Honor, may I?
09:05 5  THE COURT:  No.  Mr. Logar.
6  MR. LOGAR:  Well, you know, you indicated
7  to us, your Honor, when we had our meeting last week
8  that you have had some difficulty with the
9  representations of counsel in the past.
09:05 10  I don't know how to respond to that, other
11  than the fact that if there was any indication by way
12  of either Mr. Flynn or Mr. Stillman that there was a
13  problem, the application would not have even been
14  filed, nor would I have considered the association.
09:05 15  I make the representation to the Court in
16  good faith and ask that Mr. Stillman be allowed to
17  participate subject to approval and an order signed
18  by this Court this week.
19  MR. PEEK:  Your Honor, if this were a
09:06 20  situation where there weren't already able counsel --
21  I count four at counsel table right now -- to
22  represent Mr. Montgomery and the Montgomery Trust, I
23  probably would not have that objection, and I also
24  know, respectfully to Mr. Logar, whose

LIZA CHAPEN, CCR, RMR    (775) 323-5492

9

1    representations I accept, but he does not speak for
2    the State Bar.
3            So until the State Bar has spoken, I think
4    that my objection under SCR Rule 42 is well taken and
09:06   5    should be honored.
6            THE COURT:  Well, the rule, if I recall
7    it, SCR 42, says that until approval and the order is
8    signed, that the out-of-state counsel shall not be
9    allowed to actively participate.
09:06 10           I think with this objection, I'm bound by
11   the rule so I cannot -- I will allow the first
12   gentleman to participate, but I cannot --
13           MR. LOGAR:  I understand, your Honor.
14           THE COURT:  If it weren't for the rule, I
09:07 15   would.
16           MR. LOGAR:  I understand.
17           THE COURT:  But one of the things I'm
18   finding out the longer I'm up here is there are a lot
19   of things that judges think they can do that, if you
09:07 20   read the rule, they can't, and this is one of them.
21           I think the rule says "shall not" and
22   so --
23           MR. LOGAR:  Well, that is "participate,"
24   but I believe that it's permissible, Mr. Stillman can
LIZA CHAPEN, CCR, RMR   (775) 323-5492

10

1    confer with us.
2            THE COURT:  Oh, sure.  I don't see a
3    problem with that.  I don't see a problem with being
4    able to talk to him.
09:07   5    I think that the rule talks about
6    participate in settlement conferences and various
7    other things, but I don't see -- I don't see that
8    there would be any reason why you couldn't confer
9    with him.
09:07 10           MR. PEEK:  And I have no objection to him
11   sitting before the Bar either, your Honor.
12           THE COURT:  Right.
13           MR. PEEK:  It's just a matter of
14   participating.
09:07 15           THE COURT:  Well, I'm hopeful that we're
16   not going to have, you know, every time there's a
17   argument, that every lawyer on each side is going to
18   speak, anyway; I'd like to try to keep it a little
19   bit more organized than that.
09:08 20           So I think that we're going to have some
21   conferencing on both sides.
22           MR. PEEK:  Your Honor, with that in mind,
23   I'm mindful of that rule and generally what I have
24   seen is that if I'm presenting a witness, I'm the one
LIZA CHAPEN, CCR, RMR   (775) 323-5492

11

1    making the objection; if Mr. Jakopin is presenting
2    the witness, he's the one making the objection.
3            I assume that that will be the procedural
4    order of this Court today, that whoever is presenting
09:08   5    that witness or cross-examining will be the one
6    making the objections.
7            THE COURT:  All right.  Yes, I'd like to
8    try to do that just for the purpose of order and
9    organization.
09:08 10           Again, you know, I'm interested mostly in
11   finding out what the truth is here and so that is the
12   first goal; procedural proprietary is the second one.
13           So, you know, if something comes up that
14   somebody needs to say something and it's not
09:08 15   something that we're doing all day long, that's fine.
16           So with that in mind, Mr. Peek, are you
17   ready to proceed?
18           MR. PEEK:  We are ready to proceed, your
19   Honor.
09:09 20           THE COURT:  All right.
21           MR. FLYNN:  Good morning, your Honor.
22   Thank you for granting my admission.
23           Before we proceed, I need to address the
24   Court about an urgent and immediate procedural
LIZA CHAPEN, CCR, RMR   (775) 323-5492

12

1    problem with regard to how we proceed.
2            THE COURT:  All right.
3            MR. FLYNN:  And I'm going to be limited as
4    to how much I can flesh out to the Court because of
09:09   5    the nature of what I'm going to describe to the
6    Court.
7            Let me preface my remarks by saying that
8    what we're involved in here is of the highest, most
9    secretive, most urgent, most immediate classified
09:09 10   security information, that I think, after the Court
11   gets an idea what it is, will agree with me, that can
12   be possibly imagined by this Court.
13           So at the outset, we're dealing with the
14   fact that who has a security clearance in the
09:10 15   courtroom and who does not, because everything I'm
16   going to describe peripherally involves this secret
17   information which goes to the heart, the core issues
18   of what this Court has to decide, including the core
19   issue of what proprietary information is involved and
09:10 20   who owns it.
21           The dichotomy existent within eTreppid
22   Technologies, between the original deal that was made
23   under the Contribution Agreement, which I understand
24   the Court has seen, for data compression technology
LIZA CHAPEN, CCR, RMR   (775) 323-5492

**13**

1  has been merged into by the Plaintiff.

2  MR. PEEK: Your Honor, I --

3  MR. FLYNN: The issues --

4  MR. PEEK: I appreciate counsel's

09:10  5  eloquence, but this is not a filibuster. If there's

6  a motion to be made, make a motion.

7  You asked if I was ready to proceed; I'm

8  ready to proceed on my motion.

9  If there's a motion to be made, as opposed

09:11 10  to the superlatives and the filibuster, I'd like to

11  hear the motion so that we can address if there is a

12  motion of urgency to be made, but otherwise I'd like

13  to proceed with my case.

14  The Court told us we only have today to do

09:11 15  this. We have already had over two weeks of delay

16  from Mr. Montgomery and I don't want one more delay.

17  So I would appreciate, your Honor, this is

18  my case, I'd like to proceed with my case.

19  THE COURT: All right. I believe he's

09:11 20  prefacing what he's saying as a preface to some kind

21  of a request or motion.

22  MR. FLYNN: That's correct, your Honor.

23  If the Court will indulge me --

24  THE COURT: I will.

LIZA CHAPEN, CCR, RMR   (775) 323-5492

**14**

1  MR. FLYNN: -- for five minutes.

2  THE COURT: I will. Go ahead.

3  MR. FLYNN: The dichotomy that exists in

4  eTreppid between the technology that was the subject

09:11  5  of the Contribution Agreement and the most classified

6  information relating to the technology that's at the

7  core of this case is the problem.

8  We could proceed, I believe, up to

9  December 19th, 2002, in open court, as long as the

09:12 10  court is sealed and perhaps no one else other than

11  the deputy sheriff, the clerk, and the court

12  reporter. I think we're safe there as long as the

13  courtroom is sealed even during that phase.

14  Once we reach 2002, I think the Court is

09:12 15  going to have to conduct some type of a procedure,

16  and I've been thinking all night what you could do,

17  and the only thing I can come up with, because of the

18  nature of this information, is for you alone to take

19  Mr. Trepp and Mr. Montgomery into chambers with a

09:12 20  sworn confidentiality oath by your Honor, under oath,

21  and have them basically explain what is involved.

22  I think the Court will then see that it is

23  absolutely impossible, given the national security

24  interests involved, right now, this minute, today,

LIZA CHAPEN, CCR, RMR   (775) 323-5492

**15**

1  for the Court to even issue any type of an order or

2  findings, given the nature of the issues involved,

3  because I would submit to the Court that the national

4  security interests preempt judicial intervention in

09:13  5  this Court, and that's a strong statement.

6  I believe that the entire proceedings have

7  to ultimately go over to the Federal Court, be sealed

8  in the Federal Court, and even then how they are

9  going to be able to proceed is frankly a mystery to

09:13 10  me, your Honor.

11  So here's what I -- here is what the

12  defense recommends: Let the Plaintiff go forward to

13  December '02. I've got a chronology that I can give

14  to the Court which will basically outline the

09:13 15  impending problems.

16  Once we reach December '02, we're going

17  into the heart of classified material. At that

18  point, I don't know how we can proceed except for the

19  Court to take Mr. Trepp and Mr. Montgomery into

09:14 20  chambers and inquire into the nature of the material.

21  THE COURT: Well, let's see how it goes.

22  My thought, and again, I'm probably the

23  least educated individual in the courtroom as far as

24  what this involves, but my thought is that we're not

LIZA CHAPEN, CCR, RMR   (775) 323-5492

**16**

1  here necessarily to talk about the content of

2  whatever "it" is, but the ownership and the right to

3  possession of "it," and so it would seem to me, and I

4  don't know this yet, but it would seem to me that we

09:14  5  can talk about all of those issues and perhaps make a

6  determination on those issues without even talking

7  about what the contents of "it" are, and if I'm

8  wrong, then you can explain that to me, and if I

9  agree with you, then I agree with you.

09:14 10  So I'd like to go ahead and give it a

11  shot.

12  Secondly, I would like to have some

13  reference to some case law, a statutory law, some

14  other authority that says that -- that, one,

09:15 15  identifies this as classified; two, tells us what

16  level of classification that it has; three, by whom;

17  and then some kind of statutory case law or other

18  documentation that would tell us that it was not

19  proper for me to proceed, for us to proceed in this

09:15 20  court, and if I'm persuaded that that's right, then

21  certainly I'll follow the rules.

22  I'm surprised I haven't heard from the

23  federal government, if they have such a concern, but

24  maybe you can address that.

LIZA CHAPEN, CCR, RMR   (775) 323-5492

---

**17**

1  MR. FLYNN: This information is so
2  secretive, and so compartmentalized within the
3  federal government, that there are very few
4  individuals within the federal government that have
09:15 5  access to it.
6  I will tell the Court in open court what
7  is involved, involved daily briefings to President
8  Bush over the last two years, daily briefings.
9  And with regard to your Honor's other
09:16 10  point covering the "it" without getting into the
11  content, the "it" is the content.
12  THE COURT: We'll see.
13  MR. LOGAR: Your Honor, we would like to
14  invoke the rule as to exclusion of witnesses for
09:16 15  sealing and everything we can do to protect the
16  integrity of these proceedings.
17  THE COURT: All right. I don't know the
18  gentleman seated in the front row back there.
19  MR. PEEK: He's a witness of ours, your
09:16 20  Honor. He will step out.
21  THE COURT: All right.
22  MR. PEEK: I don't know who the other --
23  THE COURT: And the other gentleman is my
24  law clerk. He will observe the order that I will

LIZA CHAPEN, CCR, RMR    (775) 323-5492

---

**18**

1  make here with regard to confidentiality.
2  MR. PEEK: Your Honor, we will have an
3  expert who will come in, and I would like him, of
4  course, to sit in.
09:16 5  I think it's appropriate to have an expert
6  to at least sit in on rebuttal, if necessary.
7  MR. FLYNN: Your Honor, I think Mr. Frye,
8  unless he's the first witness, should be removed from
9  the courtroom.
09:17 10  MR. PEEK: Your Honor, he's a client.
11  He's a private client. He's a member manager of the
12  company.
13  THE COURT: He can stay.
14  MR. PEEK: Your Honor, respectfully to
09:17 15  what counsel had said earlier, I take that also to be
16  that they would at least offer a stipulation that the
17  proceedings conducted here today, the affidavits that
18  have been previously submitted under seal, and the
19  transcript of these proceedings may remain
09:17 20  confidential, and may be sealed by this Court only to
21  be opened upon motion --
22  THE COURT: Well --
23  MR. PEEK: -- and that nothing other than
24  that which is stated here today can go any farther,

LIZA CHAPEN, CCR, RMR    (775) 323-5492

---

**19**

1  and I say that -- and I'm curious to hear counsel's
2  argument, when we certainly, last Wednesday, heard
3  much about, "I need to be able to talk about my
4  technology to be able to sell my technology," and
09:17 5  if -- we had, as you recall, much ado about what the
6  ability was to discuss with others, so I'll take that
7  as a stipulation and I'd ask the Court to enter that
8  kind of an order.
9  THE COURT: Well, I'm happy to do that on
09:18 10  the record right now and I will enter that order and
11  it is entered in the record.
12  Does that contain, for the moment, all of
13  the issues that you wanted to address with regard to
14  confidentiality?
09:18 15  And I would ask that, in addition, that
16  you prepare some type of a stipulation that meets the
17  concerns you articulated a minute ago, first present
18  it to the other side, present it to me, and then I'll
19  review it, and particularly, if you have reference to
09:18 20  any statutory authority or anything else, put that in
21  the stipulation and order, and I'll take a look at it
22  and sign it, more likely than not, particularly if
23  all sides -- if both sides approve.
24  MR. FLYNN: We're happy to do it, your

LIZA CHAPEN, CCR, RMR    (775) 323-5492

---

**20**

1  Honor.
2  We will prepare the stipulation. The
3  problem will become, as your Honor will hopefully be
4  able to learn during these proceedings, that even the
09:19 5  attorneys cannot be given access to this information.
6  THE COURT: Do you have access to it?
7  MR. FLYNN: I have limited access, enough
8  to conduct the proceedings.
9  THE COURT: Do you have --
09:19 10  MR. FLYNN: Do I have complete access?
11  Absolutely not.
12  THE COURT: Do you have a security
13  clearance of any kind?
14  MR. FLYNN: No, and neither does -- do the
09:19 15  gentlemen on the other side of the aisle.
16  MR. PEEK: And, your Honor, I don't have
17  access to the material and I have not had access to
18  the material because the source code has been deleted
19  from our file and taken from our premises.
09:19 20  THE COURT: All right. Well, you know, I
21  don't have enough information right yet to know -- to
22  make an intelligent --
23  MR. PEEK: I will review the stipulation,
24  your Honor --

LIZA CHAPEN, CCR, RMR    (775) 323-5492

21

1    THE COURT: All right.
2    MR. PEEK: -- and make sure that it isn't
3    too overly broad, because what I'm hearing here
4    today, I think, maybe too overly broad.
09:19 5    THE COURT: Well, we'll see.
6    MR. PEEK: With that in mind, your Honor,
7    Mr. Jakopin will be presenting the first witness.
8    THE COURT: All right. Let's go.
9    (The witness was sworn.)
09:20 10    THE COURT: Please take the witness stand.
11    As a preliminary matter, for the record,
12    not only are the parties and counsel but court staff,
13    as well, and I include myself in this, are instructed
14    that anything that's said or done here in this
09:20 15    courtroom today, pending the submission and approval
16    of an order, is confidential and will not be
17    discussed with third parties outside of the
18    courtroom, except to the extent that it needs to be
19    discussed with witnesses and experts with regard
09:21 20    specifically to the pursuit of the proceedings in
21    this particular case.
22    Go ahead.
23    MR. JAKOPIN: Did you swear the witness?
24    (Discussion off the record.)

LIZA CHAPEN, CCR, RMR    (775) 323-5492

22

1    SLOAN VENABLES,
2    called as a witness, having been first duly sworn,
3    testified as follows:
4
5    DIRECT EXAMINATION
6    BY MR. JAKOPIN:
7    Q. Your name, please.
8    A. Sloan Venables.
9    Q. Where do you reside?
09:21 10    A. In the Virginia City Highlands.
11    THE REPORTER: Would you spell your name
12    for me, please.
13    THE WITNESS: First name, S-l-o-a-n; last
14    name --
09:21 15    MR. LOGAR: Your Honor, I'm sorry. I'm
16    having difficulty hearing the witness. Could he use
17    the microphone, please.
18    THE COURT: Hopefully it works.
19    Why don't you try to speak up and try to
09:21 20    use the microphone.
21    We had some difficulty with it last week;
22    is it working now?
23    THE BAILIFF: Is the button below you on
24    the left-hand side, on the ground, is it on? Is it

LIZA CHAPEN, CCR, RMR    (775) 323-5492

23

1    lit up?
2    THE COURT: Yes.
3    THE BAILIFF: Then, it should be working.
4    THE COURT: Okay.
09:21 5    THE WITNESS: Can you hear me?
6    THE BAILIFF: Now, try it.
7    THE COURT: There we go.
8    THE WITNESS: How about now?
9    Last name, V-e-n-a-b-l-e-s.
09:22 10    THE COURT: All right. Mr. Venables, just
11    try to speak up a little bit, too.
12    THE WITNESS: All right.
13    THE BAILIFF: You have a volume control,
14    your Honor, right up by your own speaker.
09:22 15    THE COURT: All right. How is that?
16    THE WITNESS: How about now?
17    THE COURT: Yeah, I think that's batter.
18    MR. LOGAR: That's better.
19    MR. PEEK: Thank you, your Honor.
09:22 20    THE COURT: Okay.
21    BY MR. JAKOPIN:
22    Q. Can you describe your educational
23    background since high school?
24    A. Since high school, I went to UC Berkeley

LIZA CHAPEN, CCR, RMR    (775) 323-5492

24

1    briefly, or for three years; then, I went to graphic
2    design school, learned 3D modeling and computer
3    programming; and since then, I've been self-taught in
4    computer programming.
09:22 5    MR. JAKOPIN: Your Honor, our expert is
6    outside and the bailiff is not permitting him to come
7    in.
8    Can we have permission to have him come
9    into the courtroom and attend the proceedings?
09:22 10    THE COURT: All right. I'll allow him,
11    and any expert for the other side, too, if you've got
12    one.
13    MR. FLYNN: We have no expert at the
14    present time, your Honor.
09:23 15    We object. Under the documents that
16    Mr. Trepp and Mr. Montgomery signed with the
17    intelligence department of the U.S. Government
18    involved in this case, they would be precluded from
19    confiding anything to any expert.
09:23 20    THE COURT: Well, I've got to see the
21    documents. I've got to see some authority. Unless I
22    do, I'm going to permit him to be here.
23    MR. FLYNN: Nor has he been disclosed to
24    us, your Honor.

