Case 3:06-cv-00263-PMP-VPC    Document 63-4    Filed 08/09/06    Page 1 of 40

eTreppid vs. Montgomery    Hearing - Preliminary Injunction - Vol. II & III Tuesday, February 7, 2006

## Page 98

1  A. That I know of, yes.
2  Q. No one else on earth has them that you know of?
3  A. That I -- that I know of, yes, that's true.
4  Q. No one at eTreppid Technologies has them that you know
5  of?
6  A. Correct.
7  Q. So those source codes that you want are a very
8  distinct set of codes that are required for a very specific and
9  distinct business purpose in connection with these classified
10 government contracts?
11  A. Well, not just them. They could be used for a very,
12 very vast group of different contracts.
13  Q. Mr. Trepp, please.
14  THE COURT: Well --
15 BY MR. FLYNN:
16  Q. That's what they've been used for in the past at
17 eTreppid; is that correct?
18  A. They've been used for them and other things for
19 eTreppid in the past, that's correct.
20  Q. Now -- and only Mr. Montgomery, according to you, has
21 the codes. All of the work that's been -- being done at
22 eTreppid and all of these doctors and sophisticated programmers
23 that you've got employed, none of them have it; is that
24 correct?

## Page 99

1  A. I do not believe they have anything other than what's
2  been recovered through our recovery process, and I believe
3  Mr. Montgomery has it.
4  Q. So we could call him a specialist in these particular
5  source codes; is that correct?
6  A. I believe there are plenty of people that would have
7  the ability to understand the analysis, to understand what the
8  source codes are.
9  Q. But no one has in 30 years; is that correct?
10  A. Well, how would I know that?
11  Q. Do you know of any person, in eTreppid or not, who has
12 the sophistication, the knowledge in his brain, about how these
13 source codes work to process the things that Mr. Montgomery was
14 processing?
15  A. To some degree, absolutely.
16  Q. Who?
17  A. Zehang.
18  Q. Then Zehang could go out tomorrow and do it; is that
19 correct?
20  A. I did not say that. He has -- I believe what you
21 asked me was, does he have some knowledge of. And my response
22 to that is yes. Do I believe other employees have some
23 knowledge of it? I believe the answer to that is yes. Who
24 kept it under his wing in his private cubbyhole, not on a

## Page 100

1  source server? That was Mr. Montgomery.
2  Q. Thank you. Who else that you know of, other than
3  Mr. Montgomery, has the skill in the next year to put all these
4  source codes together so that these government contract items
5  can be processed?
6  MR. PEEK: Objection, Your Honor. He's assuming facts
7  not in evidence that Mr. Montgomery has the skill to actually
8  write the C++ code or the MET code that's being described here.
9  MR. FLYNN: That's absolutely correct, Your Honor.
10 It's what he did for two-plus years.
11  MR. PEEK: That's maybe what his testimony is, but
12 that's not what the testimony is so far.
13  THE COURT: Well, I think -- go ahead and ask the
14 question, and we'll tie it up if we can.
15 BY MR. FLYNN:
16  Q. Who else has the skills to put the complete package of
17 source codes together so that these government contracts can be
18 done, other than Mr. Montgomery?
19  A. I don't know.
20  Q. The instruments and tools that Mr. Montgomery used
21 while he was at eTreppid, do you know what they are, to do this
22 government processing?
23  A. Is that a question about hardware, software? I don't
24 understand the question.

## Page 101

1  Q. Do you have any idea how he did it, how he would take
2  things and process them?
3  A. Well, I certainly can tell you what I believe that
4  he's described to me. I also totally believe now that he's
5  lied to me.
6  Q. Well, let's just take -- do you have any idea, as you
7  sit here under oath, how he did it?
8  THE COURT: How he did what?
9 BY MR. FLYNN:
10  Q. How he would process -- see, how he would process
11 things in connection with these government contracts.
12  A. Just to the extent of what he told me he did.
13  Q. In terms of the source codes, the line coding, the
14 technology that was used, do you understand it?
15  A. No.
16  Q. And you would agree with me that that was, in effect,
17 the tool by which these contracts were done?
18  A. I don't think I have the knowledge to be able to
19 answer that question.
20  Q. Up until the end of 2002, how was Mr. Montgomery
21 being -- even though he was a founder and principal, how was he
22 being treated in terms of being paid, as an independent
23 contractor? How was he being treated?
24  A. There was a period of time where he was being paid, I

26 (Pages 98 to 101)

821d05dd-39a8-4560-b998-2db41a804b7c

Case 3:06-cv-00263-PMP-VPC   Document 63-4   Filed 08/09/06   Page 2 of 40

eTreppid vs. Montgomery   Hear   - Preliminary Injunction - Vol. I: III Tuesday, February 7, 2006

Page 102

1  guess you would call it as an independent contractor, because
2  he wasn't getting a W-2 from me; he was getting a 1099.
3      And there were various reasons for doing that, one of
4  which was his attorney said, "Well, this is what Dennis told
5  me." His accountant had told him that he had tax loss
6  carry-forwards from prior lawsuits where he had losses in them
7  and that he didn't need to get the deductions because --
8  whatever the CPA said.
9     Q.  Who was -- do you know when he got K-1s, when he got
10 1099s?  Do you know?
11    A.  Well, I know he got -- I know he got -- wait.  K-1s --
12 he'd get a K-1 every year, like every other owner in the
13 entity, and a 1099.  That's not a W-2.  I believe that was in
14 neither the first year -- earlier years because of this tax
15 thing that he had told me.
16    But he's gotten a W-2 certainly in -- well, to the
17 best of my knowledge, in '03, '04, and '05.  I don't know
18 about '01 and '02.
19    Q.  To bring this to a close, Mr. Trepp, there was no one
20 at eTreppid who instructed Mr. Montgomery what to do in the
21 regular course of the fulfillment of his work on these
22 government contracts; isn't that correct?
23    A.  Well, I'm not sure that is correct.  I mean, if I told
24 him to do something relative to the government contract, I

Page 103

1  would certainly expect he was going to do it.
2     Q.  Well, you don't even know what he was doing or how he
3  was doing it, do you?
4     A.  That's absolutely not true.  I certainly knew the end
5  result.  He knew exactly what he was doing.  He established the
6  contract that our company received and we performed on.
7     Q.  What you knew -- without getting into content, what
8  you knew, for example, is that a certain item was processed for
9  the government, you would know the end result of whether the
10 information that was given to the government was accurate in
11 terms of what the government wanted.  That's what you knew, and
12 you were told that by Mr. Montgomery; isn't that correct?
13    A.  No.
14    Q.  Isn't it true that at a certain time at eTreppid,
15 there was a certain governmental agency with certain employees
16 or agents who had nothing to do with you, they only dealt with
17 Mr. Montgomery?
18    A.  That's absolutely ridiculous.
19    Q.  Isn't it true that you and Mr. Montgomery had a
20 discussion about what they told him and that you were not privy
21 to and he told you that he couldn't tell you?
22    A.  No.  That's absolutely ridiculous.
23    Q.  Do you know, as you sit here today, the end results of
24 the confirmations of the accuracy of the information that

Page 104

1  Mr. Montgomery produced, the dates, the contents, what they
2  related to, and how often they were confirmed?
3      MR. PEEK:  Your Honor, could I have that question
4  back?  I have no idea what was asked.
5      THE COURT:  I think there were a lot of questions.
6      MR. FLYNN:  I'll try it again, Your Honor.
7      THE COURT:  You might want to break it down a little
8  bit because it's a little confusing to me too.
9  BY MR. FLYNN:
10    Q.  When Mr. Montgomery would process information for the
11 government --
12    A.  Uh-huh.
13    Q.  -- on one of these government contracts, first, do you
14 have any records, sir, of the end result of that processing?
15    A.  Yes.
16    Q.  Just in -- generically, what types of records do you
17 have?
18    A.  I have spreadsheets that he gave me, starting from the
19 first processing frame we had through the end.  I think I have
20 every record that he ever generated, both in electronical
21 format, and I certainly have it, reams of it, in paper format.
22    Q.  Is this classified information that you claim you
23 have?
24    A.  Is it classified information today?  I believe it is

Page 105

1  not, although I'd like to check to see if, in fact, it was.  I
2  personally do not believe it is classified today.
3     Q.  Let's take one aspect of one contract with the special
4  agency.
5     A.  Uh-huh.
6     Q.  In terms of confirmation of Mr. Montgomery's results,
7  is it your testimony you have eTreppid documents relating to
8  that confirmation?
9     A.  I don't understand the question, Your Honor.
10    Q.  Well, you know that eTreppid, under the clearances
11 that they have, is not entitled to store any classified
12 information?
13    A.  The information that eTreppid had was not classified.
14 The information -- the outputs of the information of that would
15 be classified as far as the government is concerned.  We never
16 had that information classified for the simple reason, at the
17 time we were doing the work, we had no classifications
18 individually.
19      MR. FLYNN:  May I have a moment, Your Honor?
20      THE COURT:  Certainly.
21 BY MR. FLYNN:
22    Q.  Who currently has the books and records of the
23 company?
24    A.  They're in the building.

27  (Pages 102 to 105)

CECILIA VOHL, NV CCR #246(775) 827-0672

eTreppid vs. Montgomery   Hearing - Preliminary Injunction - Vol. II - III Tuesday, February 7, 2006

---

**Page 106**

1    Q.  And who has custody of them?  Is there a bookkeeper,
2  an accountant?
3    A.  Yes.
4    Q.  Who is the individual?
5    A.  We have -- we have a bookkeeper.  Her name is
6  Su Perez.  We have a CPA firm, which is Ashley Quinn.  I
7  certainly have access to anything I want whenever I want it.
8    Q.  And what books and records are there?
9    A.  Whatever we need to do to create our K-1s at the end
10  of the year, anything relating to tax information.  We
11  certainly have our checkbooks, our deposits, our withdrawals,
12  our wires, all of the expenses.  I mean, to create a tax
13  return, you have to have everything.
14    Q.  Are there any P & Ls?
15    A.  Well, we could certainly generate one.  I don't know
16  if the accountant has generated a P & L.  Well, he had to have
17  created a P & L to generate K-1s, so --
18    Q.  And they're in the company?
19    A.  Well, they're either at the CPA's or at the company
20  or -- I don't know, frankly, which.
21    Q.  How many meetings of the board of directors have taken
22  place since 1998?
23    MR. PEEK:  Your Honor, this doesn't have a board of
24  directors.  This is a limited liability company.  It has member

---

**Page 107**

1  managers.
2    THE COURT:  You might want to rephrase that.  But I
3  just have a general question, and that is, I don't understand
4  the relevance of a lot of these questions, so you could maybe
5  try to tie that in so that I do.
6    MR. FLYNN:  A lot of it has to do with
7  Mr. Montgomery's testimony.
8    THE COURT:  All right.  All right.
9  BY MR. FLYNN:
10    Q.  Have there ever been any minutes kept of any meetings,
11  committee meetings, shareholder meetings of eTreppid?
12    MR. PEEK:  There aren't shareholders, Your Honor.
13    THE COURT:  I understand that.  Just simply rephrase
14  it.  This sounds more like discovery than anything else to me,
15  but go ahead.
16    MR. FLYNN:  I'll move on, Your Honor.
17    THE COURT:  All right.
18  BY MR. FLYNN:
19    Q.  Did you ever discuss with Mr. Montgomery the intrusion
20  detection software that he had incorporated into certain parts
21  of the software?
22    MR. PEEK:  Objection.  Lacks foundation, Your Honor,
23  that there was such a technology incorporated into the
24  software.  He already asked Sloan if whether there was.  We

---

**Page 108**

1  have Mr. Hennessey's evidence that suggests that there was not.
2    THE COURT:  I think he could ask the question did you
3  ever have a discussion about whether or not there was any
4  intrusion technology inserted into the software.
5    MR. PEEK:  I don't have a problem with that kind of a
6  question, Your Honor, and it would be a lot easier if he could
7  just ask it that way.
8    THE COURT:  I understand your objection, and if there
9  were a jury sitting here, I'd sustain it.  But I understand
10  what he's asking, and I'm going to allow it.
11  BY MR. FLYNN:
12    Q.  Did you have those discussions?
13    A.  No.
14    Q.  Never?
15    A.  I do not believe it ever existed.
16    Q.  Was there ever a discussion between you and
17  Mr. Montgomery in a heated exchange wherein he told you that if
18  you or one of your people try to go access anything, the
19  software will melt down?
20    A.  A, I've never had a heated exchange with him, with the
21  exception of the January 10th exit; and B, absolutely not.
22    MR. FLYNN:  That's all I have, Your Honor.
23    THE COURT:  All right.
24  ////                                          ////

---

**Page 109**

1    REDIRECT EXAMINATION
2
3  BY MR. JAKOPIN:
4    Q.  One question.  Was the source code used for processing
5  on the eTreppid government contracts developed at eTreppid?
6    A.  Absolutely.
7    MR. JAKOPIN:  No further questions.
8    MR. FLYNN:  I object.  Move to strike.  Lacks
9  foundation.
10    THE COURT:  Well, let me ask this question:  Do you
11  know whether it was or not?
12    THE WITNESS:  Well, I firmly believe all of the source
13  code at eTreppid was eTreppid's.  And if it was eTreppid source
14  code that operated anything for any customer, I certainly
15  believe that it was ours and it was used.
16    THE COURT:  All right.  I understand that that's your
17  belief, but do you have any actual knowledge about that?
18    THE WITNESS:  That there was a source code run to
19  operate the government equipment?
20    THE COURT:  And that it was developed on eTreppid's
21  equipment.
22    THE WITNESS:  Well, I don't see how it could be
23  developed anyplace else, Your Honor.
24    THE COURT:  All right.  All right.  I understand.

28 (Pages 106 to 109)

CECILIA VOHL, NV CCR #246 (775) 827-0672

eTreppid vs. Montgomery    Hearing - Preliminary Injunction - Vol. I. & II Tuesday, February 7, 2006

---

Page 110

1    MR. FLYNN: That's all I have, Your Honor.
2    THE COURT: All right.
3    THE WITNESS: Am I done?
4    THE COURT: I believe so.
5    THE WITNESS: Thank you.
6    THE COURT: You can step down.
7    (Witness excused.)
8    THE COURT: Is that --
9    MR. JAKOPIN: That concludes our case, Your Honor.
10   THE COURT: All right. Do you have one witness?
11   MR. FLYNN: I do, Your Honor. I have one witness. I
12   want to make a motion, but I'll reserve on the motion, with the
13   Court's permission -- with regard to burden of proof, and I'll
14   reserve on the motion.
15   THE COURT: All right. Go ahead.
16   MR. FLYNN: We would call Mr. Montgomery to the stand.
17   MR. PEEK: Your Honor, how late are you going to go?
18   THE COURT: Until we're done.
19
20       D E N N I S  L.  M O N T G O M E R Y,
21   called as a witness, having been duly sworn,
22       testified as follows:
23
24   THE COURT: I mean, I should say within reason. But I

---

Page 111

1    can't imagine that we'll be going later than I would be willing
2    to go.
3    MR. PEEK: Well, I understand that Mr. Flynn said he
4    was going to have Mr. Montgomery for 30, 40 minutes. I
5    wouldn't anticipate a lengthy, lengthy, lengthy cross.
6    THE COURT: I think you're safe.
7    MR. PEEK: Okay.
8
9       DIRECT EXAMINATION
10
11   BY MR. FLYNN:
12   Q.  State your name, please, sir.
13   A.  Dennis L. Montgomery.
14   Q.  Your age?
15   A.  Fifty-three.
16   Q.  Where do you live?
17   A.  You want the address?
18   Q.  Just --
19   A.  Reno, Nevada.
20   Q.  What's your occupation?
21   A.  Well, I'm unemployed right now.
22   Q.  What was your occupation?
23   A.  Chief technology officer at eTreppid Technologies.
24   Q.  What's your educational background, Mr. Montgomery?

---

Page 112

1    A.  I got a bachelor -- an associate of science in
2    cardiopulmonary technology, and I did not complete a bachelor's
3    degree in biology.
4    Q.  And with regard to your career history, what type of
5    work have you done since college?
6    A.  I went to work in a hospital for two years as a
7    perfusionist.
8    Q.  What's a perfusionist?
9    A.  I'll restate that. I went to work as a
10   cardiopulmonary technician in a hospital, and as a
11   cardiopulmonary technician, I had duties regarding respiratory
12   therapy, EKG, blood gas analysis, so forth. That was from '73
13   to '75, I believe. And from '75 to around '80, I worked as a
14   consultant on medical equipment and medicine.
15   Q.  Okay. What is blood gas analysis?
16   A.  It's a process by which you determine the gas levels
17   inside the blood.
18   Q.  And what specifically was the nature of your work in
19   blood gas analysis when you were working at the hospital?
20   A.  I was developing a series of programs that would allow
21   an automated method for calculating blood gas and several other
22   parameters.
23   Q.  At that time, what was your background in computer
24   programming?

---

Page 113

1    A.  Um, I was just learning it as I was going along.
2    Q.  And at some point, did you form a company?
3    A.  Yes, in '81 or '82, called Computermate.
4    Q.  And what's the business purpose of that company?
5    A.  To do -- write medical software for medical
6    instrumentation.
7    Q.  And did the company have clients?
8    A.  Yes.
9    Q.  Who were the clients?
10   A.  Corning, Corning Medical, Kodak, DuPont, American
11   Hospital, so forth.
12   Q.  And at some point in connection with your work with
13   Corning and Computermate, did Corning enter into a licensing
14   agreement with Computermate in connection with spectral
15   analysis of blood gasses?
16   A.  Yes.
17   Q.  And what was the nature of that agreement?
18   MR. PEEK: Your Honor, best evidence is the agreement
19   itself.
20   THE COURT: Oh, I think he can describe the nature of
21   it. This is all background, isn't it?
22   MR. FLYNN: Yes, Your Honor, but it's the background
23   in regards to --
24   MR. PEEK: It's background, Your Honor, related to

---

29  (Pages 110 to 113)

CECILIA VOHL, NV CCR #246 (775) 827-0672

821d05dd-39a8-4560-b998-2db41a804b7c

eTreppid vs. Montgomery    Hearing - Preliminary Injunction - Vol. I... II Tuesday, February 7, 2006

---

Page 114

1    what the claim is as framed by the opposition of certain
2    copyrights in this time frame. So that's why I am very
3    cautious in my objections more than -- it's not just
4    background. It goes to the substance of their defense that
5    they own -- there we go (being shown document).
6        THE COURT: I think he's just showed you the document,
7    has he not?
8        MR. PEEK: I don't believe so. It's an agreement, but
9    it's certainly the document.
10   BY MR. FLYNN:
11       Q. Mr. Montgomery, does this file basically contain the
12   agreement on the nature of the work that you were doing for
13   Corning in connection with blood gas analysis?
14       A. That was the manual that described the software that
15   was used on the instrumentation.
16       Q. And let me show you several documents that have been
17   taken out of that manual. And I'd ask you --
18       MR. PEEK: Your Honor, if he's going to offer this so
19   I can at least examine it --
20       THE COURT: Yeah.
21   BY MR. FLYNN:
22       Q. And I'd just ask you if those pages come out of the
23   manual.
24       A. Yes.

---

Page 115

1        MR. PEEK: This is Exhibit 19?
2        MR. FLYNN: Exhibit 19.
3        MR. PEEK: Has that even been offered yet?
4        THE CLERK: Hasn't been marked.
5        MR. PEEK: Hasn't been marked?
6        MR. FLYNN: I'm going to offer it.
7        MR. PEEK: You've got to mark it.
8        MR. FLYNN: And then I'm going to offer it.
9        MR. PEEK: Can you mark it first. Is it Exhibit 19?
10       MR. FLYNN: Do you want him to look at it first or --
11       THE COURT: You guys want to have a recess so you can
12   have a conversation?
13       MR. FLYNN: Do you want to read it first, or do you
14   want me to mark it?
15       THE COURT: Well, I think it might be up to me. Mark
16   it, and let's go from there.
17       MR. PEEK: What I ask -- is he going to mark this
18   document?
19       THE COURT: Yes.
20       MR. PEEK: That's what I didn't know. I thought he
21   was just going to mark the pages out of it. Do we have a copy
22   of it so I can have a copy of it?
23       MR. FLYNN: I have a copy of the pages which are
24   relevant.

---

Page 116

1        THE CLERK: It's Exhibit 19.
2        (Defendant's Exhibit 19 was marked for
3    identification.)
4        MR. PEEK: Your Honor, respectfully, this is what we
5    asked for last week. And if he's known about it and he's going
6    to use it as an exhibit, it's important that I have the entire
7    document to be able to cross-examine, as opposed to just
8    limited pages.
9        THE COURT: It appears that you have the document
10   itself right there in front of you --
11       MR. PEEK: I do.
12       THE COURT: -- and you're holding it --
13       MR. PEEK: I do.
14       THE COURT: -- and he's letting you look at it. And
15   we'll decide later about getting you a copy.
16       MR. PEEK: I've just now seen it, Your Honor.
17       THE COURT: All right. I understand.
18       MR. FLYNN: Let's mark for identification, first, the
19   pages that the witness is going to testify about.
20       THE COURT: Mark those 20.
21       MR. FLYNN: 20, Your Honor.
22       (Defendant's Exhibit 20 marked for identification.)
23       MR. FLYNN: And the record will reflect I gave a copy
24   of those pages to Plaintiff's Counsel.

---

Page 117

1        THE COURT: All right. Let me see the exhibit.
2        MR. FLYNN: While he's looking at that, why don't we
3    mark the copyrights for identification.
4        THE COURT: How are we going to mark those, 21 through
5    what?
6        THE COURT: He just gave me one document.
7        THE COURT: Mark it 21, then.
8        MR. FLYNN: Yeah, just 21, I think.
9        (Defendant's Exhibit 21 was marked for
10   identification.)
11       MR. PEEK: Has this been identified as to what it is?
12       MR. FLYNN: It's just been marked.
13       MR. PEEK: Okay.
14       MR. FLYNN: Tell me when you're ready.
15       MR. PEEK: I'm ready.
16   BY MR. FLYNN:
17       Q. With regard to Exhibit 20, Mr. --
18       A. Is this the manual?
19       Q. Yes, the pages from the manual.
20       A. Yes.
21       Q. Are those, in fact, pages that have been taken out of
22   Exhibit 19?
23       A. Yes.
24       Q. They're copies thereof?

