1 | Ronald J. Logar, Esq., Nevada Bar No.: 0303
2 | Eric A. Pulver, Esq., Nevada Bar No.: 7874
   | **Law Office of Logar & Pulver, PC**
3 | 225 S. Arlington Ave., Ste A
   | Reno, NV 89501
4 | Phone: 775-786-5040; Fax: 775-786-7544

5 | Michael J. Flynn, Esq., Mass. State Bar No.: 172780
6 | Philip H. Stillman, Esq., California State Bar No.: 152861
   | **Flynn & Stillman**
7 | 224 Birmingham Drive, Suite 1A4
   | Cardiff, CA 92007
8 | Phone: 888-235-4279;Fax: 888-235-4279
9 | *Admitted Pro Hac Vice in related Federal Case No. 3:06-cv-0056-BES-VPC*

**FILED**

SEP  1 2006

U.S. MAGISTRATE JUDGE
DISTRICT OF NEVADA
BY_____.DEPU

10 |
11 |
12 |

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEVADA**

13 | In the Matter of the Search of:
14 | 12720 BUCKTHORN LANE, RENO, NV

15 | and

16 | 888 MASTRO DRIVE, RENO, NV, STORAGE
17 | UNIT NUMBERS 136, 140 , 141, 142, AND 143

CASE NO.: 3:06–CV-0263 (formerly MJ-0023-VPC)

REQUEST TO FILE OVERSIZED POST-HEARING MEMORANDUM.

18
19
20
21
22
23
24
25
26
27
28

*78*

Dennis Montgomery, the moveant in his F.R.Crim. P. 41(g) motion, requests permission to file an oversized "Post-hearing Memorandum" in support of his motion under 41(g). Mr. Montgomery makes this request because the mens rea analysis to show what the government knew and when they knew it, and the 'failure to corroborate the charges' analysis were lengthy. Also, a good portion of the memorandum includes citations to exhibits, three days of hearing transcripts—pages and lines, and state court preliminary injunction hearing transcripts, which significantly beefed up the memorandum, but were included in an effort to aid the Court. Mr. Montgomery's counsel did try to cut the brief down, but believe the filed memorandum will aid the Court. For example, if citations to exhibits or transcripts were relevant in several locations, Mr. Montgomery's counsel repeated those citations so the Court would not have to go hunting for prior references or exhibit number. In addition, as reflected in the Court's "sealed Minutes of Proceeding," dated August 17, 2006, the Court did not limit the pages for the post-hearing memorandum. Also, the post-hearing memorandum is not Mr. Montgomery's moving papers or opposition, so he is unsure of whether his memorandum actually requires compliance with the thirty page limit. Nevertheless, he makes this request in the event he is so limited. A lot is at stake, and he wants to ensure the Court has full points and authorities.

Accordingly, Mr. Montgomery respectfully requests permission to file his oversized post-hearing memorandum.

Respectfully submitted,

/s/
Michael J. Flynn, Esq.
Attorney for Dennis Montgomery

September 21, 2006

-1-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**<u>CERTIFICATE OF SERVICE</u>**

Pursuant to NRCP 5(b), I certify that I am an employee of the LAW OFFICE OF LOGAR
& PULVER, PC, and that on the __21st__ day of September, 2006, I sent the above document
the following ways:

Via: Facsimile 784-5181
         Paul Pugliese

a.    Civil Process Clerk, United States Attorney for the District of Nevada;
      100 W. Liberty Street
      Reno, NV 89501

                                 LEZLIE M. LUCAS, Notary Public
                                 Legal Assistant to the
                                 Law Office of Logar & Pulver, PC



1  Ronald J. Logar, Esq., Nevada Bar No.: 0303
2  Eric A. Pulver, Esq., Nevada Bar No.: 7874
   **Law Office of Logar & Pulver, PC**
3  225 S. Arlington Ave., Ste A
   Reno, NV 89501
4  Phone: 775-786-5040;Fax: 775-786-7544
   Michael J. Flynn, Esq., Mass. State Bar No.: 172780
5  **Flynn & Stillman**
6  224 Birmingham Drive, Suite 1A4
   Cardiff, CA 92007
7  Phone: 858-759-7000;Fax: 858-759-0711
8  *Admitted Pro Hac Vice in related Federal Case No. 3:06-cv-0056-BES-VPC*

9  **UNITED STATES DISTRICT COURT**

10  **FOR THE DISTRICT OF NEVADA**

11

12  In the Matter of the Search of:                    )    CASE NO.: 3:06–CV-0263 (formerly MJ-0023-
    12720 BUCKTHORN LANE, RENO, NV                     )    VPC)
13                                                      )
                                                        )    DENNIS MONTGOMERY'S POST-HEARING
14  and                                                 )    MEMORANDUM IN SUPPORT OF HIS
                                                        )    MOTION FOR THE RETURN OF HIS
15  888 MASTRO DRIVE, RENO, NV, STORAGE )    PROPERTY PURSUANT TO F.R.CRIM.P. 41(g).
    UNIT NUMBERS 136, 140 , 141, 142, AND 143 )
16                                                      )

17

18

19

20

21

22

23

24

25

26

27

Montgomery Post-Hearing Memo Re: FRCrimP 41(g)

# Table of Contents

**Page**

Introduction . . . . . . . . .                                                                    4

I.   ESTABLISHED FACTS AND ANALYSIS . . . . . . . . . .                                           6
     The "Illusory" Basis for the Illegal Raid—"Classified Information."                          6
     The Great Government "Palm Trees" Raid.                                                       7
     The Great "Palm Trees" Raid is a Great Hoax.                                                 8
     The Government as the Principal is Charged With Knowledge.                                    8
     No Classified Information mandates the Immediate Return of All Property.                      10
     The Fourth Amendment Requires "Particularity" Based on Due Process.                           10
     The Real Reason for the Raid.                                                                 11
     The Search Affidavit, Theft of Trade Secrets, Source Code, Patents and Copyrights.           15
     Intentional and Knowing Falsehoods: The Contribution Agreement.                              16
     The Deleted Phrase from the Operating Agreement.                                             18
     Mr. Montgomery's Security Clearance.                                                          19
     No Facility Clearnace—No eTreppid Right to Store Classified information.                      19
     Pre-raid Judicial Knowledge and/or Inquiry Into Facts in the Search Affidavit.               21
     Redaction and Sealed Materials Unavailable to Mr. Montgomery.                                24
     No "Inventory"—No "Stolen Property."                                                          24
     "Deleted" Not "Stolen" Source Code.                                                           25
     Six Months later and the Government Still Cannot Identify "Stolen" Source Code.              25
     Government Knowledge of Montgomery's Sole and Exclusive Access to the Source Codes.          26
     Agent West Has Not Been Truthful with the Court.                                             27
     Who Really Wanted the Source Codes?                                                          28
     Government Avoidance and Disregard of Established Law.                                        29
     Source Code Secrecy and Irreparable Harm.                                                    30
     Searching Computers and Electronic Media.                                                    30
     Factors the Court Should Consider for Its Analysis.                                          32

II.  LEGAL ARGUMENTS AND EVIDENCE . . . . . . . . . .                                             34

     1.   The Two Alleged Crimes Against Mr. Montgomery . . . . . . . . . .                       3 4

          A.   Theft of Trade Secrets Under 18 U.S.C. §1832.
          B.   Unlawful Retention of National Defense Information Under 18 U.S.C. §793(e).

     2.   The Standard of Review Is One of "Reasonableness Under the Circumstances," And Here
          the Search and Seizure Were Unreasonable and Lacking Probable Cause. . . . . . . . . . .
                                                                                                  35
          A.   There Was No Classified Information, and No Probable Cause to
               Believe Mr. Montgomery Unlawfully Retained Classified Information.                 36

**B.**   **Agent West's Sources Were Biased and Had Ulterior Motives, AND He Did Not Check Their Backgrounds Or Corroborate Their Allegations to Determine Their Reliability With Evidence Easily Within the Government's Possession Before He Applied for the Search Warrants. . . . . . . . . . . .**                39

    1. Agent West's Sources Were Biased, And He Didn't Check Their Backgrounds.                41

    2. Agent West Did Not Corroborate What His Biased Sources Alleged.

        a. No Corroboration of Alleged Trade Secret Violations.                43

        b. No Corroboration of Alleged Missing Classified Information.                50

    3. Agent West Never Told the Court Whether His Sources Were Reliable.                56

    4. Agent West Admittedly Did Nothing to Obtain Mr. Montgomery's Side of the Civil Dispute.                56

    5. Intentional Misstatements of "Mr. Haroldsen," Vitiate the Warrant.                59

**C.**   **Agent West Showed a Disregard of DOJ Policy for Prosecuting These Alleged Crimes, He Lacked Skills to Investigate Them, and He Sought No Expertise in These Areas. . . . . . . . . .**                61

    1. Agent West Showed a Disregard of DOJ Policy, And Was Not Forthright About His Background.                61

    2. Agent West Lacked Sufficient Knowledge Re: Unlawful Retention, Classified Information and Security Clearances.                63