LIZA CHAPEN, CCR, RMR    (775) 323-5492

**Page 25**

1 THE COURT: I'm still going to permit him,
2 absent being provided with those documents and
3 material.
4 MR. FLYNN: Your Honor will note my
09:23 5 objection.
6 THE COURT: All right. It's noted.
7 Go ahead.
8 MR. JAKOPIN: Thank you, your Honor.
9 BY MR. JAKOPIN:
09:23 10 Q. Can you describe your employment from the
11 time you finished schooling up until eTreppid,
12 briefly.
13 A. I worked most recently before eTreppid for
14 about ten years in the video game industry making
09:23 15 computer games from the PC platform. Initially, I
16 was a 3-D modeler and then later on as a programmer.
17 My most recent job before coming to
18 eTreppid, I was a lead programmer on the last couple
19 of video games made for electronic cards.
09:24 20 Q. And you began working at eTreppid when?
21 A. In December of '99.
22 Q. And were you one of the first employees?
23 A. That's correct.
24 Q. Who was working there at the time you

**Page 26**

1 started?
2 A. Dennis Montgomery; his son, Brian
3 Montgomery; and they had three contractor Indian
4 nationals that are no longer there.
09:24 5 They were just briefly there the first
6 year that I worked there.
7 Q. And when you began, what position did you
8 have with the company?
9 A. I was initially hired to be a director of
09:24 10 game development. I brought my video game technology
11 that I developed on my own with me and sublicensed it
12 to eTreppid and continued further development on it
13 for a game that we would someday release from the
14 company.
09:25 15 Q. So when you worked at eTreppid, then what
16 did you do?
17 A. Gradually took on more tasks, began doing
18 all the IT work for the company, all the e-mail, all the
19 WEBSERVER, all the network infrastructure, gradually
09:25 20 took on all the hardware purchasing, all the hardware
21 development.
22 Most recently, in the past two years, I've
23 taken on the role of our facility security officer.
24 I maintain all of the security clearances and the

**Page 27**

1 facility security clearances and procedures.
2 Q. You work with a lot of different kind of
3 electronic information, correct?
4 A. That's right.
09:25 5 Q. Could you describe some of the different
6 types of information that is stored at the company
7 premises?
8 A. We have, first of all, the source code,
9 which is a -- basically, source cord is a lot of text
09:26 10 files that is compiled into an actual runable
11 program; all of the tools that we use to develop the
12 source code, which is usually third-party software,
13 Microsoft developed programs; also all the other
14 third-party software that we use, the operating
09:26 15 systems, other tools for developing.
16 So all that stuff is stored, as well as
17 sample files that we use to run our code on; images,
18 movies, bit maps, all kinds of files.
19 Q. Are there certain files that are
09:26 20 classified files, and there's other files that are
21 not?
22 A. That's correct, based on where the content
23 came from and who we received it from.
24 Usually, a source code isn't classified.

**Page 28**

1 So far, we haven't had any classified
2 source codes, but the bit map images or frames of
3 pictures have been classified.
4 Q. That would not be all images, but just
09:26 5 certain ones?
6 A. That's correct.
7 Q. When you say the eTreppid source code,
8 what are you referring to?
9 A. The actual C++ files that are used to be
09:27 10 compiled into the software we develop.
11 Q. And who writes that source code?
12 A. Various programmers in the building.
13 Q. Have you written some of that source code?
14 A. Not for a while.
09:27 15 The last stuff I worked on was about 2002.
16 I worked on a player that we developed for a project
17 with Intel.
18 I've also worked on the game engine over
19 the years that we developed.
09:27 20 Other than that, I haven't.
21 Q. Are you responsible for backing up any
22 information at the company?
23 A. I back up all of our servers that run all
24 of our infrastructure, our e-mail, our web sites, but

LIZA CHAPEN, CCR, RMR (775) 323-5492

---

29

1  I don't do any of the source code backup; that was
2  all Mr. Montgomery's job.
3          Q. And how long have you been doing that?
4          A. Pretty much from the beginning; the past
09:28 5  six years.
6          Q. And why do you back up that information?
7          A. Hardware always fails. You've got to have
8  a backup so you can recover from it.
9          I haven't lost a file since we've been in
09:28 10  existence. Hardware always tends to fail from
11  overheating or what have you, mechanical failure, so
12  if you don't have backups, you won't be able to
13  recover from it.
14          Q. Now, is it your understanding that the
09:28 15  company backed up its source code for the same
16  reason?
17          A. Right.
18          Q. Up until recently, had the company ever
19  lost any of the source code?
09:28 20          A. Not to my knowledge.
21          Q. Is there anyone other than Mr. Montgomery
22  that was responsible for backing up the source code?
23          A. No.
24          Q. For how long had he been responsible for

---

30

1  backing up the source code?
2          A. From the beginning.
3          Q. Was he also responsible for maintaining
4  the source code?
09:28 5          A. As far as I know, that was his job.
6          Q. How was it maintained?
7          A. We have a structure, a file system
8  structure on our server where we kept it, and it
9  stored various methods underneath the -- our folder
09:29 10  structure.
11          We have our current projects. Each
12  project had a subfolder. We also have a subsystem
13  of -- all the programmers in the building have
14  locations where only they can access and store their
09:29 15  projects.
16          So all this file structure is all stored
17  on one of our servers that Mr. Montgomery backed up
18  to another set of machines in our separate location.
19          Q. Was there a name for that server that you
09:29 20  were just talking about?
21          A. We call it the source server, abbreviated
22  SRC, S-E-R-V-E-R.
23          Q. Who had access to the source code that was
24  on that SRCSERVER?

---

31

1          A. We have different levels of access.
2          The physical access, it's in a room that's
3  been locked that only have -- I believe, five or six
4  people had the key to.
09:30 5          Log-on access, only Mr. Montgomery and I
6  had the password to it.
7          Network access, various programmers in the
8  building had different file-share level permissions
9  to the folders, but none of them had a full access --
09:30 10  full permissions to the file levels under network
11  sharing; they had modified, which means they can add
12  but they can't delete.
13          Full access level was only for
14  Mr. Montgomery and me.
09:30 15          Q. And how was that put into place?
16          A. We had an ET, what we call our eTreppid
17  administrator account, which only Mr. Montgomery and
18  I had the password for.
19          Only with that user account that you could
09:30 20  get on and log on and change these permissions;
21  otherwise, you have to go through the networking and
22  you're subject to all the permissions that we've set
23  up.
24          Q. Was there a server other than the

---

32

1  SRCSERVER that you were referring to?
2          A. We had another server, a couple -- well,
3  we have several servers in the building; not all of
4  them use our source code. E-mail servers, servers
09:31 5  that run the infrastructure of our network.
6          We have another server for storing all the
7  third-party tools that we do, and another server that
8  I had recently set up, in the past four months, that
9  was used for a backup to the SRCSERVER.
09:31 10          Q. Did all of these servers get accessed with
11  the eTreppid administrator password?
12          A. All the servers are only logged on with
13  the eTreppid administrator account, that's right.
14          Q. And it was only the two of you that had
09:31 15  access to all of those?
16          A. That's right. Not even Mr. Trepp knew the
17  password to the administrator account.
18          Q. About how large were the total eTreppid
19  source code files?
09:31 20          A. Well, from my recollection of doing a
21  backup some time back, and also I did another backup
22  in the middle of December, it was about 200 gigabytes
23  on the SRCSERVER that was copied over to my other
24  backup server which I call an ISASERVER.

**33**

1    Q. And how large is the memory capacity of
2  the ISASERVER?
3    A. Well, the actual memory is separate from
4  the hard drive space. There's -- all of our servers
09:32 5  have about one to two gigabytes of memory, but that's
6  just random access memory.
7    The hard drive space on the SRCSERVER is
8  about -- just shy of three terabytes. My ISASERVER
9  is just over four terabytes, but we weren't using
09:32 10  anywhere near the capacity on either one of those.
11    Q. You had mentioned some other work stations
12  that had been used for backing up the eTreppid source
13  code?
14    A. I built two work stations that we kept out
09:32 15  in our warehouse area that had, each of them,
16  attached storage box, what we call RAID storage box.
17  Each of those stored about 1.7, 1.8 terabytes.
18    Those are used to back up what was on
19  SRCSERVER.
09:33 20    Those backups were made by Mr. Montgomery
21  on a regular basis.
22    Q. As of, say, around December 21st, 2005 --
23    A. Uh-huh.
24    Q. -- what was your understanding of where

**34**

1  complete copies of the source code existed at
2  eTreppid?
3    A. As far as I know, there was the complete
4  original copy on the SRCSERVER, as well as copies on
09:33 5  each of these two work stations in our warehouse.
6    The work stations in the warehouse also
7  had copies of all the hard drives of all the
8  programmers in the building.
9    Those were copies made by Mr. Montgomery
09:33 10  on a fairly regular basis. I had seen him doing it
11  pretty often, multiple times a week over the past
12  several years.
13    Q. You had mentioned an ISASERVER; was it
14  also stored there?
09:33 15    A. Up until December 21st, that was just in
16  testing.
17    On December 21st, I made a copy of
18  everything on SRCSERVER. I was going on a trip on
19  December 22nd for the holidays, I went out of the
09:34 20  country, and I started copies, part of them completed
21  before I left on the 21st.
22    I was there until about 11:00 o'clock on
23  the night of the 21st finishing up the copies, and
24  when I left some of them were still going.

**35**

1    But my log files, when I got back, showed
2  that they had completed, so I had backed up
3  everything from SRCSERVER over to this ISASERVER.
4    Q. And did your log tell, say, when that
09:34 5  finished?
6    A. Some of them finished the night of the
7  21st; some finished the next day, the 22nd.
8    All the log files aren't there anymore;
9  there's only a couple left. Some of them were
09:34 10  deleted.
11    Q. Do you have any reason to think that if it
12  didn't occur the way you had programmed it to, that
13  it wouldn't have been completely backed up?
14    MR. FLYNN: Objection, your Honor.
09:35 15    THE COURT: What's the objection?
16    MR. FLYNN: None of this testimony -- the
17  entire course of the testimony so far has been
18  utterly lacking in foundation.
19    THE COURT: Well, I think there --
09:35 20    MR. FLYNN: I'd move to strike all of the
21  testimony, but I'm trying to cut through it, so I
22  don't want to keep objecting because I believe I've
23  got a way to cut through and across --
24    THE COURT: All right. Well --

**36**

1    MR. FLYNN: -- but none of this has any
2  foundation.
3    THE COURT: All right. Until I learn a
4  little bit more about the background, it's hard for
09:35 5  me to evaluate that.
6    MR. FLYNN: I understand that.
7    THE COURT: There's not a jury here, so
8  I'm going to allow the testimony.
9    Go ahead, sir.
09:35 10    THE WITNESS: What was the question?
11    MR. JAKOPIN: I think you finished.
12    I think it was just an objection after the
13  conclusion.
14    THE COURT: All right. For the record,
09:35 15  the objection is overruled. I think this is
16  foundation to what ultimately we're going to get to.
17    Seems to be, at any rate, at least as of
18  now.
19    Go ahead.
09:35 20  BY MR. JAKOPIN:
21    Q. Could you describe how the programmers
22  have their work stations configured and how they
23  relate to the SRCSERVER?
24    A. The programmers have a hard drive on their

37

1  machine outside of their regular operating system
2  hard drive that's kept on there. Their folder called
3  Current Source was for the projects they're currently
4  work on.
09:36 5       That Current Source folder contains their
6  working in progress and the projects that they're
7  currently programming on. Those folders are copied
8  by Dennis over to the two work stations we keep in
9  our warehouse for backing those up.
09:36 10      Q. And do the programmers have personal work
11  stations?
12      A. Every programmer has at least one.
13           Some of them have two for testing
14  purposes.
09:36 15      Q. What's the operating system on the work
16  stations that they have?
17      A. Windows XP, on the majority.
18           There's a few that have Windows 2000 for
19  testing, and then they were programming with some
09:36 20  older code that wouldn't compile on windows XP.
21      Q. Directing your attention to the last day
22  that you were at the office before you went on your
23  vacation.
24      A. Uh-huh.

LIZA CHAPEN, CCR, RMR    (775) 323-5492

38

1      Q. Can you describe what happened that day?
2      A. I came in that day.
3           At the beginning of the day, I called as I
4  was coming in for some reason, I forget what it was.
09:37 5      I called Dennis and he asked me if I'd
6  gotten all my preparation ready for my trip and I
7  said no, and he said, "Well, stay home and do your
8  packing or whatever," and I told him I was almost to
9  the office anyway, so I was coming in. I wanted to
09:37 10  get the ISASERVER finished setting -- setting up and
11  doing the backups.
12           We had talked about setting the ISA up for
13  doing the backups of SRCSERVER and also our
14  DEVSERVER.
09:37 15      So I came in and I got my stuff arranged
16  in my office and I went out to the warehouse, and
17  that's when I noticed that the work -- one of the
18  work stations that had the RAID box attached to it
19  was gone, and I asked Dennis where it was.
09:37 20      This was one of the ones that he used for
21  backing up the SRCSERVER.
22           And he said he'd taken it home, and he
23  didn't tell me why.
24           And so then the rest of the day I spent

LIZA CHAPEN, CCR, RMR    (775) 323-5492

39

1  setting up the ISASERVER and running the backups.
2           And the next morning, I left on my trip to
3  Budapest.
4      Q. You were gone until when?
09:38 5      A. I got back the late night of the 2nd,
6  January 2nd.
7      Q. And did you at some point go back to the
8  office?
9           MR. LOGAR: Could you speak up, please.
09:38 10      I'm sorry.
11  BY MR. JAKOPIN:
12      Q. At some point did you go back to the
13  office?
14      A. The morning of the 3rd, I came to work.
09:38 15      Q. What did you discover then?
16      A. When I got into the office, I noticed
17  that -- my office is situated right next to our
18  server room with the door so I can see through to my
19  servers, and I noticed that somebody had been doing
09:38 20  something on our SRCSERVER.
21           And so I went over and looked at it and
22  there was a command prompt window up doing something
23  which I didn't know what it was, and Dennis came in
24  at that point and I asked him what he was doing and

LIZA CHAPEN, CCR, RMR    (775) 323-5492

40

1  he said he was doing some clean-up work, getting rid
2  of old stuff we didn't need anymore.
3           So then I believe one of our employees,
4  Jim Bauder, came in at that point and started talking
09:39 5  to me like he usually does each morning, and Dennis
6  left.
7           So then I started going over the SRCSERVER
8  and noticed that most of our subfolders on that -- on
9  our source RAID box had been all deleted out.
09:39 10      Q. What did you do then?
11      A. I went to go look on my backup server,
12  ISASERVER. They're all attached to the same monitor
13  and keyboard, so I just do a command to switch over
14  to the next computer, and that machine was totally
09:39 15  locked up. I couldn't log on to it. It wasn't
16  responding at all.
17           So then I went back to my desk and tried
18  to look at that machine through the network and I
19  could see the ISA box was responding, that ISA's RAID
09:40 20  was responding through the network and it also had
21  been completely deleted out.
22      Q. Did you ask Mr. Montgomery about this?
23      A. Right away -- I think I talked to some
24  other people, asked what happened while I was gone,