---

30 (Pages 114 to 117)

CECILIA VOHL, NV CCR #246 (775) 827-0672

eTreppid vs. Montgomery    Hearing - Preliminary Injunction - Vol. Ii    II Tuesday, February 7, 2006

Page 118

1    A.  Yes.
2    Q.  Describe what they are.
3    A.  It's a series of programs that patient identification
4  information was put in, or calibration data, and the system
5  analyzed the blood and then produced the results.
6    Q.  Can you describe to me, from a computer programming
7  point of view, how these pages describe the technology used to
8  do things like gas analysis?
9    A.  The column in the middle, which represents the output
10  of the data, is spectral analysis output of data, and that data
11  has patterns in it.  And you generate --
12    MR. PEEK:  Your Honor, before we testify from the
13  document, could we have the document at least offered so that
14  we can determine whether or not it is or is not into evidence?
15    MR. FLYNN:  I'll offer the document, Your Honor.
16    THE COURT:  All right.
17    MR. PEEK:  Your Honor, I would object to this as
18  irrelevant to this proceeding and so remote in time as to have
19  no relevance to what is at issue here in terms of pattern
20  recognition and our source code.  This doesn't define the
21  actual source code.  Someone could compare what is being done
22  here with what is actually being performed by the source code
23  of eTreppid.
24    THE COURT:  Well, it seems a little remote.  It seems

Page 119

1  unrelated.  But I believe that under their theory of the case,
2  that it's not.  And I'm going to allow him to develop that, so
3  I'm going to allow the exhibit.
4    MR. PEEK:  The other concern I have, Your Honor, is
5  that what we have, which is Exhibit 21 -- and if the Court
6  would look at the second page of that, it relates, if you will,
7  Your Honor, to apparently who the owners are of the various
8  copyrights.  You will see here that the owner is not
9  Dennis Montgomery or the Montgomery trust.  It is, in fact,
10  Computermate, Computermate, Computermate, Computermate in every
11  one of these.
12    Where is the link as we go showing an assignment back,
13  if you will, to the Montgomery trust?  The Montgomery trust, in
14  fact, owns them, if that's what the Library of Congress says
15  the ownership of the copyrights is today.
16    So again, getting back to relevance, I think we'd have
17  to start the thread of, I have the copyright, I own the
18  copyright, this is the copyright, as opposed to this is the
19  copyright, without at least establishing the predicate of
20  ownership.
21    THE COURT:  I remember the testimony with regard to
22  what Computermate is.  I see Mr. Montgomery's name on it.  I
23  think, in terms of relevance, the relevance has been at least
24  established enough to my satisfaction, I'm going to admit

Page 120

1  Exhibits 20 and 21.  And then --
2    MR. PEEK:  He's not the owner of the copyrights,
3  though, Your Honor.
4    THE COURT:  I admitted them.  And whether he's the
5  owner or not will be developed in the testimony, and then I'll
6  make a decision as to --
7    MR. PEEK:  Whether to strike them or not?
8    THE COURT:  I don't know about striking them, but
9  whether or not they play into the decision I'm going to make.
10    (Defendant's Exhibits 20 and 21 were admitted into
11  evidence.)
12  BY MR. FLYNN:
13    Q.  With regard to Exhibit 20, Mr. Montgomery --
14    A.  Yes.
15    Q.  -- would you describe to the Court how Exhibit 20
16  explains the nature of the software technology that was being
17  used for the spectral gas -- spectral analysis and how that
18  relates, first, to the copyrights in Exhibit 21 before we get
19  to the ownership issues.
20    A.  The software that did the detection of the anomalies
21  and the patterns in the spectral analysis is that software that
22  was developed originally.  That is the original work.
23    Q.  That's being described in Exhibit 20?
24    A.  Yes, that's correct.

Page 121

1    Q.  And the copyrighting of that technology to do the work
2  that's described in Exhibit 20, which is the blood gas spectral
3  analysis, is based on the copyrights that are marked in
4  Exhibit 21; is that your testimony?
5    A.  Yes.
6    Q.  Now, today, who owns the copyrights that are reflected
7  on Exhibit 21?
8    MR. PEEK:  Objection.  The best evidence is the
9  document itself showing ownership.
10    THE COURT:  Overruled.
11  BY MR. FLYNN:
12    Q.  Who owns them, sir?
13    A.  The original copyrights were filed on behalf of
14  Computermate, which I was the owner.
15    Q.  And subsequently, was there an assignment from
16  Computermate to you?
17    A.  Yes.
18    Q.  And when did -- did -- at some point, did Computermate
19  close and cease doing business?
20    A.  Yes.
21    Q.  When did that take place?
22    A.  I'm thinking around '85.
23    Q.  In regard to what we will call the source codes --
24    MR. PEEK:  Your Honor, again, move to strike.  Where

31  (Pages 118 to 121)

821d05dd-39a8-4560-b998-2db41a804b7c

eTreppid vs. Montgomery   Hearing - Preliminary Injunction - Vol. II   VII Tuesday, February 7, 2006

---

**Page 122**

1   is the assignment back to Computermate?
2   THE COURT: I don't know. Maybe we're getting there.
3   Let's see. That was a question that I intended to ask myself,
4   but I'm not asking it right now, so let's let this go forward a
5   little bit.
6   Trust me that I'm going to give this evidence the
7   weight that I think it deserves, but I need to hear it before I
8   can understand its relationship and its relevance. So as a
9   staring to these transactions, I need to get all the
10   information before I make a ruling that's going to be
11   prejudicial, or detrimental, to either side.
12   So, please, Mr. Flynn, go ahead.
13   MR. FLYNN: Thank you, Your Honor.
14   BY MR. FLYNN:
15   Q. Is there anything in Exhibit 20 that in some way shows
16   how the copyrights in Exhibit 21 work?
17   A. Well, I own Computermate, and the copyrights -- I was
18   the author, and I retained rights to those copyrights since the
19   beginning of time.
20   Q. And after Computermate ceased doing business, did you
21   retain those rights?
22   A. Yes, I did.
23   Q. Okay. Now, is there anything in Exhibit 20 that shows
24   how the copyrights are at play in the spectral analysis? Is

---

**Page 123**

1   there anything the Court can look at?
2   A. Well, the source code was filed with the original
3   work. And I mean, other than the names, there's nothing
4   directly on here. I mean, I know the work.
5   Q. If you look at these various diagrams or lab report
6   readouts --
7   A. Uh-huh.
8   Q. -- printouts, are those based on the copyrights that
9   are in Exhibit 21?
10   A. All of the software on that system reflects those
11   copyrights.
12   Q. Now, what is the terminology that you use to describe
13   those copyrights?
14   A. Well, they contain the anomaly and the pattern
15   detection work. That was the beginning of the work.
16   Q. Now, those copyrights, I believe, are dated in
17   May 1982, is it?
18   A. Correct, I think up until February of '03.
19   Q. And between that time, May '82, February '03, to the
20   present, do you know any person on the planet who has the
21   anomaly detection software that is contained in these
22   copyrights?
23   A. No.
24   Q. Has it ever been duplicated?

---

**Page 124**

1   A. Well, I -- I don't know about Corning, because I
2   didn't continue doing work for them at some point. We -- you
3   know, we had moved on to other things, so I really wouldn't
4   know whether that's the case or not.
5   Q. All right. But in terms of the anomaly detection
6   aspect of the software that's in these -- these copyrights?
7   A. I've never seen anything in the literature describing
8   it.
9   Q. And at some time after 1982, did you improve on the
10   technology that's in these copyrights?
11   A. Yes, I believe in '86 or '87. I can't remember
12   exactly, but somewhere in that time frame.
13   Q. Describe to the Court what you did.
14   A. Well, these were originally written on a
15   Hewlett-Packard computer, and I had translated them to work on
16   IBM computers. This was the beginning when the IBM PC was
17   first becoming available.
18   Q. And in what way did that improve or refine the anomaly
19   detection software that you had proprietary rights in?
20   A. I was able to add more anomalies. I was able to make
21   it run faster. And HP computers -- the IBM was -- it was
22   pretty obvious that the IBM computer was to going to become
23   pretty popular.
24   Q. And at some point, did you form a company called

---

**Page 125**

1   Barrett Labs?
2   A. Yes.
3   Q. When was that, sir?
4   A. I think around '85 or '86. I'm not certain of the
5   date.
6   Q. And did you use the anomaly detection software that
7   you had developed between '82 and '87 in Barrett Labs?
8   A. Yes.
9   Q. And in what way did you use it?
10   A. Well, we had hooked up to more sophisticated
11   instruments. We did far more complicated spectral analysis
12   work and so forth.
13   Q. How was Computermate dissolved?
14   A. I think it was either sold -- I think it was sold.
15   Q. And who was it sold to?
16   A. I don't recall the person.
17   Q. And how did you retain the rights in the company?
18   A. I have a letter retaining the rights to the original
19   work.
20   Q. Now, after 1980 to 1987 period, in connection with
21   Barrett Labs, did you do any further refining of the anomaly
22   detection software that's in Exhibit 21?
23   A. From then to when?
24   Q. Well, when was the next time you did any refining?

---

32   (Pages 122 to 125)

CECILIA VOHL, NV CCR #246 (775) 827-0672

821d05dd-39a8-4560-b998-2db41a804b7c

eTreppid vs. Montgomery   Heari   Preliminary Injunction - Vol. I   II Tuesday, February 7, 2006

Page 126

1    A.  I don't remember if it was in 3Net or not.  Surely
2   after 3Net I did.
3    Q.  Okay.  When was 3Net?
4    A.  '80- -- I think it was '87 to '92, '93.
5    Q.  And what was 3Net?
6    A.  3Net was a company that had built large-scale clinical
7   information systems in the hospital.
8    Q.  And did any part of your anomaly detection software
9   play any role with regard to your involvement with 3Net?
10    A.  Well, I'm sure that there was some small pieces inside
11   the 3Net software that used anomaly detection, but that was not
12   their primary business.
13    Q.  And what is the distinction between anomaly detection
14   and pattern recognition?
15    A.  Anomaly detection is looking for anything out of the
16   normal, and pattern recognition is specifically looking for
17   patterns in things.
18    Q.  Are they two different technologies?
19    A.  Yes.
20    Q.  And does your prior testimony you just gave,
21   basically, in a simple way, in a layman's way, describe the two
22   different technologies?
23    A.  Yes.
24    Q.  And Exhibit 21 containing the copyrights was, in fact,

Page 127

1   used in connection with your company, Barrett Labs?
2    A.  Yes.
3    Q.  And in what way did you license that technology to
4   your clients?
5    MR. PEEK:  Best evidence is the license itself.
6   Everything here lacks either an assignment document, a license
7   document or anything else.  The best evidence are the documents
8   themselves to address the assignment or the licensing.
9    THE COURT:  Objection is overruled.  Go ahead.
10   BY MR. FLYNN:
11    Q.  In what way was the technology -- anomaly detection
12   software used, Mr. Montgomery?
13    A.  In which company?
14    Q.  In Barrett Labs.
15    A.  Well, they had hooked up, I think I stated earlier,
16   far more sophisticated instruments and required far more
17   sophisticated anomaly detection or pattern recognition
18   software.
19    Q.  And at that point, to your knowledge, did anyone in
20   the world possess the sophistication, the software, to do that
21   type of work of anomaly detection?
22    A.  Since our work was in medicine, I did not know of
23   anyone.
24    Q.  Now, when was the next time after 3Net that you had

Page 128

1   occasion to use your copyrights for anomaly detection?
2    A.  I did some consulting work for Kaiser in '94, I
3   believe.  And I was building some instrumentation control
4   unit -- I don't remember specifically what it was, but I was
5   doing work for them.
6    Q.  And so you did further work on anomaly detection?
7    A.  Yes.
8    Q.  Okay.  Now, between '93 and '98, how were you -- what
9   was your occupation?
10    A.  I was self-employed as a consultant.
11    Q.  And was that with Pacific Consulting?
12    A.  Yes.
13    Q.  And what type of consulting were you doing?
14    A.  I was doing both medical -- and I started doing work
15   in Los Angeles in motion pictures.
16    Q.  And did anomaly detection software -- was that
17   involved in any of your consulting work at that time?
18    A.  Not anomaly detection.
19    Q.  What was involved?
20    A.  Pattern recognition.
21    Q.  What type of pattern recognition?
22    A.  I was working with a company that had an interest in
23   trying to database assets out of live -- video -- movies.
24    Q.  And what type of pattern recognition -- how would you

Page 129

1   describe that type of pattern recognition?
2    A.  Well, that was looking for a known object in a film.
3   So if they were looking for a cup, they would try to tell the
4   computer, and they needed software to say in -- this cup, is it
5   in any of these frames, and it would go look for it.
6    Q.  Now, at some point, you met Mr. Trepp?
7    A.  Yes.
8    Q.  When did you first meet Mr. Trepp?
9    A.  It might have been in '96 or '97.  I don't recall.
10   The time I do recall is when I met him at the Eldorado in '98.
11    Q.  Okay.  And describe to the Court everything that you
12   can recall in connection with your meeting with Mr. Trepp at
13   the Eldorado in 1998.
14    A.  I was just introduced to him by a gentleman named
15   Steve Sands.  And I've known Steve, I don't know, maybe a year
16   or so forth.  When I went there, he had heard some of the work
17   I was doing in Los Angeles and said that he might have somebody
18   that might be interested in it.
19    Q.  Okay.  Describe the conversation about what you and
20   Mr. Trepp discussed with regard to the work you were doing.
21    A.  I simply told him the work that I'd been doing in
22   compression, both video and data compression, and I described
23   that to him.
24    Q.  Okay.  As best you can recall, understanding you can't

33 (Pages 126 to 129)

821d05dd-39a8-4560-b998-2db41a804b7c

eTreppid vs. Montgomery    Hearing - Preliminary Injunction - Vol. II    II Tuesday, February 7, 2006

Page 130

1   remember word for word, but as best you can recall, describe to
2   the Court what you were telling Mr. Trepp about data
3   compression.
4       A.  I was simply telling him that I had the ability to
5   shrink a movie much smaller at the time than the common video
6   compressors worked.
7       Q.  Okay.  What is that, Mr. Montgomery?
8       A.  It's a form of lossy data compression, where you take
9   information and add a certain amount of loss into it and shrink
10  it.
11      Q.  And how does that differ from data -- strike that --
12  from pattern recognition?
13      A.  It's totally different.  Pattern recognition is
14  actually looking for something in the video.
15      Q.  Now, when you say "it's totally different" -- I'm not
16  a computer programmer and I'm not experienced in the ways of
17  computer programming.  Is there some way you can describe to
18  the Court in a layman's way how they are two completely
19  different animals?
20      A.  Well, video compression is looking to shrink a file
21  and trying to keep the file intact, mostly.  Pattern
22  recognition is looking through the file and trying to find
23  things.
24      Q.  Okay.  Now, you obviously were in the courtroom during

Page 131

1   Mr. Trepp's testimony about Gunga Din and --
2       A.  Right.
3       Q.  -- discussing both pattern recognition and data
4   compression before the deal was signed on September 28th, 1998.
5       A.  Yes, I heard.
6       Q.  And you heard it --
7       A.  Yes.
8       Q.  -- is that correct?
9       A.  Yes.
10      Q.  Was it truthful?
11      A.  I don't recall anything to do with Gunga Din.
12      Q.  Do you recall anything about pattern recognition?
13      A.  No.
14      Q.  Is it possible that you had that conversation?
15      A.  No.
16      Q.  What was in your mind -- what was your intent as a
17  contracting party when you signed the contribution agreement
18  and formed eTreppid, then Intrepid Technologies, with Mr. Trepp
19  as to what you were putting into the company?
20      MR. PEEK:  Your Honor -- I'm sorry.  I apologize.
21      THE COURT:  Go ahead.
22      MR. PEEK:  My objection is to intent.  I think the
23  Court allowed "understood," but intent, I think, definitely
24  would go to vary the terms and conditions of the contract, as

Page 132

1   opposed to his understanding.
2       THE COURT:  Well, I think that there are some claims
3   here as to what the contract says and what it means and what
4   the parties intended.  And I know Mr. Trepp talked about what
5   his intent was, and I think it will aid me in understanding
6   exactly what we're dealing with.  I'm going to overrule the
7   objection.  I think it's not necessarily to contradict the
8   terms of the contract, but to explain them.
9       So, go ahead.
10      THE WITNESS:  Data compression.
11  BY MR. FLYNN:
12      Q.  And at this point in time, September 1998, how many
13  different technologies did you have sophisticated knowledge of
14  with regard to computer programming, other than data
15  compression?
16      A.  Well, I had spent, you know, the last 10 or 15 years
17  working in medicine, so I had a lot of experience in building
18  medical-type devices and medical programming through a lot of
19  variety of areas, both in the clinical laboratory and the
20  medical records and X-ray.  And 3Net was building a large-scale
21  clinical information system to do that.
22      Q.  So you had all that sophistication?
23      A.  Yes.
24      Q.  What other sophisticated knowledge did you have?

Page 133

1       A.  Well, obviously, I had a lot of experience in pattern
2   and anomaly recognition because it was used in those
3   technologies.
4       Q.  So when you made this deal with Mr. Trepp, again, what
5   was your understanding, understanding the differentiation
6   between those technologies, as to what you were putting in?
7       A.  Data compression.
8       Q.  At any time, in any discussions with Mr. Trepp prior
9   to September 28th, do you recall any discussion about putting
10  in any other technology other than data compression?
11      A.  No.
12      Q.  In fact, you signed the 1998 contribution agreement,
13  sir?
14      A.  Yes.
15      Q.  And you're aware of its provisions?
16      A.  Yes.
17      Q.  You're aware of that provision, 1.2.1, which says that
18  the only thing being given is the technology -- the software
19  compression engine development program contained on CD
20  Number 1?
21      A.  Yes.
22      Q.  Did you, in fact, prepare CD Number 1?
23      A.  Yes.
24      Q.  When did you prepare it?

34  (Pages 130 to 133)

821d05dd-39a8-4560-b998-2db41a804b7c

eTreppid vs. Montgomery   Hearing - Preliminary Injunction - Vol. II   II Tuesday, February 7, 2006

## Page 134

1  A.  I don't know the exact date, but in that time frame.
2  Q.  Did you deliver it?
3  A.  Yes.
4  Q.  You wanted to form this company; isn't that correct,
5  sir?
6  A.  Yes.
7  Q.  You wanted to put the data compression technology you
8  knew into that company; isn't that right, sir?
9  A.  Yes.
10  Q.  What was the then-best form that you could utilize to
11  put that data compression technology into the company?
12  A.  I put it on a CD.  Is that your question?
13  Q.  Yes.
14  A.  Yeah, I put it on a CD.
15  Q.  And who did you give the CD to?
16  A.  Doug Frye.
17  Q.  Where did you sign the documents, the September 28th,
18  1998 contribution agreement, which has been marked as
19  Exhibit 3?
20  A.  I believe in my home in Lodi.
21  Q.  And did Frye give it to you?
22  A.  Yes.
23  Q.  Did you have any discussion with Mr. Frye about the
24  provisions, the language, in the contribution agreement?

## Page 135

1  A.  Yes.  I mean, they wanted the CD Number 1, which
2  contained the software for data compression.
3  Q.  If you hadn't delivered CD Number 1, would the company
4  have started?
5  A.  No.
6  Q.  How could the company have started if it didn't have
7  CD Number 1?
8  A.  No, it did.  That was the point.
9  Q.  So, you gave the CD Number 1 to Mr. Frye?
10  A.  Yes.
11  Q.  Do you know what he did with it?
12  A.  No.
13  Q.  And thereafter, after the deal was made, you gave
14  Mr. Frye CD Number 1.  Shortly thereafter, did Mr. Trepp leave?
15  A.  Yes.  He left, I believe, in November or December
16  of '98.
17  Q.  And who was running the company after he left?
18  A.  Doug Frye.
19  Q.  What did Mr. Frye do?
20  A.  Well, he told me that Warren wasn't going to be back
21  until May or June and that he was the one that was in charge of
22  the company.
23  Q.  Now, let me refer you to the contribution agreement,
24  which has been marked as Exhibit 3, to paragraph 1.3, "Excluded

## Page 136

1  Assets and Liabilities."  Do you recall that provision, sir?
2  A.  Yes.
3  Q.  And does that provision accurately set forth the
4  agreement that you made with Mr. -- with Mr. Trepp?
5  A.  Yes.
6  Q.  And it was your understanding that you weren't giving
7  any technology other than data compression and the data
8  compression on CD Number 1; is that correct?
9  A.  Yes.
10  Q.  Did you and Mr. Frye have any discussion about that?
11  A.  Well, I had to deliver the CD to him.
12  Q.  So it was a given?
13  A.  Yes.
14  Q.  Now, what type of work did Mr. Trepp do in running
15  then Intrepid Technologies after Mr. Trepp left?
16  A.  To be honest with you, I don't know because I
17  continued to do my work, and I was waiting for Warren,
18  obviously, to get back.
19  Q.  What type of work were you doing?
20  A.  Data compression, working on the data compression
21  model.
22  Q.  Describe, if you can, in some detail -- see if you can
23  flesh that out a little bit.  Were you working on a computer?
24  A.  Yes.