    3. Agent West Lacked Sufficient Knowledge Re: Trade Secrets Investigations.

**D.**   **Agent West and The Reno U.S. Attorney's Office Took a Side in A Civil Dispute, Putting the Prestige of The Reno U.S. Attorney's Office Behind Trepp—A Bad Character and Large Nevada Political Donor With Loads of Soiled Money. . . . . . . . . .**                65

**E.**   **Stripping the Affidavit of Its Material Misstatements or Contradictions, The Court Is Not Left With Probable Cause; Or, Adding Into the Affidavit West's Deliberate Omissions, The Court Is Not Left With Probable Cause. . . . . . . . . . .**                67

**3.**   **The Search Warrants Are Overly Broad, So the 41(g) Motion Must be Granted. . . . . . . . . . . . .**                69

    **A.**   **The Government Overreached.**                69

    **B.**   **The Warrants Fail Because They Expired, and Were Procedurally Improper.**                72

**4.**   **The Motion Should Be Granted Because the Government Never Provided a Compelling Reason As to Why It Could Not Provide the Complete FBI Affidavits. . . . . . . . . . . . . .**                73

**5.**   **The Warrant is Not Saved By the Good Faith Exception, and Other Anticipated Arguments of the Government Should Also Fail. . . . . . . . . .**                75

**Conclusion . . . . . . . . .**                77

# INTRODUCTION

This memo is divided into two primary sections. The first section is an analysis of the basic issues confronting the Court, mostly without citations or transcript references. It assumes a working knowledge of the facts and law in the record, and is designed to give the Court an overall perspective of the facts in the context of the very timely and substantial constitutional issues before the Court. The second section comprises a legal argument with citations, transcript references and correlations between them. It is more like a reference guide requiring some repetition, but no prior knowledge of these proceedings. Mr. Montgomery's counsel has chosen this approach because Judge Cooke, who has read and heard the entire matter, is intending to prepare a Report and Recommendation to the District Judge.

The memo also addresses Mr. Montgomery's claim of substantial prejudice for those redacted or sealed "facts," which the Government still conceals; and concludes that the redactions and sealings are presumptively prejudicial, and presumably inaccurate given the Government's pervasively false statements in the existing record. The record establishes that the Government misled this Court on every material issue in the search affidavit when it applied for the warrants. The redactions must be more of the same. Otherwise, the Government would have unveiled the redactions and stopped its charade. When challenged, including the very first sentence of the search affidavit regarding West's expertise in these alleged "crimes," the statements in the affidavit have proven to be either outright false, materially misleading, and/or inaccurate. Those redactions, must, by law, be provided to Montgomery. Obviously, Montgomery cannot challenge the specific redactions and sealings. But he asks the Court to review them in light of the demonstrable falsity employed by the Government as set forth in this memo; and to rule on the issues presented by the disclosed portions of the search affidavit and the testimony of Agent West.

Moreover, if the Government is claiming that some vital national security interests are at stake

1  in the redactions and sealed documents, then it *must* either properly assert the state secrets privilege in

2  conformity with established precedent in all pending litigation, including the civil cases, or turn over the

3  redactions and concealed documents.

4

5       The bottom line to Mr. Montgomery's Rule 41 (g) motion is straightforward *As evidenced in this*

6  *record,* the Government's material misrepresentations to this Court in the search affidavit are so plainly,

7  knowingly, and pervasively false, probable cause under the Fourth Amendment standard of

8  "reasonableness" is absent; and the Government's attempt to fabricate probable cause for the search is

9  obvious. No other "reasonable" conclusion can be drawn, and no descriptive language other than

10  "knowingly false" can be applied here. The facts in this record substantially surpass any of the arguably

11

12  applicable standards of either "reasonableness under the circumstances," and/or "reckless disregard."

13       Additionally, the Government's improper motive to conduct this raid on behalf of Warren Trepp

14  in order to seize Montgomery's "source codes," when it never had an inventory of allegedly "stolen

15  eTreppid Source Code," caused the issuance of facially overbroad and invalid warrants, lacking in the

16

17  requisite particularity mandated by the Fourth Amendment. The Government's failure to meet its burden

18  and to establish either probable cause and/ or facial "particularity" from the evidence it did adduce,

19  mandates a ruling for Mr. Montgomery on the probable cause and facial invalidity issues contained in

20  this record. Otherwise, justice will not be served.

21

22       Finally, the Government's multiple admissions, when the search affidavit was challenged, should

23  leave the Court with no alternative but to return all seized property forthwith. The Government now

24  admits that there is no "classified information" involved in this matter whatsoever, let alone information

25  that has been "unlawfully retained." Thus, as a matter of law, no "classified information crime" exists

26  and there is no basis to withhold Montgomery's property on this ground.

27       As to the other alleged crime, notwithstanding repeated requests, eTeppid has failed to this day

1   to provide the Government an "inventory" of allegedly "stolen source codes," i.e., "trade

2   secrets"—something that obviously should have been done before the search. Nor will the required

3   inventory ever be forthcoming. Both eTreppid and the Government have admitted that only

4

5   Montgomery ever had access to, and/or possession of any of the disputed source codes. Thus, neither

6   eTreppid nor the Government can ever create what it has never had—unless it steals them off

7   Montgomery's computers. By law, Montgomery is the only true "owner" of any "trade secrets" in any

8   of the "secret" source code because he is the only person who developed them, owns them, and then

9

10   maintained the secrecy of the codes. Obviously, they have never been conveyed, owned or possessed

11   by eTreppid. These conclusive facts mandate the granting of the Rule 41(g) motion. There was no

12   probable cause to conduct the search in early March and, given the admissions, there is no probable

13   cause over *six months* later to retain the seized property. The Court has no alternative but to return the

14   property forthwith.

15

16                **I.    ESTABLISHED FACTS AND ANALYSIS**

17          The "Illusory" Basis for the Illegal Raid—"Classified Information."

18        On March first and third, 2006, the United States Government, acting through the Reno FBI,

19   under the supervision of the Reno U.S. Attorney's Office, and based on information from an Air Force

20   Special Agent, raided the home and storage units of Dennis Montgomery. Mr. Montgomery is a pioneer

21   in the computer industry, and an ingenious inventor and developer of computer software, which he had

22

23   created, developed, refined and *copyrighted* over the previous *twenty-eight years*. The agent in charge

24   of the raid, Agent West, swore in his search affidavit that the *Government* was seeking to seize

25   "classified information" allegedly in the "unlawful retention" of Montgomery. But the search warrants

26   never described or even mentioned any "classified information," or even used that term. The search

27   affidavit, containing vague references to an eTreppid's employee statement about what she thought might

1    be "classified information," *was not even attached to the warrants,* as required by established precedent

2    in order to fulfill the "particularity" requirement of the Fourth Amendment.  Incredibly, *before the raid,*

3    as the search affidavit states, both the Government and eTreppid  knew that the alleged "classified

4    information" specifically comprised "nine" allegedly "Secret" hard drives *from Nellis Air Force Base;* and,

5    as the Government was forced to admit in the hearing, the nine hard drives contain nothing but useless

6    pictures of "palm trees."  Thus, the complete absence in the warrants of any particularity regarding any

7

8    "classified  information"  —*the   very  foundation of the alleged "crime   "*—let  alone  the  specific

9    identification of useless palm tree photos—failed to give the requisite "notice" to Montgomery of what

10   "crime" was involved in the search.  As a matter of law, the warrants are facially overbroad with respect

11

12   to this alleged crime.

13                          The Great Government "Palm Trees" Raid

14           Not surprisingly, this fatal blunder, (likely arising out of a bad motive given the falsity of the

15   affidavit), as soon as it was exposed in the Rule 41 (g ) motion, forced the Government to voluntarily

16   unseal part of the affidavit and admit to another fatal blunder—the fact that the "palm trees'" hard drives

17   were not "classified" at all; and that there never was any "classified Information" in the "unlawful

18   retention" of Montgomery. It had to admit these facts  because "classified information" is a "sacred cow"

19

20   owned by the Government; and governed by a detailed, complex, specific, and highly regulated

21   *Governmental* scheme to designate, mark and protect it; and by criminal statutes designed to prosecute

22   violations thereof.  Specifically, the only evidence the Government had pre-raid about the "classified

23   information" allegedly in Montgomery's "unlawful retention," didn't come from the Government and

24   wasn't verified by the Government. It was a malicious, unchecked, unverified concoction by Trepp and

25   his employees about tapes of useless "palm trees."  The only conclusion is that these twofold "blunders"

26   by the Government were not "blunders" at all. As it did in raiding Mr. Montgomery's home for Trepp,

27

1    the Government deceitfully abdicated to Trepp its responsibility to ascertain its own "classified

2    information."

3

4                          <u>The Great "Palm Trees" Raid is a Great Hoax</u>

5         The "classified information" basis to raid Montgomery's home was a hoax against the Court; and

6    the Government knew it, (regardless of Agent West's thinly protested excuse that he didn't have time to

7    call Nellis Air Force base), because the Government is charged with knowledge of its own "classified

8    information." By Executive Order 13292 and comprehensive regulations, encapsulated in the National

9    Industrial Security Program Operating Manual (the "Manual"), and acting through an "Original

10    Classification Authority" (an "OCA"),    *only* the Government determines, designates, owns, and

11

12    specifically "marks" what *it* deems to be "classified information"—not eTreppid, not it's employees, and

13    not Agent West. [1] Clearly, Government employees, agents and officials must be required to determine

14    what is and is not "classified" from an "OCA"—an authorized government agency—before breaking into

15    a "citizen's" home *on behalf of the Government* to seize photos of Government palm trees. The

16    Government knew that photos of "palm trees" had never been "classified" by Nellis Air Force Base and

17    there was no crime.