LIZA CHAPEN, CCR, RMR    (775) 323-5492

**41**

1 and they said strange stuff had been going on. Stuff
2 had been gradually being deleted.
3     Then, I went out to the warehouse to ask
4 him about it and I asked him where the backup was and
09:40 5 he said he was bringing that -- the backup work
6 station with the RAID box from our warehouse, that he
7 was bringing it back, he was done with it or
8 something like that.
9     But he never told me what happened on the
09:40 10 SRCSERVER. He said he didn't do anything or
11 something to that effect.
12     Q. What happened the rest of that week?
13     A. I was going over the machines, assessing
14 what the damages were while I was gone. I was trying
09:40 15 to get ISA back up, realized that one -- something
16 had happened to it.
17     It had been working in my office for a
18 good three months before I put it into its permanent
19 location, so I figured something was -- something had
09:41 20 happened to it while I was gone, either malfunction
21 or sabotage.
22     Also, I started asking all the people in
23 the building what had been going on, and they told me
24 that Dennis had deleted all the code off their

**42**

1 machines while I was gone, and that he was
2 gradually -- just giving them little bits and pieces
3 to work on.
4     MR. FLYNN: Objection, your Honor; move to
09:41 5 strike. Hearsay, speculation, lacks foundation.
6     He's just guessing.
7     THE COURT: I think as to hearsay, it's --
8 it is hearsay; I will sustain it.
9     MR. JAKOPIN: It's just foundational, your
09:41 10 Honor. It's not --
11     THE COURT: It's not offered for the truth
12 of the matter? I think it is. I'm going to sustain
13 it.
14     THE WITNESS: That was a short week, so
09:41 15 that was about all that happened that week, I
16 believe.
17     We were also preparing -- we had a, for
18 our facilities security clearance, we had our
19 inspection scheduled for -- I believe the 9th.
09:42 20     We had our representative for the Defense
21 Security Service coming on the 9th, so I was
22 preparing our facility security documents for that
23 visit.
24 BY MR. JAKOPIN:

**43**

1     Q. What happened the week, I guess, beginning
2 January 9th?
3     A. Well, on the 8th, which is a Sunday,
4 Mr. Trepp called me at home and asked me if anything
09:42 5 unusual had been happening, and I told him that when
6 I got back from my trip that all the code on our
7 SRCSERVER had been deleted off.
8     So he asked me to come in early the next
9 day to talk about it, and asked Mr. Montgomery what
09:42 10 was going on.
11     When I got in that day, Mr. Montgomery was
12 only there for like an hour or two and he left and
13 never came back for the rest of the day.
14     So that day we started looking around the
09:42 15 building to see what else was missing, and we had
16 basically everyone in the building going through
17 stuff.
18     He said he was coming back but he never
19 came -- Mr. Montgomery never came back.
09:43 20     So we spent most of the night -- I was
21 also getting ready for my visits on the 10th. I had
22 Jay Dixon from the Defense Security Service there
23 first thing in the morning.
24     And also when I got there that morning --

**44**

1 I called before I came to the office, and Dennis said
2 he was going to be there when I got there.
3     I asked if he was going to be in that day.
4 He said, "I'll be there when you get there."
09:43 5     When I got there, he was out in the
6 warehouse with Mr. Trepp and a friend of Mr. Trepp's,
7 yelling at him, obscenities, going through the
8 warehouse out the back door, and he got in his truck
9 and drove away.
09:43 10     We spent the rest of that day meeting with
11 Jay Dixon, explaining to him that we had major chaos
12 going on and personnel problems, and he basically
13 told us that we've got to go through a bunch of
14 procedures for -- we also -- procedures for
09:44 15 determining what happened.
16     We also determined that possible -- it was
17 possible that Dennis Montgomery had taken or shown
18 some of our classified material to foreign nationals,
19 so I started that investigation on what happened with
09:44 20 that situation.
21     MR. FLYNN: Your Honor, objection; move to
22 strike, speculation.
23     And can we have the identity of the people
24 present? He keeps saying "we."

LIZA CHAPEN, CCR, RMR    (775) 323-5492

**45**

1    There's been no foundation as to who was
2    present on -- in any of these conversations or
3    circumstances, and the last part of the testimony was
4    just rank hearsay and speculation and lacks -- lacked
09:44 5    foundation.
6    THE COURT:  Well, I think he's simply
7    reciting events that took place to show what his
8    conduct and state of mind were at the time.  I'm
9    going to overrule the objection.
09:44 10    It would be appropriate, however, to
11    identify who the "we" is.
12    THE WITNESS:  The "we"?  Do you want me to
13    say it?
14    THE COURT:  Yeah.
09:45 15    THE WITNESS:  All the employees in the
16    building, as a group.
17    We were -- I'd say Jessie Anderson, Jim
18    Bauder.
19    I can list all the people that worked for
09:45 20    the company.  It was -- the whole company was going
21    through the hard drives in our warehouse, going over
22    video -- our -- we went to check our surveillance,
23    Mr. Trepp and myself did that, check our surveillance
24    video cameras, which had all been deleted.

LIZA CHAPEN, CCR, RMR    (775) 323-5492

**46**

1    We noticed that on the 10th, as well.
2    I can't remember all the -- Patty Gray
3    wasn't there that day, or maybe -- no, she wasn't.
4    Len Glogauer.
09:45 5    Everybody in the building besides Patty
6    Gray and Dennis Montgomery were there, all the
7    employees, which I'm sure they can give you a list
8    of.  They were all present.
9    THE COURT:  All right.  Are those names
09:45 10    you've given us the ones you recall right now?
11    THE WITNESS:  Uh-huh.
12    THE COURT:  All right.  Go ahead.
13    BY MR. JAKOPIN:
14    Q.  Did you have any discussions with
09:45 15    Mr. Montgomery on Monday the 9th?
16    A.  Other than he asked me -- I didn't call
17    him over the weekend to go trap shooting like we
18    usually do.  I said I just wanted to relax after the
19    trip.  That was about it.
09:46 20    Q.  Anything else that day?
21    A.  The 9th, no.
22    The 10th, we did.
23    Q.  What happened on the 10th, in terms of
24    conversations?

LIZA CHAPEN, CCR, RMR    (775) 323-5492

**47**

1    A.  The 10th was the morning when the chaos in
2    the warehouse between him and Mr. Trepp was going on.
3    Later on, I called -- Mr. Trepp asked me
4    to call him to come back to the office to talk to us,
09:46 5    and Dennis came back and he went into Dennis' --
6    Warren's office and they talked privately.
7    And then Dennis came over to my office and
8    I asked him what was going on, and he said that
9    Warren was trying to screw him out of money for
09:47 10    years, he hadn't been paying him properly for his
11    source code, and he said --
12    I said, "What about this latest project we
13    have, our" -- "this classified project that was of
14    extreme importance?"
09:47 15    And he said that if the company wanted it,
16    they had to give him big money.
17    And then he left and he never came back to
18    the building since.
19    Q.  You had mentioned before that the company
09:47 20    had a security system with cameras.
21    Could you describe that?
22    A.  We've got about 16 cameras in our
23    building, and last summer we installed -- we
24    originally had maybe 12.  We installed different

LIZA CHAPEN, CCR, RMR    (775) 323-5492

**48**

1    cameras on the roof and we ran all the feeds for
2    these cameras out to our warehouse area, the area
3    where Dennis usually works, and we set up 16 work
4    stations, one work station for each camera, and they
09:47 5    digitally recorded all the footage coming off of
6    these cameras.
7    Dennis maintained it; I didn't.  I had --
8    my only involvement was originally setting up the
9    hardware.  After that, he maintained all the actual
09:48 10    recording and maintenance of these machines.  He and
11    his son.
12    I don't know, Jessie might have had some
13    involvement.  I don't know.
14    Q.  And you had mentioned that you and
09:48 15    Mr. Trepp had gone and looked at what was stored on
16    that video system?
17    A.  About noon on the 10th, we went and looked
18    on the -- all of those hard drives for those
19    recording machines had been cleaned off.  The last
09:48 20    modified date on the folders for recording was the --
21    between 8:00 and 9:00 in the morning on the 9th, so
22    for that -- for those modified dates, it means that
23    those folders -- the last time something was on those
24    folders was between 8:00 and 9:00 a.m. in the morning

LIZA CHAPEN, CCR, RMR    (775) 323-5492

49

```
  1    of January 9th.
  2              After that, it had been deleted off.
  3         Q.  Does eTreppid have an alarm system?
  4         A.  Yes, we do, maintained by ATD.
09:48 5         Q.  Could you describe that?
  6         A.  We've only got -- I believe there was five
  7    codes for the alarm prior to the -- prior to this
  8    incident.
  9              Dennis had one, Warren had one, I had one,
09:49 10   Patty had one, and I believe Jessie Anderson and Jim
  11   Bauder shared one; and only those people could turn
  12   off the alarm to come in the building at any time
  13   they wanted to.
  14             Barjinder Bal probably had one; I'm not
09:49 15   sure.
  16             I had an old list of who had what alarm
  17   codes from 2002, so I don't know what the -- when we
  18   moved into the building, I don't know what had
  19   been -- changes made since then.
09:49 20        Q.  Can you tell by those codes who turned the
  21   alarm on and off?
  22        A.  Each user, from my file, which is the
  23   November of 2002, that I got from Dennis, it had user
  24   numbers for each code.
```

LIZA CHAPEN, CCR, RMR    (775) 323-5492

50

```
  1              So, for example, I think I was User
  2    No. 12, Dennis was User No. 13, and the ATD Alarm
  3    logs which we received shows what user number came in
  4    and what hours, which one set the alarm, which one
09:50 5    turned the alarm off.
  6         Q.  Could you tell -- is a report generated of
  7    those codes?
  8         A.  Right.  ATD keeps those and we get them by
  9    request.
09:50 10        Q.  Did you request a report for who was in
  11   and out of the building on the weekend of January 7th
  12   and 8th?
  13        A.  Yes, we did.  I requested it when I
  14   checked -- we reset the alarm codes on the building
09:50 15   on the 10th.  We had ATD come out and reset the codes
  16   and we added new codes for just a smaller group of
  17   people, and we also got the log and it showed the 7th
  18   and the 8th weekend, User No. 13, which is Dennis, is
  19   the only one that came in the building.
09:50 20        Q.  Let me ask you a few questions.
  21             You had talked about e-mails.  Were there
  22   any e-mails that were deleted at the company?
  23        A.  Well, I don't know about everybody, but I
  24   know in particular I ran recovery software on a
```

LIZA CHAPEN, CCR, RMR    (775) 323-5492

51

```
  1    lot -- we ran recovery software starting on the 10th
  2    to try to recover deleted files on everybody's
  3    machines.
  4              And all the programmers' work stations had
09:51 5    a wipe and delete program, which is a program used to
  6    wipe off space on the hard drive.  The military uses
  7    them to declassify hard drives.  It wipes zeroes
  8    every space on the hard drives.
  9              So all of the programmers' machines had
09:51 10   run -- had this wipe and delete program run on all of
  11   them, so nothing was able to be recovered from any of
  12   those.
  13             But I ran it on Dennis' personal work
  14   station and they had wipe and delete run on there but
09:51 15   it hadn't wiped and deleted all the areas.
  16             The recycle bin area hadn't been wiped.
  17   It had been emptied but not wiped, and I recovered
  18   nine e-mail files from that that had been deleted on
  19   or before December 11th and 12th.
09:52 20        Q.  Did any of the other employees complain
  21   about their e-mail files that had been deleted?
  22        A.  I had one programmer, Krishna Tangirala,
  23   complain that when I was gone, Dennis took his hard
  24   drive away and gave it back to him with just a clean
```

LIZA CHAPEN, CCR, RMR    (775) 323-5492

52

```
  1    slate hard drive, just the operating system.
  2              And I asked Dennis about that.  This is
  3    the week of the 3rd to the 6th.  I asked Dennis and
  4    he said that Krishna's machine had crashed and died.
09:52 5              And I asked Krishna and he said that
  6    wasn't true.  The computer was working fine; he just
  7    took his hard drive.
  8              MR. FLYNN:  Objection; hearsay.
  9              THE COURT:  Sustained.
09:52 10             MR. FLYNN:  Objection; hearsay.
  11             THE COURT:  It's sustained.
  12             Ask another question.
  13             MR. JAKOPIN:  Fine, your Honor.
  14   BY MR. JAKOPIN:
09:53 15        Q.  Other than Krishna, did any other
  16   employees complain about e-mails having been deleted?
  17             MR. FLYNN:  Objection; hearsay.
  18             THE COURT:  I'm not sure I'm going to
  19   sustain that.  I think this goes more to their state
09:53 20   of mind and what they did afterwards than it does the
  21   truth of the matter.
  22             I'll consider it only for the former as
  23   opposed to the latter.
  24             Go ahead.
```

LIZA CHAPEN, CCR, RMR    (775) 323-5492

**53**

BY MR. JAKOPIN:

1    Q. Answer the question.

3    A. They didn't delete -- I don't believe they
4    complained about e-mails being deleted; they
09:53 5    complained about source code on their machines being
6    deleted.

7    Q. Did you do any recovery for e-mails of
8    anyone other than Mr. Montgomery's e-mails?

9    A. E-mails, no.

09:53 10    I only -- we tried recovery of all files
11    deleted, not just e-mails. We tried to recover
12    anything deleted.

13    So we weren't just narrowing in on
14    e-mails; we were trying to figure out what was
09:53 15    deleted.

16    We didn't know what was deleted overall,
17    so we were trying to recover to determine what was
18    deleted.

19    MR. JAKOPIN: That's all I have.

09:54 20    THE COURT: Cross?

22    CROSS EXAMINATION

23    BY MR. FLYNN:

24    Q. You testified about a conversation that

LIZA CHAPEN, CCR, RMR    (775) 323-5492

**54**

1    you had with Mr. Montgomery about big money?

2    A. Right.

3    Q. And I believe you said that Mr. Montgomery
4    said that unless the government gave him big money --
09:54 5    something; is that correct?

6    A. No.

7    Q. No?

8    A. He didn't mention the government.

9    Q. Was it unless Mr. Trepp gave him big
09:54 10    money?

11    A. Mr. Trepp was the words he used.

12    Q. And that conversation took place on
13    January 10th?

14    A. That's right. In my office.

09:54 15    Q. Now, let's go back to the beginning of
16    your employment.

17    I've noticed in your Declaration and your
18    testimony here, you keep using the singular eTreppid
19    source code.

09:54 20    Are you aware of that?

21    A. I call it the collective. It's multiple
22    projects, multiple source code files, so eTreppid
23    source code is probably more than a hundred different
24    projects, thousands of files.

LIZA CHAPEN, CCR, RMR    (775) 323-5492

**55**

1    Q. Okay. Now, so you agree with me, though,
2    that in your Declaration, you used the singular
3    eTreppid source code.

4    In your testimony here, you've been using
09:55 5    the eTreppid source code in the singular.

6    You agree with that?

7    A. Right.

8    Q. But what you really meant was
9    collectively?

09:55 10    A. Right.

11    MR. JAKOPIN: Objection; argumentative.

12    BY MR. FLYNN:

13    Q. Is that correct?

14    THE COURT: No, I think it's a question.
09:55 15    It's not a statement.

16    Go ahead, answer it.

17    THE WITNESS: That's correct.

18    BY MR. FLYNN:

19    Q. Now, let's talk about what collectively
09:55 20    means.

21    When you first started working at
22    eTreppid, describe actually what you were doing.

23    A. I was programming the game engine that I
24    had developed previous to working for eTreppid,

LIZA CHAPEN, CCR, RMR    (775) 323-5492

**56**

1    continuing developing on it.

2    Dennis and Warren wanted me to possibly
3    make it into a Kenny Rogers video game, The Gambler.
4    We explored that route.

09:56 5    We explored many different routes, but
6    programming it.

7    Q. How long did you work on that?

8    A. Couple of years.

9    Q. How many files would you estimate you
09:56 10    created? Computer files?

11    A. Couple thousand.

12    Q. How many computer libraries would you
13    estimate you --

14    A. I'm including the libraries.

09:56 15    When you compile source code, it generates
16    libraries as intermediate files. You can also use
17    those as final files, but I'm including those files,
18    as well.