## Page 137

1  Q.  What were you doing?  Were you creating lines of code?
2  A.  I mean, I was generating code and creating different
3  varieties of that particular technology.
4  Q.  For different applications?
5  A.  Yes.
6  Q.  What types of different applications?
7  A.  Well, data compression inside of Windows, and video
8  and audio requires a specific interface so you can hook to the
9  hardware devices in Windows.  So, I was building those
10  interfaces for those different hardware devices.
11  Q.  And what was your typical work routine during that
12  time frame, i.e., early October 1998 through the end of
13  December '98?
14  A.  I worked eight, ten hours a day on the software.
15  Q.  During that time frame?
16  A.  Yes.
17  Q.  How many days a week?
18  A.  Probably five or six.
19  Q.  During that time frame?
20  A.  Yes.
21  Q.  And for how long did you continue developing different
22  applications with that data compression technology?
23  A.  Continuously.
24  Q.  Up until what time?

CECILIA VOHL, NV CCR #246(775) 827-0672

821d05dd-39a8-4560-b998-2db41a804b7c

eTreppid vs. Montgomery   Hearing - Preliminary Injunction - Vol. II   II Tuesday, February 7, 2006

Page 138

1    A.   Until I was fired.
2    Q.   Until you were fired?  Okay.
3         Now, between the time you were working exclusively in
4    building those models that you described, forgetting, for the
5    moment, any anomaly detection in connection with government
6    classified issues, did you do any other type of data
7    compression work at eTreppid Technologies?
8    A.   Well, we were developing an audio and a video and a
9    data Kodak in multiple forms.
10   Q.   And how many lines of code were typically being
11   written per day in connection with these applications you were
12   preparing?
13   A.   By me personally or collectively?
14   Q.   Well, let's first talk you personally.
15   A.   That's very hard to determine.  Thousands.
16   Q.   And collectively, how many lines of code were being
17   written?
18   A.   Five to ten thousand.
19   Q.   Per day?
20   A.   Yes.
21   Q.   All in data compression?
22   A.   Yes.
23   Q.   At this -- and for -- and that continued all the way
24   up until the time you were fired?

Page 139

1    A.   That's correct.
2    Q.   Now, where is, today, all of those -- before we get to
3    the source codes -- all of the lines of code that were created
4    over all of those years for the data compression?
5    A.   In eTreppid.
6    Q.   And you've heard this testimony saying this has been
7    deleted and that has been deleted.  If you walked over to
8    eTreppid tomorrow morning, could you find the source codes,
9    first, for all of those lines of code?
10   A.   Assuming it hasn't been destroyed, yes.
11   Q.   Okay.  Now, let's talk a little bit about the -- what
12   you call, what, "copy and destroy," when you're doing a -- when
13   you're creating something on a server.
14   A.   I think what you're asking is, when people are writing
15   programs, the computers are continuously building and
16   destroying files, I mean, hundreds of files, files that are
17   used in the process of making the source code.
18   Q.   So, at every workstation, every programmer is
19   continuously creating and destroying every time, virtually, he
20   writes code?
21   A.   That's correct.
22   Q.   And that has always been the way at eTreppid
23   Technologies; is that correct?
24   A.   The nature of building complex programs, that is an

Page 140

1    inherent -- you know, a task in it.
2    Q.   Okay.
3    A.   Things are built and taken apart.
4    Q.   Now, have you ever destroyed in any way or taken any
5    data compression technology from eTreppid?
6    A.   No.
7    Q.   On how many different computers at eTreppid does data
8    compression technology appear?
9    A.   Over a hundred.
10   Q.   On how many different hard drives?
11   A.   Hundreds.  Three or four hundred, probably.
12   Q.   And we heard a figure of about 150 million bytes of
13   information, was it?
14   A.   Files.
15   Q.   Files?
16   A.   Yes.
17   Q.   And Mr. Venable testified that there's still
18   80 percent of that that he's found there.  Have you heard that
19   testimony?
20   A.   Yes.
21   Q.   And with regard to the other 20 percent, have you done
22   or taken or deleted any of that 20 percent?
23   A.   No.
24   Q.   And if Mr. Venable cannot find this alleged purported

Page 141

1    20 percent, do you have any explanation as to where it might
2    be?
3    A.   Well, it was on the computers when I left the
4    building, um, so they're obviously not looking in the right
5    spots, I presume.
6    Q.   And as the chief technology officer, unless someone
7    else has destroyed it, if you went in there, could you find it?
8    A.   If it hadn't been destroyed, yes.
9    Q.   Now, is there any reason it would have been destroyed
10   by other eTreppid Technologies employees?
11   A.   The stuff I was working on downstairs had intrusion
12   detection.
13   Q.   Now, when you say "downstairs," what do you mean?
14   A.   In the area of the warehouse.
15   Q.   And describe to the Court what that downstairs area --
16   or how it was configured.
17   A.   There was about 100 computers that were in cabinets
18   and about 20 computers that were not in cabinets.  And those
19   computers were all hooked together in what's called one
20   cluster, and information was, obviously, on those computers.
21        MR. FLYNN:  Your Honor, I have a chronology that will
22   simply aid the Court.  I would just simply ask that it be
23   marked at this point in time.  I don't know if I'll ever offer
24   it.  I think it would help the Court to follow it.

36  (Pages 138 to 141)

821d05dd-39a8-4560-b998-2db41a804b7c

Case 3:06-cv-00263-PMP-VPC   Document 63-4   Filed 08/09/06   Page 12 of 40

eTreppid vs. Montgomery   Hear... · Preliminary Injunction - Vol. II   II Tuesday, February 7, 2006

Page 142

1  THE COURT: Is this going to be for demonstrative
2  purposes?
3      MR. FLYNN: Yes, Your Honor.
4      THE COURT: I don't think it needs to be marked,
5  unless somebody wants it to be marked. I mean, if it's
6  something you can write on the board, if you wanted to take the
7  time to write it on the board --
8      MR. FLYNN: It would be time-consuming.
9      MR. PEEK: It's only for demonstrative purposes, Your
10 Honor, and not a matter of evidence. And he could use anything
11 he wants. And like you said, he could write it on the board.
12     THE COURT: That's why I'm saying, let's use the
13 chronology.
14     MR. PEEK: But let's not assume that every one of
15 these items are, in fact, evidentiary or proven.
16     THE COURT: Any more than if he wrote them on the
17 board or anybody wrote them on the board.
18 BY MR. FLYNN:
19     Q.  Now, at some point in time, sir, during 1998, did you
20 have occasion to work 18 hours and seven days a week?
21     A.  In '98?
22     Q.  Yes.
23     A.  I lost my train of thought.
24     MR. PEEK: Objection. Asked and answered. He said he

Page 143

1  worked about five or six days a week.
2      THE WITNESS: That was at the very beginning. I had
3  not moved up here.
4      THE COURT: That was what he said.
5  BY MR. FLYNN:
6      Q.  How were you being treated by eTreppid Technologies in
7  terms of your status?
8      A.  I was an independent contractor.
9      Q.  And how much were you being paid?
10     A.  Well, I started out, I believe, at 12,000 a month, I
11 think, in '98 and '99. In 2000, I believe I went to 192,000.
12 I'm not certain of the date, but roughly around then. No,
13 actually, I went to one-sixty in 2000, and then I went to --
14 in '99 or 2000, I went to one-ninety or 200,000, I believe.
15     Q.  Now, at some time in the summer of 1999, did you begin
16 to question the expenses that eTreppid was incurring, when you
17 were 50 percent owner, for airfare?
18     A.  Yes.
19     Q.  And what happened?
20     A.  I believe we needed money already. Um, and I was
21 somewhat shocked. And I think I actually inquired in to Doug,
22 and he said we had a pretty big airfare bill.
23     Q.  Did you ask him if the 1.3 million had been paid in?
24     A.  Yeah. He said we're out of money.

Page 144

1      Q.  And did he tell you whether the 1.3 million had been
2  paid in?
3      A.  I don't believe he said it had been paid in, but he
4  said we were out of money.
5      Q.  And did he tell you how much the airfare bill was
6  that -- that he described to you was the reason you were out of
7  money?
8      A.  I believe it was around 500,000.
9      Q.  Now, during that period of time, did you have a
10 conversation with Mr. Trepp, around the summer of 1999, about
11 your stock interest in eTreppid?
12     A.  Yes.
13     Q.  What was that conversation?
14     A.  It was regarding the initial dilution I had to give
15 the stock up for.
16     Q.  How did that occur, Mr. Montgomery?
17     A.  I don't remember the exact date, but I was told --
18 Steve Sands approached me and told me that documents were
19 produced and I -- that I was immediately to give up 10 percent
20 of my stock.
21     Q.  This is the same Steve Sands who was the finder who
22 connected you to Mr. Montgomery (sic); is that correct?
23     A.  "Trepp," yes.
24     Q.  Mr. Trepp.

Page 145

1      A.  Yes.
2      Q.  And did you have a conversation with either Mr. Sands
3  or Mr. Trepp about why your 10 percent should be given to
4  Mr. Sands?
5      A.  I -- I don't know the exact date, so my date may be
6  off. I think Mr. Trepp was still out of the country when I was
7  approached by Mr. Sands initially, and I couldn't contact him
8  because he was on a ship.
9      Q.  And -- but Mr. Sands wanted 10 percent of what you
10 owned?
11     A.  Yes.
12     Q.  And then did you subsequently meet with Mr. Trepp on
13 this issue?
14     A.  We -- I know I -- I had to sign the documents that
15 day. I was given no choice.
16     Q.  When you say you were given no choice, who gave you no
17 choice?
18     A.  Mr. Sands.
19     Q.  What did he say to you?
20     A.  "You will sign the documents today as they were
21 prepared."
22     Q.  Or what?
23     A.  "Or you won't have any deal with Warren Trepp."
24     Q.  And how much were you then being paid, 12,000 a month?

eTreppid vs. Montgomery   Hearing - Preliminary Injunction - Vol. II   II Tuesday, February 7, 2006

## Page 146

1    A. Roughly, yes.

2    Q. And is it fair to say you were basically living hand

3  to mouth at that time with regard to that salary, supporting

4  your family?

5    A. Yes.

6       MR. PEEK: Objection, Your Honor. "Hand to mouth"?

7  12,000 a month? 144,000?

8       THE COURT: I mean, you're objecting as to whether or

9  not that's hand to mouth?

10      MR. PEEK: But that's also leading.

11      MR. FLYNN: I'll withdraw it.

12      MR. PEEK: Also, I was a little bit slow on the gun

13 because I wasn't sure how Steve Sands did it, but I'm going to

14 move to strike all the statements of Steve Sands as hearsay.

15      I'm not sure he's identified -- I mean, other than the

16 finders -- so I thought, well, maybe that's the, maybe, the

17 leap that he's somehow -- the testimony will be admissible.

18      But the whole testimony was that he had no choice,

19 sign or no deal with Warren Trepp. I move to strike all of

20 that as hearsay.

21      MR. FLYNN: I am just offering this as to the state of

22 mind, Your Honor.

23      THE COURT: All right. The motion is denied.

24 ////                        ////

## Page 147

1  BY MR. FLYNN:

2    Q. Mr. Montgomery, did you sign the documents?

3    A. Yes.

4    Q. Now, are you married, sir?

5    A. Yes.

6    Q. How long have you been married?

7    A. Thirty-three years.

8    Q. And what documents did you sign?

9    A. I think it was a stock -- I don't want to say a stock

10 transfer. It was some document like that. I had this

11 document, but I had to transfer 10 percent of it to him.

12   Q. And then what happened with regard to this 10 percent?

13   A. At some point, I think Mr. Trepp came back, and I

14 explained the problem or situation I was in.

15   Q. And what did he say?

16   A. He would deal with it.

17   Q. Then what happened?

18   A. I went, at some point, back to the office of the

19 attorney that represented Mr. Sands with Mr. Sands there. And

20 they had come up with a new deal where, all of a sudden, I only

21 had to give him, I believe, 5 percent of the stock.

22   Q. And what happened to the other 5 percent?

23   A. I believe -- I don't know if all 5 percent went to

24 Mr. Frye.

## Page 148

1    Q. Did you hand another assignment to Mr. Frye?

2    A. Yes.

3    Q. And do you know -- you don't recall the specific

4  percentage, but it was --

5    A. I think it might have been 4 percent. I don't really

6  remember.

7       MR. PEEK: Your Honor, I'm going to object to this

8  line of questioning as being irrelevant related to the

9  dilution. I don't know where we're going here, Your Honor.

10      THE COURT: Well, I'm not sure.

11      MR. PEEK: I want to try to finish, as you did,

12 tonight. We're already past 40 minutes.

13      THE COURT: I have a concern about where it's going

14 too. But I would like to allow it to continue just for a

15 little bit, and we'll see where it's going.

16      MR. FLYNN: I'll keep moving on, Your Honor. And it

17 goes to the parties conforming to the terms of the contract.

18 BY MR. FLYNN:

19   Q. Now, at some point, did you, in early 2000, request to

20 see the books and records of eTreppid Technologies after you

21 had just lost this stock to Mr. Sands and Mr. Frye?

22      MR. PEEK: Objection, Your Honor. Characterized as

23 loss of stock.

24      THE COURT: Yes, if you could just ask the question

## Page 149

1  without characterization.

2  BY MR. FLYNN:

3    Q. After the stock ended up in the hands of Frye and

4  Sands?

5    A. Yes.

6    Q. And were you given access to the records?

7    A. No.

8    Q. Did you ask Mr. Trepp at that point how much money had

9  been put into the company?

10   A. I believe so.

11   Q. What did he say?

12   A. Several million.

13   Q. Did you ask to see it to verify it?

14   A. I believe I wanted some form of proof.

15   Q. And were you given any form of proof?

16   A. No.

17   Q. Did you then have a discussion about the airfare

18 expenses of eTreppid Technologies when you were now, roughly, a

19 40 percent owner during the year 2000?

20   A. I had never been around anybody where the airfares

21 were like this. This is unbelievable.

22   Q. And what were you told the airfares were in the year

23 2000?

24      MR. PEEK: Do we have by whom, Your Honor?

38 (Pages 146 to 149)

821d05dd-39a8-4560-b998-2db41a804b7c

eTreppid vs. Montgomery   Hearing - Preliminary Injunction - Vol. II - III Tuesday, February 7, 2006

| Page 150 |
|---|
BY MR. FLYNN:
1  Q.  By whom?
2  A.  By whom?  I mean, it was obvious, because I had seen a
4  few of the bills, that, you know, they were high.  You're
5  talking fifty, sixty thousand a trip.
6  Q.  And where were the trips, to your knowledge?
7  A.  New York, LA.
8  Q.  On what type of airplane?
9  A.  Gulfstream, usually III or IV.
10  Q.  Privately chartered?
11  A.  Yes.
12  Q.  What was the purpose of the trips?
13  A.  I can't remember all of them.  Did we ever go on
14  business?  Yes.  But I can't vouch for every trip that that
15  plane was ever used for.
16  Q.  Did you have an understanding in the year 2000 as to
17  how much, roughly, the expenses were for airfare at eTreppid
18  Technologies?
19     MR. PEEK:  Objection, Your Honor.  Could we have a
20  foundation as opposed to an understanding.
21  BY MR. FLYNN:
22  Q.  Where did you get the understanding from?
23     THE COURT:  Well, first of all, did he have an
24  understanding.

**Page 151**

1  BY MR. FLYNN:
2  Q.  Did you have an understanding, yes or no?
3  A.  Yes.
4     THE COURT:  Where did you get the understanding?
5  BY MR. FLYNN:
6  Q.  Where did you get it?
7  A.  Mr. Trepp.
8     THE COURT:  All right.  Go ahead.
9  BY MR. FLYNN:
10  Q.  And what was your understanding as to approximately
11  the expenses were in the year?
12     MR. PEEK:  Your Honor, do we have a conversation
13  where, Mr. Trepp, time, place, who was present?  Same
14  foundation that Mr. Flynn expected of us.
15     THE COURT:  I understand.  But I think -- what I think
16  he's asking is what did Mr. Trepp tell him about that.
17     So if you could just ask him that question, then we're
18  not talking about his understanding, but what he was told.
19  BY MR. FLYNN:
20  Q.  What did he tell you?
21  A.  That he had signed a contract for so many hours of
22  flight and that they had guaranteed those hours.
23  Q.  Who did he tell you he signed the contract with?
24  A.  Trans-Exec in Van Nuys, California.

**Page 152**

1  Q.  And did he tell you how much it was costing the
2  company?
3  A.  I believe he said it was a million dollars.
4  Q.  Now, let's move forward into November of 2001.  Prior
5  to November of 2001, was all your work still data compression?
6  A.  Yes.
7  Q.  And in November of 2001, did you have a conversation
8  with Mr. Trepp about sharing the profits of eTreppid
9  Technologies?
10  A.  Well, I was concerned how I was going to get profit
11  out of the company.
12  Q.  And what did you say to him?
13  A.  "How am I going to get profit out of the company?"
14  Q.  What did he say?
15  A.  "We haven't made any money yet."
16  Q.  And did you bring up the airfare expenses?
17  A.  Yes.
18     THE COURT:  Excuse me.  I just wanted to ask my court
19  reporter how she was holding up.  I didn't mean to -- let me
20  just interrupt for a minute.  How much longer are you going to
21  be with this witness?
22     MR. FLYNN:  What time did Your Honor want to try to --
23     MR. PEEK:  Don't take all my time, Mr. Flynn.
24     MR. FLYNN:  I'm thinking 20 minutes, Your Honor.

**Page 153**

1     THE COURT:  Well, perhaps this would be a good point
2  in time to take a break.  We've been going since a little after
3  5:00.  Would you anticipate an equal amount of time on
4  cross-examination?
5     MR. PEEK:  I would anticipate an equal amount of time
6  on cross-examination.  So far, he's gone 40 minutes, almost 50.
7     THE COURT:  I said all of it was irrelevant, so what
8  are you going to cross-examine him about?  I'm just kidding.
9     MR. PEEK:  I understand, Your Honor.  That's a nice
10  yank.  I appreciate the yank.  But by the same token, the Court
11  has considered it relevant, so I have to at least address the
12  points that were made by Mr. Flynn.  If the Court had sustained
13  it, I wouldn't have gone into it, Your Honor.  But I appreciate
14  the yank.
15     THE COURT:  All right.  Let's be in recess for 15
16  minutes, so quarter after 7:00.
17     (A brief recess was taken at the hour of 7:00 p.m.)
18     THE COURT:  Be seated.
19  BY MR. FLYNN:
20  Q.  November 2001, prior to November 2001, who paid for
21  your medical insurance?
22  A.  I did.
23  Q.  Did you get any other employee benefits?
24  A.  No.

39  (Pages 150 to 153)

eTreppid vs. Montgomery   Hearing Preliminary Injunction - Vol. II   III Tuesday, February 7, 2006

## Page 154

1    Q.  In November 2001 -- or, strike that.
2        Prior to 2001, was anything other than data
3    compression work being done at eTreppid Technologies?
4    A.  The video game -- the video game was.
5    Q.  And are you -- you're not making any claim of any
6    ownership of any aspect of the video game; is that correct?
7    A.  No.
8    Q.  In November 2001, did you have a meeting with
9    Mr. Trepp regarding your stock?
10   A.  Well, I was being -- they needed to raise money, and I
11   was going to be diluted.
12   Q.  Is that what Mr. Trepp told you?
13   A.  Yes.
14   Q.  Did you have a conversation at that time about
15   Doug Frye's legal expenses being charged off against the
16   company?
17   A.  Yes.  They were enormous, I thought.
18   Q.  And what range per year were they?
19   A.  200,000.
20   Q.  And did you ask him if Mr. Frye was then doing
21   $2000,000 a year of work for eTreppid Technologies?
22   A.  He said he would look into it.
23   Q.  Did you ask to see the books and records of the
24   company to see what else was being expensed against the

## Page 155

1    company?
2    A.  Yes.
3    Q.  Were you given access?
4    A.  No.
5    Q.  And what happened in connection with -- with the stock
6    transaction in November 2001?
7    A.  I don't remember the exact date, but I had to borrow
8    250,000 so I would not be diluted.
9    Q.  And at that time, did you also sell 2 percent of your
10   stock to someone named Wayne Primm?
11   A.  Yes.
12   Q.  And how did that transaction take place?
13   A.  Warren made an arrangement with Wayne, and Wayne and
14   Doug -- I don't know who -- they carried out the logistics of
15   it.
16   Q.  Were you paid $1.5 million?
17   A.  I believe so, yes.
18   Q.  And what did you do with the $1.5 million?
19   A.  I wrote Mr. Trepp back two checks, one for
20   980-some-thousand and one for 100,000.
21   Q.  And, in fact, was the check in the amount of
22   $975,000.29?
23   A.  Yes.
24   Q.  And is that a copy of the check?

## Page 156

1    A.  Yes.
2        MR. FLYNN:  I'd offer this, Your Honor.
3        MR. PEEK:  No objection, Your Honor.
4        THE COURT:  It's admitted.
5        (Defendant's Exhibit 22 was marked and admitted into
6    evidence.)
7        MR. PEEK:  Is this 22?
8        THE CLERK:  Yes, Exhibit 22.
9        THE COURT:  I'm still not sure how this is all tied
10   into the issue we're trying to decide here today.  It might be
11   tied into some potential counterclaims, I suppose, but I don't
12   see --
13       MR. FLYNN:  It has to do with the breach of the
14   contract and the ultimate fight that takes place.  And
15   notwithstanding Mr. Trepp's testimony in the fall of 2005, this
16   was the foundation for the -- an accumulation.
17       MR. PEEK:  I haven't heard what the breach of contract
18   was yet, though, Your Honor.  He received $975,000; he paid
19   back $975,000.
20       THE COURT:  I understand.
21       MR. PEEK:  Or, was it Doug Frye's legal fees?
22       THE COURT:  Try not to spend a whole lot of time on
23   this.
24       MR. FLYNN:  I won't, Your Honor.