18

19                    <u>The Government as the Principal Is Charged with Knowledge</u>

20         Since the Government, by law, is charged with the duty of "classifying" information, it's agents,

21    by law, including Agents Haraldsen and West, are charged with knowledge of what is "classified," as

22    well as the duty to ascertain it. Simple agency law makes the agent responsible for the knowledge of

23    the principal when the agent is commissioned to perform duties in connection with the precise

24

25

26

27       [1]The Manual, Section 4-101 states: "An original classification decision *at any level* can be made *only by* a U.S Government official who has been delegated the authority in writing. A determination to originally classify information may be made *only when* (a) an original classification authority is classifying the information;...." (Emphasis added) (Manual, p. 4-1-1, <u>Exhibit15</u>).

1  information within the principal's custody and control.  Any other analysis on this issue is not *reasonable*

2  under any objective Fourth Amendment standards.  The compelling inference is that the *Government*

3  conducted the raid for Trepp, not to retrieve "classified information."  Otherwise, West, a Government

4  Agent,  would not have simply accepted the vague and baseless accusations of one of Trepp's clerks in

5  connection with what only the Government could mark as "classified."

6

7      If West and the Government really believed a "classified information *crime*" had occurred with

8  respect to "Secret" tapes of useless "palm trees," this Court can reasonably conclude that the Government

9  would have been exhaustively diligent in determining precisely before the raid how the "palm trees"

10  constituted "classified information"; and what *threat* to vital national security interests (as the Manual,

11  Section 4-101 (c), requires when "classifying" information) was involved.  Common sense, the Manual,

12  and the statutory scheme, and the plethora of cases where the Government determines what is classified

13  and then aggressively litigates to protect its own information conclusively negates Agent West's feeble

14  testimony that he failed to call Nellis Air Force base, when he was  working with an intra-agency  *Air*

15  *Force Special Agent*, Paul Haraldsen, who was providing him with the factual basis for the alleged

16  "crime."   His excuse is an affront to common sense and an insult to this Court, particularly as the

17  reviewing Court issuing the warrants.  Otherwise, it now places this Court in the untenable position of

18  finding that uncorroborated Government sources can manufacture any excuse, however absurd, to justify

19  a false statement *by the Government* in a search affidavit in connection with information exclusively

20  under the Government's control *and which constitutes the very foundation of the alleged "crime."*  Only

21  the Government had the power, the means, the authority, and the responsibility to inform the reviewing

22  Magistrate - Judge what was "classified" in order to obtain the warrants.

23

24      Of course, the Government never offered any explanation from Agent Haraldsen about "what

25  he knew and when he knew it."  Nor could a total denial of knowledge by Haraldsen, or a ridiculous

26

27

1   excuse like West's, alter the analysis. By any measure of common sense in applying the Fourth

2   Amendment particularity requirement, where the Government falsifies information that it exclusively

3   possesses, and where that very information is the basis for the crime, the Government, not just West,

4   lacked probable cause to believe Montgomery unlawfully retained "classified information."

5

6        No "Classified Information" Mandates the Immediate Return of All Property—And More.

7        Since there is no "classified information" in the seized items, the motion must be granted and

8   everything returned forthwith. As a matter of law, the search and seizure violates the Fourth

9   Amendment and vitiates the warrants regardless of any other alleged basis for the search. The statements

10  in the affidavit were knowingly false, not only with respect to the "palm trees crime," but also with

11  respect to the "theft of trade secrets," and the failure to attach the affidavit to the warrants in connection

12  with both alleged crimes was fatal. This Court was deceived by the Government with respect to both

13  alleged "crimes" and both raids three days apart—one compounded by the other. First, on February 28,

14  2006, when it issued the warrant for the search on Montgomery's home on March 1; and then again on

15  March 3 when it issued the storage unit warrants.

16

17

18       The Fourth Amendment Requires "Particularity" Based on Due Process.

19       If the affidavit had been attached to the first warrant, Montgomery and his counsel, who were

20  present during the search of Mr. Montgomery's home on March 1, 2006, would have known specifically

21  that the "classified information" sought were tapes or hard drives of "palm trees." Obviously, Mr.

22  Montgomery knew then that the "palm trees'" tapes were not classified, could not be evidence of any

23  "crime," and were useless, but the warrants didn't even mention "classified information," let alone tapes

24  of "palm trees" - hence no "particularity" and no notice of items *evidencing crimes* relating to "classified

25  information." It gets worse. While the search of Mr. Montgomery's home was ongoing on March 1,

26  2006, his counsel vigorously attempted to find out the basis for the raid. Attorney Flynn made repeated

27

phone calls to AUSA Rachow requesting access to the affidavit; attorney Stillman wrote a letter at the same time demanding access, (Letter, p. 2, <u>Exhibit 5</u>) [2] ; and attorney Pulver, on-site, demanded the same from Agent West.

AUSA Rachow told Mr. Flynn that it wasn't his case, it was AUSA Pugliese's case who was away that week, and that he didn't know anything about it except that it was to seize "classified information" from Montgomery. When Mr. Flynn demanded to know what "classified information" was sought and access to the search affidavit, Mr. Rachow refused and said that AUSA Pugliese would return the following week. (Flynn Decl., p. 3-4, <u>Exhibit 6</u>).That refusal precluded formal and documented notification to the Court and to the Government that the "palm trees" tapes were not "classified," and that the Government needed to, at the very least, call Nellis Air Force Base and verify it. Obviously, if the Court knew that the March 1 raid was based on false information in the search affidavit - information exclusively within the control of the Government - it never would have issued  multiple warrants *three days later*. As soon as the issue was in question, the barest of judicial inquiry would have elicited from the Government that it had never bothered to make a phone call in connection with the very essence of the alleged "crime."

Instead, the Government deceitfully concealed all of these facts from Montgomery, and from the Court, and then used its continued deceptions to obtain  the warrants for the storage units on March 3, 2006. The Government simply trampled upon the Fourth Amendment requirement of  "particularity." The compounded Government deceptions mandate the immediate return of all property from the storage units, regardless of any other considerations.

---

[2] All Exhibits refer to exhibits introduced into evidence at Mr. Montgomery's 41(g) hearing held on June 29, July 31 and August 17, 2006 before the Honorable Valerie Cooke.

## The Real Reason for the Raid.

The real purpose of the raid, also cited by Agent West in his affidavit, is now obvious: the Government, acting on behalf of Trepp, Mr. Montgomery's former partner—and current adversary in civil cases pending before this court at the time of the raid—sought to seize and/or steal the twenty-eight years of Montgomery's creative work involving some of the most valuable "intellectual property" ever developed—intellectual property involving *copyrighted* computer "source codes" that have *never* been seen, accessed, possessed, controlled, utilized, or owned by any person other than Montgomery—and this fact is so obvious, for purposes of this analysis, it is axiomatic. West's affidavit on this critical issue is a ridiculous collection of false and illogical statements, explicitly contradicted by his source—Venables; and violates the "trade secret" statutory requirement of owner "secrecy." How can a putative owner maintain "secrecy" of a "trade secret" he has never possessed, has no means whatsoever to possess and/or own; and doesn't even know what it is? Only the *real* owner can fulfill this statutory requirement. The proof is found in logic, common sense, and in the examination of the falsehoods in the Government's search affidavit. In fact, after extensive research, Montgomery has found <u>no</u> "theft of trade secret" cases where the defense is "ownership"; and/or "theft of trade secret cases" between competing owners—more proof that the Government improperly thrust itself into the civil cases on behalf of Trepp, an alleged owner who doesn't even know what the trade secret is.

If there was a shred of truth to the Government and Trepp's position that eTreppid, not Montgomery, had *owned, developed, possessed* and *maintained* "trade secrets" in the disputed codes for the days, months and/or years before the raid, there never would have been a raid. The Government fabricated this one <u>big</u> falsity, with Trepp's help, then built upon it with others. For example, this fabrication required West to present facts to the Court that *both* Venables, eTreppid's security officer, *and* Montgomery had access to <u>the specific source codes in dispute</u> at eTreppid, and that periodic copies

1   of these source codes were routinely copied and given to Trepp. West's affidavit explicitly states that

2   the subject source codes were located on the "Source Code Server," using the "RAID Unit" and "back-up

3   ISA" on the premises of eTreppid, and that Venables had access to them.  According to West, these

4
5   disputed  source  codes  that  Venables  had  access  to  on  the  Source  Code  Server related to    "data

6   compression, pattern recognition, change and anomaly detection and other inventions." (Affidavit, 3-4,

7   Exhibit 2).  West testified under oath that  Venables told him that he had access to " all" of the source

8   code at eTreppid, including the disputed code, and that Montgomery began "deleting" it after December

9   22, 2005 when Venables went on vacation.