19    Q. So can you characterize any of these files
09:56 20    collectively as libraries? Or no?

21    A. Libraries are part of a source code.
22    They're pre- -- they're intermediate compiled file.

23    Q. How many source codes were there for this
24    video game technology?

LIZA CHAPEN, CCR, RMR    (775) 323-5492

57

1    A.  The actual C++ files is what you're
2  referring to?
3    Q.  Explain to the Court what a C++ file is.
4    A.  That's the actual -- when you're
09:57 5  programming, you can program in various languages. I
6  programmed in C++.
7        They're basically text files.  You can
8  read them with just a regular notepad, even, and
9  these compile to generate libraries as intermediate,
09:57 10  and finally as an executable.
11        So I -- you create the text -- these
12  various text -- C++ text files, and I would say there
13  were several hundred; maybe 800 in the game engine.
14    Q.  Eight hundred source codes just for the
09:57 15  video technology that you worked for two years on?
16    A.  Correct.
17    Q.  And that takes us up to 2001?
18    A.  Into 2002.
19    Q.  And the --
09:57 20    A.  I mean, I still work on -- I'm still
21  working on it regularly with one of our programmers,
22  Michael Svatek.
23    Q.  Were there any other projects you worked
24  on between the inception of your employment and

LIZA CHAPEN, CCR, RMR    (775) 323-5492

58

1  throughout the time you were working on the video
2  game project?
3    A.  The player that we used for the Intel Home
4  Theater System.
09:58 5    Q.  And how many source codes did you create
6  for that?
7    A.  I can't recall with that.
8        There was not as many as the game engine,
9  but a couple hundred.
09:58 10    Q.  How many lines of code were involved --
11  are involved in the video game technology?
12    A.  Thousands.
13    Q.  Tens of thousands?
14    A.  Tens of thousands.
09:58 15    Q.  But you're not calling those source codes?
16  Because that's not C++ coding?
17    A.  That is C++ coding.
18    Q.  So there were tens of thousands of source
19  codes just for the video game technology?
09:58 20    A.  You wouldn't call that source code.
21        Source code refers to the actual code to
22  make up a program.
23    Q.  Okay.  And on this second project you were
24  working on, how many lines of code did you create

LIZA CHAPEN, CCR, RMR    (775) 323-5492

59

1  during that two-year period that we're talking about?
2    A.  I don't recall.
3        I worked on it with a couple of other
4  programmers.
09:58 5    Q.  During this period of time, did you work
6  on any other additional projects other than those
7  two?
8    A.  Program-wise, no.
9    Q.  So during this two-year period,
09:59 10  collectively, how many source codes did you create
11  for eTreppid Technology?
12    A.  Just add up the ones we just talked about.
13    Q.  So how many?  Roughly?
14    A.  Lines of code or files or what are you
09:59 15  asking?
16    Q.  Well, let's deal with lines of code.
17    A.  A code isn't like some little simple card
18  or something.  It's not just one little bit of
19  number.  You wouldn't call that a code.  You would
09:59 20  call -- source code is what makes up a program.
21        So to make up, like, say, for example,
22  Windows Media Player, they have thousands -- 10, 20,
23  40,000; who knows how many.  You would call that
24  collectively the source code that makes Windows Media

LIZA CHAPEN, CCR, RMR    (775) 323-5492

60

1  Player.
2    Q.  But there are, in fact, tens of thousands
3  of codes?  Lines of code?
4    A.  Lines of code is more accurate.
10:00 5    Q.  And collectively, to access those tens of
6  thousands of lines of code, how much source coding
7  would you need?
8    A.  Your question doesn't make much sense.
9    Q.  Does it all end up in an executable file?
10:00 10    A.  It all ends up in one file.
11        Or possibly auxiliary DLL files, which are
12  helper files, if you want to be simple about it.
13        DLLs are like -- you would say Windows
14  Media Player has one executable and maybe 10, 20
10:00 15  additional files to make it run.
16    Q.  All right.  How many lines of code are
17  involved in those two types of files?  The helper
18  file or the executable?
19    A.  Tens of thousands; 50,000, maybe a hundred
10:00 20  thousand.
21        For like the Windows Operating System,
22  it's millions of lines of code.
23    Q.  So if we were dealing with something we
24  want to call source code to access that --

LIZA CHAPEN, CCR, RMR    (775) 323-5492

s of 65 sheets
LIZA CHAPEN, RMR, CCR#93  775-323-5492
Page 57 to 60 of 259

---

**61**

1    A.  Uh-huh.
2    Q.  -- how many actual lines of code would we
3  be dealing with in that source code?
4    A.  For what, like the player I made for
10:01 5  Intel?
6    Q.  Yeah.
7    A.  That one had thousands of lines.
8        The game engine that's, you know -- lines
9  in there, I believe there's 50,000, probably, in all
10:01 10  the various parts.
11    Q.  And what would you call those?  Source
12  codes?
13    A.  There's no codes, plural; it's code,
14  singular.
10:01 15    Q.  But it involves tens of thousands of lines
16  of code?
17    A.  Lines of code is the actual term.
18    Q.  Okay.  Now, where is that technology
19  today?
10:01 20    A.  Which technology?
21    Q.  This technology for the video game?
22    A.  We have that.  That hasn't been deleted.
23        It's kept on my machine; my programmer,
24  Michael Svatek's, machine; and also we have that

---

**62**

1  still on our SRCSERVER.
2        That wasn't deleted.
3    Q.  So when you were giving your testimony on
4  direct, when you said all these source codes --
10:02 5  eTreppid source code was deleted --
6    A.  Uh-huh.
7    Q.  -- you weren't referring to two years of
8  work and tens of thousands of lines of code, perhaps
9  millions?
10:02 10    A.  Dennis has never had any involvement in
11  doing the game engine.
12    Q.  Please, please, Mr. Venables.
13        You were not referring, even though you
14  used the singular, you were not referring to those
10:02 15  tens of thousands of lines of code on the video game
16  technology, were you?
17    A.  No.
18    Q.  And that is eTreppid source code, isn't
19  it?
10:02 20    A.  That's some of the eTreppid source code.
21    Q.  But you didn't make that distinction, did
22  you?
23    A.  We've got, I would say --
24    Q.  Please.  Again, you didn't make that

---

**63**

1  distinction?
2    A.  -- one percent of the eTreppid source code
3  is the game engine.
4    Q.  Thank you.
10:02 5        So if there are tens of thousands and that
6  represents one percent, then the eTreppid source code
7  involves millions and millions of lines of code, does
8  it not?
9    A.  We don't have that much.  The game engine
10:03 10  is more complex than a lot of the other eTreppid
11  stuff.
12        I would say in the hundreds of thousands.
13    Q.  Are you able to draw on the blackboard an
14  outline of the network structure, the infrastructure
10:03 15  at eTreppid Technologies?
16    A.  Yes.
17    Q.  How the computer network was set up?
18    A.  Yes.
19        MR. FLYNN:  With the Court's permission,
10:03 20  could we move the blackboard perhaps over here so the
21  Court could see it?
22        THE COURT:  Yes.
23        MR. FLYNN:  And have the witness --
24  BY MR. FLYNN:

---

**64**

1    Q.  Before we do that, did you have, in your
2  home, a personal connection to all of the servers at
3  eTreppid Technology?
4    A.  I had a dial-up VPN at my house, virtual
10:04 5  private network.
6        That lets me connect to the office through
7  an encrypted tunnel so the passwords or anything else
8  couldn't be spied on over the Internet, and I had set
9  up that VPN in September of this past year so I can
10:04 10  monitor our mail server on our WEBSERVER.
11    Q.  Why did you set that up?
12    A.  So I can monitor our mail servers and our
13  WEBSERVER and our network status.
14        Occasionally, our networks would go down
10:04 15  and I wanted to make sure that -- Dennis wanted to
16  make sure -- I wanted to make sure that they weren't
17  going -- they weren't dying on us, and I can watch
18  them from my house.
19        That could only be connected to from my
10:04 20  house.
21    Q.  Did anyone else have that capability?
22    A.  No.
23        Patty Gray wanted it set up for her house
24  in Phoenix, but we hadn't set that up yet.

---

**65**

1    Q. And so you -- what would you call it, a
2  virtual private network?
3    A. That's right.
4    Q. Can you tell the Court whether you did
10:05 5  this because after a certain date and time there
6  seemed -- there began a period where there were tens
7  of thousands of efforts to intrude into the eTreppid
8  software?
9    A. After, I believe, our first military
10:05 10  contract was made public by some sort of press
11  release by somebody in the military, our network was
12  constantly under attack.
13        So we beefed up our router system. I got
14  a much stronger Cisco router, and I ran -- started
10:05 15  running intrusion detection software to see who was
16  trying to get into our network from the outside.
17    Q. Now, many hits after the first -- can we
18  call it a military contract?
19    A. Right.
10:05 20    Q. After the first military contract was made
21  public, as you put it, how many hits began to appear
22  per day?
23    A. We were getting thousands a day, probably
24  four or five thousand.

LIZA CHAPEN, CCR, RMR   (775) 323-5492

**66**

1        It's tapered off since, but initially
2  there were a lot; 4- to 5,000 range.
3        I keep a log. I have a log of all the
4  inputs. It's been recording since that period.
10:06 5    Q. And prior to that, how many hits per day
6  were you getting? Prior to the military contract?
7    A. We host various web sites, so including
8  those, probably a couple hundred, maybe 500 a day.
9    Q. So it went from 500 a day to 4- to
10:06 10  5,000 --
11    A. Thousand.
12    Q. -- or more per day?
13    A. Right.
14    Q. Now, the first military contract, just in
10:06 15  as few words as possible to give a description of it
16  for the Court, how would you characterize it, just in
17  terms of some type of a description?
18    A. I don't have all the details about our
19  contract. Warren and Dennis --
10:07 20    Q. In fact, you never had access to any of
21  the source codes or any of the government contracts,
22  did you?
23    A. I don't actually -- I know what programs
24  we delivered to them.

LIZA CHAPEN, CCR, RMR   (775) 323-5492

**67**

1    Q. All right.
2    A. I was involved in --
3    Q. You never had access to any of them?
4        (Discussion off the record.)
10:07 5    THE COURT: One at a time.
6    MR. PEEK: Will he be allowed to finish
7  his answer before --
8    THE COURT: Yes, yes, yes.
9  BY MR. FLYNN:
10:07 10    Q. What's the answer to my question?
11    THE COURT: Let him finish the last
12  answer.
13    THE WITNESS: Which part?
14    THE COURT: Do you remember the question?
10:07 15  BY MR. FLYNN:
16    Q. Did you ever have access to any of the
17  lines of code done by Mr. Montgomery on the secret
18  government projects?
19    A. I know what executables we delivered. I
10:07 20  was involved with the delivery.
21        The actual code to generate those
22  executables, I haven't seen any of that.
23    Q. You were never given access to them, were
24  you?

LIZA CHAPEN, CCR, RMR   (775) 323-5492

**68**

1    A. Right.
2    Q. Now, can we use the term, for the first
3  military contract, facial recognition?
4    A. I don't even know if that was it.
10:08 5        I believe the first contract was more with
6  the Predator. That's the public -- public --
7  publicly known thing.
8    Q. So you don't even know which one actually
9  came first?
10:08 10    A. Huh-uh. I have a --
11    Q. Is it fair --
12        Go ahead.
13    A. I have an actual -- for part of our
14  facility, military facility, I've got copies of
10:08 15  the -- what's called DD Form 254, which is the
16  military contract form.
17        I have the copies of the original one of
18  that, and the first one came from the Air Force.
19    Q. So you were given -- because of the actual
10:08 20  form in the contract, you were given some knowledge
21  by someone at eTreppid about what the end result was
22  of what Mr. Montgomery was doing; is that a fair
23  characterization?
24    A. Just overall, general, what it was about.

LIZA CHAPEN, CCR, RMR   (775) 323-5492

69

1    Q. But you would never -- no one ever told
2  you specifically what he was doing?
3    A. No.
4    Q. All right. If we could have you create an
10:09 5  outline of the networking infrastructure at
6  eTreppid --
7        THE COURT: Is there something for him to
8  write with?
9        THE CLERK: I believe there's chalk up
10:09 10  there.
11        THE COURT: Okay. All right.
12        THE CLERK: Would they like to use the
13  paper or the chalkboard?
14        THE COURT: I prefer the paper, if we've
10:09 15  got some.
16        MR. FLYNN: The paper may be better for
17  your Honor, if you could just maintain custody of it.
18        THE COURT: I'm going to maintain custody
19  of it after it's filled out.
10:09 20        And we'll mark it --
21        MR. FLYNN: Thank you, your Honor.
22        THE COURT: -- as Exhibit 1.
23        Did you hear that, Greg?
24        THE CLERK: Yes.

LIZA CHAPEN, CCR, RMR    (775) 323-5492

70

1        (Exhibit 1 was marked for identification.)
2        THE WITNESS: What exactly do you want me
3  to diagram?
4        Network structure is pretty open; we don't
10:10 5  have a lot of divisions.
6        (Discussion off the record.)
7        THE WITNESS: Our network structure is
8  fairly open. We don't have any subdivisions or
9  sub-networks on our network.
10:10 10        We have our main Internet, say, coming --
11  say this is the Internet coming into our main router,
12  which is Cisco router. In that router, I have a list
13  of fire wall instructions which prevents what can
14  come into the network.
10:10 15        I basically let everything go out; there's
16  no restriction on that.
17        After that, I have a series of switches
18  set up in a rack that all of the computers in the
19  buildings are set up to. I actually go through
10:10 20  another intermediate router before this, which does
21  our NAT, which is Network Address Translation.
22        So everybody on the Intel network is on a
23  private IP segment, so these machines can't even be
24  seen from the Internet except through one IP.

LIZA CHAPEN, CCR, RMR    (775) 323-5492

71

1        This one IP is set up -- I don't even need
2  to tell you what it is, but it's one private IP
3  everybody's in the building, looks like, out on the
4  network, on the Internet. So if you're busy in a web
10:11 5  site, everybody in the building looks like just one
6  IP.
7        Then, every -- all the machines in the
8  building are plugged into this. That includes our
9  servers and all the work stations that all the
10:11 10  programmers use.
11        I had one other segment of network set up
12  out in the warehouse. These are the machines that
13  Dennis used regularly for doing some of his
14  classified projects.
10:11 15        Those were going through another machine.
16  That machine was the gateway to this network. There
17  weren't any restriction controls; this traffic was
18  two-way.
19        We were going to put another router here
10:11 20  in place of this computer because this computer was
21  not very reliable.
22        That's the basic structure.
23  BY MR. FLYNN:
24        Q. What would we call this?

LIZA CHAPEN, CCR, RMR    (775) 323-5492

72

1        You said it's in the warehouse? This set
2  of machines that you said Dennis was working with?
3        A. Dennis called them the cluster. They were
4  a group of Windows XP work stations set up in -- at
10:12 5  various times, we had different amounts.
6        There's about five of these work stations
7  in each rack. Each one of these would be a rack
8  cabinet.
9        Q. And where was Dennis actually working in
10:12 10  connection with the cluster?
11        A. This was up in our -- our building is kind
12  of divided in two parts. The front section is
13  offices. This back section here is warehouse.
14        Dennis had set up a series of tables out
10:12 15  here that he worked on. He was regularly out here.
16        Q. Okay. And where did you work,
17  Mr. Venables?
18        A. Our server room was up in this area and my
19  office is right next to it.
10:12 20        So our servers were here and I was here.
21        Q. Okay. Could you just put the initials DM
22  down there.
23        And who worked in these work stations over
24  here in the warehouse, near Dennis?

LIZA CHAPEN, CCR, RMR    (775) 323-5492

**73**

1    A. Just Dennis.

2        Warren occasionally was out there working

3    with him.

4    Q. And no one else?

10:13  5    A. Right.

6    Q. Did you ever go out there and work on any

7    of those work stations?

8    A. Troubleshooting, helping him clone them to

9    make more of them.

10:13 10    Q. But actually creating lines of code --

11    A. No.

12    Q. -- did you ever do that?

13    A. Never.

14    Q. The answer was never, correct?

10:13 15    A. Right.

16        MR. FLYNN: Thank you, sir.

17        You can resume the stand, please.

18        THE COURT: Are there going to be any

19    additions to this drawing?

10:13 20        MR. FLYNN: I believe so. Mr. Montgomery

21    will be --

22        THE COURT: All right. We'll leave it up

23    there, then, until we --

24    BY MR. FLYNN:

LIZA CHAPEN, CCR, RMR    (775) 323-5492

---

**74**

1    Q. Where were the programmers actually

2    working?

3        I believe -- are these the work station

4    that the programmers --

10:13  5    A. Right.

6    Q. -- were actually working?

7    A. That section there that I have that top

8    diagram on is actually a two-story area. The

9    warehouse is all single-story.

10:14 10        So some of them were on the second floor,

11    some were on the first floor.

12    Q. So, for example, on the video game, was

13    that data compression-type technology?

14    A. No, just 3-D rendering.

10:14 15    Q. So eTreppid Technologies was doing

16    software technology other than just data compression,

17    correct?

18    A. Correct.

19        MR. PEEK: Counsel, I can't see the

10:14 20    witness.

21        Thank you.

22    BY MR. FLYNN:

23    Q. And who was in charge of these programmers

24    working over here?

LIZA CHAPEN, CCR, RMR    (775) 323-5492

---

**75**

1    A. Generally Dennis was in charge of all the

2    programmers in the building.

3    Q. And who were -- can you give the identity

4    of those programmers for the Court?

10:14  5    A. Upstairs area or the downstairs area?

6    Q. Upstairs first.

7    A. Upstairs, we had Barjinder Bal.

8        I only remember his first name, Karthik.

9        This is current; we've had people come and

10:14 10    go over the years.

11        Venkata Kalluri.

12        Lalith Tenneti.

13    Q. If I could just stop you there.

14        Mr. Bals and Mr. Kalluri are the same

10:14 15    people that have submitted Declarations in this case?