## Page 157

1    BY MR. FLYNN:
2    Q.  And then did you have to pay taxes?
3    A.  Yes.
4    Q.  How much did you pay in taxes?
5    A.  I believe 282,000.
6    Q.  How much did you net?
7    A.  I believe a hundred grand.
8    Q.  Now, in February 2002, where did you go?
9    A.  To a location in Florida.
10   Q.  And was that a government location?
11   A.  Yes.
12   Q.  And who went with you?
13   A.  I think, the first day, I went by myself.
14   Q.  And for what purpose did you go?
15   A.  We went to demonstrate video compression.
16       MR. PEEK:  Could we have the "we," Your Honor?
17       THE WITNESS:  I'm sorry.  I went to demonstrate video
18   compression.
19   BY MR. FLYNN:
20   Q.  At some point, did someone else show up from eTreppid?
21   A.  Yes.
22   Q.  Who?
23   A.  Patty Gray.
24   Q.  And how long were you there?

CECILIA VOHL, NV CCR #246(775) 827-0672

821d05dd-39a8-4560-b998-2db41a804b7c

eTreppid vs. Montgomery  Hearing - Preliminary Injunction - Vol. II   II Tuesday, February 7, 2006

---

Page 158

1    A. I believe five days, four or five days.
2    Q. What type of video compression did you demonstrate?
3    A. I took data off of an aircraft, and I streamed it at a
4    very low kilobit rate.
5    Q. Are we getting into classified information?
6    A. Yes.
7    Q. After you did this, did you go back and have a
8    discussion with Mr. Trepp?
9    A. Yes.
10   Q. And what was the nature of that discussion in terms of
11   whether or not eTreppid was going to get involved in
12   object-tracking?
13   A. When I -- when I was out there, I did one
14   demonstration of object-tracking, and I came back and told him
15   the results of the object-tracking and the results of the video
16   compression.
17   Q. So there were two different technologies being
18   demonstrated out there?
19   A. Yes.
20   Q. And what did Mr. Trepp say?
21   A. He was very interested in the data compression.
22   Q. The video compression/data compression?
23   A. Yes.
24   Q. Was he interested in the object-tracking?

---

Page 159

1    A. Not really.
2    Q. What did he say?
3    A. He was very interested in the data compression.
4    Q. And thereafter, during the year 2002, what were you
5    working on, as the chief technology officer?
6    A. Video compression.
7    Q. And during the year 2002, who was paying your medical
8    insurance?
9    A. I was.
10   Q. And what type of documents were you getting from
11   eTreppid with regard to your status?
12   A. A 1099.
13   Q. And were you getting a K-1?
14   A. Yes.
15   Q. All right. Now, in November 2002, did something
16   happen with your stock?
17   A. Well, I believe I was diluted again, if that's your
18   question.
19   Q. And did you have to, again, pay back money to
20   Mr. Trepp?
21   A. I don't believe at that time -- I'm -- I'm not
22   certain.
23   Q. At some point, did you pay back money for --
24   A. Yes, yes.

---

Page 160

1    Q. And in 2002, did you have occasion to see Mr. Trepp
2    and Mr. Milliken on the premises of eTreppid Technologies?
3    A. Yes. They came to our building. I don't remember if
4    it was December, but they had come to our building.
5    Q. And did you have a conversation with Mr. Trepp about
6    it?
7    A. Yes.
8    Q. And what was that conversation?
9    A. I was surprised that that was going to happen.
10   Q. And what did you say to him about Mr. Milliken?
11   A. I don't know how we would ever get clearance in the
12   government with him as an investor.
13   Q. Did he tell you what Mr. Milliken was going to invest?
14   A. I thought he said 10 or 12 million.
15   Q. For how much of the company?
16   A. Five percent.
17   Q. Now, in December of 2002, did you complete certain
18   tests?
19   A. 2002 or '3?
20   Q. December 2002.
21   A. Yes.
22   Q. What tests did you complete? Without describing the
23   contents, just what, generically, was the nature of the test?
24   A. We, once again, did some tests on aircraft with the

---

Page 161

1    video compression.
2    Q. And did any of those -- aspects of those tests involve
3    anomaly detection?
4    A. Yes, I believe it was pattern recognition.
5    Q. And without getting into the contents of or what you
6    were actually doing, can you differentiate for the Court?
7        MR. PEEK: Your Honor, could I ask if the witness is
8    just reading from his timeline or actually is testifying from
9    memory?
10       THE WITNESS: Testifying from memory.
11       MR. PEEK: Okay. Could we have the timeline removed
12   from the witness stand?
13       THE COURT: I don't know that that's necessary.
14       MR. LOGAR: I don't think he has a right to do that.
15       THE COURT: I don't either.
16       MR. PEEK: Your Honor, I think I'm --
17       MR. LOGAR: If the witness is using a document to
18   refresh his recollection, and Counsel has a right to see it,
19   but he has no right to --
20       MR. PEEK: But who prepared this, Your Honor? Did he
21   prepare it? Did it come contemporaneous from notes? Where did
22   it come from? I think I do have a right to know, and I don't
23   think the witness should be using it to testify from. It's not
24   going to come into evidence, Your Honor. It's not his notes,

---

41 (Pages 158 to 161)

821d05dd-39a8-4560-b998-2db41a804b7c

eTreppid vs. Montgomery   Heari_ _ Preliminary Injunction - Vol. I1 _ II Tuesday, February 7, 2006

| Page 162 | Page 164 |
|---|---|

**Page 162**

1  it's not contemporaneous, and I don't think he should be using
2  it, respectfully, Your Honor.
3      THE COURT: It looks kind of like a script to me.
4      MR. PEEK: It does look like a script.
5      THE COURT: I think perhaps it's a good idea not to
6  refer to it, at least right now. If you have something that
7  you can't remember or want to refresh your recollection, we'll
8  see about it.
9      MR. PEEK: We'll put it aside, then, Your Honor?
10     MR. FLYNN: Turn it over, Mr. Montgomery.
11 BY MR. FLYNN:
12     Q.  At some point, did you complete these tests?
13     A.  Yes.
14     Q.  Okay. And how would you differentiate the technology
15 that was being used on the testing with other types of
16 technology that you owned or eTreppid was -- or eTreppid owned?
17     A.  This is what time frame? I believe December of 2002?
18     Q.  Correct.
19     A.  Is that the time frame?
20     Q.  Right.
21     A.  I believe Zehang, which had testified earlier, had
22 just been hired, and he was beginning to do some work in
23 object-tracking. I, on the other hand, was continuing to do --
24 had my anomaly and pattern detection software that I had made

**Page 164**

1      A.  Yes. They told me I was going to become an employee.
2      Q.  He told you, you were now going to be an employee?
3      A.  That's correct.
4      Q.  Now, with regard to your routine work in the company,
5  after you were supposedly designated "employee," did anything
6  change with regard to how you supervised yourself, conducted
7  yourself, and did your work?
8      A.  No.
9      Q.  Was there any change of any nature or description
10 between when you were classified as an independent contractor
11 and the way you worked and when you were now classified as an
12 employee?
13     A.  No.
14     Q.  And the technology, the anomaly detection and pattern
15 recognition software, as of December '02, was complete?
16     A.  Yes.
17     Q.  And did that result, in early '03, of a government
18 contract?
19     A.  I think it was sometime around March or April.
20     Q.  And now, was that for an agency within the government
21 different than the Air Force?
22     A.  Yes.
23     Q.  And did you sign an agreement in connection with that
24 project --

| Page 163 | Page 165 |
|---|---|

**Page 163**

1  earlier. I had used that on occasion to test with also, and
2  video and data compression continued.
3      Q.  And was eTreppid paid for these tests?
4      A.  Yes, yes.
5      Q.  How much?
6      A.  I believe 280,000.
7      Q.  And after these tests were completed -- strike that.
8  At the end of 2002, when these tests were complete -- and as I
9  understand your testimony, based in part on your anomaly
10 detection and pattern recognition software; is that correct,
11 sir?
12     A.  Yes.
13     Q.  Were you still an independent contractor?
14     A.  Yes.
15     Q.  Was that technology complete?
16     A.  Yes.
17     Q.  Did you own it?
18     A.  Yes.
19     Q.  And were you still an independent contractor?
20     A.  In 2002?
21     Q.  Yes.
22     A.  Yes.
23     Q.  In January 2003, did -- did you have a conversation
24 with Mr. Trepp about the change of your status?

**Page 165**

1      A.  Yes.
2      Q.  -- with that department of the government?
3      A.  Yes.
4      Q.  And just generically, under that agreement --
5          MR. PEEK: Your Honor, could we have the agreement, if
6  this is separate and apart from eTreppid, and maybe -- may I
7  have the witness a little bit on voir dire?
8          THE COURT: Hold on a second.
9          MR. PEEK: I'm trying to understand, is this a
10 separate contract with eTreppid?
11         THE COURT: Hold on. Let me just ask Counsel, is this
12 a separate contract between Mr. Montgomery and this other
13 government agency?
14         MR. FLYNN: This is the oath of secrecy, Your Honor.
15 We're not into the --
16         THE COURT: All right.
17         MR. FLYNN: But --
18         MR. PEEK: Well, I didn't hear the answer.
19         THE COURT: He said an oath of secrecy.
20         MR. PEEK: Your Honor, hiding behind the so-called
21 national security --
22         THE COURT: Well, he hasn't -- all he said is, did you
23 sign --
24         MR. PEEK: Well, this is the oath of secrecy. That's

CECILIA VOHL, NV CCR #246 (775) 827-0672

821d05dd-39a8-4560-b998-2db41a804b7c

eTreppid vs. Montgomery   Hear    Preliminary Injunction - Vol. II    II Tuesday, February 7, 2006

## Page 166

1  the agreement --
2       THE COURT: Did he sign it?  That's fine.  I think he
3  can answer that.
4       MR. PEEK: I apologize, Your Honor.  I thought he was
5  talking about a separate contract for work.
6  BY MR. FLYNN:
7     Q.  Did you sign a document, you personally, with the
8  government with regard to your security clearance in connection
9  with what you could disclose and not disclose ever to anybody?
10    A.  Yes.
11    Q.  And did an individual from this department give you
12 that contract?
13    A.  Yes.
14    Q.  Did you execute it?
15    A.  Yes.
16    Q.  Did you give it back to him?
17    A.  Yes.
18    Q.  Did you read it?
19    A.  Yes.
20    Q.  And did he give you a copy of it?
21    A.  No.
22    Q.  Under the terms of that contract, what is your
23 understanding today as to whether you can disclose anything
24 about the identity of anybody or the work you did in connection

## Page 167

1  with the March 2003 contract for this department?
2     A.  Well, we -- we signed -- the agreement states that I
3  cannot divulge the nature of the work or who the clients are.
4     Q.  And can you imagine any higher governmental security
5  or classified project at that time frame than what you were
6  doing?
7       MR. PEEK: Your Honor, I would object to that
8  because --
9       THE COURT: Yeah, if we're not going to get to know
10 what it is, the testimony about something higher than that
11 can't be cross-examined about.  So since that cross-examination
12 is foreclosed, I'm not going to allow that question.
13      MR. FLYNN: Fine.  Thank you, Your Honor.
14 BY MR. FLYNN:
15    Q.  Did you use source codes to do this project?
16    A.  Yes.
17    Q.  Where did you get them?
18    A.  There were multiple facets to the project.  The video
19 and the face recognition was eTreppid's, and the anomaly and
20 pattern detection was mine.
21    Q.  And in connection with this particular project, did
22 you have discussions -- just yes or no -- with governmental
23 agents with regard to the anomaly detection aspect of the
24 software?

## Page 168

1     A.  At that time, no.
2     Q.  At some point, did you have these discussions?
3     A.  Yes.
4     Q.  And when?
5     A.  September of '03.
6     Q.  And did you complete the project to the satisfaction
7  of the government?
8     A.  Yes.
9     Q.  And the source codes that you used in terms of
10 governmental classification, what are they called,
11 Mr. Montgomery, the anomaly detection source codes?
12    A.  Well, it was called the anomaly detection or pattern
13 recognition source codes.
14    Q.  What the does the term "SAP" mean?
15    A.  Special access program.
16    Q.  Does anyone else have an eTreppid -- have any dealing
17 with any governmental agency about special access programs?
18    A.  Ever?
19    Q.  During this time frame.
20    A.  Not that I know of.
21    Q.  Were the source codes classified?
22    A.  I believe, yes.
23    Q.  And were they called SAP?
24    A.  No.  Well, it was just called source codes under that

## Page 169

1  umbrella.
2     Q.  Under the umbrella of SAP?
3     A.  Yes.
4     Q.  How much was being paid by the government -- this
5  governmental agency for the work you were doing during this
6  time frame?
7     A.  Roughly, 350,000 a month.
8     Q.  And for how long did you do it?
9     A.  I think about a year.
10    Q.  Up until what time?
11    A.  September, October of 2004.
12    Q.  Now, in September -- strike that.  In February of '03,
13 did you have a discussion with Mr. Trepp about the ownership of
14 anomaly detection?
15    A.  Yes.
16    Q.  What was that discussion?
17    A.  I wanted to know how I was going to be compensated for
18 it.
19    Q.  And this was during the period where this governmental
20 contract was developing?
21    A.  Yes.
22    Q.  And what did he say?
23    A.  He would work it out.
24    Q.  Did you -- did you tell him who owned the technology

43  (Pages 166 to 169)

821d05dd-39a8-4560-b998-2db41a804b7c

eTreppid vs. Montgomery   Hearin   Preliminary Injunction - Vol. II   III Tuesday, February 7, 2006

Page 170

1   that was being used?
2       A.  He knew who did.
3       Q.  And what did he say?
4       MR. PEEK:  Objection, Your Honor.  Nonresponsive.
5       THE COURT:  Did you tell him?
6       THE WITNESS:  I'm sorry.  Yes.
7       THE COURT:  What did you tell him?
8   BY MR. FLYNN:
9       Q.  What did you say to him?
10      A.  I owned it.
11      Q.  And what did he say?
12      A.  I think, initially, nothing.  He just kept saying he
13  would work it out.
14      Q.  And then at some point, did the -- did he acknowledge
15  your ownership?
16      A.  Yes.
17      Q.  When?
18      A.  Middle -- middle of 2004.
19      Q.  Now, in July 2003, did this particular department of
20  the government state that they wanted security clearances for
21  five people?
22      A.  I think -- yes.  Well, the way that worked, actually,
23  was after December of 2002, the Air Force applied for the
24  government because we needed access to those programs.  And

Page 171

1   when we started doing the work in 2003, they accelerated it,
2   the other group.
3       Q.  Okay.  And what is an interim clearance?
4       A.  Well, you apply for a clearance, and within 90 days,
5   they usually give you a temporary clearance.
6       Q.  And how many programmers got a temporary clearance?
7       A.  One.
8       Q.  And who was that?
9       A.  Barjinder.
10      Q.  And when did you get your clearance?
11      A.  Interim or final?
12      Q.  Interim.
13      A.  March or April of 2004.
14      Q.  2003?
15      A.  '3.  Excuse me.
16      Q.  And when did you get your final?
17      A.  I believe it was sometime in the summer of 2004.
18      Q.  Okay.  In August of 2003, were you given certain tapes
19  by the government?
20      A.  Yes, yes.
21      Q.  And did those tapes and what was on them precipitate a
22  lot of discussion with Mr. Trepp?
23      MR. PEEK:  Objection, Your Honor.  Again, it's leading
24  and, I think, lacks foundation.

Page 172

1       THE COURT:  Well --
2       MR. PEEK:  Assumes facts not in evidence.
3       THE COURT:  He asked him did it precipitate a
4   conversation.  That may be a little bit leading.
5       MR. PEEK:  It's also speculative as to whether the
6   tapes themselves --
7       THE COURT:  Did you give him the tapes, and was there
8   a conversation about the tapes after you gave him the tapes?
9       THE WITNESS:  I received tapes, and there was
10  something on the tapes that was of interest.
11      THE COURT:  All right.  And did you have a
12  conversation with Mr. Trepp about that?
13      THE WITNESS:  Yes.
14      THE COURT:  All right.  Go ahead.
15  BY MR. FLYNN:
16      Q.  And did the nature of the tapes and what was of
17  interest to this agency relate to the conversation you had with
18  Mr. Trepp?
19      MR. PEEK:  Again, Your Honor, this goes back to not
20  being allowed to cross-examine because this is -- again, you're
21  going to say this is top secret, national secret, I can't talk
22  about it, talk about it, so --
23      THE COURT:  Well, we don't know if he's going to say
24  that.  I want to see what he says, and then we'll see where we

Page 173

1   go with that.
2       I mean, one of the things that occurs to me is that
3   where one side of a case or the other relies upon a privilege,
4   then I can take that into consideration with regard to whether
5   or not the other side has been provided with the information
6   they're entitled to be provided with.
7   BY MR. FLYNN:
8       Q.  Having that in mind, Your Honor -- did you share what
9   was on the tapes with Mr. Trepp?
10      A.  Yes.
11      Q.  And then did you have a conversation about money or
12  your ownership or interest in eTreppid Technologies with
13  Mr. Trepp?
14      A.  And what time frame is this, again?
15      Q.  At the time the tapes were given.
16      A.  Yes.
17      Q.  And what was that conversation?
18      A.  I wanted to know how I was going to be compensated.
19      Q.  If you did the work on the tapes?
20      A.  That's correct.
21      Q.  And what did he say?
22      A.  He would work it out.
23      Q.  Did you go ahead and do the work on the tapes?
24      A.  Yes.

44  (Pages 170 to 173)

CECILIA VOHL, NV CCR #246(775) 827-0672

821d05dd-39a8-4560-b998-2db41a804b7c

eTreppid vs. Montgomery   Hearing - Preliminary Injunction - Vol. I, II Tuesday, February 7, 2006

---

Page 174

1    Q. And whose technology was used to do the work on the
2 tapes?
3    A. Well, there were two pieces. The piece of facial
4 recognition and video recognition was eTreppid's. The anomaly
5 detection was mine.
6    Q. And how much was being paid during that time frame?
7    A. Well, I think they -- I think that was close to
8 200,000.
9    Q. After doing the work on the tapes, did you, as the
10 chief technology officer and then as the owner of the anomaly
11 detection software, make any conclusions about the reliability
12 of your software?
13    A. I thought it was very reliable.
14    MR. PEEK: I'm sorry. What?
15    THE WITNESS: It was very reliable.
16 BY MR. FLYNN:
17    Q. Did you have any conversation with Mr. Trepp about
18 that reliability?
19    A. I don't think initially at that exact time frame.
20 Later on, I think we did.
21    Q. And what was that conversation?
22    A. He wanted to know how confident I was that the data
23 was correct, and I told him that I believed it was very
24 accurate.

---

Page 175

1    Q. And did you ever have a conversation about the value
2 of your technology at that point?
3    A. Sometime in 2004, is that --
4    Q. Yes.
5    A. Yeah. Well, he told me he asked for a billion dollar
6 bond from the U.S. Government.
7    Q. And did you have a discussion with him about how much
8 he wanted to sell the technology for?
9    A. I believe initially it was 500 million.
10    Q. And did you have a discussion with him about what part
11 of the 500 million would belong to you and what part would
12 belong to him?
13    A. Yes.
14    Q. And what was that conversation?
15    A. I was concerned that I was going to get my fair share
16 of that.
17    Q. All right. Now, in September of 2004, was the
18 government contract -- that phase of the government contract
19 coming to an end?
20    A. I believe at September 31st, that -- the next phase
21 was going to be completed.
22    Q. And did you have a conversation with Mr. Trepp about
23 extending the contract for another three months?
24    A. The people that were here from the government stated

---

Page 176

1 they wanted to extend it.
2    Q. And did you have a conversation with Mr. Trepp about
3 extending it?
4    A. Yes.
5    Q. What was that conversation?
6    A. He wasn't going to.
7    Q. And did you have a conversation with him as to why he
8 wouldn't?
9    A. At the time -- the initial time is that we wanted more
10 money. We, meaning eTreppid, had wanted more money and
11 Mr. Trepp wanted to move on to some other work.
12    Q. And so did you go forward and do -- continue -- did
13 you continue processing work for this particular department of
14 the government?
15    A. We continued processing, I believe, until after
16 Thanksgiving of 2004.
17    Q. And were you using your anomaly detection software?
18    A. Yes.
19    Q. And did you a conversation with Mr. Trepp in the fall
20 of 2004 about the fact that it was your software that you
21 owned?
22    A. Yes.
23    Q. Now, at some time, did you have a conversation with
24 the government from this particular department about protecting

---

Page 177

1 the software with intrusion devices?
2    A. Well, early on, told us --
3    MR. PEEK: Objection, Your Honor. Hearsay.
4    THE COURT: Well, I'm going to allow it. I've allowed
5 quite a bit of hearsay in this case anyway. I'll determine
6 whether or not it's been being offered for the truth of it or
7 not, or whether it's being offered to explain the question that
8 was asked.
9    Go ahead.
10    THE WITNESS: I believe, in early 2004, they suggested
11 what they wanted to do to protect the systems.
12    MR. PEEK: Could we have who the "they" is.
13    THE WITNESS: The government.
14    MR. PEEK: Can we have Air Force, person, individual,
15 name.
16    THE WITNESS: Not the Air Force, the other group.
17    MR. PEEK: What was the name of the other group?
18    THE WITNESS: I'm not going to say.
19    MR. PEEK: That's my problem again, Your Honor, hiding
20 behind the privilege.
21    THE COURT: I understand.
22    MR. FLYNN: We're not hiding behind anything, Your
23 Honor. We'll allow Mr. -- we'll enable a number of procedures.
24 Either it goes to a judge who has a security clearance on this

---

45 (Pages 174 to 177)

CECILIA VOHL, NV CCR #246 (775) 827-0672

821d05dd-39a8-4560-b998-2db41a804b7c

eTreppid vs. Montgomery   Hearing; Preliminary Injunction - Vol. II   II Tuesday, February 7, 2006

| Page 178 | Page 180 |
|---|---|

**Page 178**

1  level, which is called for under the act, or we'll enable
2  Mr. Montgomery, Mr. Trepp to go into chambers so the Court can
3  verify it, or we'll enable -- we'll allow it to go over to
4  federal court. Your Honor, we're not hiding behind anything.
5  　　　THE COURT: I don't know how it's going to go over to
6  federal court. It's already been bumped out once. All I'm
7  saying all day is cite me the statute that says that he can
8  say, "I'm not going to answer the question." I'm perfectly
9  happy with the idea that if he possesses information that's
10  classified, he probably shouldn't, and has probably been told
11  not to say it. But I need some authority so that I can make a
12  reasonable, decent decision on this issue without speculating
13  about it. Now --
14  BY MR. FLYNN:
15  　　Q. Under the contract you signed with the government,
16  were you made an agent of the government in connection with
17  this software technology?
18  　　A. I believe so.
19  　　　MR. PEEK: Your Honor, again, I move to strike that.
20  He said, "I believe so," "I don't have the contract," "I don't
21  know what it says." I can't cross-examine him on that. He
22  says, "I didn't get a copy of it." Everybody else had it.
23  　　　THE COURT: I'm not even sure that this relates to any
24  of the issues in the case. And I'm not -- you know, I'm not

**Page 179**

1  going to tell you how to try your case. But to me, I'm not
2  concerned about what it says or what it doesn't say. I don't
3  even care what agency it is.
4  　　　MR. PEEK: I care, Your Honor, because of the
5  inference here that I was directed to put intrusion software,
6  and it is the intrusion software that, if there was any
7  deletion, that deleted all of this. When we and get an
8  affidavit from the Air Force, who is managing this, a lot of
9  these contracts --
10  BY MR. FLYNN:
11  　　Q. Mr. Montgomery, in connection with this particular
12  work and the intrusion devices, did the Air Force manage this
13  aspect of it?
14  　　A. No.
15  　　Q. And did you put the intrusion devices on?
16  　　A. Yes.
17  　　　MR. PEEK: Same objection, Your Honor.
18  BY MR. FLYNN:
19  　　Q. When did you put the intrusion devices on?
20  　　A. I believe it was February of 2003.
21  　　Q. And what are the intrusion devices? Explain to the
22  Court how they work. Is that classified?
23  　　A. I don't really know whether it is or not, to be honest
24  with you.