10

11        The Government's representations on these facts in the affidavit, and now, are just falsehoods.

12   Venables admittedly never had access to the disputed codes, and they were  never on the Source Code

13   Server, or the "RAID Unit" or "back-up ISA."  This fact is common sense because obviously Trepp would

14   have had Venables routinely copy the codes for him and put them in his off-site safe deposit box, as

15   Venables references in his testimony, particularly before he left for a two week vacation in late December

16   2005 and Montgomery and Trepp were engaged in open conflict for the prior three months. Venables

17   swore under oath to his lack of access in the preliminary injunction hearing on February 7, 2006, three

18

19   weeks before West signed the search affidavit. Venables testified  in the context of his search for source

20   code allegedly deleted by Montgomery from the Source Code Server, the RAID Unit, and the ISA, as

21   follows:

22

23        "Q. But since you were never given prior access to the source codes for object tracking, pattern
     recognition, and face recognition, you wouldn't know what source codes to look for, would you?

24        A. I don't know if they were ever there. I wouldn't  know."

25                                   .  .  .  .

26        "Q. So again, you don't know if they were ever there?  Correct?  [referring to the presence of the
     referenced source codes on any eTreppid computers or media including the 'Source Code Server']"

27

Montgomery Post-Hearing Memo Re: FRCrimP 41(g)          -13-

**A. Correct."** (Prelim. Inj. Tr., Vol. 2, p. 163:12-164:5, <u>Exhibit 33</u>).[3]

When West was presented with this testimony at the hearing, he testified as follows:

**"A. Again, my understanding was that Venables and Montgomery had access to <u>all</u> the source codes. They had administrative profiles which would allow them access to all the folders in the source code server as well as the ISA server.
I don't know specifically who had access to Montgomery—to what you say is Montgomery's source code." (Emphasis added).**

· · · ·

**"Q. Well you just heard what I read from Mr. Venables under oath saying he didn't even know what they were? . . . . . .
"A. He did not tell me that.
"Q. He told you something different?
"A. He told me that all of eTreppid's source code was maintained on the source code server and that it was deleted, or I think he termed it the majority of the source code was deleted."** (Prelim. Inj. Tr., Vol. 2, p. 165:23-166:7, <u>Exhibit 33</u>).

The fabrication by West in his affidavit that Venables had access to all of the source codes, including codes for "pattern recognition," "object tracking," etc. then led to the fabrication that Montgomery had deleted the disputed codes and/or somehow "stolen" them. But common sense tells us that if Venables never had access to the codes he could never determine if they had been deleted or stolen, as he testified three weeks before the raid; and if he did have access he would have copied them for Trepp. On this issue of eTreppid, through Venables, having possession of the disputed source codes, the Government's affidavit is a fabrication.

The truth is that Montgomery never disclosed the source codes to anyone, including eTreppid, and that the collusion between the Government and Trepp caused them to make false statements to the Court in order to seize them. Nor is there any evidence that the disputed codes were ever even on eTreppid premises. Source codes are lines of information readable by a person that trigger "binary" forms of "executable" code on a computer in order to run a software program. The source codes in dispute

---

[3] The preliminary injunction transcript refers to the Feb. 7, 2006, state court preliminary injunction hearing in *eTreppid, et al v. Montgomery*, later transferred to U.S.D., Reno, 3:06CV-145.

here were never, in fact, on eTreppid premises. The Government in this matter never utilized its specially trained agents skilled in computer software matters, and trained in Department of Justice (hereinafter "DOJ") protocols and policies regarding "computer crime" to investigate this case. Indeed, these specialists were ignored by the local authorities. The Reno FBI and the U.S. Attorney's Office did not function like independent Government investigators cooperating with DOJ experts, and sworn to uphold the Constitution. Instead the evidence shows they acted like local, collusive thieves with Trepp, blindly ignoring the Constitution, the law and DOJ policy, while churning out more falsity than even Trepp.

<u>The Search Affidavit: Theft of Trade Secrets, Source Codes, Patents and Copyrights.</u>

Significantly, Montgomery's claimed *copyright* ownership of the source codes, along with the actual copyright registration numbers, which were involved in implementing the "executables" in certain Government contracts, (vaguely and ambiguously referenced in the search affidavit), were on file in this very Court and publicly available to the Government weeks before the search. The record establishes that these copyrights were never conveyed to eTreppid.

Fundamentally, the search affidavit contains no specific and/or "particular" reference to any specific allegedly "stolen trade secrets" whatsoever. It does make a general reference to "eTreppid source code" and to a number of patents. By law, the patents cannot be "trade secrets." Under principles of property law and/or under facts in this matter, the affidavit references to "eTreppid source code" cannot reasonably, or even remotely, constitute either "eTreppid trade secrets," most certainly not "stolen trade secrets," and the affidavit references do not supply any means either at the time of the raid, or even with the facts known today, for the Government to identify and seize any "stolen trade secrets." The term "eTreppid source code "is meaningless.

The case law and trade secrets statutes, as discussed in Section II, are dispositive on the issue of

ownership, in favor of Montgomery. No criminal cases between two alleged owners involving "theft of trade secrets" were found. The civil cases universally mandate that the "owner" of a "trade secret" must identify with "particularity" the precise "trade secrets" claimed. The criminal "trade secret" statute, 18 U.S.C. 1832, et seq., relied on by the Government to support probable cause requires that the "owner" take "reasonable measures to keep such information secret." 18 U.S.C. 1839 (3)(A). Trepp could never comply with the statutory or case law requirements because he never possessed the disputed source codes and can never identify them with any "particularity" whatsoever; ipso facto, he is not the "owner." Prior to the raid, the Government knew these facts relating to ownership of the codes because it *knowingly falsified the only* two written documents governing these issues—"The Contribution Agreement" and "The Operating Agreement"—both of which West *quotes at length in his search affidavit.*

The only relevant affidavit references to the "theft of trade secrets" contain such knowingly explicit falsehoods, including **_deletions_** *from documents* patently material to ownership and probable cause; and alleged "facts" so intentionally misleading, all submitted under oath to this Court, *by the Government,* in and of themselves they individually and/or collectively vitiate the warrants. The evidentiary hearing established that Montgomery had not "stolen" any "trade secrets" and the *Government knew* it at the time of the raid. Incredibly, the Government has now admitted that before the raid, it *did not know what "source codes" it was searching for and/or attempting to seize, nor did it have any means whatsoever either at the time of the raid, or currently, to identify any "stolen" source codes of any nature or description.* In fact the Government has admitted that it knew before the raid that it was not even dealing with "stolen" source codes, but allegedly "deleted" codes from eTreppid computers.

<u>Intentional and Knowing Falsehoods: The Contribution Agreement.</u>

The Government's search affidavit, collectively put together by West, Haraldsen and Trepp, based

the entire raid relating to the "theft of trade secrets" on the premise that Montgomery had conveyed the disputed codes to eTreppid *in a written document* - "The Contribution Agreement," (the "Agreement"). The Government quoted at length from the specific sentence (the "conveyance sentence"), in the Agreement, paragraph 1.2.1, relating to Montgomery's conveyance and eTreppid's purchase of specific "software programs" and "Source Code" in order to establish in the affidavit a written transfer of ownership and possession of the allegedly stolen trade secrets. As the Court now knows, the Government intentionally misrepresented to this Court the meaning, the language and the contents of not only the entire Agreement, but of the "conveyance sentence" itself. The Government extensively quoted from the broad language of *transfer* of "software programs," "copyrights," "trademarks," "trade secrets," and specifically "Source Codes" etc. in the "conveyance sentence," then **deleted** the very *next phrase from the same sentence* that explicitly limited the "software" and "Source Code" conveyance to that *"certain Software Compression Engine Development Program contained on CD No. 1."* (Emphasis added).

This phrase can only have been *knowingly deleted.* The Agreement, *and this phrase* (hereinafter the "deleted phrase"), was admittedly in the possession of the Government, including Agent Haraldsen, Agent West, and its source, Trepp. The only reasonable conclusion to draw is that the Government knowingly deleted it because it knew that Montgomery, not eTreppid had a lawful claim of ownership and possession to any and all, copyrights, trade marks, intellectual property, "source codes," "trade secrets" etc. not *"contained on CD No. 1"*, *as the "Contribution Agreement" explicitly recites.* The fact that the Government specifically quoted the *phrase* immediately prior to the deleted phrase, which contains a laundry list of references to "copyrights, trade marks etc., all contained in the *same* sentence then concluding in the deleted phrase, compels a conclusion of a knowing, intentional and deceptive deletion. The *mens rea* involved in the deleted phrase speaks volumes about Government

deception in this matter.