16    A. Correct.

17    Q. But they never worked with Dennis down in

18    this other area you've got down below, either, did

19    they?

10:15 20    A. They were occasionally down there. I

21    don't know for what.

22        The upper area had glass windows so we

23    could see who went down to that area, and I observed

24    just about everybody in the building down there with

LIZA CHAPEN, CCR, RMR    (775) 323-5492

---

**76**

1    Dennis at one time or another.

2    Q. But they never did any source code

3    creation?

4    A. For that project?

10:15  5    Q. To your knowledge?

6    A. I have no idea what they did for him.

7    Q. Okay. And would you continue with the

8    identity of the programmers, please.

9    A. Just programmers, Michael Svatek; you got

10:15 10    that one.

11        Jessie Anderson.

12        I believe that's all the programmers

13    upstairs. There's other people, but those are the

14    programmers.

10:15 15    Q. All right. Now, so you've done -- during

16    those first two years, did you do any work that we

17    would call data compression-type work?

18    A. No.

19    Q. Do you know of anyone who did?

10:16 20    A. Venkata did.

21    Q. Anyone else?

22    A. I'm sure others.

23        I know him for sure; I've seen the

24    programs he's worked on.

LIZA CHAPEN, CCR, RMR    (775) 323-5492

---

77
1    Q. During those first two years, what
2 percentage of the company work, if you know, was data
3 compression-type work?
4    A. Initially, I believe that was the majority
10:16 5 of what we were doing.
6    Q. Have you ever seen any of the books or
7 records of the company?
8    A. No.
9    Q. Have you ever seen any of the agreements
10:16 10 between Mr. --
11    A. No.
12    Well, as far as records, I have the
13 majority stockholder list as part of our facility
14 security. I have that information.
10:16 15    Q. In your office?
16    A. Yes.
17    Q. Describe those records, please.
18    A. They show who the majority shareholders
19 are.
10:16 20    For getting your facility security
21 clearance, you need to know if the company has any
22 foreign interest in the company so that we could
23 have -- foreign interest or influence, so the records
24 show -- I believe it's Friendly Capital Partners,
LIZA CHAPEN, CCR, RMR    (775) 323-5492

78
1 and --
2    Q. That's Mr. Trepp, also, correct?
3    A. Mr. Trepp represents Dennis and Brenda
4 Montgomery, and I believe one other share -- there's
10:17 5 three shareholders on this as the majority
6 shareholders.
7    Q. Is Wayne Primm one of those?
8    A. He's not on the list.
9    Q. Is Randy Halloway on that list?
10:17 10    A. The list has Mr. Trepp personally,
11 Mr. Trepp representing Friendly Capital, and Dennis
12 and Brenda Montgomery.
13    Those are the three main entities on the
14 majority shareholders list.
10:17 15    Q. Is Michael Milken in any of the records as
16 being shown as a shareholder of eTreppid
17 Technologies --
18    A. Not that I know of.
19    Q. -- that you have possession of?
10:17 20    A. Not that I have, no.
21    Q. Are you aware that Mr. Trepp has stated
22 that he is a shareholder of eTreppid Technology?
23    A. Yes.
24    That Mr. Trepp is?
LIZA CHAPEN, CCR, RMR    (775) 323-5492

79
1    Q. That Mr. Milken is.
2    A. Oh, I don't know about that.
3    Q. Are you aware of who Mr. Milken is?
4    A. Yes.
10:17 5    Q. In fact, he's -- have you ever
6 participated in any discussions with Mr. Trepp about
7 Michael Milken's involvement of eTreppid Technology
8 and being a convicted felon?
9    MR. JAKOPIN: Objection, your Honor.
10:18 10    MR. FLYNN: If I can finish, your Honor.
11    THE COURT: Yeah, let him finish the
12 question. I don't know if it's objectionable or not
13 until I hear it.
14 BY MR. FLYNN:
10:18 15    Q. In being a convicted felon, and that fact
16 interfering with the government military contracts?
17    THE COURT: Wait. Hold on just a second.
18    Sit down, Counsel, just for a minute.
19    All right.
10:18 20    THE WITNESS: He's never talked to me
21 about Mr. Milken.
22    MR. PEEK: Mr. Venables, please.
23    THE COURT: Now, go ahead and ask the
24 question so I can --
LIZA CHAPEN, CCR, RMR    (775) 323-5492

80
1 BY MR. FLYNN:
2    Q. Have you ever had any discussion with
3 Mr. Trepp about Mr. Milken being a shareholder of
4 eTreppid Technology, and that fact, because he is a
10:18 5 convicted felon at the Drexel -- during the Drexel
6 days --
7    MR. PEEK: Your Honor, this is outrageous
8 conduct. There's no question --
9 BY MR. FLYNN:
10:18 10    Q. -- of interfering with a government --
11    THE COURT: Wait, wait. Wait a minute.
12    MR. PEEK: Your Honor, there's only --
13    THE COURT: Your co-counsel is handling
14 this witness --
10:18 15    MR. PEEK: Okay.
16    THE COURT: -- so allow him to deal with
17 this issue.
18    MR. JAKOPIN: Objection, your Honor. He
19 answered the question no.
10:18 20    THE WITNESS: He's never talked to me
21 about Mr. Milken; never.
22    THE COURT: Well, I -- this is
23 cross-examination. I don't know whether there's any
24 relevance at all to this issue about the felony
LIZA CHAPEN, CCR, RMR    (775) 323-5492

81

1   conviction.
2         I'm personally very well aware who
3   Mr. Milken is, I know what his background is, and if
4   we had a jury here, I'd be a little more worried
10:19 5   about it, but we don't have a jury.
6         I'm going to try to sort out what I think
7   has something to do with this case, what doesn't, so
8   I'm going to go ahead and let you go with that just a
9   little bit, but I do want you to tie it in on a -- on
10:19 10   relevance grounds.
11         Maybe it has to do with security
12   clearances.
13         MR. FLYNN: It does, your Honor, and when
14   Mr. Montgomery testifies, we'll go into it.
10:19 15   BY MR. FLYNN:
16         Q. In the books and records that you have, as
17   I understand your testimony, you only show three
18   shareholders?
19         A. Three majority; that's all we require for
10:19 20   our facility clearance.
21         The government doesn't care about any
22   minority shareholders, any lower than -- I forget the
23   number; I think it's four percent.
24         Anything lower than that, they don't care

82

1   about.
2         Q. Did you ever have any conversations with
3   anyone from the government about the identity of any
4   of the shareholders of eTreppid Technology?
10:20 5         A. They just wanted to know who the majority
6   ones were.
7         Q. And you gave them --
8         A. Based on that, they granted us our
9   facility clearance.
10:20 10         Q. Okay. Explain to the Court what a
11   facility clearance is.
12         A. Facility clearance is what we get as a
13   collective after the key people in our company got
14   their personal clearances.
10:20 15         The key people that we've submitted were
16   Dennis Montgomery, Warren Trepp, and myself as our
17   facility security officer.
18         After us three got our clearances, they
19   reviewed who the shareholders were, and after that,
10:20 20   what contract we had with the government -- you
21   have -- to get a clearance, you have to have a
22   contract that specifies compliance, and after that
23   they granted us our facility clearance, meaning we
24   can handle classified material after a further

83

1   inspection to see what storage capabilities we had.
2         Q. Did that clearance give eTreppid the right
3   to store any classified material?
4         A. We weren't given that final permission
10:21 5   yet. It said that we could but we needed further
6   inspection to inspect our storage containers, our
7   safes.
8         Q. So as of today's date, eTreppid has never
9   been given a final security clearance to store
10:21 10   classified material; is that correct?
11         A. Correct.
12         Q. And your explanation of the reason why is
13   what again, Mr. Venables?
14         A. The rules state that DSS, Defense Security
10:21 15   Service, is in charge of granting that final storage
16   clearance. They come and inspect what our entry and
17   exit procedures for the building, our alarm code
18   stuff, and also what storage containers we're using
19   and how we maintain the procedures for entering and
10:21 20   taking out classified material, which was part of
21   that review on December 10th, that Jay Dixon came to
22   start -- initiate.
23         Q. All right. Let's go back to -- let's go
24   back to the various technologies that you were

84

1   involved in, and I guess we're up to some time in
2   2001, and we've got the video game technology,
3   correct?
4         A. Correct.
10:22 5         Q. And the other technology -- what did we
6   call that, Mr. Venables?
7         A. I forget the name of it. It was a media
8   player for the Intel Home Theater System.
9         Q. And what time in 2001 does that take us
10:22 10   to?
11         A. That was up until 2002 before we moved to
12   our current building.
13         We moved to our current building in August
14   of 2002.
10:22 15         Q. Okay. And what did you work on after
16   these other technologies that you mentioned for
17   eTreppid Technology?
18         A. The building we moved into had no network
19   infrastructure whatsoever. I worked on setting all
10:22 20   that up, working with contractors to wire our
21   building, setting up all the network stuff.
22         We had nothing in that building, so I
23   worked on that.
24         Q. For how long?

**85**

1  A. It took about a year to get it to where it
2  is now.
3  Q. So during that year, did you have anything
4  to do with creating source coding for any codes for
10:23 5  eTreppid Technology?
6  A. On a regular basis, I dealt with Michael
7  and what he was doing, but other than that, no.
8  Q. Michael who?
9  A. Michael Svatek, working on the game
10:23 10  engine.
11  Q. So other than that, for another whole
12  year -- we're now up to when in 2002, would you say?
13  A. We're into 2003 by the time we finalize
14  our full network setup.
10:23 15  Beginning in 2003, I was involved with
16  doing all the purchasing and designing of the
17  hardware that he's got out there on that rack --
18  system of racks.
19  Q. So, again, no involvement with regard to
10:23 20  creating source coding for eTreppid Technologies?
21  A. No.
22  Q. Is there any time up to the present, since
23  your involvement in the video games, where you've
24  been involved in creating source code for eTreppid

LIZA CHAPEN, CCR, RMR   (775) 323-5492

**86**

1  Technology?
2  A. Not since then, no.
3  Q. Do you have any knowledge as to what
4  percentage of the eTreppid business involved data
10:24 5  compression technology up until December of 2002?
6  A. I have no idea where the breakdown of
7  money came from.
8  Q. So you have no knowledge of even what was
9  paid for any of the projects eTreppid was working on?
10:24 10  A. No.
11  Q. Do you have any knowledge of how many
12  projects eTreppid was doing?
13  A. Total number, no.
14  I think Patty Gray, Dennis and Warren were
10:24 15  probably one the only ones -- the only three that
16  know all that.
17  Q. Let's call one technology data
18  compression.
19  You apparently never worked on any source
10:24 20  coding for data compression?
21  A. That's correct.
22  Q. We'll call the other one video compression
23  technology.
24  Is that basically the game?  The video

LIZA CHAPEN, CCR, RMR   (775) 323-5492

**87**

1  game?
2  A. No.  Video compression is for playing back
3  video, such as a DVD or just a video file itself,
4  like, for example, compressing a DVD movie to fit
10:25 5  onto a CD.
6  Q. So you have no knowledge as to how much
7  source coding was done by eTreppid for video
8  compression technology; is that correct?
9  A. I've seen the various programmers and what
10:25 10  projects they're working on and --
11  Q. Do you --
12  A. -- I've dealt with that video compression
13  for the Intel Media Player.
14  Q. Do you know what percentage of the company
10:25 15  business that involved?
16  A. No idea.
17  Q. Do you know what percentage of the company
18  revenues that involved?
19  A. I have no idea.
10:25 20  Q. But again, you never created any source
21  coding yourself for that?
22  A. No.
23  Q. Did you ever have any access directly
24  where you looked at the source coding for video

LIZA CHAPEN, CCR, RMR   (775) 323-5492

**88**

1  compression technology?
2  A. I had worked with one of the programmers
3  on the streaming of our video compressed video,
4  Lalith Tenneti, so I've seen some of the projects he
10:25 5  worked on.
6  And also with one of the prior employees,
7  Amit.
8  I forget Amit's last name.
9  I've seen some of the stuff, helping them
10:26 10  troubleshoot, compiling stuff.
11  Q. Do you know how many lines of source
12  coding there are at eTreppid for the video
13  compression technology?
14  A. I have no idea.
10:26 15  Q. Do you know how many lines of source
16  coding there are at eTreppid for the data compression
17  technology?
18  A. No.
19  Q. When you gave all this direct testimony
10:26 20  and you were doing this search with all of the other
21  employees, as you put it, did you go back and look
22  for source coding for data compression or video
23  compression technology?
24  A. We looked for all deleted files.

LIZA CHAPEN, CCR, RMR   (775) 323-5492

89

1    Q. Did you look for any source coding for
2 data compression technology?
3    A. You can't do a search for deleted files by
4 what kind of technology it is.
10:26 5    Q. Is there any data compression technology
6 source coding at eTreppid today, if you know?
7    A. I don't know what files we've recovered.
8    We're still in the process of recovering
9 deleted files; we haven't gone through them all.
10:27 10    Q. So you could -- as you sit here today,
11 there could be tens of thousands of source codes --
12    MR. JAKOPIN: Objection.
13 BY MR. FLYNN:
14    Q. -- for data compression technology in the
10:27 15 computers at eTreppid that you haven't even checked
16 yet; is that correct?
17    MR. JAKOPIN: Objection; using "source
18 codes" is improper, foundation.
19    THE COURT: I'm not sure I understand the
10:27 20 objection.
21    THE WITNESS: He keeps using the term
22 wrong.
23    THE COURT: All right. Rephrase your
24 question and then we'll go from there.

LIZA CHAPEN, CCR, RMR    (775) 323-5492

90

1 BY MR. FLYNN:
2    Q. In the computers, as you sit here today,
3 at eTreppid Technology, is there source coding for
4 data compression technology?
10:27 5    A. I have no idea what we've recovered.
6    Q. You don't know?
7    A. It could be.
8    We haven't gone through it all. We've
9 actually -- working with law enforcement officials,
10:27 10 they don't want us to tamper with any more of the
11 evidence of trying to recover this.
12    Q. So as you sit here today, since you
13 haven't gone through it all, there could be tens of
14 thousands of source codes for data compression
10:28 15 technology alone on the eTreppid computers; is that
16 correct?
17    A. That doesn't really make sense.
18    MR. JAKOPIN: Objection; confusing.
19    THE WITNESS: That doesn't really make
10:28 20 sense --
21    THE COURT: Well, I'm not sure --
22    THE WITNESS: -- what you're saying, but
23 maybe you can clarify it.
24    THE COURT: Hold on. Stop. Stop.

LIZA CHAPEN, CCR, RMR    (775) 323-5492

91

1    I'm not sure that I have the understanding
2 yet to make a determination as to whether or not it's
3 confusing. I'm not sure that that's an objection
4 that I would sustain, anyway.
10:28 5    So I'm going to allow this testimony for
6 whatever it's worth so it helps me get educated about
7 what the issues in this case are.
8    I'm beginning to see that there's an issue
9 between source code, singular, source code, plural,
10:28 10 and whether we're talking about lines of source code
11 and lines of data codes, as opposed to separate
12 codes, but I want to learn a little bit more about
13 this, and so allowing me to listen to this helps me
14 to do that.
10:29 15    So if you'd indulge me a little bit,
16 please, I'd like to hear a little more about this.
17 BY MR. FLYNN:
18    Q. Mr. Venables, we've established that there
19 are, I think as you put it, hundreds of source codes
10:29 20 for the video game technology that you worked on that
21 are still at eTreppid; is that correct?
22    A. We've recovered hundreds of files that
23 were deleted. What the contents of those files or
24 what -- if there's actually any codes, we know that

LIZA CHAPEN, CCR, RMR    (775) 323-5492

92

1 some files have zero contents because they were wiped
2 clean.
3    So there's a file name but zero code is
4 within that file.
10:29 5    Q. We're just talking about the video game
6 now.
7    A. The video game?
8    Q. Yeah, just the video game.
9    A. We haven't --
10:29 10    Q. Are there hundreds of source codes just on
11 the video game, as you testified before, that are
12 still on the eTreppid --
13    A. That's like saying there's hundreds of
14 tomatoes in the video game.
10:29 15    What you're saying doesn't make any sense
16 in any way.
17    THE COURT: Well, hold on just a second.
18    THE WITNESS: We have all --
19    THE COURT: Stop.
10:30 20    THE WITNESS: -- the video --
21    THE COURT: Stop.
22    THE WITNESS: -- game files.
23    THE COURT: When I say hold on, I mean
24 stop.