**Page 180**

1  　　Q. Well, generically, can you describe to the Court what
2  happens if someone tries to access it?
3  　　A. The government group was very concerned that someone
4  would walk in and take a computer out of the building,
5  physically take it out. And since the room that we had in the
6  building was not big enough to hold all the computers, they
7  wanted some form of protection so that those computers could
8  not be taken out of the building and accessed.
9  　　Q. And how -- and did you load these devices onto these
10  computers?
11  　　A. Yes. It's software.
12  　　Q. And how does the software, basically, work? Does
13  it -- what does it do?
14  　　A. Well, it's designed to get a response over some period
15  of time, and if the response hasn't been given to it or the
16  responses are incorrect, it will purge itself.
17  　　Q. And did anyone at eTreppid know that that's how this
18  system worked?
19  　　A. I don't think so.
20  　　Q. I mean, in terms of the details of the technology.
21  　　A. No, no.
22  　　Q. In terms of the generic nature of the fact that it
23  existed, did Mr. Trepp know?
24  　　A. I don't know if he did or not. I suspect he talked to

**Page 181**

1  the same government people that I did, that he might have
2  known.
3  　　Q. Now --
4  　　　THE COURT: Let me just stop and ask a question.
5  Do the lawyers know what agency we're talking about?
6  　　　MR. FLYNN: Yes.
7  　　　THE COURT: Do you know?
8  　　　MR. PEEK: No, I don't.
9  　　　THE COURT: Your client has not told you? You don't
10  know? You don't know?
11  　　　MR. PEEK: I -- I don't know. I will ask Mr. Trepp.
12  　　　MR. FLYNN: I do, Your Honor.
13  　　　(Whereupon, Mr. Peek has a conversation with Mr. Trepp
14  off the record.)
15  　　　MR. PEEK: Yes, I do know.
16  　　　THE COURT: All right. Approach.
17  　　　(A discussion was held at the bench out of the hearing
18  of the reporter.)
19  　　　THE COURT: All right. Go ahead. I'm sorry for the
20  interruption.
21  　　　MR. FLYNN: Thank you, Your Honor.
22  BY MR. FLYNN:
23  　　Q. Let's fast-forward a little bit. The work ended with
24  this particular agency at some point in time; is that correct?

46 (Pages 178 to 181)

CECILIA VOHL, NV CCR #246 (775) 827-0672

821d05dd-39a8-4560-b998-2db41a804b7c

Case 3:06-cv-00263-PMP-VPC   Document 63-4   Filed 08/09/06   Page 22 of 40

eTreppid vs. Montgomery   Hearing - Preliminary Injunction - Vol. III   Tuesday, February 7, 2006

Page 182

1    A.  Yes.
2    Q.  And that was after Thanksgiving of 2004?
3    A.  Yes.
4    Q.  And were there continued negotiations with that
5  department thereafter?
6    A.  My understanding was that that group wanted the
7  Air Force to get involved.
8    Q.  And during 2004 -- just yes or no -- were there
9  individuals in the U.S. Government at the highest levels at
10  eTreppid Technologies?
11    A.  Yes.
12       THE COURT:  What is "the highest levels"?  Does that
13  mean was President Bush there?  That doesn't mean anything to
14  me.
15  BY MR. FLYNN:
16    Q.  Was Warren Trepp there?
17    A.  Yes.
18    Q.  So he knows who these individuals are?
19    A.  Yes.
20    Q.  Now, at the end of 2004, did you and Mr. Trepp begin
21  to have discussions -- heated discussions about who owned --
22  strike that -- about how you were going to be paid going
23  forward if there were future governmental contracts?
24       MR. PEEK:  Objection.  Leading, Your Honor, as to

Page 183

1  "heated."  They had discussions.
2  BY MR. FLYNN:
3    Q.  Okay.  Did you have discussions?
4       THE COURT:  All right.  Yeah.
5       THE WITNESS:  Yes.
6  BY MR. FLYNN:
7    Q.  And how would you characterize the development of the
8  relationship towards the end of 2004 and going into 2005, with
9  Mr. Trepp?
10    A.  It was getting strained.
11    Q.  And what was the nature of the conflict?
12    A.  Well, I had been promised, um, to get this worked out,
13  and it never gets worked out.
14    Q.  And did Mr. Trepp ever dispute that you owned the
15  anomaly detection software?
16    A.  No.
17    Q.  In late November of 2005, did you have a conversation
18  with Mr. Trepp about how much had been paid by the government
19  in connection with these various top secret projects?
20    A.  Yes.
21    Q.  And how much did Mr. Trepp say had been paid?
22    A.  I think he said around 10 to 12 million.
23    Q.  What was your -- your understanding of how much had
24  been paid?

Page 184

1    A.  In the two years?
2    Q.  Yes.
3    A.  I think more closer to 18 million.
4    Q.  And in early December of 2005, did you have a
5  conversation of how much was in the bank and you wanted to see
6  the bank statements?
7    A.  Yes.
8    Q.  What did you say to him?
9    A.  "I want to see the bank statements."
10    Q.  And what did he say?
11    A.  He never showed it.  He didn't say anything.  He never
12  showed it.
13    Q.  And after this conversation in early December of 2005,
14  did he say anything about giving you any money?
15    A.  Well, I told him I needed a couple hundred grand.  Is
16  that the question?
17    Q.  Yeah.
18    A.  Yes.
19    Q.  So what did he do?
20    A.  In December, I don't remember the exact date.  It must
21  have been around -- I think around the 10th or something, he
22  gave me either 125 or 150 thousand.
23    Q.  And what was your understanding as to what that was
24  for?

Page 185

1    A.  Once again, he said he'll work it out.
2    Q.  And let me show you Exhibit 18.  Did you have a
3  conversation about Exhibit 18 with Mr. Trepp in the end of
4  December of '05?
5    A.  He brought me two documents, this being one of them --
6  I don't remember the other one -- and told me that he wanted me
7  to sign it.
8    Q.  And what did you say?
9    A.  "I won't sign it."
10    Q.  And is that your signature on Exhibit 18?
11    A.  No.
12    Q.  Did you ever sign any document like that in front of
13  this individual, Mr. Bora?
14    A.  No.
15    Q.  Who is Mr. Bora?
16    A.  Gellay's (phonetic), which is Warren's wife's brother.
17    Q.  And based on your knowledge of your own signature, is
18  that signature forged?
19    A.  It's not mine.  I didn't sign it.
20       MR. FLYNN:  And at some point, Your Honor, I'd ask the
21  Court to compare that signature to the signatures on all the
22  other documents with Mr. Montgomery's handwriting that have
23  been introduced.
24       MR. PEEK:  Your Honor, I think that --

47 (Pages 182 to 185)

eTreppid vs. Montgomery   Hearing: Preliminary Injunction - Vol. I, III Tuesday, February 7, 2006

---

Page 186

1      THE COURT: I've already done that. But my question
2  is, where is the original?
3      MR. PEEK: We have the original, Your Honor. I guess
4  we're going to have to submit it to forensics now, questioned
5  document examiner, now that Mr. Flynn's client denies, contrary
6  to the testimony of Mr. Trepp, signing it and that of the
7  witness who witnessed it.
8      THE COURT: Well, I can't tell you what to do.
9      MR. PEEK: I'm not going to do it today. I don't
10  think I need to do it for this purpose.
11      THE COURT: I know what I would do.
12      MR. PEEK: I certainly wouldn't ask the Court to
13  compare it to others.
14      THE COURT: I think it's within the layperson's
15  ability to compare signatures and make judgments, but not --
16  I'm not really going to engage in that exercise for that
17  purpose. I was just curious.
18      MR. PEEK: Are we about done here?
19  BY MR. FLYNN:
20      Q.  Mr. Montgomery, you've heard all of this testimony
21  about the various deletions during the January period in 2006,
22  files missing, et cetera, raid boxes gone.
23      Would you describe to the Court what you did in your
24  relationship with eTreppid Technologies in January of 2006 in

---

Page 187

1  connection with any of the software that was present in the
2  company.
3      A.  I got called -- Mr. Trepp was getting ready to leave
4  on a cruise. I don't remember which week that was, if it's the
5  week of the 8th. And I planned on taking the week off because
6  he was going to be gone also.
7      And I got a call on, I think, Monday morning from
8  Mr. Trepp saying that I need to come down to the building.
9      Q.  And what was the nature of that discussion other than
10  that? Was there anything else?
11      A.  No, he just said, "You need to come down here right
12  now."
13      Q.  And what happened?
14      A.  I had another commitment, and I couldn't come down
15  that day.
16      Q.  So then what happened?
17      A.  He called me either -- he left a message on my phone
18  that night, saying I needed to come down there tomorrow
19  morning.
20      Q.  Did he tell you why?
21      A.  No, he just said it was important, I needed to come
22  down.
23      Q.  Did you go down the next day?
24      A.  Yes.

---

Page 188

1      Q.  And then what happened?
2      A.  I entered through the warehouse, and I saw all of
3  these people going through all the hard drives.
4      Q.  Okay. What date was that?
5      A.  It's the -- it would be the Tuesday. I don't know --
6  I don't know which day it is. January.
7      Q.  The Tuesday -- the second week in January?
8      A.  Yes, the second week in January.
9      Q.  And did you have any foreknowledge that these people
10  would be going through the hard drives?
11      A.  No.
12      Q.  Were they going through the hard drives in this area
13  here (indicating), this area near --
14      A.  Yes, yes.
15      Q.  -- on Exhibit 1 --
16      A.  Yep. Yes.
17      Q.  -- which we've called Dennis's, Mr. Montgomery's, work
18  area?
19      A.  Work area, yes.
20      Q.  And were those all government computers?
21      A.  Yes.
22      Q.  What was the value of those computers?
23      A.  My guess, 350,000-plus.
24      Q.  And when were those computers brought in to eTreppid?

---

Page 189

1      MR. PEEK: Counsel, I can't see the witness answer the
2  question.
3      THE WITNESS: December 2003, I believe, or
4  January 2004.
5  BY MR. FLYNN:
6      Q.  And did a particular branch of the government bring
7  those in?
8      A.  I -- we purchased them on behalf of the government.
9  They were government computers, and we purchased them, one from
10  each group. So I don't know which group belonged to which one.
11      Q.  Did -- at some point, did the government bring in
12  computers that you didn't purchase?
13      A.  Yes.
14      Q.  When did they bring those computers in?
15      A.  I believe January of 2004.
16      Q.  And what was the value of those computers?
17      A.  Three million.
18      Q.  And --
19      MR. PEEK: Objection. Move to strike. There's no
20  foundation for this testimony that the value of the computers
21  was $3 million.
22      MR. LOGAR: What difference does it make? That's not
23  an objection.
24      THE COURT: Hold on. Hold on. Hey, guys, listen to

---

48  (Pages 186 to 189)

821d05dd-39a8-4560-b998-2db41a804b7c

Case 3:06-cv-00263-PMP-VPC   Document 63-4   Filed 08/09/06   Page 24 of 40

eTreppid vs. Montgomery   Hearing - Preliminary Injunction - Vol. II, III Tuesday, February 7, 2006

Page 190

1  me. Hey, no, listen. We're getting late here tonight. It's
2  easy to get carried away and have exchanges, but I want to
3  maintain reasonable order in here. So if you have something to
4  say, say it to me.
5      And likewise to you, if you have something to say, say
6  it to me.
7      So what we'll do --
8      MR. PEEK: My objection, Your Honor, was lack of
9  foundation and qualification as to what the value is, as well
10 as the relevance here.
11     THE COURT: All right. Well, first of all, what is
12 the basis for your knowledge of the value of the computers?
13     THE WITNESS: You're asking me, Your Honor?
14     THE COURT: Yes.
15     THE WITNESS: I was told that was the price by the
16 government.
17     MR. PEEK: Objection. Hearsay, Your Honor.
18     THE COURT: I don't know that I see the relevance.
19 What's the relevance?
20     MR. FLYNN: The relevance, Your Honor, is that the
21 government brought these computers in because of
22 Mr. Montgomery's ownership of the anomaly detection software.
23     THE COURT: Well, that's your conclusion. But I mean,
24 I don't know that there's any evidence here from which we can

Page 191

1  conclude that that's not hearsay.
2  BY MR. FLYNN:
3      Q.  Mr. Montgomery, why did the government bring the
4  computers in?
5      A.  They wanted us to run the anomaly detection software
6  on all the computers.
7      MR. PEEK: Again, Your Honor, objection. That's
8  hearsay. That calls for hearsay from the government as to why
9  they were there. It had to have come from a hearsay statement
10 from a government official, as opposed to pursuant to a
11 contract.
12     THE COURT: I understand that, but why they brought
13 them is pretty apparent to me, to run the programs. But the
14 question I was concerned about was, why is it -- the cost of
15 those programs, why is that relevant? That was the question I
16 had.
17 BY MR. FLYNN:
18     Q.  The magnitude of the work that was being done with
19 regard to anomaly detection that warranted the contract price
20 had to do with how quickly you could process the information;
21 is that correct?
22     A.  Yes.
23     Q.  Now, continue with your -- you had no forewarning of
24 the fact that the people in eTreppid would be trying to access

Page 192

1  the hard drives?
2      A.  No.
3      Q.  And were they also in this area called the private
4  room (indicating)?
5      A.  Not that I know of. I only walked in through the
6  warehouse up the back stairs to Mr. Trepp's office.
7      Q.  And did you have a conversation with Mr. Trepp about
8  what these people are doing with these hard drives, would do
9  with the software?
10     A.  Yes.
11     Q.  What did you tell them?
12     A.  I was surprised that he was letting people with no
13 classification dismantle disk drives.
14     Q.  And what did he say?
15     A.  He's looking for the software.
16     Q.  And who did you see working on this -- on these hard
17 drives?
18     A.  Michael Salvetek, Jim Bauder, Jesse Anderson,
19 Venkata Kalluri.
20     Q.  Did any of these people have government clearances?
21     A.  Jim, I believe -- or, Jesse, I believe, did; the
22 others, no.
23     Q.  And when you confronted them with the fact that they
24 weren't allowed or permitted under the contract with the

Page 193

1  government to do that, what did he say?
2      A.  That he's ordering them to do it, Mr. Trepp is.
3      Q.  And did he tell you why?
4      A.  No.
5      MR. PEEK: Your Honor, can we move on? I'm going to
6  object. This is just dragging on and dragging on to be a
7  filibuster, and denying me the opportunity to cross-examine.
8  It's now 8 o'clock.
9      MR. LOGAR: Is there an objection, Counsel, to your
10 statement?
11     THE COURT: Again, conversation -- I want conversation
12 direct to the bench.
13     MR. LOGAR: It's just speaking objections.
14     THE COURT: I understand that. But I really am having
15 a lot of difficulty seeing how this ties into the issue here.
16 We're almost at an hour now for your 20-minute examination, so
17 please hurry up.
18 BY MR. FLYNN:
19     Q.  Did what they do destroy any of the software in any of
20 the source codes?
21     A.  Possibly, yes.
22     Q.  The source codes with regard to anomaly detection
23 software, where are they?
24     A.  In the building.

CECILIA VOHL, NV CCR #246(775) 827-0672

821d05dd-39a8-4560-b998-2db41a804b7c

eTreppid vs. Montgomery   Hearing - Preliminary Injunction - Vol. II   II Tuesday, February 7, 2006

Page 194

1    Q.  And how many lines of code do they -- exist,
2  Mr. Montgomery?
3    A.  Half a million-plus.
4    Q.  And do you know whether, when they tried to access the
5  software, any of those lines of code were destroyed?
6    A.  It could have been.
7    Q.  And are those lines -- are the source codes to access
8  those lines of code also in your head?
9    A.  Yes.
10    Q.  And are those the same -- is that the same anomaly
11  detection software that you copyrighted back in 1982?
12    A.  Yes.
13    Q.  And explain to the Court why that is the case, namely,
14  that they're identical.
15    A.  Well, I mean, I'm the one that did all the original
16  work on the anomaly detection software.
17    Q.  Did you destroy or take any files or hard drives or
18  anything from eTreppid Technologies?
19    A.  No.
20    Q.  And is there anyone at eTreppid Technologies today, to
21  your knowledge, that has the capability to determine what's
22  there and what isn't there in connection with the government
23  contract on anomaly detection?
24    A.  I don't think so.

Page 195

1    Q.  So they wouldn't even know how to do it?
2    A.  That's correct.
3    Q.  Have you heard any testimony from Mr. Venable or
4  Dr. Sun or anyone else that would indicate they have any
5  knowledge or expertise whatsoever, or the expert that was
6  called, as to how to access the anomaly detection codes inside
7  eTreppid today?
8    A.  No.
9    Q.  Are you the only one?
10    A.  I don't know that for a fact, but I would suspect
11  that's probably the case.
12    Q.  In connection with your conversations with Mr. Trepp
13  in the presence of governmental agents, did some of those
14  conversations relate to the fact that you were the only person
15  on the planet that could do this anomaly detection?
16    A.  They just want -- I don't know if they said it exactly
17  like that, but up until that point, we were the only ones that
18  were able to get out these kinds of results.
19    Q.  Do you know of anyone else that, you know, deleted
20  files at eTreppid Technologies?
21    A.  Well, all the programmers, from time to time, did that
22  on their own.
23    Q.  But do you know of anyone who deleted files who
24  shouldn't have been deleting files?