The incredibly false excuse proffered by the Government during the hearing that Haraldsen sent a copy of the Agreement to West with the "top" cut off, thereby *deleting* paragraph, 1.3 at the top of page 2 of the Agreement, which immediately followed paragraph 1.2.1, is more evidence of knowing and intentional deception by the Government. That paragraph recites:

> *"Notwithstanding any of the foregoing [referring to the "conveyance sentence"] Contributor is specifically not contributing, transferring, or conveying to INTREPID under this agreement or by any other means, nor is INTREPID acquiring from contributor, any other tangible or intangible assets of contributor not specified herein . . . "*

Clearly both Trepp and Haraldsen had the complete Agreement; and it was on file in this very Court weeks before the search with complete quotes from these specific paragraphs. The Government's use of a "cut off" Agreement is both insulting and disingenuous. The "conveyance sentence" was not "cut off." The Court should not sanction such manifest misconduct in a Fourth Amendment analysis *by a Government affiant on the single most material issue in his affidavit—ownership and possession*. No other reasonable inference can be drawn from these facts but knowing and intentional falsehoods made under oath *by the Government*.

### The *Deleted Phrase* From the Operating Agreement.

As if such chicanery was not enough, the Government added more deception. In an effort to show the Court that Montgomery was bound by an "Agreement Not to Compete" preventing him from disclosing and/or using "trade secrets" after he left eTreppid, (agreements commonly involved in intellectual property cases), the Government falsified the precise sentence in the search affidavit relating to that issue in the "Operating Agreement." The relevant sentence states:

> **"So long as MONTGOMERY is appointed as a Committee Member and/or as Chief Technology Officer pursuant to this Agreement,** MONTGOMERY and his Affiliates, agree that, during the term of this Agreement, none of them shall compete with the LLC, whether for their own account and/or for the account of others, individually, jointly with others, or as a part of any other limited

liability company, limited partnership, general partnership, joint venture, corporation or other entity, by: (i) developing, licensing or exploiting in any manner any software programs or other technology which is competitive with the Technology or the Business of the LLC or providing any services or supplies which are encompassed within the definition of the "Business" of the LLC set forth in this agreement" . . . .

The Government knowingly deleted the very first phrase, underlined above ("deleted phrase no. 2") which made the Agreement Not to Compete only valid **"[s]o long as Montgomery is appointed as a Committee Member an/or as Chief Technology Officer."** When West signed the affidavit, Montgomery was neither a Committee Member nor Chief technology Officer. Obviously, he knew it because he deleted the phrase and did not inform the Court that he had done so. It gets worse.

Nor was Montgomery an "employee" as the Government falsely informed the Court. In the search affidavit, the Government stated that Montgomery assigned various patents in 2000 and 2001 "while an employee at eTreppid." This is false. Even eTreppid treated Montgomery as an "independent contractor" before December 31, 2002 as proven in the K-1's attached to the Declaration of Greg Gilbert, attached hereto. Coupled with all of the other fabrications, this Court can only conclude that such cumulative falsehoods were intentionally designed to deceive the Court into issuing warrants the Government wasn't entitled to obtain. Incredibly, West admitted at the hearing that he used the assigned patents to prove Montgomery's alleged status as an "employee," which contain absolutely no reference whatsoever on this issue, but ignored asking Trepp for W-2's during the critical years 2000 to 2002. And the parade of deception only gets worse.

### Montgomery's Security Clearance

West testified at the hearing that he knew Montgomery had a "Top Secret " clearance to possess "classified information" *issued by the Government*. West claimed that he checked with Venables and some commercial on-line source used by Government contractors to determine if it had been "suspended." But only the Government can issue "security clearances" (which West admits) and only the

Government can "suspend" or "terminate" them after notice, a hearing, and compliance with the due process requirements found in Executive Order 10865 and Department of Defense Directive 5220.6 (Exhibit 24). Montgomery's clearance has, by law, never been suspended regardless of Trepp's manipulations. Once again, the Government deceitfully abdicated to Trepp it's responsibility to determine the status of Montgomery's clearance, which only *the Government* could suspend. And it gets worse.

### No Facility Clearance—No eTreppid Right to Store "Classified Information"

West testified that he knew before the raid that eTreppid did not have a "Facility Clearance" to "store" classified information, and that Montgomery had a Top Secret Clearance to possess it; and that eTreppid had been unsuccessfully trying to get such a clearance for three years, but that Montgomery had successfully possessed his clearance for the entire three year period. In his affidavit he recites at length how Patty Grey provided facts to him establishing probable cause to believe that Montgomery had taken the "Secret" "nine palm trees" hard drives "stored" in eTreppid's safe. In order to deal with this thorny problem in his search affidavit, and convince the Court that "classified information" *properly "stored"* in *eTreppid's possession* had been taken by Montgomery, West inserted on page 4 of his affidavit the following: **"On August 1, 2005, SOCOM amended the Department of Defense (DOD) contract Security Classification Specification, DD form 254, permitting eTreppid to store Secret Material at the facility."**

At the hearing, Montgomery challenged the validity of any "Facility Clearance" and the validity of "Form 254" as recited in the affidavit. So the Government then introduced "Form 254." Exhibit 34). But like every other time Montgomery challenged the affidavit, the Government's evidence was manufactured. Form 254 was not signed and, in fact, had never been signed. Nor has the Government ever proffered a signed Form because it doesn't exist. The reason is that the Manual, Section 2-102 c,

1   (p. 2-1-1, <u>Exhibit 15</u>), mandates that in order to obtain a "Facility Clearance" eTreppid must **have a**

2   **reputation for integrity and lawful conduct in its business dealings.** " Given Trepp's unsavory "business"

3   background, well documented in books, court cases, SEC investigations, (<u>Exhibit 9</u>), FBI investigations

4   

5   when he was at Drexel and currently in Ohio (<u>Exhibit 8</u>), eTreppid could not obtain a clearance to "store"

6   classified information.  West clearly knew it because he painstakingly attempted to deal with this *very*

7   serious problem in his affidavit.

8        But, once again, one falsehood led to another. The affidavit is just patently  *false* on each and

9   

10  every one of these  issues: (a)  "classified information" was never "stored" at eTreppid; (b) the "palm

11  trees" hard drives were never "classified" at all; (c)  Form 254 never gave eTreppid the clearance to

12  "store" anything including the "palm trees"; and (d) the "unlawful detention" of useless "palm trees"

13  never happened.  Indeed, a close reading of West's attribution to Patty Grey about the "nine hard drives"

14  

15  being in the safe, not being in the safe, being moved, being found etc., reveals this purported "crime"

16  to be just a fabricated charade. The Government deceitfully abdicated its responsibility and obligations

17  to Trepp.

18       The Court should not sanction such obvious perfidy, particularly by a Government affiant. West

19  cannot even blame a "citizen  informant," let alone one with a polluted background like Trepp, for these

20  falsehoods. Cumulatively, they were designed to mislead the Court into believing that Montgomery was

21  

22  an "employee" who had taken "classified information," who had transferred all of his "Technology" to

23  eTreppid; and who was barred from even possessing eTreppid trade secrets for any of the stated

24  restrictions, i.e., "developing, licensing or exploiting" etc.; and that "all" of the "Technology" and

25  "software programs" were owned and possessed by eTreppid; and that Montgomery was prohibited from

26  using "Any Technology" "in competition" with eTreppid. Each and every one of these Government

27  representations were and are completely false. - *all contradicted by the deleted phrases, and the admitted*

Montgomery Post-Hearing Memo Re: FRCrimP 41(g)          -21-

1   *testimony of West and the Government's documents.*

2       Basic principles of equity should require this Court to rule that Government falsehoods permeate

3

4   these proceedings to such a degree that the Government has "unclean hands" with respect to its claim

5   of probable cause, or claimed "particularity" in the warrants or affidavit.

6       <u>Pre-Raid Judicial Knowledge and/or Inquiry Into Facts in the Search Affidavit.</u>

7       If the Government had highlighted or referenced the *deleted phrases* then this Court would have

8

9   known   what specific property had been conveyed by Montgomery and, therefore, what specific

10   property—trade secrets—had been allegedly "stolen" by Montgomery, i.e., the very specific "source

11   code" belonging to eTreppid "contained on CD No. 1." Moreover, if the Government had not deleted

12   "phrase No. 2," the Court would have known that there were substantial issues as to what, where and

13   when the disputed software was developed, that Montgomery was *not* under an "agreement not to

14

15   compete"; and that Montgomery claimed ownership to all of his intellectual property not "contained on

16   CD No. 1," and expressly excluded in the "cut off" paragraph. Alternatively, if the Government was

17   attempting to obtain a warrant for *the* source code "contained on CD No. 1," then the claim of "theft"

18   was legally impossible because those codes had already been patented by Montgomery; and/or on the

19   face of the affidavit, had allegedly only been "deleted" not stolen; and there was no "particularity" in the

20

21   warrants referencing either "CD No. 1," or the source codes on it. Finally on this point, the

22   Government's own fabrications prevented it from claiming that Montgomery had even stolen "CD No.

23   1" because it never informed the Court that "CD No. 1" existed. Thus, the Government's own falsehoods

24   prevented it from providing to the Court the "particularity" required under the Fourth Amendment for that

25   alleged theft. Once again, one BIG falsehood leading to a multitude of others prevented the

26   Government from providing the Court a legitimate and complete affidavit for the alleged theft of "CD No

27   1." And it gets worse.