LIZA CHAPEN, CCR, RMR    (775) 323-5492

93

1    You got it?
2    THE WITNESS: Okay.
3    THE COURT: All right. What I would like
4 both of you to do is to try to allow the other one to
10:30 5 finish. This is not like normal conversation.
6    We've got a court reporter here that's got
7 to get down what's being said, and I know that it's
8 not an easy thing to do if you're not used to it.
9    So, please, if he's asking a question, let
10:30 10 him finish it. If he's making an answer, let him
11 finish it.
12    And I'm sorry for the interruption, but I
13 just want to try to deal with this issue right now.
14    So go ahead, please.
10:30 15    MR. FLYNN: Thank you, your Honor.
16 BY MR. FLYNN:
17    Q. Mr. Venables, let's try it this way.
18    You say you have found deleted files of
19 source code; is that correct?
10:30 20    A. Correct.
21    Q. Have you found deleted files of source
22 code on your video game technology?
23    A. I said in the beginning, those files were
24 never deleted.
LIZA CHAPEN, CCR, RMR  (775) 323-5492

94

1    Q. Thank you.
2    Have you found deleted files of source
3 code on data compression technology?
4    A. I have found deleted folders for a program
10:31 5 called ET Adaptive, which I believe is the data
6 compression program.
7    Q. What makes you believe that?
8    A. Because I asked the programmer, Venka, who
9 was working on it what it's used for and he said data
10:31 10 compression.
11    Q. And when you say you found deleted files,
12 you found files -- you saw something that showed you
13 that the files were once there and now they're not
14 there? Or did you recover them?
10:31 15    A. Some locations, we didn't recover them.
16    Like the programmers' machines, they
17 recovered file names but zero contents in the files.
18    On the server, I've recovered the folders
19 and some of the files but not all of the files.
10:32 20    Q. Okay. On video compression technology
21 software, have you found any files at eTreppid -- on
22 eTreppid computers that were never deleted?
23    A. No.
24    Q. Have you looked?
LIZA CHAPEN, CCR, RMR  (775) 323-5492

95

1    A. We've looked all over. We looked on every
2 machine in the building.
3    Q. For video compression?
4    A. By video compression, I assume that you're
10:32 5 talking about the video Codec that we use.
6    There's various names for it. ETVC is one
7 of them. ERVP is another one. I don't remember all
8 of them, but we haven't found any of those on
9 anybody's work stations or the server.
10:32 10    Q. Have you made any effort to recover those
11 files?
12    A. Yes, I have.
13    Q. What did you do?
14    A. From the SRCSERVER, we're running the
10:32 15 program made by Executive Software called Emergency
16 Undelete. It's made for recovering deleted files.
17    Q. And have you recovered any of them?
18    A. I've got some folders with the names of
19 the video Codecs.
10:33 20    We haven't gone through all of them yet.
21 It's still running. It takes weeks and weeks to
22 piece these pieces together.
23    Q. That's how I understand it.
24    How many files have you recovered to date
LIZA CHAPEN, CCR, RMR  (775) 323-5492

96

1 and how long -- how many files have you recovered to
2 date on the video compression technology?
3    A. I have no idea. I just have a total
4 number of gigabytes that I've recovered.
10:33 5    Q. What is that?
6    A. About 40 to 50 gigabytes have been
7 recovered.
8    Q. How long has that recovery program been
9 running?
10:33 10    A. Since January 12th.
11    Q. And how long will it -- it will take weeks
12 longer to continue to run it to recover files; is
13 that correct?
14    A. By the current rate, probably.
10:33 15    Q. Okay. And is that technology, the
16 recovery technology going to enable you to recover
17 all of the source codes on the video compression
18 technology?
19    A. I have no idea.
10:34 20    Q. You don't know?
21    A. No.
22    Q. How many source codes, what you describe
23 as source codes have you recovered to date on the
24 video compression technology?
LIZA CHAPEN, CCR, RMR  (775) 323-5492

97

1    A. I have no idea.
2        I just have the recovered folders and
3    files, and nobody has access to it right now. It's
4    not even plugged into our network.
10:34 5    Q. Why not?
6    A. We don't want to corrupt anything. We
7    want to preserve the state that it was in at the
8    point of deletion.
9    Q. Just yes or no.
10:34 10       Did you ever have a conversation with
11   Mr. Trepp instructing you to go into Mr. Montgomery's
12   work station and try to recover classified
13   information or classified source codes?
14   A. He asked me to recover what files I could
10:34 15   find, in particular the e-mail files which I did
16   recover.
17   Q. What did you do to try to recover?
18   A. I ran the same program I already talked
19   about, Emergency Undelete.
10:35 20   Q. And just yes or no.
21       Did you ever have a conversation with
22   Mr. Montgomery about a certain governmental agency
23   requiring intrusion devices on all of the equipment
24   Mr. Montgomery was working on?

LIZA CHAPEN, CCR, RMR    (775) 323-5492

98

1    A. Never.
2    Q. Do you know what an intrusion device is?
3    A. Yes. I've got one on our Cisco router.
4    Q. What is an intrusion device?
10:35 5    A. It detects if somebody is trying to get
6    into the thing, and it will usually log it; try to
7    block it and log it.
8    Q. Does -- so as I understand it, you have no
9    knowledge of whatever governmental interaction
10:35 10   Mr. Montgomery had to establish intrusion devices
11   that would self-destruct any information on
12   Mr. Montgomery's equipment?
13   A. I have no knowledge of any of his
14   interactions.
10:36 15       I know what's on all the machines in the
16   building.
17   Q. Do you know whether or not there is an
18   intrusion device on Mr. Montgomery's workplace --
19   A. No, there's no such --
10:36 20   Q. -- computers, that if anyone tries to
21   access without certain codes, self-destructs all the
22   material in the computers?
23   A. There's no such thing.
24   Q. To your knowledge?

LIZA CHAPEN, CCR, RMR    (775) 323-5492

99

1    A. To my knowledge and others in the building
2    that I've consulted: Jessie Anderson, Lalith
3    Tenneti.
4    Q. Let's talk about audio compression
10:36 5    technology.
6        Did eTreppid do audio compression
7    technology?
8    A. Yes.
9    Q. Do you have any knowledge of what
10:36 10   percentage of the business was audio compression
11   technology?
12   A. I have no idea.
13   Q. And I take it you don't know what kind of
14   revenue the audio compression technology generated?
10:37 15   A. No.
16   Q. Did you ever do work on audio compression
17   technology?
18   A. No.
19   Q. In the last several weeks, have you made
10:37 20   an effort to examine the computers of eTreppid to
21   determine whether any audio compression technology
22   software files are present or not present?
23   A. We've looked for what we call ETAC,
24   eTreppid Audio Codec or compression, and none of our

LIZA CHAPEN, CCR, RMR    (775) 323-5492

100

1    programmers' work stations, none of the machines out
2    in the warehouse have it.
3        I believe I've recovered a folder or two
4    from SRCSERVER, but I don't know what the contents
10:37 5    are.
6    Q. Are you running any recovery technology
7    for any audio compression software?
8    A. We're recovering any and all files that we
9    can find on SRCSERVER that have been deleted.
10:38 10       It doesn't look for any particular kind of
11   file; it just looks for any deleted files.
12   Q. So has any -- have any source code files
13   been recovered, if you know, in audio compression
14   technology software?
10:38 15   A. There's a couple of folders that are for
16   ETAC.
17   Q. Okay. And that's currently on the
18   company's premises?
19   A. Yes.
10:38 20   Q. Now, I'm just going to use three different
21   descriptive terms and I'll just ask you some
22   yes-or-no questions. Okay?
23   A. Okay.
24   Q. Object tracking.

LIZA CHAPEN, CCR, RMR    (775) 323-5492

**101**

1  Do you know, yes or no, whether eTreppid
2  Technologies has any government contracts with regard
3  to object tracking?
4  A. Yes.
10:38 5  Q. Have you ever done any computer
6  programming on object tracking?
7  A. No.
8  Q. Have you ever had access to any of the
9  source codes for object tracking?
10:39 10  A. No.
11  Q. Who at eTreppid has had access to the
12  source codes for object tracking?
13  A. A person I mentioned before, Krishna.
14  **Zehang Sun is working on it with a team of**
10:39 15  **people downstairs, in our downstairs area which I**
16  **haven't mentioned yet. We have another ten people**
17  **down there. All of them -- not all of them, but a**
18  **majority of them are working on that stuff.**
19  Q. Under Mr. Montgomery's supervision?
10:39 20  **A. Yes.**
21  Q. And is it true to say that each of these
22  individuals has only had bits and pieces, and only
23  Mr. Montgomery has the full picture of what's being
24  worked on?

LIZA CHAPEN, CCR, RMR   (775) 323-5492

**102**

1  **A. I have no idea how he delegated.**
2  Q. That's all classified; is that correct?
3  **A. How he delegates isn't classified; only**
4  **the classified material.**
10:40 5  Q. The work being done is all classified?
6  **A. They can work on all kinds of program, but**
7  **the classified material which we receive from the**
8  **government agency is classified.**
9  **So they can program on whatever they want,**
10:40 10  **but they can't handle -- they can't see classified**
11  **material because none of them have clearances.**
12  Q. Only Mr. Montgomery?
13  A. Correct.
14  **Well, we have -- six people have**
10:40 15  **clearances in the building.**
16  Q. So to your knowledge, were they doing line
17  coding?
18  **A. Yes, they were.**
19  Q. Bits and pieces?
10:40 20  **A. They were working on whatever; I have no**
21  **idea what they were doing exactly.**
22  Q. On average, how many codes can a
23  programmer do a day?
24  How many line codes could a programmer do

LIZA CHAPEN, CCR, RMR   (775) 323-5492

**103**

1  per day?
2  **A. I have no idea what the -- a lot of it is**
3  **editing pre-existing lines, not generating new lines.**
4  **So I would say the majority of the days**
10:41 5  **are spent on tweaking and modifying existing lines.**
6  Q. I'm going to use another descriptive term,
7  and I'll just ask for yes or no.
8  To your knowledge, did eTreppid Technology
9  have any classified government contracts with regard
10:41 10  to pattern recognition technology?
11  **A. We only have one classified contract, to**
12  **my knowledge, and that's -- that's in our file on**
13  **record.**
14  Q. So you don't even -- do you know what
10:41 15  pattern recognition technology is? Yes or no?
16  **A. Yes.**
17  Q. And to your knowledge, you don't even --
18  you have no awareness, as you sit here today, of what
19  eTreppid was doing on pattern recognition?
10:41 20  **A. I have bits and pieces of what I've seen**
21  **going on in the building, but I don't have the full**
22  **picture.**
23  Q. Do you have any idea how many source codes
24  have ever existed on pattern recognition technology?

LIZA CHAPEN, CCR, RMR   (775) 323-5492

**104**

1  **A. No, I have no idea.**
2  Q. Do you have any idea where any of those
3  source codes could ever be found anywhere?
4  **A. Well, if we go by what Dennis told me, all**
10:42 5  **the source code is on SRCSERVER. I know what the**
6  **contents of the SRCSERVER were by file, number of**
7  **files, and total file size.**
8  Q. So this is just based on what
9  Mr. Montgomery told you?
10:42 10  **A. Right.**
11  **If he said it's not there, if he's saying**
12  **it's not there, then I would have no idea.**
13  Q. Have you ever seen any of the contracts
14  Mr. Trepp and Mr. Montgomery signed with a certain
10:42 15  governmental agency with regard to either object
16  tracking or pattern recognition technology?
17  **A. If you're talking about special access**
18  **program stuff, no, I don't have any knowledge of it.**
19  Q. So you have no knowledge of the terms of
10:43 20  any of those contracts?
21  **A. No.**
22  Q. And with regard to Mr. Montgomery's
23  supervision techniques of the people working under
24  him, the programmers, you have no knowledge of what

LIZA CHAPEN, CCR, RMR   (775) 323-5492

105

1  he was allowed to share and what he was not allowed
2  to share in order to get the work done; is that
3  correct?
4      A. I have no idea.
10:43 5      Q. I'm going to use another term, and just
6  answer yes or no, please.
7          Facial recognition technology. Have you
8  ever heard that term at eTreppid Technologies?
9      A. Yes. I've seen the work in progress being
10:43 10  done by the people downstairs.
11      Q. Have you ever seen the source codes for
12  facial recognition technology?
13      A. No, I haven't.
14      Q. Who was the individual at eTreppid that
10:43 15  was doing the work on facial recognition technology?
16      A. Zehang Sun's team. He has a team of
17  people working underneath him.
18      Q. Under the supervision of Mr. Montgomery?
19      A. Right.
10:44 20      Q. And have you, in any recovery program
21  you've been implementing, made an effort to recover
22  any source codes for facial recognition technology?
23      A. As I said, we're not looking for any -- we
24  can't look by any particular technology, just by

LIZA CHAPEN, CCR, RMR    (775) 323-5492

106

1  file, deleted file.
2      Q. So you just went on all of
3  Mr. Montgomery's computers, some of which are, in
4  fact, a certain governmental agency's computers; is
10:44 5  that correct?
6          MR. PEEK: Counsel, I can't see the
7  witness.
8          THE WITNESS: None of those machines out
9  there have been certified for classified material, if
10:44 10  that's what you're asking.
11  BY MR. FLYNN:
12      Q. As you sit here today, are you aware that
13  a certain governmental agency brought in computers?
14      A. Yes.
10:44 15      Q. Have you attempted to access those
16  computers?
17      A. They took those computers back away.
18      Q. When did they do that?
19      A. Last year sometime, I believe. Last
10:45 20  spring.
21      Q. And they took the source codes with them?
22      A. I don't believe so. They just took
23  hardware.
24      Q. Were the source codes on the hardware?

LIZA CHAPEN, CCR, RMR    (775) 323-5492

107

1      A. Mr. Montgomery had me make a program that
2  would delete all the hard drives in all the computers
3  we gave back to them.
4      Q. So it's your testimony today that all
10:45 5  those source codes at eTreppid were taken by the
6  government?
7      A. No. We ran Active Kill, I believe that
8  one was called. It's a DOD certified program for
9  wiping all those hard drives.
10:45 10          Those were all given back clean slate.
11      Q. So what was left?
12          THE COURT: Is this a good time to take a
13  little break?
14          MR. FLYNN: Sure.
10:45 15          THE COURT: We've been going not quite two
16  hours.
17          MR. FLYNN: Just one question, your Honor?
18          THE COURT: Sure. Go ahead.
19  BY MR. FLYNN:
10:45 20      Q. So to your knowledge, what is left at
21  eTreppid with regard to the source codes for that
22  technology that was wiped out?
23      A. I have no idea what source code was used
24  for that project.

LIZA CHAPEN, CCR, RMR    (775) 323-5492

108

1          MR. FLYNN: Thank you, your Honor.
2          THE COURT: All right. Let's be in recess
3  until -- let's make it five after 11:00.
4          (Recess taken.)
11:04 5          THE COURT: Please be seated.
6          MR. FLYNN: Thank you, your Honor.
7          THE COURT: Oh, by the way, before you
8  start, I do have an order permitting you to practice.
9          I'll file that in with the clerk.
11:04 10          And then when you conform the copies, give
11  them the copies, too, please.
12          MR. FLYNN: Thank, your Honor. It's nice
13  to be legal for a change.
14          THE COURT: Doesn't hurt.
11:04 15          Go ahead.
16  BY MR. FLYNN:
17      Q. Mr. Venables, how many hard drives are
18  there at eTreppid Technology?
19      A. I don't know. I -- since I purchased them
11:05 20  all, I should know an accurate number, but we've
21  bought many, many hundreds.
22          I would say, total, we probably have about
23  a thousand, but no more than 2000.
24      Q. Hard drives?