Page 196

1    A.  No.
2    Q.  Did anyone control your work, ever, at eTreppid
3  Technologies?
4    A.  What do you mean by that?  That's --
5    Q.  With regard to your -- first, your data compression
6  type of work, did, say, anyone instruct you or supervise you on
7  how to do that type of work?
8    A.  No, no.
9    Q.  With regard to your anomaly detection work, did anyone
10  ever instruct you or supervise you in any way on how to do that
11  work?
12    A.  No.
13    Q.  And in regard to the anomaly detection work, that was
14  work that you distinctly understood as far back as 1982; is
15  that correct?
16    A.  Yes.
17    Q.  Did anyone else have the skill at eTreppid
18  Technologies to do the --
19        MR. PEEK:  Objection.  Lacks foundation as to how he
20  can evaluate somebody else's skill, given the fact he only has
21  an associate's science degree.
22        THE COURT:  Well, I think you could evaluate it based
23  upon your experience, education, training, et cetera.  But the
24  better question, I think, is how does he know what their level

Page 197

1  was?  That's the thing I'm concerned about.
2  BY MR. FLYNN:
3    Q.  Based on all your years in working with all these
4  people, are you aware what skill levels these various
5  individuals had that were computer programmers at eTreppid?
6    A.  Yes.
7    Q.  Did anyone have the skill level other than you to do
8  anomaly detection?
9    A.  Probably not.
10    Q.  And the instruments and the tools that were used by
11  you to do the anomaly detection, was that based on the
12  copyrights that you --
13    A.  Yes.
14    Q.  -- filed back in 1982?
15    A.  Sorry.  Yes.
16    Q.  With regard to the intrusion technology,
17  Mr. Montgomery --
18    A.  Yes.
19    Q.  -- was there some type of a system set up by you that
20  required a response, and if it didn't get a response, it would
21  start self-destructing?
22    A.  Yes.
23    Q.  How did that work?
24    A.  You set the time frame, and you had to respond within

50  (Pages 194 to 197)

821d05dd-39a8-4560-b998-2db41a804b7c

Case 3:06-cv-00263-PMP-VPC   Document 63-4   Filed 08/09/06   Page 26 of 40

eTreppid vs. Montgomery   Hearing · Preliminary Injunction - Vol. II   II Tuesday, February 7, 2006

## Page 198

1  that period of time frame. And if you didn't, it would purge
2  itself.
3      Q.  And as you sit here today, do you have any
4  understanding as to whether that may have occurred at eTreppid
5  Technologies?
6      A.  Well, since I was locked out of the building and I
7  could never go into it, I suspect it probably happened.
8      MR. FLYNN:  That's all I have, Your Honor.
9      THE COURT:  All right. Let me just stop and ask a
10 question, which is probably going to not make any sense. But
11 there's been an amended complaint filed on the 1st of February.
12 Obviously, time to answer it hasn't expired, but there hasn't
13 been an Answer filed, at least as far as I can see.
14     MR. PEEK:  There's an Answer to the earlier, but not
15 to the amended one, that's correct.
16     THE COURT:  I didn't find that in my file, but was --
17 were there any counterclaims?
18     MR. PEEK:  There is a counterclaim, Your Honor, for
19 copyright infringement contained within the counterclaim.
20     THE COURT:  All right. Let me ask you a question.
21     During the time that eTreppid was being paid for
22 this -- for the use of this copyrighted material by the
23 government, which you claim belongs to you, did you ever object
24 to the government and say, wait a minute, that's my material,

## Page 199

1  that's not eTreppid's material?
2      THE WITNESS:  I don't recall, Your Honor, if I did or
3  not.
4      THE COURT:  Well, go ahead, Mr. Peek. I was going to
5  open my big mouth about something.
6      MR. PEEK:  I'm happy to hear from the Court. If it
7  will shorten the proceeding, I'm happy to hear from the Court.
8      THE COURT:  Well, let me tell you, counsel for both
9  sides, kind of how I think I'm seeing this, but I'm prepared to
10 be persuaded otherwise. But maybe that might be helpful. I
11 know, when I was a practicing lawyer, I kind of liked to know
12 sometimes what that judge was thinking about. Not always happy
13 to know, but I kind of wanted to.
14     And it seems to me that the agreement that was
15 originally entered may or may not cover the technology that
16 we're talking about. But certainly, at some point in time, by
17 conduct or agreement, oral or by conduct and by performance, it
18 was agreed that eTreppid could market this technology and
19 didn't market this technology to this agency of government and
20 that all the parties acknowledged that it was eTreppid's to
21 market.
22     The problem arises with regard to a further agreement
23 or further compensation or other issues that may be the subject
24 of a very meritorious counterclaim. Whether it's meritorious

## Page 200

1  or not, I have no idea. But I don't -- at this point in time,
2  I'm not -- it would appear to me that the technology was indeed
3  conveyed to eTreppid to market and sell to the government and
4  that the government paid eTreppid for that.
5      Now, if there was an agreement that there would be
6  compensation for it later and that agreement wasn't honored,
7  that's part of the counterclaim. If there's an agreement that
8  copyrights were infringed, that's part of the counterclaim.
9      But as to the ownership of it, it would seem to me,
10 like I said, by conduct, by oral understanding, that it was
11 agreed, yeah, this belongs to eTreppid and I'm going to get
12 compensated for it later. That's where the counterclaims come
13 in. So tell me where I'm wrong about that.
14     MR. FLYNN:  Your Honor, with all due respect, black
15 letter law -- and we have a brief on it -- says that no
16 copyright --
17     THE COURT:  Title 17, right?
18     MR. FLYNN:  -- no copyright can be given under these
19 circumstances without a written assignment.
20     The closest they can get is the Work For Hire
21 Doctrine. We have -- a state court is absolutely preempted,
22 under case law statute, from using trade secret, from using
23 conduct, from using implied agreement, to breach the provisions
24 of the copyright act. The most that they could get is a

## Page 201

1  nonexclusive, oral license under the conduct.
2      And as I say, Your Honor, we have the brief. We're
3  ready to submit the brief to the Court.
4      THE COURT:  Oh, it hasn't been submitted to me yet?
5  I'm familiar with Title 17.
6      MR. FLYNN:  It hasn't been submitted.
7      THE COURT:  And I think I know the section that you're
8  talking about. But I mean, if that's the case, what the heck
9  are we doing in state court? Why aren't you guys in federal
10 court?
11     MR. FLYNN:  The only reason we're here is the Court
12 simply said, you can't remove it based on the counterclaim.
13 But we've already filed over in the federal court.
14     So, no matter what this Court does --
15     THE COURT:  I'm wasting my time?
16     MR. PEEK:  You're not wasting your time, Your Honor.
17     THE COURT:  Well, why don't you just let me do it, and
18 then you can go to federal court and do whatever federal court
19 does.
20     MR. FLYNN:  Your Honor, because it's just so
21 flagrantly incorrect, under the copyright law, for a state
22 court to -- in effect, to give away a copyright, which is the
23 clear basis of the record at this point in time, with no
24 reputation, with no meeting of any burden of proof to the

51  (Pages 198 to 201)

821d05dd-39a8-4560-b998-2db41a804b7c

eTreppid vs. Montgomery   Hearing - Preliminary Injunction - Vol. II, III Tuesday, February 7, 2006

Page 202

1  contrary. Based on all the case law and the brief we've got
2  for the Court, it simply cannot be done.
3       THE COURT: All right. See, I'll have to consider
4  that. I mean, I'm aware of Title 17. I'm aware, I think, of
5  the section you're talking about.
6       I'm just looking at this from the standpoint of
7  regular contract. If it can't be done, then we go back to the
8  issue, and I determine whether or not, in fact, it was in
9  writing and whether the writing is sufficient to convey that
10 and whether conduct can supplement it or expand upon that
11 agreement. Those are the things that I'll have to take into
12 consideration. And I'm not necessarily going to decide it now;
13 I'm just telling you the contents in my head.
14      MR. FLYNN: Yes, Your Honor. See, on that point,
15 we're -- the contract clearly says only CD Number 1 has been
16 given. I do not see how you can possibly get outside of that
17 where you're not dealing with an employee, you're dealing with
18 a founder and a principal and an independent contractor.
19      THE COURT: Well, that's something I'll have to decide
20 when I take that into consideration.
21      MR. PEEK: And a fiduciary duty as a member of the
22 LLC, Your Honor, with partnership fiduciary responsibilities.
23      May I go ahead and cross-examine?
24      THE COURT: Yeah, go ahead.

Page 203

1       MR. PEEK: I understand where the Court is. I may be
2  able to shed some light on this, as well.
3       THE COURT REPORTER: May I say, for the record, I'm
4  getting really tired.
5       MR. PEEK: I'll be slow, Ms. Vohl. I don't agree with
6  that, but -- I don't believe that.
7
8            CROSS-EXAMINATION
9
10 BY MR. PEEK:
11      Q.  Let's talk a little bit, Mr. Montgomery, about, as you
12 say, the anomaly detection, which you say you copyrighted as
13 part of your work at Computermate; is that correct?
14      A.  Yes.
15      Q.  And that was related to blood gas analysis?
16      A.  Well, it related to blood gas analysis.
17      Q.  And the blood gas -- the blood is being drawn from
18 time to time by techs and tested as to what its gases are?
19      A.  Yes.
20      Q.  And those gases have to be within a certain range, do
21 they not, have a certain medical range where they might show
22 that there's something wrong with the patient?
23      A.  Is that a question?
24      Q.  Yes. Is that correct?

Page 204

1       A.  Yes.
2       Q.  And your anomaly detection portion of the blood gas
3  was, you said that the range for certain levels of blood gases
4  would be a percentage for hydrogen, oxygen, nitrogen, carbon
5  dioxide, things of that nature?
6       A.  I don't understand your question.
7       Q.  Well, you're determining, are you not, whether or not
8  a person's blood gases contain more hydrogen, carbon dioxide,
9  or oxygen than they are supposed to?
10      A.  No.
11      Q.  What are you testing for, then? What is the anomaly?
12      A.  I've never tested for hydrogen. You just used
13 hydrogen as an example.
14      Q.  Okay. But you were testing for other blood gases, are
15 you not?
16      A.  Yes.
17      Q.  And there are medical ranges for blood gases, are
18 there not?
19      A.  Yes.
20      Q.  And if those blood gases fall outside of those ranges,
21 that would be an anomaly; is that correct?
22      A.  No. That would be abnormal.
23      Q.  Well, what's the anomaly, then, that is being tested,
24 the anomaly detection that you're determining with your blood

Page 205

1  gas analysis?
2       A.  You're shooting light through blood, and a spectrum is
3  being produced. And that spectrum, depending on which value
4  you're looking for, determines the spec- -- you look for each
5  of the variables in a different range in the spectrum.
6       Q.  You're looking for, as I understand it, certain gases?
7       A.  Patterns.
8       Q.  Patterns?
9       A.  Patterns.
10      Q.  What are the patterns?
11      A.  Well, a gas shows up at a certain spectrum and has a
12 certain appearance.
13      Q.  Can you show me within Exhibit 19 where it talks about
14 anomaly detection?
15      A.  You want me to read this whole thing?
16      Q.  I want you to -- it's your book, is it not?
17      A.  It's been 20 years.
18      Q.  Oh, so you haven't looked at this book for 20 years,
19 Mr. Montgomery; is that correct?
20      A.  No.
21      Q.  Well, what -- when was the last time you looked at
22 this book, sir?
23      A.  Two weeks ago.
24      Q.  When you looked at it two weeks ago, did you find the

CECILIA VOHL, NV CCR #246 (775) 827-0672

821d05dd-39a8-4560-b998-2db41a804b7c

eTreppid vs. Montgomery   Hearing - Preliminary Injunction - Vol. I, II Tuesday, February 7, 2006

---

Page 206

1   phrase "anomaly detection" anywhere within it?
2      A.  I don't recall if I did or not.
3      Q.  Is there anything in there that you would characterize
4   as anomaly detection?  If it is, point us to it.
5      A.  The software.
6      Q.  Well, point us to someplace in that book that
7   describes anomaly detection.
8      A.  I'm not sure this book describes anomaly detection.
9      Q.  Well, what about Exhibit 21, which is part of -- came
10  out of that -- or Exhibit 20, I think, that came out of that?
11     A.  The copyrights?
12     Q.  No, no.  The Exhibit 20, which was the excerpts from
13  that, where in those documents that are excerpts from
14  Exhibit 19 does it describe, as you say, anomaly detection?
15     A.  The center screen is the output of the determination
16  of that anomaly.
17     Q.  Okay.  Can you then tell me -- point me, then, to that
18  exhibit.
19     A.  Am I done with this book?
20     Q.  Pardon?
21     A.  Page 22 in the middle.
22     Q.  Page 22?
23     A.  Yep.
24     Q.  Okay.  So this is what you describe as being anomaly

---

Page 207

1   detection?
2      A.  Excuse me.  32.
3      Q.  Okay.  I apologize.  32.  Well, what's on 22?
4      A.  Well, the blood hadn't been ejected yet.
5      Q.  Oh, okay.  So on 32, there is something there that you
6   say relates to anomaly detection.  Where do we see that?
7      A.  You -- you see the value that is displayed, tells you
8   the peak of the detection of the anomaly, and that peak has a
9   qualifying amount.
10     Q.  Where am I reading that?
11     A.  Well, see, a number like 29, as an example, for
12  bicarbonate.
13     Q.  For what?
14     A.  For HCO3.
15     Q.  Is it in the middle column?
16     A.  Yes, 29.1.
17     Q.  29.1?
18     A.  Yeah.
19     Q.  That's a detection of an anomaly?
20     A.  That gives you the size of the anomaly, that's
21  correct.
22     Q.  How do I know that's the size of an anomaly?
23     A.  I just told you it was.
24     Q.  Oh, just because you tell me it was.

---

Page 208

1      It says, over here, if I read across the column on
2   Exhibit 20 -- the middle column has no heading; it just says
3   "Corning 178-3 1/1/76."  Is "1/1/76" the date?  Is that a date?
4      A.  I believe it looks like a date.
5      Q.  Okay.  And then HCO3 -- what does HCO3 stand for?
6      A.  Bicarbonate.
7      Q.  And then it says "29.1."  How do we know that's an
8   anomaly?
9      A.  Well, we're looking for --
10     Q.  Tell me this --
11     A.  Do I get to answer?
12     Q.  Yeah.
13     A.  We're looking for the pattern in the spectral analysis
14  that relates to bicarbonate.
15     Q.  Where do we see that in this that shows --
16     A.  You see the result of it.
17     Q.  What's that?
18     A.  You see the end result of it.
19     Q.  How do I know that that was part of the spectral
20  analysis and was an anomaly detection from this document, or
21  are you reading from the book?
22     A.  I don't remember from the book.  We put the
23  original -- what the original patterns looked like.
24     Q.  So how is the Court going to tell from -- without aid

---

Page 209

1   of this exhibit, that there was a spectral analysis taken on
2   this patient's blood gas showing an anomaly of apparently a
3   bicarbonate 29.1?
4      MR. LOGAR:  Other than the witness's testimony?
5      THE COURT:  Mr. Logar, please.  If you have an
6   objection, direct it to me, would you, please.
7      Will you?
8      MR. LOGAR:  I will.
9      THE COURT:  All right.  Mr. Peek, where are you going
10  with this?  Is your point that the stuff that was patented and
11  what was --
12     MR. PEEK:  The copyright is not anomaly detection.
13  It's just more stuff --
14     THE COURT:  I get it.
15  BY MR. PEEK:
16     Q.  Is there anything in there?
17     A.  The end result.
18     Q.  The end result.  But we don't know what the -- was the
19  original to be able to look at the spectral analysis, as you
20  described it, to say this was a detection of an anomaly, other
21  than your testimony?
22     A.  Correct.
23     Q.  And there's nothing in the book that talks about that?
24     A.  I'll look again.

---

53  (Pages 206 to 209)

821d05dd-39a8-4560-b998-2db41a804b7c

eTreppid vs. Montgomery   Hearing - Preliminary Injunction - Vol. II   II Tuesday, February 7, 2006

Page 210

1    Q.  Okay.
2         THE COURT:  While we're taking this little break,
3    according to my review of the file, I do not have an Answer to
4    the complaint.  Do you have a copy of the Answer?
5         MR. LOGAR:  Your Honor, did you not get the documents
6    that were filed in federal court on remittitur?
7         THE COURT:  "On removal"?
8         MR. PEEK:  "On remittitur."
9         THE COURT:  Oh, "on remittitur."  Yeah, when they sent
10   them back?
11        MR. LOGAR:  Yes.
12        THE COURT:  Perhaps not, but do you have a copy of
13   the --
14        MR. LOGAR:  We do.
15        MR. PEEK:  And, Your Honor, they were filed and
16   captioned the United States District Court in the District of
17   Nevada.
18        THE COURT:  Do you have a copy I could look at?
19        MR. PEEK:  I've got one, Your Honor.
20        MR. LOGAR:  It was unclear, when we were in federal,
21   when the remittitur would occur.  I assumed that the file had
22   been sent back by now.
23        THE COURT:  It may have.  Who knows.
24        MR. LOGAR:  But you don't have it?

Page 211

1         THE COURT:  I don't have it, no.
2         MR. PEEK:  We all assume that because Judge McKibben
3    ordered it that way.
4         THE COURT:  Let me just see a copy.  All I'm saying,
5    Mr. Peek, is, I think I know where you're going with this.  And
6    ultimately, if we don't get finished, then I'm going to have to
7    ultimately declare some kind of a recess, and God knows when
8    we're going to come back.  So I encourage you to use your
9    time --
10        MR. PEEK:  Wisely?  I'll move on, Your Honor.
11   BY MR. PEEK:
12    Q.  In the brief moment you've had to look, you find
13   nothing in there about anomaly detection, do you?
14    A.  No.
15    Q.  And you were not the only founder of Computermate,
16   were you?
17    A.  Yes, I was the original founder.
18    Q.  Were you the only founder, sir?
19    A.  Yes, I was the original founder.
20    Q.  Were there any other individuals who -- well, for
21   example, who is Robert West?
22    A.  I actually don't remember.
23    Q.  And who is William Mannak?
24    A.  He joined Computermate -- I don't remember the exact

Page 212

1    date.
2     Q.  And was it in 1982?
3     A.  It was like a year after -- I'm just --
4     Q.  A year after you had what?
5     A.  Started Computermate.
6     Q.  When did you start Computermate?
7     A.  I thought it was '81.
8     Q.  So about a year later, he joined you.
9         And the source code that you wrote for blood gas
10   analysis, that was written in what language?
11    A.  I believe RPN.
12    Q.  RPN.  And in what language were you writing anomaly
13   detection at eTreppid?
14    A.  The anomaly detection at eTreppid already existed.
15    Q.  It already existed?
16    A.  Yes.
17    Q.  Because you put it on the computers?
18    A.  Yes.
19    Q.  Okay.  And what language was it that you put it on?
20    A.  I think it was Visual C.
21    Q.  Visual C.  Not C++?
22    A.  Not originally, that's correct.
23    Q.  Now, were there engineers who wrote code onto the
24   anomaly detection that you had, at some time, put on the

Page 213

1    servers at eTreppid?
2     A.  No.
3     Q.  So, there were no -- none of the engineers in Zehang's
4    group, as he is director of engineering, did any additions
5    whatsoever in writing source code or writing code, either in
6    MET lab or C++, to the anomaly detection; is that right?
7     A.  To my anomaly detection?
8     Q.  That's right.
9     A.  No.
10    Q.  Was your anomaly detection on the source server?
11    A.  No.
12    Q.  Was it on the ESA server?
13    A.  No.
14    Q.  Was it in a raid box?
15    A.  Had it ever been on a raid box?
16    Q.  Uh-huh.
17    A.  Possibly.
18    Q.  Possibly.  So -- and did you -- from time to time, as
19   the government was asking you to make additions or deletions or
20   improvements to the -- as you call your source code, did you
21   have to write additional code?
22    A.  To the anomaly detection software?
23    Q.  Yes.
24    A.  No.

54  (Pages 210 to 213)

CECILIA VOHL, NV CCR #246 (775) 827-0672

eTreppid vs. Montgomery   Hearing - Preliminary Injunction - Vol. II   II Tuesday, February 7, 2006

| Page 214 | Page 216 |
|---|---|
| 1 Q. Okay. And when did you put it on -- when did you put | 1 A. (Witness draws on diagram.) |
| 2 the anomaly detection software onto the computers at eTreppid? | 2 Q. Is there any identifying characteristic of that |
| 3 A. Which computers? | 3 computer, location, type, manufacturer? |
| 4 Q. The computers at eTreppid. | 4 A. Well, when I saw it last, it was still sitting there. |
| 5 A. July or August of 2003, I believe. | 5 Q. What's the manufacturer of it? |
| 6 Q. And which computer -- on which computer did you put | 6 A. It was a clone. There was no manufacturer of it. |
| 7 it? | 7 Q. It was a clone built by -- |
| 8 A. The one in my office. | 8 A. eTreppid. |
| 9 Q. Okay. On this diagram here where we showed | 9 Q. eTreppid. Is it the first computer as you walk into |
| 10 Dennis Montgomery in sort of the lower right, is that where -- | 10 the warehouse on the left-hand side? |
| 11 that's your desk station? | 11 A. From which direction? |
| 12 A. Where? | 12 Q. As you're walking into it from the -- I don't know the |
| 13 Q. Is that your desk? Show us -- actually, why don't you | 13 directions here, but from the offices into the warehouse, would |
| 14 do it in green. Do it in green, please, sir. | 14 it be on the left-hand side? |
| 15 A. (Witness complies.) | 15 A. Yes. |
| 16 Q. So it's not in the warehouse? | 16 Q. That's where it's drawn on this drawing, isn't it? |
| 17 A. That's correct. | 17 A. Well, that drawing didn't actually represent the way |
| 18 Q. Okay. And do you have any other identifying | 18 the computers were set up in the warehouse. |
| 19 characteristics of that, other than that computer that was in | 19 Q. Okay. |
| 20 your office? | 20 (Plaintiff's Exhibit 23 was marked for |
| 21 A. I don't understand what you mean. | 21 identification.) |
| 22 Q. Is there anything, if I were to -- I want to make sure | 22 BY MR. PEEK: |
| 23 that I could go to the right computer. Is there just one | 23 Q. Now, again with respect to Computermate, I think you |
| 24 computer in your office? | 24 said that that company, at some time, went out of business? |

| Page 215 | Page 217 |
|---|---|
| 1 A. And what time frame was that? | 1 A. I don't remember if it did or not or we sold it. |
| 2 Q. Let's say in December of 2005. | 2 Q. And did it merge into Barrett Laboratories? |
| 3 A. I thought you said originally -- | 3 A. I don't think so. |
| 4 Q. No, I wanted to know -- | 4 Q. And did Barrett Laboratories merge into 3Net? |
| 5 A. You said originally 2003. | 5 A. That is a possibility. I'm not certain. |
| 6 Q. You put it there. You put it there, in 2003, on your | 6 Q. Let me hand you what has been marked as Exhibit 23 and |
| 7 computer in your office? | 7 ask you to tell me whether or not you can identify whether or |
| 8 A. That's correct. | 8 not that's anything you have seen before today. |
| 9 Q. Did it go anyplace after that? | 9 A. I can't read all of them, but I think I get the gist. |
| 10 A. Yes. | 10 Q. The gist is, these are the original documents filed by |
| 11 Q. Where did it go after that? | 11 Computermate with the United States Copyright Office, are they |
| 12 A. Downstairs. | 12 not? |
| 13 Q. That's into the warehouse area? | 13 A. I don't know if they are or not. |
| 14 A. Yes. | 14 Q. Well, you recognize your name there as |
| 15 Q. Did you just take the entire box and put it -- take it | 15 Dennis Montgomery, do you not, as the author? |
| 16 down to the warehouse, or did you just take portions of it? | 16 A. Yes. |
| 17 A. I made just a copy of it. | 17 Q. You recognize the TXu as corresponding to the claim |
| 18 Q. And did you leave the original on your desktop or your | 18 that you made? |
| 19 computer in your office? | 19 A. I could look -- I'll trust you. Yes. |
| 20 A. No. | 20 MR. PEEK: You recognize Mr. Mannak as being somebody |
| 21 Q. So you deleted that? | 21 who was -- I'll offer it, then, Your Honor. |
| 22 A. Yes. | 22 THE COURT: What's the number? |
| 23 Q. Okay. And then where did you put it after 2003, which | 23 THE CLERK: 23. |
| 24 computer? | 24 MR. PEEK: It's 23. |

55   (Pages 214 to 217)

CECILIA VOHL, NV CCR #246 (775) 827-0672

821d05dd-39a8-4560-b998-2db41a804b7c

eTreppid vs. Montgomery    Heari    Preliminary Injunction - Vol. II    II Tuesday, February 7, 2006

Page 218

1      THE COURT: Any objection?
2      MR. FLYNN: He has no foundation, Your Honor, for
3   authentication purposes.
4      THE COURT: I think it has enough that I'm going to
5   admit it. It's admitted.
6      (Plaintiff's Exhibit 23 was admitted into evidence.)
7      THE COURT: Where are we going with this? Are we back
8   to who really owned it?
9      MR. PEEK: Yes, Your Honor.
10     THE COURT: If he didn't own it, how could he sell it
11  to your clients? He shouldn't even own it.
12     MR. PEEK: That may very well be, Your Honor, as to
13  who should be here. What we maintain is, whatever he did with
14  blood gas has nothing to do with what happened -- or what was
15  actually developed at eTreppid.
16     THE COURT: Well, that, I understand.
17     MR. PEEK: There's two prongs.
18     THE COURT: Ownership has got a back side to it.
19     MR. PEEK: I understand it may be that I'm dealing
20  with Computermate or Barrett Laboratories or somebody else who
21  can come in and actually use us that their source code is the
22  same as ours and written in the same language.
23     MR. FLYNN: Your Honor, if that's the position, there
24  isn't an iota of evidence so far that they have presented that

Page 219

1   this anomaly detection software was developed, produced, worked
2   on, anything, by eTreppid Technologies other than
3   Mr. Montgomery. And the only state of the record is it derives
4   from the copyrights. There is nothing to the contrary.
5      MR. PEEK: Your Honor, that's untrue. Mr. Zehang
6   testified that he did anomaly detections in MET lab --
7      THE COURT: He did. He did.
8      MR. FLYNN: No, Your Honor -- well --
9      THE COURT: It's my recollection -- if I'm wrong, I
10  suspect that what I'm going to do is, I'm going to want to take
11  a look at the transcript. Maybe not. But I made some notes,
12  and I can tell you that, according to my notes -- hold on --
13  according to my notes, Dr. Sun -- well, I don't see it right
14  here, but that was my recollection. I'll look back at my
15  notes. I'm not going to take the time --
16     MR. FLYNN: Your Honor, I specifically asked --
17     THE COURT: Hold on right here.
18     Dr. Sun, according to my notes, he created software
19  for pattern recognition, motion detection, face recognition,
20  tracking the vehicles, and anomaly detection. I wrote it down.
21     MR. FLYNN: Yes, Your Honor. And then on cross, I
22  asked him if the anomaly detection work that he did had
23  anything to do with the anomaly detection work that
24  Mr. Montgomery did on the government contracts, and he said no.