If the Government was trying to support its probable cause and "particularity" requirements with regard to theft of source codes—theft of trade secrets—other than those on "CD No. 1," the falsehoods just get compounded; the Government's corrupt intrusion into a purely civil matter gets sneakier, and the Fourth Amendment gets forever subverted. As a matter of law, at this juncture, given the Government's knowing falsehoods, there can never be probable cause for this search. First, because the Government inserted the "conveyance sentence" in the affidavit without the deleted phrase, it fabricated a false basis for the Court to determine that the written Agreement conveyed " *all*" of Montgomery's intellectual property, i.e., all of his "software programs, "all of his "copyrights," all of his "Source Codes," etc. This is and was simply false because, as the evidence shows, only "CD No.1" had been conveyed. Second, by deleting the phrase in the Operating Agreeement, it fabricated a false basis for the Court to determine that Montgomery was unlawfully in possession of "<u>all</u>" "Technology" and "software programs" which were "*in competition*" with eTreppid.

These compounded falsehoods caused the Court to issue overly broad warrants to seize "[a]ny computer files protected by copyright" etc., "[a]ny computer hardware" etc., "[a]ny computer software" etc.,"[a]ny computer related documentation" etc., without regard to Montgomery's rightful ownership or possession of his own source codes, trade secrets etc., because the Government had deceived the Court into believing that "[a]ny" of the Technology in Montgomery's possession might be "in competition" with eTreppid. And this entire perverse scheme was based on the false nomenclature in the warrants that "[a]ny" of these items constituted "eTreppid Source Code"; and that Montgomery had "stolen" it as part of "eTreppid Trade Secrets." This, of course, all flies in the face of the truth in the "deleted phrases" that Montgomery had only conveyed his intellectual property "contained on CD No. 1"; everything else was explicitly excluded by the Agreement; and that there was no "Agreement Not to Compete." Thus, Montgomery was legally entitled to be "in competition" with anyone involving his own

intellectual property.  Again, one falsehood led to another.

Had the Government truthfully informed the Court of the deleted phrases, the Court would have known and had to confront multiple  issues to determine whether the requisite probable cause even existed and the Court would have required constitutional "particularity." Issues such as the following: did the FBI have CD No. 1? Had it been analyzed?  What was on it?  Did Montgomery allegedly "steal" the codes on CD No. 1?  Were other codes in dispute? Who owned them and what evidence existed to support ownership? Who possessed any other disputed source codes? Who had the right of possession? Who had actual possession?  Were they "trade secrets?"  Had they been "deleted" or "stolen?"  Was Montgomery an owner, independent contractor, employee? Was there a covenant not to compete as the Government falsely claimed? Was this a civil matter that the FBI had no right to thrust itself into? Had the FBI properly investigated the matter before seeking a warrant?  What was the relevance and legal significance of the patents, and/or of the dates when they were "assigned?"  Was there any real and immediate threat to the Government?  Was that threat legitimate, or were the sources for that threat legitimate, or in collusion with Trepp, or had those sources verified the threat?  Did the threat involve "classified information?"  Had the appropriate Government Agents checked, verified, and received certification of the "classified information" according to law from a source charged with responsibility by law? If there was a known civil dispute between two claimed owners, what if any DOJ policy existed on intruding into that dispute? Etcetera, etcetera.

The Government falsehoods thwarted legitimate judicial inquiry. The warrants, affidavits, search and seizure must be adjudged for what they are: cumulative falsehoods designed to improperly take property for Trepp.  Otherwise, the Court can only conclude that the Government agents involved in a matter as serious as this, have the experience, expertise, legitimacy, training and vested authority of the village idiot acting as the Mayor.  And we know that is not the case.

## Redactions and Sealed Materials Unavailable to Mr. Montgomery.

If any portion of the redacted affidavit and/or sealed documents, not presently available to Montgomery, contain statements by either Haraldsen, or West, or Trepp or his employees, which purport to support probable cause, the evidence shows that *none* of these sources are either reliable, credible or trustworthy. Moreover, since Haraldsen, (sending a "cut off" CD and not checking with Nellis, when he worked for the Air Force as a Special Agent involving "classified information"), West and Trepp have demonstrably engaged in knowing falsehoods. This Court must reasonably disregard any of their redacted statements and/or sealed documents. The only reasonable conclusion is that Government efforts to maintain their secrecy is a continuum of Government deception. Montgomery's inability to challenge such misconduct is severely and fatally prejudicial under these circumstances.

## No "Inventory"—No "Stolen Property"

One overriding factual basis for the foregoing conclusions repeatedly emerged during the evidentiary hearing. Notwithstanding the FBI's allegedly repeated requests prior to the raid in early March and right up to the last day of evidentiary hearing in this matter, *six months later,* Trepp and his cohorts have never given the FBI an *inventory* of the allegedly "stolen property," i.e., an inventory of the allegedly stolen "source codes." In other words, the alleged owner, to this day, cannot even describe or identify what if any "source codes" have been "stolen," or removed from eTreppid. The only reasonable conclusion to draw from these admittedly concrete facts is that Montgomery is the lawful owner and possessor of any disputed source codes—not Trepp and/or eTreppid. Because of these foundational facts neither the warrants nor the affidavit allege any specific facts claiming that Montgomery has "stolen" any particular source code. At best, there is only a vague and ambiguous general assertion that "source code" had been "deleted" from eTreppid computers.

## "Deleted" Not "Stolen" Source Code.

Deleted source code is obviously not "stolen source code" – hence no crime for the "theft of trade secrets." Moreover, source code that was never on the eTreppid computers or servers, as Venables admitted, could never have been deleted; and if Venables never had access to it, as he has admitted, he could never know whether it was either on the computers or deleted. Conclusively, "deleted" source code, even assuming there were facts to support that spurious accusation (source code was deleted on a routine basis at eTreppid, and the "executables" on the Government contracts were admittedly deleted in the spring/summer of 2005 by "Active Kill"), could not support probable cause to seize "stolen trade secrets" from Montgomery's home or storage. So the FBI simply ignored all of the basic and fundamental facts relating to the alleged "theft" of the "source codes," not even knowing if they constituted "trade secrets," and executed a proscribed "general warrant" utterly lacking in any specificity, let alone that required by the Fourth Amendment.

### Six Months Later and the Government Still Cannot Identify "Stolen" Source Code.

To this day, if the FBI opened the computers and storage media seized from Montgomery's home and storage, it could not identify, or even compare Montgomery's copyrighted and/or proprietary "source codes" developed over the previous twenty-eight years from the allegedly "deleted," or even "stolen" source code it sought to seize. And now the Government knows that Venables cannot identify the disputed codes. Incredibly, the FBI still does not have "CD No. 1," the only property conveyed by Montgomery to Trepp by written agreement as required by the 1976 Copyright Act, nor has it checked the publicly available source codes on the patents conveyed to eTreppid in 1990-91, nor does it have an "Inventory" of stolen property. Indeed, if the FBI ever does open the computers and storage media and obtains Montgomery's copyrighted and/or any of his exclusively proprietary source codes, all developed before December 31, 2002, it would be effectively stealing them for Trepp and/or for the Government. Then a real crime and irreparable harm will have occurred.

Government Knowledge of Montgomery's Sole and Exclusive Access to the Source Codes.

1

2    This record contains unrefuted testimony by Montgomery from the preliminary injunction

3

4    hearing, and in his declaration that *all* source codes used on the Government contracts were completely

5    created and developed by Montgomery prior to December 31, 2002, when even eTreppid treated

6    Montgomery as an independent contractor. (Prelim. Inj. Tr. Vol. 2, 163:7-165:3,    Exhibit 33).  This

7    testimony is buttressed by Montgomery's K-1's (treated by the IRS as 1099's) as explained in the

8

9    declaration of CPA Gilbert, attached hereto, (*see also* K1s, Exhibit 29), and by the fact that no one at

10   eTreppid has ever had access to the source codes used on the government contracts, *as admitted under*

11   *oath by Venables three weeks before the raid,* and by the explicitly exclusionary language in the

12   Contribution Agreement.

13        Again, the Government must be charged with this knowledge because sworn testimony on this

14   material fact was in Trepp's possession, the complaining party, in a certified transcript, also available to

15

16   the Government (notwithstanding West's lame protests to the contrary) weeks before the search.  When

17   he prepared his affidavit, West knew how important the fact of access was to the issue of lawful

18   ownership and possession of the source codes/trade secrets; West knew that he needed an inventory of

19   what was "stolen"; and that there was a dispute as to what source codes were owned by Trepp versus

20   Montgomery. The specific testimony of Venables on this critical issue, West's only source on this point,

21

22   stated that Montgomery had sole and exclusive access to the codes/trade secrets.  The only reasonable

23   conclusion, *given the Government deletions in both of the documents* cited by West in his affidavit, is

24   that it knew that  Montgomery, not eTreppid, had a superior claim to ownership of the source codes

25   which the Government was trying to seize for Trepp. That is why the Government  presented a now

26

27   obviously false picture to this Court that eTreppid, through Venables had access to everything. This sworn

part of the affidavit is just plain false.  Yet, again, Agent West was not only obligated to determine it's

Montgomery Post-Hearing Memo Re: FRCrimP 41(g)        -27-

accuracy, *his deletions* deceived the Court on this precise issue. It's difficult to believe West's testimony contradicting Venables, when Venables gave precisely the opposite testimony three weeks before under oath; and had worked for years with no access to perhaps the most vital source codes in the world involving the war on terror.