LIZA CHAPEN, CCR, RMR    (775) 323-5492

**109**

1    A. Yeah. Correct.
2    Q. How many files are on those hard drives?
3    A. We've got --
4    Q. Your best estimate?
11:05 5    A. We've got plenty that only have a couple
6    of files in them in our file cabinets in the
7    warehouse.
8    Q. Collectively, how many would you estimate?
9    Or can you?
11:05 10    A. I can't estimate.
11    Q. How many computers do you have at eTreppid
12    Technology?
13    A. On my network, I have less than a hundred,
14    but we've got plenty of other ones that are not in
11:05 15    use or --
16    Say, total, 200 or less computers.
17    Q. If I suggested to you there were over
18    150 million files on eTreppid Technology computers,
19    would you disagree?
11:06 20    A. No.
21    Q. But you don't know?
22    A. I would say --
23    Q. You can't give us your best estimate?
24    A. Since I've seen a lot of the files we've
LIZA CHAPEN, CCR, RMR    (775) 323-5492

**110**

1    been going over the last couple of weeks on most of
2    these hard drives in the warehouse and what have you,
3    a lot of them have individual frames of video, so a
4    single frame for every second, or less than 30 frames
11:06 5    a second they were recorded at, so your number of a
6    million or more would be accurate because it contains
7    a lot of these video frames.
8    Q. Well, 150 million?
9    A. Right. That's --
11:06 10    Q. How many of the 150 million have you
11    checked to date?
12    A. In the past two weeks, since the 10th,
13    I've looked at just about every hard drive in the
14    building.
11:07 15    Q. How many files have you checked to date,
16    of the 150 million?
17    A. I haven't opened every single file. I'd
18    say I'd open a folder and it has like a thousand
19    frames of something, I'll just look at the first one
11:07 20    and then go to something else.
21    Q. So of the 150 million files, can you tell
22    the Court today how many are still on the eTreppid
23    computers that have never been deleted?
24    A. I'd say about 80 percent are not source
LIZA CHAPEN, CCR, RMR    (775) 323-5492

**111**

1    code and those aren't deleted.
2    Q. Now, perhaps it was an oversight of mine,
3    but as I understand it, there is a fairly significant
4    little structure right there on eTreppid premises, is
11:07 5    there not?
6    A. In the downstairs -- center of the
7    downstairs area, our little private room?
8    Q. Yes.
9    Could you -- would you indulge me and put
11:07 10    it where you think it should go, the private room?
11    A. It's underneath -- say this is the rest of
12    the building here; it's about located center
13    downstairs.
14    Q. Have you ever been in the private room?
11:08 15    A. Yes.
16    Q. How many times?
17    A. In the past two weeks, I've spent a lot of
18    time there.
19    Q. Before the past two weeks, how many times
11:08 20    were you in the private room?
21    A. Very little.
22    Q. Who had access to the private room at
23    eTreppid?
24    A. Warren and Dennis and Patty and some
LIZA CHAPEN, CCR, RMR    (775) 323-5492

**112**

1    outside government people.
2    Q. Just if you can give me a number, how many
3    of those outside government people that had access to
4    the private room have you ever dealt with?
11:08 5    A. I dealt with two of them a lot recently,
6    and I've dealt with them in the past.
7    Other than that, we had some with the
8    special access program. I dealt with all of them
9    regularly.
11:09 10    I had to know who they were coming and
11    going out of the building. They can't just get to
12    that room without coming through our -- one of our
13    outside doors.
14    Q. These government people you've dealt with
11:09 15    in the last two weeks, who contacted them?
16    Did you?
17    A. No.
18    Q. Who at eTreppid do you know contacted
19    them?
11:09 20    A. Jay Dixon actually is the guy with DSL. I
21    brought him in there.
22    But outside that, there are government
23    people that Warren contacted.
24    Q. Who --
LIZA CHAPEN, CCR, RMR    (775) 323-5492

113

1  Strike that.
2  You personally contacted Jay Dixon?
3  A. Well, it was -- we're on a regular contact
4  basis since he's our representative with our facility
11:09 5  clearance.
6  Q. What is in the private room?
7  A. A couple of tables, a couple of computers,
8  and a couple of secure containers; safes.
9  Q. And have you made an effort in the last
11:10 10  several weeks to access those computers?
11  A. The -- one of them wasn't even plugged in.
12  The other one was running and I saw what
13  was on it.
14  Q. What was on it?  Just in terms of a
11:10 15  general description?
16  A. Basically just operating system and
17  Microsoft Office and access to the Internet; nothing
18  else.
19  Q. Okay. Did you make any effort to access
11:10 20  any of the files on either of these two computers?
21  A. No. I just saw what was on them.
22  I connected one of them to the Internet.
23  Q. Did you bring Mr. Dixon into that room?
24  A. He requested to go there to see where our

LIZA CHAPEN, CCR, RMR    (775) 323-5492

114

1  containers were.
2  Q. Now, I believe you had previously
3  testified that these computers down here belong to
4  eTreppid?
11:10 5  A. I'm aware that some of them were paid for
6  by various government agencies; I don't know which
7  ones belong to us, which ones don't.
8  Q. Just -- did you testify before the break
9  that these belong to eTreppid?
11:11 10  A. I don't believe I said that.
11  Q. Okay. How many computers are there in
12  this bank here next to Mr. Montgomery's work station?
13  A. Currently, there's like 30 or less.
14  Q. And do you have any knowledge of who owns
11:11 15  those 30 or less computers?
16  A. There's two banks, actually.
17  MR. PEEK:  Counsel, I can't see the
18  witness.
19  THE WITNESS:  There's two banks.
11:11 20  The one bank I'm describing there is the
21  one that Dennis worked on regularly. There's another
22  bank that's just along the same wall that had all our
23  security cameras hooked -- connected to it.
24  They're the same kind of -- same exact

LIZA CHAPEN, CCR, RMR    (775) 323-5492

115

1  computer, same exact cabinets.
2  BY MR. FLYNN:
3  Q. The question again is, who owns those
4  computers?
11:11 5  A. I have no idea.
6  I know I purchased all of them and
7  eTreppid paid for all of them. I don't know if they
8  were paid for through outside contracts. I don't
9  know.
11:11 10  Q. Do you know whether there are any source
11  codes in those computers?
12  A. The surveillance computers don't have
13  anything, and -- don't have anything except for video
14  recording software, which is outside third-party.
11:12 15  This bank of computers has nothing on them
16  anymore. Warren and I went and looked on each one
17  and there's nothing on any of them.
18  Q. Who --
19  A. Just operating system.
11:12 20  Q. Who else was in the room when you tried to
21  look on those computers?
22  A. Just Warren and me.
23  Q. And you found nothing?
24  A. That's correct.

LIZA CHAPEN, CCR, RMR    (775) 323-5492

116

1  Q. What did you do to try to access any of
2  the source codes in those computers?
3  A. We just logged on and looked to see what
4  was on the drives and there was nothing; just
11:12 5  operating system.
6  Q. And every single file on all 30 computers
7  had nothing?
8  A. We do a regular partition of drive space,
9  so the space where data is kept, the "E" partition
11:12 10  had nothing on it; zero files.
11  Q. Now, this 80 percent of the files, the
12  150 million files that are still at eTreppid.
13  A. Uh-huh.
14  Q. How many of those have source codes?
11:13 15  A. None of them. They're all sample test
16  files.
17  Q. I believe you testified that the game
18  engines for your video program, there were about a
19  hundred source code files still at eTreppid, correct?
11:13 20  A. On Michael's machine.
21  These aren't any of the other drives I've
22  looked throughout the building.
23  Q. Now, I understand that, but overall in the
24  computers, there's about a hundred source codes just

LIZA CHAPEN, CCR, RMR    (775) 323-5492

Case 3:06-cv-00263-PMP-VPC Document 62 Filed 08/02/06 Page 34 of 40

117

1 for the video games that are still there?

2     **A. Two hard drives: My machine and Michael's**

3 **machine.**

4     Q. And --

11:13 5     **A. I believe there might be a couple in the**

6 **SRCSERVER still.**

7     Q. A copy on the SRCSERVER?

8     **A. Correct.**

9     Q. Let me show you your Declaration, signed

11:13 10 under the penalties of perjury. It was filed in this

11 case.

12     MR. FLYNN: On the copy I have, your

13 Honor, there's no date on it, it's blank, but there's

14 a signature, but it's among the documents that were

11:14 15 filed to support the TRO.

16     THE COURT: All right. Go ahead. I've

17 got it.

18     MR. FLYNN: You've got it, your Honor?

19 BY MR. FLYNN:

11:14 20     Q. Did you prepare this Declaration?

21     **A. Yes.**

22     Q. Did you, yourself, personally type it up?

23     **A. No.**

24     Q. Did you prepare it in conjunction with

LIZA CHAPEN, CCR, RMR    (775) 323-5492

---

118

1 counsel for eTreppid?

2     **A. Yes.**

3     Q. Now, you say in paragraph 11, page three,

4 bottom of the page.

11:15 5     "From this check" --

6     This was after you returned from vacation.

7 You can read along with me.

8     **A. Okay.**

9     Q. "From this check, I determined that all of

11:15 10 the eTreppid source code stored on each of these

11 servers had been deleted."

12     **A. Right.**

13     Q. Is that truthful?

14     **A. It's a little bit of an overstatement**

11:15 15 **since the game engine, there's a copy of the game**

16 **engine probably still there.**

17     Q. And how much -- how many of the files have

18 you not even checked yet?

19     **A. The rest of the folders were completely**

11:15 20 **deleted.**

21     **If I could explain the way the structure**

22 **of the hard drive is.**

23     Q. Sure.

24     **A. We have four main folders on that**

LIZA CHAPEN, CCR, RMR    (775) 323-5492

---

119

1 SRCSERVER. The one called ET Latest was where all of

2 the source code, except for the game engine, was

3 stored.

4     The game engine, Michael and I kept as a

11:15 5 separate backup. We didn't -- since it only involved

6 he and I, it was only he and I that kept backups of

7 it, and Dennis was agreeable with this.

8     All the rest of the source code was kept

9 under this ET Latest folder and ET Development

11:16 10 folder.

11     Those folders were deleted, completely

12 deleted out; nothing existed underneath those.

13     Q. But since you were never given prior

14 access, as for the source codes for object tracking,

11:16 15 pattern recognition, and face recognition, you

16 wouldn't even know what source codes to look for,

17 would you?

18     A. I don't know if they were ever there. I

19 wouldn't know. I don't know what the actual programs

11:16 20 were called.

21     There's a couple hundred different

22 projects underneath that, that were underneath that

23 ET Latest folder.

24     Q. So, again, you don't know whether they

LIZA CHAPEN, CCR, RMR    (775) 323-5492

---

120

1 were ever there, correct?

2     **A. Correct.**

3     Q. You don't know whether the government took

4 them, correct?

11:16 5     **A. Correct.**

6     Q. And if they were ever there, you have no

7 knowledge of how they ever, at some point, were not

8 there?

9     **A. Well, if they were never there, I have no**

11:17 10 **idea if they disappeared, correct.**

11     Q. Right.

12     If the assumption is at some point they

13 were there, without using the word deleted, you have

14 no knowledge of how, at some point, they were there

11:17 15 and then not there?

16     **A. I could only tell you what was there based**

17 **on what I'm recovering.**

18     Q. And you were never given access --

19     Strike that.

11:17 20     You never had a conversation with

21 Mr. Montgomery about the methodology of the intrusion

22 detection devices that the government wanted to put

23 on these computers and these computers, did you?

24     **A. No.**

LIZA CHAPEN, CCR, RMR    (775) 323-5492

121

1          MR. FLYNN:  And for the record, when I

2    said these computers, I was referring to the 30 or so

3    computers next to Mr. Montgomery's work station and

4    the two computers in the so-called private area.

11:18  5          THE COURT:  In Exhibit 1?

6          MR. FLYNN:  On Exhibit 1.

7          Thank you, your Honor.

8    BY MR. FLYNN:

9          Q.  Who were the programmers downstairs that

11:18 10  you referred to?

11         A.  You want the list by name?

12         Q.  Yes.

13         A.  Krishna Tangirala that I mentioned before.

14    "Chu" --

11:18 15        Q.  Are his files missing?

16         A.  Yes.  His hard drive had a completely new

17    hard drive when I came back from my trip.

18         Q.  And the next one?

19         A.  Chucal Huang.

11:18 20        Q.  Are his files missing?

21         A.  He's working on something that I don't

22    even know what it is, so I couldn't tell you.

23              Some other people checked his machine; I

24    didn't.

          LIZA CHAPEN, CCR, RMR    (775) 323-5492

122

1          Q.  But you don't know whether this

2    individual's files are missing or not?

3          A.  No, I can't say for sure.

4          Q.  Who is the next programmer?

11:18  5        A.  Suchita Samant.

6          Q.  Are his files missing?

7          A.  That's a lady.

8              She has reported to somebody else besides

9    me, as well.

11:19 10        Q.  So you don't know?

11         A.  I don't know.

12              Then --

13         Q.  When you say "all" in your Declaration,

14    were you referring to their files, too?

11:19 15        A.  I was talking about the two servers I had

16    under my control.

17         Q.  And, of course, you never had under your

18    control the 30 or so computers next to

19    Mr. Montgomery's work station on Exhibit 1 and the

11:19 20  private area; is that correct?

21         A.  Correct.

22         Q.  And who is the next individual?

23         A.  Zehang Sun.

24         Q.  Were his files missing?

          LIZA CHAPEN, CCR, RMR    (775) 323-5492

123

1          A.  He had his hard drive taken away from him.

2          Q.  By who?

3          A.  He said by Dennis.

4          Q.  So right now, this individual has no hard

11:19  5  drive?

6          A.  He had his work-in-progress hard drive

7    removed -- the removable drive taken out.  His

8    operating system drive is in there.

9          Q.  Were there any files on that?

11:20 10        A.  No.

11         Q.  Who is the next individual?

12         A.  Not that I know of.  Not that I know of.

13              The next one in the room is -- I only

14    remember his first name, Yong Mian.

11:20 15        Q.  Were any of his files missing?

16         A.  I don't know.

17              I didn't -- half of the people downstairs,

18    I only talked to maybe three of them.  The rest of

19    them were spoken to my Jessie and Patty.

11:20 20        Q.  How many people are there downstairs?

21         A.  There are three more, in addition to the

22    ones I've mentioned.

23         Q.  So since you've never spoke to them, you

24    don't know whether any of their files are missing,

          LIZA CHAPEN, CCR, RMR    (775) 323-5492

124

1    either?

2          A.  I only know what I was told by the others

3    who checked their computers.

4          Q.  You don't personally know?

11:20  5        A.  Right.

6          Q.  You mentioned something about a law

7    enforcement person coming to eTreppid?

8          A.  No, I said law enforcement told me not to

9    run the machines anymore, some of the machines that I

11:21 10  was running recovery on.

11              They never came to the building.

12         Q.  So you had a telephone conversation with

13    this person?

14         A.  I went to go meet him outside the

11:21 15  building.

16         Q.  Who is this law enforcement person?

17              THE WITNESS:  Am I supposed to say?

18              MR. PEEK:  Your Honor, the law enforcement

19    individuals have asked us not to identify that there

11:21 20  is ongoing investigation, so he's a little reluctant

21    to say that.

22              THE COURT:  Well, you know --

23              MR. PEEK:  So I know this is sealed, so --

24    but they are concerned.

          LIZA CHAPEN, CCR, RMR    (775) 323-5492

125

1    THE COURT: Well, I think that -- I mean,
2  one of the things that I was going to address here
3  before we took our noon recess is this whole issue of
4  classified information, what level of classification
11:21 5  we're talking about, and frankly, Mr. Flynn, I
6  thought I heard you say, and I made a note of it,
7  that there's going to be a certain point at which we
8  need to have this private meeting, after which this
9  whole matter is going to or may go to Federal Court.
11:22 10    MR. FLYNN: Yes, your Honor.
11    THE COURT: Am I mistaken about that?
12    MR. PEEK: Well, that's what he said; I
13  don't think it's going to go to Federal Court.
14    THE COURT: I know, but let me hear --
11:22 15    MR. FLYNN: No, your Honor, you're not
16  mistaken and, yes, your Honor, we are going to reach
17  that point.
18    I've now learned from this witness that he
19  doesn't even know five percent enough of what we're
11:22 20  talking about to testify about it, and the only one,
21  probably, is Mr. Montgomery.
22    Mr. Trepp apparently doesn't know, either.
23    So at some point, Mr. Trepp is going to
24  have to be -- Mr. Montgomery is going to have to be

LIZA CHAPEN, CCR, RMR    (775) 323-5492

126

1  on the witness stand and he's going to have to go at
2  least to December '02 -- and I'll give you a copy of
3  this chronology -- and we're going to reach that
4  point at that time because I was wondering if,
11:22 5  frankly, if this individual knew enough --
6    THE COURT: Well, I guess --
7    MR. FLYNN: -- and he doesn't.
8    THE COURT: Well, I guess there's --
9    Let me finish this conversation here.
11:22 10    What I'm looking at is a couple of things.
11    One, I've certainly enjoyed your company,
12  gentlemen, very much, and I enjoy the issues; it's
13  kind of an interesting case, but if this case is
14  going to go somewhere else, then I don't want to sit
11:23 15  here and go through a half a day or a day of
16  testimony about things that, you know, I'm not going
17  to be able to ultimately decide.
18    Secondly, if there are things that are
19  classified or potentially classified, I don't have
11:23 20  enough understanding about those to make any kind of
21  ruling whatsoever on it.
22    Thirdly, I would assume, and I don't know
23  this, but I would assume that if the federal
24  government had a concern, the federal government

LIZA CHAPEN, CCR, RMR    (775) 323-5492

127

1  would be here, or the U.S. Attorney's office would be
2  here, or we would have a court order from some
3  federal government or agency directing me with regard
4  to how far this process could go.
11:23 5    Until I get that, then any question that's
6  asked is going to be answered, so --
7    MR. PEEK: Your Honor, this was just
8  related to law enforcement issues; this wasn't
9  related to the Department of Defense.
11:24 10    THE COURT: Well, I -- whatever it is,
11  until somebody cites me to a statute or until
12  somebody gives me a court order that says this stuff
13  can't be discussed, then when a question is asked,
14  I'm going to order it to be answered.
11:24 15    MR. PEEK: We're happy to let him answer,
16  your Honor.
17    THE COURT: So --
18    MR. PEEK: I just was --
19    THE COURT: But back to my -- my question
11:24 20  is, is there someone at the Department of Defense or
21  the other federal agency with whom I should have a
22  discussion about what should go forward in this case?
23    And if so, I would ask you to have that
24  individual contact me or to do something, because I'm