Page 220

1   And I asked Mr. Montgomery, and he said what Dr. Sun did had
2   nothing to do with what he did on the government contract.
3      THE COURT: That could be. All right. Let's go ahead
4   and try to get through this.
5      MR. PEEK: Thank you, Your Honor. I'll try to move
6   on.
7   BY MR. PEEK:
8      Q. You then went to -- I think you said Barrett did
9   additional work -- well, first of all, let me sort of
10  backtrack. Is there a written assignment to you from
11  Computermate of these copyrights?
12     A. Yes.
13     Q. Where is that?
14     A. I believe I have it.
15     Q. Okay. So you could produce it to this Court at our
16  next hearing or during discovery?
17     A. I will surely look for it.
18     Q. Okay. And would that be -- would Mr. Mannak be the
19  one who assigned it?
20     A. I don't recall if it was or not.
21     Q. And where do you believe it exists today? Where is
22  it?
23     A. I don't know. I'd have to look for it.
24     Q. Now, you said you went to Barrett Laboratories. Did

Page 221

1   you, then, convey this same anomaly -- what you claim to be
2   your anomaly detection technology -- or, excuse me, copyright
3   to Barrett?
4      A. I don't know if it was -- I believe it was a
5   derivative and that work had continued on.
6      Q. Okay. And so you did additional work while you were
7   at Barrett?
8      A. Yes.
9      Q. And you had additional copyrights?
10     A. Yes.
11     Q. And those copies also were for this same derivative
12  work or blood gas analysis?
13     A. No, it covered many other areas.
14     Q. Covered other areas, but it was also anomaly
15  detection?
16     A. Yes.
17     Q. And did -- so, is there a written transfer of that --
18  all that work, the copyright for blood gas analysis, to
19  Barrett?
20     A. I believe so.
21     Q. You would have that as well?
22     A. I will sure look for it.
23     Q. And so then Barrett owned it after you joined Barrett
24  sometime in '85, you said?

56 (Pages 218 to 221)

CECILIA VOHL, NV CCR #246 (775) 827-0672

eTreppid vs. Montgomery   Hearing - Preliminary Injunction - Vol. II & III Tuesday, February 7, 2006

---

Page 222

1     A.  I believe I retained the rights out of Computermate to
2  do with it what I chose, whether Barrett had it or not.
3     Q.  Well, the copyrights that you did -- that you actually
4  copyrighted at Barrett, were they for the blood gas analysis or
5  derivatives thereof?
6     A.  Would it contain that?  Yes.
7     Q.  Okay.  So the copyrights that you did while you were
8  at Barrett, who owns those?
9     A.  I do.
10    Q.  And how did you get them from Barrett?
11    A.  They were assigned to me.
12    Q.  And is there another written assignment of that?
13    A.  I believe there is.
14    Q.  You believe there is.
15        Now, are you aware that in order to make an assignment
16  effective, it has to be at the copyright office?
17    A.  I don't recall if it was or not.
18    Q.  Have you transmitted these assignments to the
19  copyright office?
20    A.  I don't recall.
21    MR. FLYNN:  Your Honor, that calls for a legal
22  conclusion.
23    THE COURT:  Well, he's asking if he's transmitted it
24  to the copyright office.  Are you talking about the question

---

Page 223

1  before that?
2     MR. FLYNN:  I'm asking him if he is aware that that's
3  what has to be done to make it legally effective.
4     THE COURT:  And he said no, he's not, so he's answered
5  that question.  And then you asked him, had he transferred it,
6  and I would assume --
7     MR. PEEK:  Transmitted it in an assignment form to the
8  copyright office.
9     THE COURT:  Yeah, yeah.  I would assume the answer is
10  no, because he didn't know --
11    THE WITNESS:  I don't know.
12    THE COURT:  -- if that is the law or isn't the law.  I
13  don't know.
14  BY MR. PEEK:
15    Q.  Would you agree with me, though, the copyrights, while
16  you were at Barrett, on whatever you claim to be an anomaly
17  detection that you developed at Barrett, were in the name of
18  Barrett?
19    A.  I don't recall if they were or not.
20    Q.  Did the copyrights that you undertook to copyright
21  while at Barrett get copyrighted in the name of Barrett or in
22  your name?
23    A.  I believe Barrett.
24    Q.  And Barrett still exists in some other iteration of an

---

Page 224

1  entity today, does it not?
2     A.  I don't know if it does or not.
3     Q.  You left it after a certain time?
4     A.  Yes.
5     Q.  Now, I think you also say that your -- you claim to
6  have the right to the source code for pattern recognition, as
7  well; is that correct?
8     A.  Yes.
9     Q.  Something that you developed while you were in
10  Hollywood, acting as a consultant?
11    A.  No.
12    Q.  Okay.  From '93 to '98, you worked as a consultant,
13  and you said during that period of time, you did some work in
14  Hollywood.
15    A.  Yes.
16    Q.  And it's while -- it's while doing that work in
17  Hollywood that you then wrote pattern recognition source code?
18    A.  No.
19    Q.  When did you write that?
20    A.  That was derivative work from the original work that I
21  had done on the copyrights.
22    Q.  Okay.  Same thing with the blood gas analysis?
23    MR. FLYNN:  Objection.  I don't understand.
24  ////                                    ////

---

Page 225

1  BY MR. PEEK:
2     Q.  What copyright was it that covered pattern
3  recognition?  Was it the blood gas analysis one?
4     A.  I believe it was the one in Barrett Laboratories.
5     Q.  And what's the name of it?
6     A.  I -- I think it was the one for microbiology.
7     Q.  The one for microbiology?  Okay.
8        (Plaintiff's Exhibit 24 was marked for
9  identification.)
10  BY MR. PEEK:
11    Q.  Let me have you take a look at, again, a document from
12  the United States Copyright Office.  I'll represent to the
13  Court and counsel that's where this came from.
14        It's Exhibit 24?
15    THE CLERK:  That's correct.
16  BY MR. PEEK:
17    Q.  Let me switch with you and give you the -- these
18  are -- I will represent to you, these are the copyright numbers
19  for the copyrights whose numbers correspond to the allegations
20  in your counterclaim and in your federal court complaint.
21    A.  Okay.
22    Q.  Can you tell me which of these relate to pattern
23  recognition, if any?
24    A.  I did pattern recognition originally in the original

---

57 (Pages 222 to 225)

eTreppid vs. Montgomery   Hearing - Preliminary Injunction - Vol. II   II Tuesday, February 7, 2006

Page 226

1  HP computers. It was expanded greatly when I got into the
2  Barrett Laboratories.
3      Q. Okay. Then let's go back -- you still have the
4  Computermate. Which one of those is related to pattern
5  recognition?
6      A. The one dated -- the one -- 117-868, titled
7  "Evapotranspiration Software."
8      Q. And this is entitled -- and you say "Computermate
9  Source Code for Hewlett-Packard Model 86, Evapotranspiration
10 Irrigation Software"; is that correct?
11     A. Yes.
12     Q. And the Hewlett-Packard Model 86, was that a computer,
13 or was that one of those hand-held --
14     A. No.
15     Q. What was it?
16     A. I believe they were all computers, the 85, 86, and 87.
17     Q. They were before the IBM XTs?
18     A. PCs.
19     Q. The XTs that ran on the 88 -- or 8800 chip?
20     A. Yes.
21     Q. And you believe that this is an HP computer, the 86?
22     A. I believe it's a computer, yes.
23     Q. And certainly not what we know today or even
24 comparable to the IBM that started all this, with the 8800 chip

Page 227

1  back in the mid-'80s?
2      A. Are you asking me --
3      Q. That's not the same thing, is it?
4      A. What do you mean, "the same thing"?
5      Q. Well, it's not with the motherboard, the hard drives,
6  the chip?
7      A. It had a motherboard and a hard drive and a chip.
8      Q. And in what language did you write this code?
9      A. I think it was RPN. I'm not certain.
10     Q. You're not certain. Okay.
11         So then we have the blood gas analysis for anomaly
12 detection and the Evapotranspiration Irrigation for pattern
13 recognition; is that correct?
14     A. Yes.
15     Q. So the so-called copyrights at Barrett had nothing to
16 do with either anomaly detection or pattern recognition; is
17 that correct?
18     A. No.
19     Q. Okay. So which of those relates -- of the Barrett
20 relate to pattern detection and anomaly detection -- pattern
21 recognition and anomaly detection?
22         I'm trying, Your Honor.
23     A. The one that ends in 750 that speaks of microbiology
24 and the one that ends in 009 that relates to anatomic

Page 228

1  pathology.
2      Q. Have you -- is there some record of what this source
3  code would look like at the copyright office, and do you have
4  an original copy of your filing showing the source code that
5  you copyrighted?
6      A. I believe the source code is included with the
7  copyright.
8      Q. So, at least those two anomaly detection copyrights
9  that were in some -- excuse me. The anomaly and the pattern
10 recognition were transferred to Barrett, and you continued to
11 work on them and developed additional -- well, developed more
12 work in pattern recognition and anomaly detection at Barrett;
13 is that correct?
14     A. Yes.
15     Q. And is the pattern recognition source code -- was it
16 also located first -- or loaded first on your office computer?
17     A. Um, I'm not certain.
18     Q. And when did you load it on that office -- your
19 computer at the eTreppid office?
20     A. '03, I believe.
21     Q. What month in '03?
22     A. I'm thinking sometime in August, July, August.
23     Q. July and August of '03.
24     A. I'm tired. I think that was the time frame.

Page 229

1      Q. Okay. And then did you, after July, August of '03,
2  write any additional source code, lines of code, to add to that
3  original source code of pattern recognition that you loaded on
4  your office computer in July and August?
5      A. For the detection?
6      Q. Yes.
7      A. No.
8      Q. And all your techs wrote pattern recognition. Did you
9  write any code on that?
10     A. For the actual detection?
11     Q. The pattern recognition that you say is yours and the
12 anomaly detection which you say is yours -- now, am I getting
13 the phrases wrong?
14     A. What you're asking is, has the technology that's
15 detecting the pattern or the anomaly been changed since it was
16 at eTreppid? I think -- is that --
17     Q. Yes.
18     A. No.
19     Q. Thank you. So you haven't written any additional
20 code, is that correct, to that?
21     A. For the actual detection?
22     Q. That's correct.
23     A. No.
24     Q. And are you telling this Court that the only software

58  (Pages 226 to 229)

CECILIA VOHL, NV CCR #246(775) 827-0672

821d05dd-39a8-4560-b998-2db41a804b7c

eTreppid vs. Montgomery   Hearing - Preliminary Injunction - Vol. II   II Tuesday, February 7, 2006

Page 230

1  which was used to complete the government contracts was your
2  anomaly detection and your pattern recognition software?
3      A.  I'm just looking at something.
4      Q.  Please answer my question, sir.
5      A.  I'm sorry.  Go ahead.
6      Q.  Are you telling this Court that the contracts that
7  were fulfilled by eTreppid were done -- were fulfilled solely
8  by your pattern recognition and your anomaly detection
9  software?
10         MR. FLYNN:  Objection.  Which contracts, Your Honor?
11         MR. PEEK:  Any of the contracts.
12         THE COURT:  Any of the contracts.
13         THE WITNESS:  You mean ever?
14  BY MR. PEEK:
15      Q.  Yes, solely by your source code for anomaly detection
16  and pattern recognition.
17      A.  Yes.
18      Q.  Okay.  And which contract -- tell this Court which
19  contract was fulfilled using just your anomaly detection and
20  your pattern recognition.
21      A.  The government agency that we --
22      Q.  Oh, the government agency that we don't want to talk
23  about, is that the only one?
24      A.  No.

Page 231

1      Q.  Okay.  Which other one where it was the sole product
2  or sole source code software used to fulfill the contract?
3      A.  We had a contract with the Department of the Navy.
4      Q.  Okay.  And what was the nature of that contract?
5      A.  Searching for an anomaly.
6      Q.  Searching for an anomaly.
7          And was your software the only software used?
8      A.  The one for detection?
9      Q.  To fulfill that contract.
10      A.  Yes.
11      Q.  So none of the other eTreppid softwares were used
12  whatsoever?
13      A.  That's correct.
14      Q.  And did you tell this unnamed agency that it was
15  only -- that it was your software that was being used, as
16  opposed to eTreppid's?
17      A.  I don't recall if I did or not.
18      Q.  Was the contract with this unknown agency between you
19  or between eTreppid and the others?
20      A.  eTreppid.
21      Q.  Was the work running the software for detection
22  undertaken while you were at eTreppid?
23      A.  Yes.
24      Q.  And was the contract with the Navy, the contract with

Page 232

1  eTreppid?
2      A.  Yes.
3      Q.  And was it a contract and the work undertaken on that
4  contract all performed at eTreppid?
5          MR. FLYNN:  Objection.  Lacks foundation.
6          THE WITNESS:  You have to ask the question again.
7          THE COURT:  Ask the question.  I mean, I understand
8  the question.
9  BY MR. PEEK:
10      Q.  Was the performance under the contract with the Navy
11  all undertaken by eTreppid on eTreppid premises?
12      A.  Yes.
13      Q.  Now, is pattern recognition a part of digital
14  compression product?
15      A.  No.
16          (Plaintiff's Exhibit 25 was marked for
17  identification.)
18  BY MR. PEEK:
19      Q.  Did you, from time to time, prepare PowerPoint
20  presentations?
21      A.  Yes.
22      Q.  Let me have you take a look at what has been marked as
23  Exhibit 25 and ask you to take a moment and examine it and tell
24  me whether, after doing so, you can identify it as something

Page 233

1  you've seen before today.
2          THE CLERK:  Just for the record, Your Honor,
3  Exhibit 24 was not offered.
4          MR. PEEK:  I'll offer Exhibit 24.
5          Thank you, Mr. Clerk.
6          MR. FLYNN:  No objection.
7          THE COURT:  It's admitted.
8          This is 25?
9          MR. PEEK:  Yes, Your Honor.
10         (Plaintiff's Exhibit 24 was admitted into evidence.)
11         THE WITNESS:  Okay.  I've looked at it.
12  BY MR. PEEK:
13      Q.  And did you prepare it?
14      A.  No.
15      Q.  Who prepared this?
16      A.  I don't know.
17      Q.  Have you seen it before?
18      A.  It looks familiar.
19      Q.  So who, in March of 2001, would have been preparing a
20  PowerPoint presentation?
21      A.  I can't recall.
22      Q.  But you say this was not prepared by you?
23      A.  I don't -- you asked me if I recall preparing it.
24      Q.  Was it prepared be you?

59  (Pages 230 to 233)

CECILIA VOHL,  NV CCR #246(775)  827-0672

eTreppid vs. Montgomery   Hearing - Preliminary Injunction - Vol. II   II Tuesday, February 7, 2006

| Page 234 | Page 236 |
|---|---|

Page 234

1    A.  I don't recall preparing it.
2    Q.  Okay.  But you prepared PowerPoint presentations very
3  similar to this, did you not, sir?
4    A.  I prepared PowerPoint presentations.
5    Q.  And do you know ITVimage Xpress?
6    A.  I think it was the name that the company was coming up
7  with to name their products.
8    Q.  But you're the chief technology officer at this time,
9  were you not?
10    A.  Yes.
11    Q.  And it was your data compression that the company was
12  using pursuant to your contribution, was it not?
13    A.  Yes.
14    Q.  Okay.  And you would have known what the business --
15  the technology business of the company was, would you not?
16    A.  Yes.
17    Q.  So you would have known about ITVdata Xpress, would
18  you not?
19    A.  I don't recall seeing that particular --
20    Q.  Okay.  Well, let me --
21    A.  -- acronym.
22    Q.  Let me have you -- let's see.  One, two -- these are
23  not numbered -- two, three, four, five, six -- on page 7 of
24  this --

Page 235

1    A.  What is --
2    Q.  The seventh page in.
3    A.  What does it start with?
4    Q.  It starts with "ITVdata Xpress; ITVdata," and it says
5  "supports SAN-Solutions based systems."
6    A.  Okay.  I can't tell you.
7    Q.  Okay.  This is talking about digital compression
8  products, is it not?
9    A.  Yes.
10    Q.  And it's talking, on at least that seventh page, about
11  pattern-matching features, is it not?
12    A.  I don't see that.
13       THE COURT:  Third down.
14  BY MR. PEEK:
15    Q.  Third one down.
16    A.  I must be on the wrong page, then.
17       MR. FLYNN:  It's page 8.
18       THE WITNESS:  I was on the sixth page.
19       MR. PEEK:  Is it page 8, Counsel?
20       THE WITNESS:  Okay.  I got it.  What's your question?
21  BY MR. PEEK:
22    Q.  Pattern-matching features, that's pattern recognition,
23  is it not?
24    A.  No.

Page 236

1    Q.  It's not.  Okay.
2       Now, 7 -- go to 8, 9, and then page 10.
3    A.  Got it.
4    Q.  Now, does it say there "ITVvideo has advanced features
5  like pattern and bit recognition"?
6    A.  Yes.
7    Q.  So eTreppid's technology, as of March 29, 2001, under
8  digital compression products, was at least saying that it had
9  pattern and bit recognition as far as digital compression, did
10  it not?
11    A.  I see that there.
12    Q.  And do you have any reason to --
13    A.  I'm sorry.
14    Q.  You don't agree with that, though, I would take it?
15    A.  I don't recall at that time if it did or not.
16    Q.  Well, you said you didn't put it on your computer
17  until sometime in 2003.  This is 2001.
18    A.  What's the question?
19    Q.  So, the pattern recognition addressed here came out of
20  the digital compression product, did it not?
21    A.  No.
22    Q.  Oh, it did not.  Okay.
23       But at least it was represented or part of this
24  PowerPoint presentation as a product that eTreppid had in March

Page 237

1  of 2001?
2    A.  I don't recall if it did or not.
3    Q.  Well, you see it here, do you not?
4    A.  I just said I didn't make this document.
5    Q.  I understand that.  You don't have any reason to
6  believe that this is not a true and correct --
7    A.  I don't know if it was true or incorrect.
8       MR. FLYNN:  Your Honor, we need a correction on the
9  record.  Mr. Peek pointed towards the green box and said that
10  what he's now discussing was put on Mr. Montgomery's computer
11  back at the time.  The question was with regard to the green
12  box with regard to anomaly detection?
13       THE COURT:  I think it was.  I think it was.
14       MR. PEEK:  He also said, Your Honor, that he put his
15  pattern recognition on the same computer on the same time frame
16  in 2003.  I'll go back.
17       THE COURT:  I don't remember that.  Why don't you ask
18  him.  I really don't remember.
19       MR. PEEK:  I understand, Your Honor.  It's late.
20  BY MR. PEEK:
21    Q.  When did you put the pattern recognition source code
22  onto your computer?
23    A.  I don't recall the exact time frame.  I'm tired.
24    Q.  Would it have been similar to the time you put the

60  (Pages 234 to 237)

821d05dd-39a8-4560-b998-2db41a804b7c

eTreppid vs. Montgomery   Hearing Preliminary Injunction - Vol. II    II Tuesday, February 7, 2006

## Page 238

1 anomaly on?
2    A.  It could have been.
3    Q.  Would it have been any earlier than that?
4    A.  I don't think so.
5    Q.  Okay.  So whenever you put -- whenever you testified
6 you put the anomaly detection on would have been about the same
7 time you put the pattern recognition source code technology on,
8 again, in that little office, in that green block on Exhibit 1?
9    A.  I'm not certain.
10       THE COURT:  How much longer, Mr. Peek, do you think?
11       MR. PEEK:  I'll try to move this along, Your Honor.
12       THE COURT:  I know, but I'd like to have some idea how
13 much longer.
14       MR. PEEK:  I'll try to finish up, Your Honor, in a
15 half an hour.
16       THE COURT:  Then there's going to be redirect, I would
17 assume?
18       MR. FLYNN:  Yes, Your Honor.
19       THE COURT:  So we're looking at 10 o'clock, maybe?
20 It's getting kind of late.  Let me just interrupt here because
21 I want to ask a question, because I don't want to be sitting
22 here, spending all this time and energy on this case -- we're
23 looking at a case that actually is preempted by federal law.
24 And what I'm trying to understand -- I haven't seen the order

## Page 239

1 of remand.  It's not in my file, anyway.  And was this issue
2 presented to Judge McKibben, and did Judge McKibben -- why did
3 Judge McKibben send it back to state court if, in fact, it was
4 preempted?
5       MR. PEEK:  That was the argument that was made by
6 Mr. Logar, Your Honor.
7       MR. FLYNN:  I wasn't there.  Mr. Logar will have to
8 address it.
9       THE COURT:  I directed the question to them, so let
10 him answer it, and you can reply to it if you want to.
11 But do you have the order of remand?  I don't.
12       THE CLERK:  I don't have it.
13       THE COURT:  All right.  Mr. Logar?
14       MR. LOGAR:  The case was originally filed by the
15 plaintiffs in state court.  We did a removal based on two
16 issues:  One was the diversity of citizenship parties, and
17 subject matter jurisdiction.  The federal court found that
18 neither applied and remanded it back to the state court.
19       THE COURT:  Well, are you telling me that McKibben
20 found that the subject matter, i.e., the issue of copyright,
21 was not preempted?
22       MR. LOGAR:  No.
23       MR. PEEK:  That's exactly what he found.
24       MR. LOGAR:  No, that is not what he found.