<u>Agent West Has Not Been Truthful with the Court.</u>

Since they have now both testified under oath, someone is either lying, or grossly distorting the truth. Is it reasonable to believe that Venables would lie to a Government Agent engaged in an official criminal investigation on one of the most material facts involving the search when he had just testified truthfully days or weeks before—particularly where West intentionally made material deletions with respect to ownership of the codes? Or, is it more likely that Venables misled West by vague and ambiguous statements about access to "all" source code and that West just accepted these statements without further questioning? West and/or Venables are either now lying on this vital point or are still trying to mislead the Court. Reasonableness under all of the circumstances suggests that West *deletions of the key phrases* conclusively places the mantle of responsibility for these fabrications on the Government. Plainly, if neither eTreppid, nor it's employees, like Venables, were ever given access to Montgomery's source codes, which the evidence clearly shows,  the reasonable inference is that Montgomery, not eTreppid owned and lawfully possessed the codes. Coupled with the failure to obtain an inventory of the "stolen codes," both  pre-raid and to this day, the only reasonable inference to draw on this record  is the fabrication of a knowing falsehood on this vital issue of access/ownership. At some point, claims of blunder, incompetence, ignorance and "I was told something different" just don't ring true.  Cumulative material misstatements by an experienced, intelligent Government Agent who professed expertise and experience in the very first line of his sworn affidavit, notwithstanding his sworn disclaimers in the hearing, (another change as soon as challenged), amount to knowing falsity.

The foregoing, coupled with the now infamous deletions, coupled with West's thoroughly implausible sworn testimony that Montgomery pulled his car into the driveway, then into the street, then *Montgomery* asked to pull into the garage, when, co-incidentally his lap top was in the car (for which there was no warrant) should cause this Court to seriously question the credibility, reliability and truthfulness of Agent West.

### Who Really Wanted to Steal the Source Codes?

The foregoing facts, and the fact that Trepp was demanding $500 million from the Government for a portion of the source codes in September 2005, when his conflict with Montgomery reached its two-year zenith; coupled with the fact that the source codes are critical to the war on terror—the single most important, *and costly* issue confronting the U.S. and the world today—raises significant issues of motive and intent on the part of the two perpetrators—the Government, i.e. it's officials and agents on the one hand, and, of course, Trepp on the other. Montgomery has always solely and exclusively had the codes. The Government, its officials—former Air Force Pilot now General Bath, former Air Force Pilot now Congressman Gibbons, and Air Force Agent Haraldsen; and Trepp have never had possession or access to the codes. (It may not be a coincidence that Nevada U.S. Attorney Daniel Bogden, whose office generated the application for the warrants was also in the Air Force Jag office, is a Republican, and was sponsored for his appointment by Gibbons, and that Gibbons has received hundreds of thousands of dollars from Trepp). The Government/Trepp trying to seize these specific codes in a patently illegal search based on material falsehoods creates an overriding and compelling inference that certain Government officials related through Trepp also had a motive to steal the codes, and split the proceeds from any sale either to the U.S. or abroad. Indeed, given Trepp's unquenchable greed illustrated in his past Drexel Junk Bond criminal association to steal billions of dollars, Trepp and his Government cohorts are capable of trying to sell this technology to anyone, in order to blackmail the United States.

Trepp's conduct and past history incontrovertibly support this premise. Montgomery's does not. Montgomery has had the codes for at least seven years and has only assisted the Government since 9/11/01. Trepp pocketed all of the money from the Government contracts—over $11 Million, giving Montgomery nothing. That is why their conflict began in September 2005 when Trepp said to "stop processing," "we'll make them buy it for $500 Million." Since the raid, Montgomery has silently and without compensation, used the codes to process vital national security information relating to terrorist communications; and has given it to some of the highest officials of the Government, not associated with Haraldsen, Bath or Gibbons, et al. This information, including flight numbers, has been documented and used by *officials* within our Government weeks before the recent attempts to fly airliners containing "fluid bombs" out of London. They know that Montgomery is the real patriot; but at this time, local power brokers in Nevada appear to be directing this case, over money.

### Government Avoidance and Disregard of Established Law.

Moreover, Government avoidance of applicable statutory law relating to trade secrets—only the true owner can maintain secrecy—and ignoring Ninth Circuit precedent prohibiting searches based on "any" and "all" computer related items particularly in connection with intellectual property "crimes" further substantiates an inference of bad Government motive, at least on the part of some officials. The combined effect of avoidance and misconduct by the Government, aside from Trepp's falsehoods, raises a motive to steal intellectual property from Montgomery on the part of some Government officials. Their misconduct is too blatant and irrational to conclude otherwise.

### Source Code Secrecy and Irreparable Harm

For these reasons, the search and seizure should be adjudged unreasonable, unconstitutional, lacking in probable cause and based on an overbroad and facially invalid warrant. All of Mr. Montgomery's property, including copies of hard drives, should be returned forthwith. Once the secrecy

of the codes is compromised, their value is essentially destroyed. *Irreparable harm occurs the moment the secrecy is lost.* The Government and Trepp knew this fact before the raid. They didn't care what laws they violated as long as they seized Montgomery's codes. The Government and/or Trepp could then claim that they lawfully created the codes by "reverse engineering." In this matter, "possession is 9/10th of the law." That is why Montgomery protected the codes and maintained their secrecy when he was at eTreppid. That is why the Government and Trepp ignored the Fourth Amendment, falsified, deleted and omitted material facts in the search affidavit, ignored all applicable DOJ policy, ignored Ninth Circuit precedent, never conducted any reasonable pre-raid investigation or analysis, and broke into Montgomery's home and storage like a common thief to steal something it didn't own. And that is only the beginning of the analysis.

<u>Searching Computers and Electronic Media</u>

Unlike cases dealing with the " theft" of property where a criminal trespasser steals tangible property plainly owned by another, the purpose of this raid was to seize intellectual property lawfully in the possession of the only person who created it and who had ever utilized it or possessed it, for the purpose of giving it to someone who had never created it, possessed it, or owned it. But even if this matter did not involve sophisticated intellectual property, the conduct of the local FBI and the U.S. attorney's office in this matter does not pass the smell test let alone bedrock constitutional law.

*If* these searches are deemed constitutional, in matters involving intellectual property, the Government can search any home, at any time, and for any reason, and, when challenged, simply claim ignorance of it's own policies and even of it's own personnel trained to protect Fourth Amendment rights. This is particularly true for searches and seizures of complex and technologically advanced intellectual property contained on computers and related electronic media, *and the sophisticated technological expertise required to search and seize it.* For that reason, the DOJ and the FBI have

published detailed guidelines, (Exhibits 12, 14, 21) and have established special units trained in the legal and technological issues involved in intellectual property "crimes." (Exhibits 12, 25 )  Here, these guidelines and the expertise of the special units trained to follow them were admittedly ignored or unknown to the Reno FBI and US Attorney's Offices. The guidelines and the special units are directly applicable to the search and seize of the computers and computer related storage media between Trepp and Montgomery in their civil dispute. (Exhibit 25). The Government's admitted ignorance of it's own guidelines and special units, although suspect in itself, in the context of it's cumulative misconduct, constitutes a direct admission that it did not know what it was doing, and, therefore, could not have acted reasonably when it raided Montgomery's home.  How can the Government, when it organizes specially trained units acting under explicitly developed policies for the specific purpose of investigating intellectual policy "crimes" and when it develops sophisticated search techniques for computers and electronic media, claim it didn't even know the policies and units existed? Such Governmental conduct is per se unreasonable.

This patently illegal raid empowered Government agents and officials, acting on behalf of a politically connected and powerful crony, to steal Montgomery's property—in this case "property" developed over twenty-eight years that is so valuable, so advanced, so complex, so secretive, and so "intellectual," neither the Government, nor it's principal—Trepp and his PHD's—are able to identify it, have ever used it, accessed it, or possessed it, and would not know it if they saw it.

<u>Factors the Court Should Consider for a Reasonable Analysis</u>

In objectively reviewing the *"reasonableness"* of the Government's conduct in this matter, this Court must consider the following essential factors:

1.      The Government was seeking to search for and seize "source codes" that it could neither identify, nor describe by any means whatsoever, let alone with reasonable particularity; nor had the

"source codes" ever been created, seen, used, developed, possessed or placed on any electronic storage media by anyone other than Montgomery. (The sole iota of evidence to the contrary—Venables *alleged statement to West in the affidavit that he ad access to the codes, if you believe West*—is not only contradicted by Venable's sworn testimony just three weeks before the raid that he had never had access to the codes on the Government contracts—it is irrelevant to a reasonable conclusion that Montgomery had the right to posses the codes). Thus, no reasonable inference can ever be drawn that Montgomery did not, at the very least, have the right to possess the source codes, let alone own them.

2.     There is no evidence whatsoever, and certainly not in the search affidavit, that the "source codes" the Government sought to seize had ever been on the premises of eTreppid, let alone outside the possession of Montgomery, nor did anyone, including the Government even possess the technological expertise to develop a program to identify and seize them, as is required by the FBI and DOJ's Manuals to search and seize computer related materials. Thus, they could only break in and steal something they had no ability and/or right to identify, let alone possess. Such conduct cannot be reasonable.