LIZA CHAPEN, CCR, RMR    (775) 323-5492

128

1  not going to have secret meetings and continue the
2  case and do all this other stuff unless I have a
3  basis to do that.
4    If I do, be happy to do it, but I don't.
11:24 5    MR. PEEK: Your Honor, may I be heard on
6  this because --
7    THE COURT: Yeah, yeah.
8    MR. PEEK: -- I think what's happening is
9  that you're being given half of the story.
11:24 10    The source code is a code that was being
11  asked by the government under contract of eTreppid to
12  develop that would do certain things, pattern
13  recognition, anomaly detection, those kinds of -- it
14  would perform those functions in an executable
11:25 15  format.
16    The Department of Defense provided to
17  eTreppid certain classified material -- and I
18  mentioned this to you the other day -- in the form of
19  video, and you might can imagine what that is -- to
11:25 20  try to see if the source -- if the code could
21  actually operate and make pattern recognition and
22  anomaly detection and facial recognition and object
23  detection.
24    But the source code itself is not

LIZA CHAPEN, CCR, RMR    (775) 323-5492

129

1  classified. It is not a classified piece of --
2        Well, it's not classified in any way.
3  It's just the information given to eTreppid that was
4  classified with that the source code would operate.
5        Now, some of those videos, there's a
6  concern about where they are. So the OSI, as part of
7  the Department of Defense, has been investigating
8  eTreppid to find out what has happened to them, but
9  you're being sort of given this impression that there
10 is something out here that in the national security
11 interest that we shouldn't be talking about, and
12 that's not the case.
13       If it were the case, you would have heard
14 from the federal government, you would have heard
15 from the United States District Court, you would have
16 even seen a motion to stay this proceeding. We would
17 address that in an abstention issue as to whether
18 they were or were not.
19       So I only raised the point about Sloan's
20 testimony, Mr. Venable's testimony, because the law
21 enforcement had asked not to disclose that there was
22 the subject of an ongoing criminal investigation.
23       That's the only reason I brought it up.
24       THE COURT: All right. Well, this record

LIZA CHAPEN, CCR, RMR    (775) 323-5492

130

1  is sealed.
2        Here is my position. I feel like I'm --
3  you know, I'm not really out in the light in terms of
4  what -- you know, what exactly it is you're saying.
5  I feel like I'm in the dark on that, and until I have
6  some solid statutory authority or something from the
7  government or contact from the federal government,
8  then I'm just going to go ahead and proceed because I
9  don't have a basis not to proceed.
10       MR. FLYNN: I understand, your Honor, and
11 with all due respect to Mr. Peek, if I only gave you
12 half the story, which admittedly I've even given you
13 less, because there is, as I said, a dichotomy
14 between the data compression technology that these
15 folks made a deal on and all this government stuff.
16       That's the bottom line to the proceeding
17 before you.
18       Now, in all this government material, the
19 way, as I understand it, on this level, the
20 government works, the individuals involved, who have
21 been at eTreppid Technologies, would never contact
22 any U.S. Attorney and go into any court to disclose
23 anything or seek any order.
24       THE COURT: Well, they're out of luck,

LIZA CHAPEN, CCR, RMR    (775) 323-5492

131

1  then, I guess, if they -- I mean, if there's some
2  statutory authority that we're not supposed to
3  proceed with this thing, then I need to see it.
4        If they don't want me to proceed with
5  this, then they need to tell me that. If it's so
6  secret that they can't tell me that, then we're just
7  going to go ahead.
8        MR. PEEK: We want you to proceed, your
9  Honor. We'll tell you what the source code is --
10       THE COURT: Well --
11       MR. PEEK: -- as we go through the
12 process.
13       We have just started our case, we are only
14 one witness into it, it is almost noon --
15       THE COURT: Right.
16       MR. PEEK: -- and I would ask that we
17 proceed expeditiously because you told us we only had
18 today. This is not a mini-trial or trial on the
19 merits.
20       THE COURT: I understand.
21       I mean, here is my problem and I hope you
22 can understand and appreciate that.
23       It's like a lawyer stands up and says, "I
24 object."

LIZA CHAPEN, CCR, RMR    (775) 323-5492

132

1        And so, "What's your basis?"
2        "Well, I'm not going to tell you what the
3  basis is, but I object to this evidence."
4        MR. FLYNN: That is the paradox.
5        THE COURT: Can you --
6        MR. FLYNN: That is the paradox the Court
7  is confronted with, and I will say this is where we
8  end up -- here's where we end up.
9        There is no source code except in
10 Mr. Montgomery's head. It has always been that way
11 by contract. You will hear his testimony. It always
12 had to be that way.
13       THE COURT: I've read that. I've read
14 that.
15       MR. FLYNN: There is no source code that
16 could be made to deliver to anyone, practically,
17 pragmatically, legally or otherwise.
18       The bottom line for the Court is whether
19 the source code that's in Mr. Montgomery's head,
20 which is what we're fighting about, because of the
21 conversations that Mr. Montgomery and Mr. Trepp had
22 financially in the fall of 2005, involving hundreds
23 of millions of dollars, is the reason for -- that's
24 the reason we're in court today.

LIZA CHAPEN, CCR, RMR    (775) 323-5492

133

1     That code, if you want to call it, that's
2  in Mr. Montgomery's head, has nothing to do with the
3  deal that was made between these people for data
4  compression technology, which is all over the
5  contracts.
6         THE COURT:  I read that, too.
7         MR. FLYNN:  So where we're going to end up
8  when Mr. Montgomery testifies, and I'll give the
9  judge -- your Honor a heads up -- is there are
10  thousands of lines of code involving this classified
11  technology, notwithstanding what Mr. Peek says, that
12  extremely few individuals in the government even know
13  about.
14        Mr. Montgomery and Mr. Trepp have signed
15  documents that they would never disclose it to
16  anyone.
17        That's where we're going to end up, your
18  Honor.
19        The only way the Court can understand the
20  ramifications of this technology, much of which Mr. Trepp
21  Mr. Montgomery to tell you, much of which Mr. Trepp
22  doesn't even know, how it was used, what the results
23  of that were over the last several years.
24        THE COURT:  And you're saying he cannot

134

1  tell me that?
2         MR. FLYNN:  Absolutely cannot tell you
3  that.
4         THE COURT:  Why --
5         MR. FLYNN:  And I believe the only thing
6  that I can come up with is that he and Mr. Trepp
7  could go into chambers, and Mr. Trepp could verify
8  what Mr. Montgomery will tell you.  I have no other
9  way of --
10        MR. PEEK:  Your Honor, we're going to do
11  this in open court.
12        THE COURT:  You have a --
13        MR. PEEK:  We're going to --
14        THE COURT:  Well, we're going to do it
15  where I say --
16        MR. PEEK:  I understand that, your Honor,
17  but I would like to have it done in open court, as
18  opposed to just send two individuals into your
19  chambers to discuss --
20        THE COURT:  Well, we're not going to even
21  do that if I don't have some statutory basis for his
22  saying he can't or won't disclose it.
23        Give me that, and I'll say fine.
24        MR. PEEK:  And, your Honor, what I find

135

1  interesting to this filibuster is that we know that
2  there were 200 gigabytes deleted off of the
3  SRCSERVER, off the ISASERVER, and out of the RAID
4  box, and he's saying, "Well, that doesn't" -- "That's
5  meaningless.  That's not a source code."
6         But you never hear him say or explain what
7  it was that he did delete.  We have this sort of
8  inference, if you will, he's trying to put out
9  there -- implication, if you will -- that there was
10  something put on a program that automatically
11  deleted, and we'll hear from that later, but --
12        THE COURT:  I'm getting that part.  I'm
13  just -- I just have a concern about this security
14  issue, that we're going to get to a point where
15  there's going to be evidence or information that's
16  critical to either side, and one side or the other is
17  going to say, "I'm sorry, I can't tell you about
18  that."
19        MR. PEEK:  Well --
20        THE COURT:  All I'm saying is when that --
21        MR. PEEK:  -- then they fail on their
22  burden.
23        THE COURT:  All I'm saying --
24        Well, who has the burden?

136

1         All I'm saying is that if we get to that
2  point, and I'm trying to give both sides a heads up,
3  what I'm saying to you, Mr. Flynn, is if we get to
4  that point and you or your client tell me that you
5  cannot disclose that, without some citation to some
6  authority for that purpose, I'm going to order it to
7  be disclosed.
8         If it's not disclosed, I'm going to
9  order -- I'm going to issue a show cause order with
10  regard to contempt.
11        And I'll do the same on the other side.
12        I don't want to do that.  I want to do the
13  right thing.  But you need to tell me what the right
14  thing is and give me citation to some authority.
15        That's all I'm saying.
16        MR. FLYNN:  I understand, your Honor, and
17  I'm convinced at this point that the Court wants to
18  do the right thing and --
19        THE COURT:  That's what I get paid for.
20  Huge salary that I --
21        MR. FLYNN:  And I don't know whether they
22  intend to call Mr. Montgomery.
23        I think a lot will become clear when we
24  call him, and you'll see when we reach a certain end

137

1  point, it will become obvious.
2       THE COURT:  All right.  Well, let's go
3  forward with it and then we'll see where we go with
4  it.
11:33 5      I do have a Judges' meeting at noon so I
6  need to recess just a couple minutes early and I'll
7  be back at 1:30, so just for planning purposes.
8       Go ahead, Mr. Flynn.
9  BY MR. FLYNN:
11:33 10     Q. For two years, according to your
11  testimony, you worked on about one percent of
12  eTreppid source code?
13     A. Correct.
14     Q. And then after that, you were basically
11:34 15 doing administrative, organizing duties?
16     A. Purchasing, preparing stuff there, right.
17     Q. So in all the years --
18     You've been there six years, is it?
19     A. Correct.
11:34 20    Q. You worked on one percent of the source
21  code?
22     A. I can't tell you what percentage of all
23  the stuff.
24     I just told you the two projects I've
       LIZA CHAPEN, CCR, RMR    (775) 323-5492

138

1  worked on.
2     Q. And whatever the Dennis Montgomery source
3  code is on these government contracts, you don't know
4  anything about it?
11:34 5     MR. PEEK:  Counsel, could you please.
6     Thank you.
7     THE WITNESS:  I don't know about the code;
8  I just know about the hardware that was used for the
9  projects.
11:34 10    MR. FLYNN:  Thank you, sir.
11     THE COURT:  Are you finished?
12     MR. FLYNN:  Yes, sir.  Thank you.
13     THE COURT:  All right.  Do you have any
14  redirect?
11:35 15    MR. JAKOPIN:  Yes, a little bit, your
16  Honor.
17
18           REDIRECT EXAMINATION
19  BY MR. JAKOPIN:
11:35 20    Q. We've heard a lot about the source code,
21  and so that we can make -- get some clarity to that,
22  Windows is an application -- or Word is an
23  application, it's a typing application, correct?
24     A. Correct.
       LIZA CHAPEN, CCR, RMR    (775) 323-5492

139

1     Q. How would you explain the source code that
2  relates to that?
3     A. Microsoft hired probably several hundred,
4  maybe thousands to develop their Office applications,
11:35 5  and they write all the actual text files that are
6  eventually compiled to make this one executable
7  called Word.EXE, and that runs and it's got who knows
8  how many lines of code in it.
9     I heard that it's several hundred
11:35 10 thousand, maybe a million just for Word because it's
11  a very, very -- what we call fat application, very
12  feature-rich.
13     Q. And are all those lines of code together
14  referred to as the source code, then, for this Word
11:35 15 application?
16     A. Correct.
17     Q. So you'll have source code that is for an
18  application that will have a whole lot of lines of
19  code that all together form the source code for that
11:36 20 application?
21     A. Correct, that are compiled and that
22  creates the application.
23     Q. Okay.  For each of the different
24  applications that exist at eTreppid, there's then
       LIZA CHAPEN, CCR, RMR    (775) 323-5492

140

1  source code that corresponds to that, correct?
2     A. That's right.
3     Q. Now, are there different applications that
4  share source codes among them?
11:36 5     A. Several of those applications used video
6  compression Codecs.
7     For example, they hard-coded the video
8  compression Codec into the player so that we could
9  ship this player to some of our clients that would
11:36 10 just be a stand-alone and it only played our type of
11  media file, our type of video.
12     So, in that case, that Codec, that video
13  compressor and the player had the same code in each
14  of those two deals.
11:36 15    Q. So you can combine together different
16  lines of source code, or the same lines of source
17  code for different applications?
18     A. That's right.
19     Q. Now, we've also heard about classified
11:37 20 information.
21     Do you have an understanding of what's
22  different between classified information and source
23  code --
24     A. Yes.
       LIZA CHAPEN, CCR, RMR    (775) 323-5492

141

1   Q. -- as it was used at eTreppid?
2       And what was that?
3       A. As a facility security officer, I'm
4   required to take courses from the government that
11:37 5   trains me on what's classified, how the classified
6   material is handled, who can handle the classified
7   material, how to destroy it, all the things that are
8   involved with classified material, how it's defined,
9   everything, and I've taken these courses and gotten
11:37 10   certificates for them.
11      Q. Are you aware of any of the eTreppid
12   source codes being classified?
13      A. No.
14      Q. Okay. Are you aware of the different
11:37 15   applications that are being worked on at eTreppid?
16      A. I know a lot of the different ones. I
17   probably don't know all of them.
18      Q. What are the ones that you're aware of?
19      A. I mentioned the one before, the Adaptive
11:38 20   Program which we've had pretty much from the start.
21      The data compressor, the video Codec
22   programs, the audio Codec programs.
23      Codec is a word for a compressor,
24   decompressor.

LIZA CHAPEN, CCR, RMR    (775) 323-5492

142

1       Our streaming programs, our voice-over IP
2   programs.
3       We've got hundreds of different
4   applications.
11:38 5      Q. Are you aware of pattern recognition
6   programs?
7      A. I don't know which programs do that.
8      Q. All right.
9      A. I couldn't give you a name of a program
11:38 10   that did that.
11      Q. Are you -- do you have an understanding of
12   where the source code for all of the different source
13   code programs was stored?
14      MR. FLYNN: Strike -- objection, your
11:38 15   Honor, to the word "all"; lacks foundation.
16      THE COURT: Define them a little bit
17   more -- better than just "all."
18   BY MR. JAKOPIN:
19      Q. Let me ask it a different way.
11:39 20      Do you have an understanding of where the
21   source code that different programmers wrote got
22   stored?
23      A. All -- they stored all of their stuff on
24   the SRCSERVER. They had local copies on their work

LIZA CHAPEN, CCR, RMR    (775) 323-5492

143

1   stations and they had -- when they had something that
2   was a working order on a version-by-version basis, it
3   might be not every day, but every couple of days or
4   every week, they would put that good build up on
11:39 5   SRCSERVER.
6      Q. And so all of the source code that each of
7   the different programmers worked on ultimately got
8   stored on the SRCSERVER?
9      A. Right.
11:39 10      And each one of the programmers could give
11   better details of which programs they worked on and
12   which folders they put them on SRCSERVER.
13      I wasn't aware of what every particular
14   one person was doing.
11:39 15      Q. Are you aware of eTreppid having backup
16   CDs of source code?
17      A. I've been told over the years that Dennis
18   had, on a regular basis, made DVDs and hard drives --
19   maybe there was CDs in the beginning -- but gave them
11:40 20   to Warren to put in a safe somewhere outside the
21   building.
22      MR. FLYNN: Move to strike; lacks
23   foundation. "I was aware." From what?
24      MR. JAKOPIN: Your Honor --

LIZA CHAPEN, CCR, RMR    (775) 323-5492

144

1       THE COURT: Hold on just a minute.
2       I'm not sure what the question was. I
3   think you asked him did he know, and his answer was
4   that he was aware.
11:40 5      I think you need to determine exactly how
6   he was aware and then I'll decide whether to strike
7   it or not.
8   BY MR. JAKOPIN:
9      Q. How were you aware that there were those
11:40 10   CDs?
11      A. Dennis told me that he was making them.
12      THE COURT: Motion is denied.
13      MR. JAKOPIN: Thank you.
14   BY MR. JAKOPIN:
11:40 15      Q. Did you ever have an opportunity to look
16   at those CDs?
17      A. Up until recently, no, and then --
18      Do you want me to continue?
19      Q. Yes.
11:40 20      A. I forget what -- I believe the 10th or the
21   11th of January, Warren brought me everything he said
22   he had in the safe and had me look at it to see what
23   it contained, and it was four hard drives and a stack
24   of DVDs and CDs mixed.

LIZA CHAPEN, CCR, RMR    (775) 323-5492