## Page 240

1       MR. PEEK:  Your Honor --
2       MR. LOGAR:  He followed the well-crafted complaint
3 rule, okay?
4       MR. FLYNN:  Your Honor, the issue that arose over in
5 federal court was real simple.  When they put in their original
6 complaint that eTreppid Technologies was the California corp.,
7 we removed it on that basis that they pled it was a California
8 corp.  They didn't realize they made a mistake.  They told
9 Judge McKibben we made a mistake, it's not a California corp.,
10 it's a Nevada corp.  Judge McKibben said I have no choice,
11 there's no diversity.
12       In the interim, we filed a copyright claim --
13 counterclaim.  So the issue of preemption or nonpreemption has
14 never been brought up or discussed or decided upon over in the
15 federal court.
16       MR. PEEK:  Your Honor, I was there --
17       THE COURT:  Hold on.  What I want to know is -- I
18 mean, you know, I enjoy this job.  I get paid to do this job.
19 But on the other hand, it troubles me that this issue that
20 where you're coming here and telling me, on February the 7th,
21 that all of this stuff is preempted, that the first time I hear
22 about that is when I'm handed this brief this evening.  I don't
23 think that's a very diplomatic way to handle this issue with
24 this Court.

## Page 241

1       MR. FLYNN:  Your Honor, I agree with the Court.
2       THE COURT:  I mean, we have -- if you are correct, if
3 you are correct -- and I think the issue that really is whether
4 or not the material we're talking about was copyrighted back in
5 the '80s sometime.  But if you're correct, then we've just
6 wasted a whole lot of time, and frankly, I would think that if
7 that was your position from way back when, I would have heard
8 about this before now.
9       MR. FLYNN:  Your Honor, Mr. Logar and Mr. Pulver are
10 not copyright lawyers.  We were just brought in.  We only filed
11 our appearances, Your Honor.  You know, we had to do all of
12 that by Federal Express.  We literally have been doing this
13 research in the last several days.  We've been brought in at
14 the 11th hour.  An enormous amount of material is being dumped
15 in the Court's lap, and it is --
16       MR. PEEK:  Your Honor, could I address this?
17       THE COURT:  You can if you want.  I mean, I've already
18 pretty much decided that what I'm going to do is, I'm going to
19 go ahead and finish this matter.  And I'm going to hear this
20 matter and I'm going to make a decision in this matter, and
21 then if the federal court says I'm preempted, that's fine.
22       MR. PEEK:  I could address why they did what they did,
23 but I won't.
24       THE COURT:  It doesn't matter.

61 (Pages 238 to 241)

821d05dd-39a8-4560-b998-2db41a804b7c

eTreppid vs. Montgomery   Hearing - Preliminary Injunction - Vol. II   II Tuesday, February 7, 2006

Page 242

1    MR. PEEK: Okay. Thank you.
2    THE COURT REPORTER: Your Honor, I just want to say,
3  for the record, I cannot go to 10 o'clock. Sorry.
4    THE COURT: You can't or you won't?
5    THE COURT REPORTER: I cannot.
6    THE COURT: How much longer do you think you can go?
7  I mean, if we're not going to go to the end, we might as well
8  stop right now.
9    THE COURT REPORTER: I'm very sorry, but the record
10  will suffer, and we've got a criminal calendar, as you know, at
11  8:30.
12    THE COURT: I sort of think I have to be here for
13  that, don't I?
14    THE COURT REPORTER: Yes, Your Honor.
15    MR. PEEK: Your Honor, could I ask Ms. Vohl to indulge
16  us just for a few more questions, because I want to make sure
17  that, one, the order that's currently there remains. And I
18  think the Court will do that. But I also want to ask for some
19  expansion of that. But may I have the Court's indulgence?
20    MR. FLYNN: I'm going to need to be heard on that,
21  Your Honor.
22    THE COURT: Well, I mean, we got a situation where
23  we've got a court reporter that's telling us she can't really
24  go much further. You know, there's not much -- I can't get out

Page 243

1  my whip and make her do that.
2    THE COURT REPORTER: You have a whip?
3    THE COURT: Yeah, I do.
4    MR. PEEK: Thanks, Cecilia.
5    MR. FLYNN: You seem way too kind, Judge.
6    MR. PEEK: I would just ask some indulgence, Your
7  Honor, for five minutes.
8    THE COURT: Can you hang in there for five?
9    THE COURT REPORTER: Yes.
10    THE COURT: All right. Let's go five.
11  BY MR. PEEK:
12    Q. Mr. Montgomery, you've heard Sloan's testimony about
13  conversations he had with you on January 3rd about why does it
14  appear that there are operations on the source server and the
15  ESA server, and you said he was cleaning up files.
16    A. I heard his testimony.
17    Q. Did you have that conversation with him?
18    A. No.
19    Q. That never occurred?
20    A. That's correct.
21    Q. So you were never cleaning up files on either the
22  source server or the ESA server?
23    A. Ever?
24    Q. In this time frame, from December through January --

Page 244

1    A. I might have.
2    Q. -- of '05.
3    So you might have cleaned them up?
4    A. Yeah.
5    Q. So when Mr. Venable was asking you questions about
6  what you were doing, you said you were cleaning up files.
7    A. No, no, I've never had a conversation with Mr. Venable
8  regarding this.
9    Q. And then you read the affidavit of Mr. Ball, have you
10  not?
11    A. Yes.
12    Q. And Mr. Ball talks about the fact that you took his
13  hard drive and his workstation on or around December 19th or
14  20th?
15    A. You'd have to show it to me.
16    Q. Well, let me just ask this question: Did you, on or
17  around December 19th or 20th, begin deleting certain eTreppid
18  source code files located on Barjinder Ball's hard drive?
19    A. No.
20    Q. Did you tell Barjinder Ball that you were deleting the
21  files on your -- his workstation for security reasons?
22    A. No.
23    Q. And did you tell Barjinder Ball that there remained
24  copies of those files that you were deleting on his server --

Page 245

1  or, excuse me, on his hard drive, on the source server, that he
2  would still be able to access?
3    A. He has a direct connection to the source server.
4    Q. Did you tell him that, sir --
5    A. No.
6    Q. -- that you were deleting files, that he could have
7  copies from the source server?
8    A. No.
9    Q. Okay. Did you delete any eTreppid source code files
10  on Venkata Kalluri's workstation in or about December of 2005?
11    A. No.
12    Q. Did you have a conversation with Mr. Kalluri about the
13  fact -- in December of 2005, about the fact that source codes
14  on his workstation had been deleted?
15    A. No.
16    Q. Did Mr. Kalluri ever ask you or did you ever explain
17  to Mr. Kalluri that you were backing up the source code at
18  eTreppid in or about late December of 2005?
19    A. I don't believe so.
20    Q. Well, did you or did you not, or you just don't
21  believe you did?
22    A. No, I didn't.
23    Q. Now, during the period of time between Christmas and
24  New Year's, if Mr. Kalluri needed an eTreppid source code file,

62 (Pages 242 to 245)

CECILIA VOHL, NV CCR #246 (775) 827-0672

821d05dd-39a8-4560-b998-2db41a804b7c

Case 3:06-cv-00263-PMP-VPC   Document 63-4   Filed 08/09/06   Page 38 of 40

eTreppid vs. Montgomery    Hearing - Preliminary Injunction - Vol. II    II Tuesday, February 7, 2006

Page 246

1  that he would request it from you and then you would make a
2  copy of it?
3     A.  Not that I recall.
4     Q.  So it could have happened?
5     A.  He didn't make a request of me.  No.
6     Q.  So all of these individuals who gave affidavits, and
7  Mr. Zehang who testified and Mr. Venable who testified, are
8  lying about the fact that you deleted source code off of their
9  workstations and off of the source server?
10       MR. FLYNN:  Objection, Your Honor.
11       THE COURT:  That's argumentative.  That's right out of
12  Law & Order.
13       MR. FLYNN:  At that point, I think an objection would
14  be best.
15       MR. PEEK:  That objection, Your Honor, is that out of
16  Law & Order?
17       THE COURT:  No, the question is, the one where the
18  guy -- I can't think of his name -- he asks that all the time.
19       MR. PEEK:  Jack.
20       THE COURT:  All right.  We're -- that was --
21       MR. PEEK:  That was the end of my five minutes.  I
22  have more questions, Your Honor.  Let me ask one more.
23  BY MR. PEEK:
24     Q.  If the Court were to reconvene with you at eTreppid's

Page 247

1  offices, would you be able to then show the Court and everybody
2  else where all this code is that eTreppid says has been
3  deleted?
4       MR. FLYNN:  Objection.  Your Honor, the Court cannot
5  order that.
6       MR. PEEK:  I think the Court can order that.
7       THE COURT:  I don't know if I could order that we
8  convene there, but I might be able to order that -- something
9  that would accomplish the same result.  I'm not sure.
10       MR. FLYNN:  Objection.  I do not believe, under the
11  13th Amendment, since this person has been fired, you can make
12  him go back and do anything.
13       MR. PEEK:  The Court can convene and show us where --
14       THE COURT:  We'll see, when that day comes, whether I
15  can or not.  I don't know, frankly, if I can or if I can't.
16  But I think I can order him to produce information that he may
17  have, and whether that is easier accomplished in another forum,
18  we'll just see, because I don't know the answer to that.  And
19  so the question was that if that were a possibility, could you
20  do that?
21  BY MR. PEEK:
22     Q.  Could you do that?
23       THE COURT:  And I'll let him answer that question.
24       THE WITNESS:  It might be possible, but considering

Page 248

1  the fact that they took all the drives out of the machines and
2  moved them around, I would have no idea.
3       MR. PEEK:  Your Honor, I still have the time that I
4  said I would take on cross in terms of things like promissory
5  notes and dilutions and the like, but I'll reserve that for
6  another day.
7       THE COURT:  I think what we're going to have to do,
8  Counsel, is you're going to have to speak with Sheila, my
9  administrative assistant, and set this matter for the first
10  earliest time that we have available, which I don't really know
11  myself, because I don't keep my own calendar, what that is.
12  I've got a hearing that's similar to this on Thursday and
13  Friday involving similar issues that I can't bump.  Tomorrow, I
14  have a criminal calendar in the morning, and I have a scheduled
15  all afternoon tomorrow, don't I -- yeah, I'm told that I have a
16  week-long jury trial on Monday.  Is that right?
17       THE CLERK:  I believe -- I spoke with the attorneys.
18  They said three or four days.
19       THE COURT:  All right.  Well, the only thing I can say
20  is the best thing to do is to talk to Sheila bright and early
21  in the morning and find out what we've got available.  I'll
22  give you my earliest available time.
23       MR. PEEK:  Can I tell the Court I have a horse show
24  with my daughter that I'm attending on the 16th.  I would ask

Page 249

1  the Court not to order me to continue this and miss my
2  daughter's horse show.
3       THE COURT:  Well, all I'm saying is, you're the people
4  that want this thing done expeditiously.  And I'm saying I'm
5  willing to accommodate that, and I'm willing -- you know, in
6  consideration of other counsel's calendars, as well, I'm
7  willing to schedule it after hours.  I'm willing to schedule
8  it --
9       MR. PEEK:  This Saturday?
10       THE COURT:  This Saturday?  I got my kids, but I could
11  work around that if everybody else can work around it.  That's
12  the problem.  And that includes staff, and it includes the
13  court reporter.  It includes all of the attorneys --
14       MR. PEEK:  Could we go off the record, Your Honor, for
15  Ms. Vohl, to have this discussion, or not?
16       THE COURT:  Well, all right.  Let's do this.  Let's go
17  ahead -- we'll be in the recess now until this hearing
18  reconvenes.
19       MR. PEEK:  The order is continued?
20       THE COURT:  It is continued until such time as we can
21  reset it.
22       And, Cecilia, you can go off the record right now,
23  unless counsel wants to put something on record, and we can
24  talk about scheduling and that sort of stuff.

63  (Pages 246 to 249)

eTreppid vs. Montgomery   Hearing   Preliminary Injunction - Vol. I, III Tuesday, February 7, 2006

Page 250

1    MR. FLYNN: I hate to impose on the court reporter,
2    but I have an argument as to why the order cannot continue.
3    It's not legally possible for this Court --
4    THE COURT: I haven't even gotten to that.
5    MR. FLYNN: -- to continue the current TRO.
6    THE COURT: Because of the 15 days?
7    MR. FLYNN: Because of the 15 days, because there is
8    no record that has been created where a burden of proof has
9    been met under all of the elements to sustain a temporary
10   restraining order. There isn't even close to a record, as the
11   original judge found, that would warrant the kind of language
12   prepared by Counsel that is in the existing order.
13   Perhaps, Your Honor, there is some type of an order
14   about data compression technology, but the Court, under the
15   current state of the record, cannot possibly fashion an order
16   on anomaly detection when there is absolutely no testimony that
17   they even own it, let alone irreparable harm.
18   THE COURT: You said a couple of things. I don't
19   think he was talking about the original judge. I talked to the
20   original judge. He said, "I didn't decide anything." He said,
21   "I just decided I wasn't going to hear it. I'm going to send
22   it to somebody else." And he decided nothing on the merits. I
23   talked to him today at noon.
24   MR. FLYNN: Your Honor, there is absolutely no showing

Page 251

1    in the record of irreparable harm. There's -- the worst that
2    could possibly happen if this order were vacated, under the
3    worst-case scenario, is that Mr. Montgomery would make a deal
4    with the government or somebody, money would be created, and
5    they'd have a claim for money. That's the worst-case scenario.
6    So, how could equity and relief for irreparable harm on this
7    record possibly exist?
8    THE COURT: Are you asking me a question?
9    MR. FLYNN: Your Honor, I'm saying that there is
10   simply no record here. The Court cannot, on this record, issue
11   a temporary restraining order for anomaly detection software
12   that these lawyers incorporated into the order that this Court
13   has signed, let alone the issue of restraining him from talking
14   to anyone, talking to the United States Government, talking to
15   the individuals he regularly communicates with on this subject.
16   He communicated with one of them today.
17   MR. PEEK: That's in violation of the order, Your
18   Honor.
19   MR. FLYNN: Your Honor specifically asked us, if the
20   government comes in here and asserts the privilege, so we
21   immediately called an individual who basically said on the
22   telephone today, he'll have an attorney in this courtroom. So,
23   whether it's a violation of the order --
24   THE COURT: I don't see the -- I'll also share with

Page 252

1    you, I talked with the United States Attorney today. And I was
2    told that they would get back to me, they hadn't heard a word
3    about it, don't know anything about it, didn't seem to be
4    concerned about it. I gave them all the information that I
5    had. And like I've been saying all day long, if they're going
6    to show up, they show up, but they haven't shown up.
7    MR. FLYNN: In light of what I've heard today, I'm
8    very confident that someone is going to show up very shortly.
9    I doubt the U.S. Attorney's Office -- this would be an attorney
10   who normally represents this agency on confidential
11   information, from what we were told today.
12   THE COURT: Then let him show up.
13   MR. FLYNN: He'd probably be from Washington.
14   THE COURT: When we continue this thing, too, he can
15   show up.
16   MR. FLYNN: Well, the original order, Your Honor,
17   simply said they've not met their standard of proof. Of
18   course, they had all these declarations, all these affidavits,
19   most of which have now been shown to be extremely --
20   THE COURT: What original order? Judge Polaha's
21   original order?
22   MR. FLYNN: Yes, the original order. "Plaintiff
23   eTreppid's application for temporary restraining order is
24   hereby denied without prejudice, and Plaintiff has not met the

Page 253

1    standard of proof as required by NRCP 65B and C at the meeting
2    with the Court."
3    THE COURT: Well --
4    MR. FLYNN: And, if anything, Your Honor, not only has
5    there been nothing more added, what has been brought into the
6    court today has been completely brought into question.
7    THE COURT: All right. Here's what I'm going to do.
8    We're going to continue this hearing until the time that will
9    be set by counsel and my administrative assistant. I am going
10   to make a determination on whether or not the TRO will
11   continue. I will get you a written order no later than
12   5 o'clock tomorrow, and I'll fax it to all the parties.
13   MR. FLYNN: And then we'll be able to comment on it,
14   Your Honor, or submit --
15   MR. FLYNN: Your Honor, until you make that decision,
16   could the order that exists today remain in place?
17   THE COURT: Until 5 o'clock tomorrow.
18   MR. PEEK: Yes.
19   THE COURT: That's the order, until 5 o'clock
20   tomorrow. So if I can't do it, I can't do it, but I think I
21   can.
22   MR. PEEK: Your Honor, can the order remain in place
23   until such time as the Court --
24   THE COURT: Well, I'll get the order done tomorrow.

64   (Pages 250 to 253)

CECILIA VOHL, NV CCR #246 (775) 827-0672

821d05dd-39a8-4560-b998-2db41a804b7c

eTreppid vs. Montgomery   Hearing Preliminary Injunction - Vol. Ii   II Tuesday, February 7, 2006

Page 254

1  I'll get it done if I've got to stay up tonight to do it, but
2  I'll get it done.
3      And I do think that -- as I said, I had a conversation
4  with the judge. He told me he did not reach the merits on this
5  thing. And in my review of the material, I felt, when the TRO
6  was presented to me, that there was sufficient evidence to
7  support the TRO for the short period of time that we talked
8  about.
9      MR. FLYNN: Would Your Honor like a copy of this
10  order? If the clerk is willing, I'll make a copy so you'll
11  have it.
12      THE COURT: I've got Judge Polaha's order. I've got
13  the order. It was not clear to me when he said "without
14  prejudice," and so I suspected that there might be something
15  more to that, and I asked him.
16      So like I said, I felt that when I reviewed it, after
17  he declined to do it, perhaps without prejudice, perhaps on the
18  merits, perhaps not -- but when I reviewed it, I felt there was
19  enough for the TRO, and I granted it.
20      MR. FLYNN: Your Honor, I'd ask the Court, while I was
21  thinking, to seriously consider whether money damages would be
22  adequate and whether irreparable harm has been met on these
23  facts.
24      THE COURT: If your client can't afford to feed his

Page 255

1  family, how is he going to afford to pay damages?
2      MR. FLYNN: I don't think that's relevant in
3  determining whether or not a judgment ultimately could be
4  awarded against --
5      THE COURT: You're right. It's probably not relevant.
6      MR. FLYNN: -- Mr. Montgomery.
7      MR. PEEK: This is a trade secret, too, in terms of
8  irreparable harm.
9      MR. FLYNN: It's a trade secret only in terms of
10  Mr. Montgomery; otherwise, he wouldn't be here.
11      THE COURT: And this order is in effect until
12  5:00 p.m. tomorrow, February 8th. That's my decision.
13      MR. PEEK: And then you'll give us another one at that
14  time?
15      THE COURT: I'll give you another one at that time.
16  I'll tell you whether it's extended or whether it's not
17  extended, to what extent.
18      We're in recess.
19      MR. PEEK: Thank you, Your Honor.
20      (Proceedings concluded.)
21          -oOo-
22
23
24

Page 256

1  STATE OF NEVADA   )
2                    ) ss.
2  COUNTY OF WASHOE  )
3
4      I, CECILIA VOHL, Official Reporter of the Second
5  Judicial District Court of the State of Nevada, in and for
6  the County of Washoe, do hereby certify:
7      That as such reporter, I was present in Department
8  No. 9 of the above court on said date, time and hour, and I
9  then and there took verbatim stenotype notes of the
10  proceedings had and testimony given therein.
11      That the foregoing transcript is a full, true and
12  correct transcription of my said stenotype notes, so taken
13  as aforesaid. That the foregoing transcript was taken down
14  under my direction and control, and to the best of my
15  knowledge, skill and ability.
16      DATED: At Reno, Nevada, this      day of
17      , 2006.
18
19          CECILIA VOHL, NV CCR #246
20
21
22
23
24

65 (Pages 254 to 256)

821d05dd-39a8-4560-b998-2db41a804b7c