3.     The "classified information" referenced in the search affidavit, like all "classified information," was something susceptible to precise definition, particularly identifiable and *certifiable* by the "Original Classification Authority"—a *Government Agency—prior to the raid*.    It was unreasonable for the Government not to check its own sources, that it owns and controls, for its own "classified information," yet raid a citizen's home on this purported basis. Because the Government was dealing with it's own "classified Information" the post raid reality that no "classified information" even existed compels an inference of pre-raid unreasonableness.

4.     The same reasonable inferences must be drawn from the Government's failure to check and comply with it's own regulations and controls relating to Montgomery's top secret security

1  clearance. Obviously, none of the Government protocols to suspend or cancel it have ever been
2  complied with, and he still has it. How can the Government now claim it was reasonable not to comply
3
4  with such a fundamental process when it purportedly conducted the raid because Montgomery was in
5  "*unlawful retention*" of information which is not even "classified?" The accumulated Governmental
6  breakdowns manifest here cannot possibly justify any standard of reasonableness.

7       5.    The avalanche of Governmental misconduct in this matter is reflected in the sworn
8  testimony and affidavit of Agent West. They are so replete with falsity, material omissions, evasiveness,
9
   ambiguity and outright fabrications, they cannot objectively support any reasonable conclusion that the
10
11  Government had probable cause to conduct the raid.

12      6.    Conclusively, Montgomery was an independent contractor when all of the disputed source
13  code had been created and developed prior to December 31, 2002. Under any applicable legal theory,
14  the disputed codes belonged to him.
15
16      7.    Trepp and his agents and employees are not sufficiently reliable sources, or without bias
17  or motive, to justify the Government's utterly blind and unchecked acceptance of their statements,
18  particularly without checking the other side's facts. It just is not reasonable under all of the
19  circumstances to do so.
20
       8.    The "connection" between Warren Trepp and James Gibbons, a powerful federal official,
21
22  as evidenced by Trepp's contributions and Montgomery's Declaration must be factored into an analysis
23  of the Government's motive for thrusting itself into the civil dispute between Trepp and Montgomery
24  *because it involves a civil dispute between two purported owners* pending at the time of the raid and
25  the Government did not even check the claimed right of possession of it's target. In choosing sides, the
26
   Government must be made to explain why it unilaterally chose Trepp's side.
27
                    **II.   LEGAL ARGUMENTS AND EVIDENCE.**

**1.    The Two Alleged Crimes Against Mr. Montgomery.**

Agent West claimed he had "probable cause to believe" Mr. Montgomery committed the following two crimes, (Warrant Affidavit, p. 15, Exhibit 2):

**A. Theft of Trade Secrets Under 18 U.S.C. §1832.**

The government must prove beyond a reasonable doubt that (1) the defendant stole or *without authorization of the owner*, obtained, destroyed or conveyed information; (2) the defendant knew or *believed this information was a trade secret* ; (3) the information was in fact a trade secret; (4) the defendant intended to convert the trade secret to the economic benefit of anyone *other than the owner*; (5) the defendant knew or intended that *the owner* of the trade secret would be injured; and (6) the trade secret was related to or was included on a product that was produced or placed in interstate or foreign commerce. (18 U.S.C. §1832; DOJ Manual, Computer Crimes & Intellectual Property Section, Prosecuting Intellectual Property Crimes, § VIII. B. 1. , p. 3 of 31 at Exhibit 12).

**B.    Unlawful Retention of National Defense Information Under 18 U.S.C. §793(e).**

"Whoever having unauthorized possession of, access to, or control over any document, writing, code book, signal book, sketch, photograph . . . relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates, delivers, transmits or causes to be communicated, delivered . . . or attempts to communicate, deliver, transmit . . . to any person not entitled to receive it, or willfully retains the same and fails to deliver it to the officer or employee of the United States . . . Shall be fined under this title or imprisoned not more than ten years, or both. *(See. U.S. v. Morison*, 844 F.2d 1057 (4th Cir), *cert. denied* 488 U.S. 908 (1988)[espionage statute applied to a military intelligence employee who made unauthorized transmittal of satellite-secured photographs to publisher]; *U.S. v. Weissman*, 2006 U.S. Lexis 56443 (D. Va. Aug. 9, 2006)["To prove that the information was transmitted to one not

1   entitled to receive it, the government must prove that a validly promulgated executive branch regulation

2   or order restricted the disclosure of information to a certain set of identifiable people, and that the

3

4   defendant delivered the information to a person outside this set . . . and knew that such communication

5   was illegal."]).

6   **2.    The Standard of Review Is One of Reasonableness Under the Circumstances, And Here the**

7        **Search and Seizure Were Unreasonable and Lacking Probable Cause.**

8        "The Fourth Amendment's policy against unreasonable searches and seizures finds

9

10   expression in Rule 41." *U.S. v. Ventresca*, 380 U.S. 102 (1965).   "Rule 41 reflects the Fourth

11   Amendments policy against unreasonable searches and seizures." *Zurcher v. Stanford Daily*, 436 U.S.

12   547 (1978), *reh. denied* 439 U.S. 885 (1978).

13        "No standard is set forth in the rule [ 41] to govern the determination of whether property should
     be returned to a person aggrieved either by an unlawful seizure or by deprivation of the property.
14     The Fourth Amendment protects people from unreasonable seizures as well as unreasonable
     searches, and **reasonableness under all of the circumstances must be the test when a person**
15     **seeks to obtain the return of property.**" *Notes of Advisory Committee on 1989 Amendments*
     *to Rule 41, citing U.S. v. Place*, 462 U.S. 696, 701 (1983) [emphasis added].
16

17   The Court must consider "totality of the circumstances," to determine whether there is a "substantial

18   basis" for believing that what is being looked for will be found at the location to be searched. *Mass. v.*

19   *Upton*, 466 U.S. 727, 104 S.Ct. 2085, 2088 (1984).  The quantum of information which constitutes

20

21   probable cause—evidence which would warrant a man of reasonable caution in the belief that a felony

22   has been committed—must be measured by the facts of the particular case. *Ng Pui Yu v. U.S.*, 352 F.2d

23   626 (9th Cir. 1965).  The district court's decision to grant or deny pre-indictment Rule 41 motions for

24   return of property turns primarily on equitable considerations; and the court is entitled to balance the

25

26   equities in deciding whether to return is in order.  *U.S. v. Kama*, 394 F.3d 1236, 1238 (9th Cir. 2005);

27

1    *Angel-Torres v. U.S.*, 712 F.2d 717 (1ˢᵗ Cir. 1983).[4] Under the circumstances of this case, these searches

2    were clearly unreasonable.

3

4    **A.    There Was No Classified Information, and No Probable Cause to**

5    **Believe Mr. Montgomery Unlawfully Retained Classified Information.**

6    Before the search, Agent West claimed he had probable cause to believe Mr. Montgomery

7    "unlawfully retained National Defense Information." (West Affidavit, p. 15, <u>Exhibit 2</u>). However, after

8    the search the AUSA handling this case admitted there was "no classified information," (AUSA Faxes,

9    <u>Exhibit 4</u>).  In two fax covers dated June 1, 2006, he said:

10

11    **"the DoD has confirmed that material originally marked classified as SECRET, [in West's**
       **affidavit] was, in fact, not properly classified by an Original Classification Authority within the**
12     **U.S. Air Force.  As such our concerns for protecting certain information and identities as**
       **reflected in the redacted affidavit provided to you in court on Friday May 26, 2006, are no**
13     **longer present."** (Id.).

14

15

16    Agent West confirmed his affidavit was incorrect. (Vol. I, 95:25-96:4, 98:1-5, 103:20-22).[5]  This error

17    fatally tainted the warrant.  It was clearly not an innocuous mistake by the *Government*; and nor is the

18    analysis confined to what Agent West knew before the raid. As previously stated, the  *Government*,

19    through an "OCA" determines, decides, designates and marks "classified information". (Executive Order

20

21

22    [4] Before the Court "decides to entertain" the 41(g) motion it should balance the equities and
      decide whether it can reach the merits. See *U.S. v. Kama*, 394 F.3d 1236, 1238 (9th Cir. 2005).
23    Here, because Montgomery filed papers requesting the 41(g) hearing, which he requested *after* the
      government belatedly admitted there was no classified information, and the Court granted that
24    request and proceeded with three days of hearings, it appears that the Court has already balanced the
      *Kama* factors and determined it should exercise its equitable jurisdiction to entertain the merits of
25    Montgomery's 41(g) motion.  Assuming Montgomery is incorrect, then, alternatively, he argues that
      under the facts set forth herein, (§I-II.2), *every Kama factor* would weigh in his favor and therefore
26    the balance of these equities tilts in favor of reaching the merits of his Rule 41(g) motion.

27    [5] Volumes I, II, and III refer to hearing transcripts from Mr. Montgomery's 41(g) hearing held
      on June 29, July 31, and August 17, 2006, respectively.  Agent West was the only witness.