FILED

NOV    2006

U.S. MAGISTRATE JUDGE
DISTRICT OF NEVADA

BY_____

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | | |
|---|---|---|
| In the matter of the search of:<br>12720 BUCKTHORN LANE,<br>RENO, NEVADA,<br>and<br>888 MAESTRO DRIVE, RENO,<br>NEVADA, STORAGE UNITS<br>136, 140, 141, 142, and 143, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 3:06-CV-0263-LRH (VPC)<br>3:06-MJ-0023-VPC<br><br><br>**ORDER** |

Before the court is a motion by Dennis Montgomery, Brenda Montgomery and the Montgomery Family Trust ("Montgomery") (1)  to unseal search warrant affidavits; (2) for the return of property pursuant to Fed. R. Crim. P. 41(g); and (3) for the segregation and sealing of all attorney client and trade secret material seized (#21, 50).  The Government opposed (#s 23, 24, & 25) and Montgomery replied (#26).   The parties engaged in additional briefing (#s 45, 46, 47, 48, 49, 50, & 51), and the court held an evidentiary hearing on June 29, July 31, and August 17, 2006.  Thereafter, the parties submitted post-hearing briefs (#s 74, 76, & 77).

The court has thoroughly reviewed the record and the papers submitted herein, and Montgomery's motion is granted as follows: 1) the search warrant affidavits shall be unsealed, and 2) Montgomery's property shall be returned.[1]

## I. HISTORY & PROCEDURAL BACKGROUND

### A. Basis for Probable Cause for Search Warrant Applications and Affidavits

Dennis and Brenda Montgomery ("Montgomery") own a home located at 12720 Buckthorne Lane, Reno, Nevada and lease storage space located at 888 Maestro Drive, Reno, Nevada, storage unit numbers 136, 140, 141, 142, and 143 (#21). The Federal Bureau of Investigation ("FBI") searched both

_____

[1]Since the court is ordering the return of Montgomery's property, the request to segregate and seal all attorney-client and trade secret material is denied as moot.

1   the residence and storage units pursuant to search warrants executed on March 1 and March 3, 2006.

2   *Id.* This court granted the Government's motions to seal the affidavits in support of the warrants (#3,

3   14). A copy of the warrant and receipt for items seized was left with counsel for Montgomery (#15).

4   On March 8, 2006, returns on the search warrants were executed, and the requisite inventories of items

5   seized were provided to this court. (#15-20).

6   　　　The Government set forth the original basis for probable cause in the affidavits accompanying

7   the applications for the search warrants (#s 1, 4, 6, 8, 10, & 12).[2] With respect to the search of the

8   Montgomery residence at 12720 Buckthorne Lane, Reno, Nevada, Michael West, Special Agent, Federal

9   Bureau of Investigation ("SA West"), states that he first became involved in the investigation of Dennis

10  Montgomery based on a complaint made by Warren Trepp ("Trepp"), management committee chair of

11  eTreppid Technologies, LLC, of Reno, Nevada (#1). Trepp alleged that Dennis Montgomery, eTreppid's

12  chief technical officer, removed eTreppid computer equipment and storage media containing "source

13  code" files derived from eTreppid's development of certain data compression and pattern recognition

14  software, removed hard disk drives containing "Secret" information provided to the Department of

15  Defense ("DOD"), and systematically deleted source code files from the remaining eTreppid data

16  servers, all in violation of 18 U.S.C. § 1832, Theft of Trade Secrets, and 18 U.S.C. § 793(e), Unlawful

17  Retention of National Defense Information. *Id.*

18  　　　The basis for probable cause is described in detail below; in sum, the majority of information was

19  provided by Trepp or eTreppid employees. The only other information appears to have come from Neil

20  Azzinaro, a businessperson with whom Montgomery allegedly had a conversation about seeking

21  investors for the source code and/or a new business venture of Montgomery's, and Air Force Special

22  Agent Haraldsen ("SA Haraldsen") with whom Montgomery had conversations about continuing to

23  perform work for the government, independent of eTreppid. To better understand the chronology of

24  events and the complex factual issues giving rise to these searches, the court has divided its discussion

25  of the affidavit into six segments.

26

27  　　　[2]For the ease of reference, this order will refer to docket #1 as the search warrant affidavit.

28  　　　　　　　　　　　　　　　　　2

1

### 1.      The Documents Offered in Support of the Affidavit

2            To establish probable cause for the search warrant SA West relied on three categories of

3 eTreppid documents: 1) a contribution agreement between Montgomery and eTreppid ("contribution

4 agreement"); 2) the eTreppid amended and restated operating agreement ("operating agreement"); and

5 3) ten patent assignments from Montgomery to eTreppid.

6

### a.      The Contribution Agreement - page 2, lines 3-12[3]

7            SA West attested that Montgomery signed a contribution agreement in which he assigned his

8 rights to "contributed assets" to eTreppid in exchange for fifty percent management interest in eTreppid.

9 According to the affidavit, "contributed assets" included trade secrets, patent rights, copyrights, licenses

10 and permits, software programs and source codes, etc. (#1, 2:3-12). The court drew the inference from

11 this summary of the contribution agreement that Montgomery assigned *all* intellectual property and

12 related property he owned to eTreppid because that is what the plain meaning of the excerpt of the

13 contribution agreement states.

14

### b.      The eTreppid Amended and Restated Operating Agreement - 2:13-25; 3:1-4

15

16            Montgomery also signed an amended and restated operating agreement of eTreppid

17 Technologies, and SA West quoted a provision of that agreement which states that Montgomery agreed

18 to devote substantially all of his time and efforts to the business and affairs of eTreppid and also

19 restricted Montgomery's independent activities; in other words, it is a non-compete agreement.

20 According to the affidavit, Trepp considered eTreppid's trade secrets to be various software programs

21 relating to data compression pattern recognition, change and anomaly detection, among other things.

*Id.* at 3:10-13.

22

### c.      Ten Patent Assignments from Montgomery to eTreppid - 3:5-16

23

24            Finally, SA West identified ten patents that Montgomery, as an eTreppid employee, assigned to

25 eTreppid in 2000-2001. *Id.* at 3:5-9. The affidavit states that through these patent assignments,

26          [3]The references that follow are to the page and line numbers in SA West's affidavit in support

27 of the search warrant (#1).

28

3

Montgomery assigned full and exclusive use of the technologies described in the patents to eTreppid. The next paragraph of the affidavit describes "trade secrets," which the court inferred were the patented technologies Montgomery assigned to eTreppid in 2000-2001: software programs relating to data compression, pattern recognition, and change and anomaly detection. *Id.* at 10-16.

### 2.    The Source Code and eTreppid Security - 3:17-26; 4:1-12

The next section of the affidavit is devoted to a description of the protocols eTreppid established to insure the security for the source code files, which contained data compression and pattern recognition software. *Id.* at 3:17-26. The affidavit states that only two eTreppid employees, Montgomery and Sloan Venables ("Venables"), had access rights to duplicate, modify or delete source code. The affidavit describes Montgomery's responsibility to maintain a back-up copy of the source code server data on specifically described hardware units, and that Trepp required Montogomery to provide him with current source code files, which Trepp stored at a secure off-site location. *Id.* at 4:7-9. The affidavit then summarizes eTreppid's locks, alarm system and video surveillance system. *Id.* at 4:10-12.

### 3.    The SOCOM Contract and Montgomery's Security Clearance - 4:13-26; 5:1-4

Having established ownership of the technology in eTreppid, Montgomery's role in the work of eTreppid, and the sophisticated security system in place at eTreppid, the affidavit turns to a March 2003 agreement between eTreppid and U.S. Special Operations Command ("SOCOM"), which required eTreppid to have access to secret material. *Id.* at 4:13-18. The affidavit states that eTreppid was permitted to store secret material onsite pursuant to DD Form 254. *Id.* at 4:16-18.

The affidavit then states that Montgomery received and signed two security briefings in August and September of 2003, which outlined his obligation to protect classified material of concern to the United States, to protect unauthorized disclosures, and to prevent negligent handling of marked or unmarked classified information, which could irreparably damage the United States and be used to advantage by a foreign nation. *Id.* at 4:19-26; 5:1-4.

4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> **4.     November 2005 Visit to Nellis Air Force Base and the Nine Secret Hard Drives - 5:5-13**

In the next section of the affidavit, SA West develops the chronology of events concerning the "nine eTreppid hard drives," which are then characterized as the "nine Secret hard drives," and ultimately transformed into "classified material." In November 2005, Patty Gray ("Gray") of eTreppid visited the Predator Drone Operations Center at Nellis Air Force Base where she recorded "Secret Predator Drone video images" onto nine eTreppid hard drives for use in developing "Automatic Target Recognition" software. *Id.* at 5:5-8. The affidavit states that pursuant to instructions from "contractor personnel at Nellis AFB," Gray marked these nine hard drives with "red standard U.S. Government Secret labels" and mailed them to eTreppid's facility in Reno. *Id.* at 5:8-11. The nine secret hard drives were stored in a GSA-approved safe as required by the DOD. Gray, Trepp and Montgomery were the only persons with access to the safe. *Id.* at 5:11-13.

> **5.     December 2005:  Montgomery's Breaches of Protocol, Deletion of Classified Material and Trade Secrets, and Removal of Classified Material and Trade Secrets from eTreppid - 5:14-26; pages 6, 7, 8, 9, and 10**

This portion of the affidavit recounts the events which led to the allegations of theft of trade secrets and unlawful retention of national defense information. According to SA West's affidavit, during December 2005, Gray and other eTreppid employees noticed that Montgomery was not following the standard protocols for use and storage of the nine secret hard drives. Gray discovered on two occasions that Montgomery was not properly securing them in the safe, and they were returned after Montgomery was questioned. *Id.* at 5:14-26;6:1-7. Despite these incidents, Gray continued to find the nine secret hard drives missing from the safe, and Trepp intervened to insure that all "classified material" be kept in the top drawer of the safe. *Id.* at 6:13-17. Gray changed the combination to the top drawer of the safe, and she was the only eTreppid employee who had it. *Id.* at 6:15-17.

Montgomery requested access to the classified material, and Trepp not only gave Montgomery authorization; he also instructed Gray to give Montgomery the combination to the top drawer of the safe, which she did. *Id.* at 6:18-22. From December 18th until December 21st, other eTreppid employees reported that Montgomery was deleting eTreppid source code files and that certain computer hardware

1    was missing. *Id.* at 6:23-26;7:1-6. When asked about the missing equipment, Montgomery responded

2    that he had taken the equipment home, although the eTreppid employee who reported the missing

3    equipment had never known Montgomery to take this equipment home. *Id.* at 7:6-12.

4         Prior to leaving for the holidays, Venables installed software to back up all of eTreppid's server

5    data, including the source code server, and he verified that it was operating properly before his departure.

6    *Id.* at 7:13-17.    Two key eTreppid employees, Gray and Venables, departed for the holidays on

7    December 22, 2005, and did not return until January 3, 2006. *Id.* at 7:18-19. During their absence, one

8    eTreppid employee discovered portions of the eTreppid source code he was working on had been

9    deleted, and when he asked Montgomery about this, Montgomery advised he would provide the

10   employee with the source code he needed to do his work. *Id.* at 7:20-26;8:1-3. Montgomery also asked

11   another eTreppid employee to load some boxes into Montgomery's truck, which had never happened

12   before. *Id.* at 8:4-8.    After Venables returned from the holidays in January, he noticed that the source

13   code server cabinet and keyboard were in disarray and the screen was active. *Id.* at 8:9-10. When he

14   asked Montgomery about this, Montgomery responded that he was "cleaning up stuff," but when

15   Venables went into the warehouse, he also noticed that the units Montgomery used to back up the source

16   code server were missing. *Id.* at 8:13-17. Montgomery told Venables he would bring back the

17   equipment, as he no longer needed it. *Id.* at 8:17-19. When he looked at the source code server,

18   Venables discovered that most of the folders used by the eTreppid software developers had been deleted,

19   and he could not access the ISA server either. *Id.* at 8:20-23.

20        Shortly thereafter, Trepp became aware source code was missing when employees complained

21   that they could not operate their computer systems, and Venables reported that all source code had been

22   deleted from the source code server, the ISA server, and all of the software developers' work stations.

23   *Id.* at 8:24-26;9:1-2. Although Montgomery then told Trepp that the source code could be located on

24   removable hard drives, a two-day analysis failed to locate the source code. *Id.* at 9:3-5. It was also at

25   this time that Gray found seven hard drives containing copies of the nine original secret hard drives from

26   Nellis AFB in Montgomery's file cabinet, and she found seven additional hard drives also containing

27   copies of the nine original hard drives in the safe. *Id.* at 9:6-10. A search of the eTreppid facility failed

28                                                         6

to locate the nine original secret hard drives, and Gray and Montgomery were the only employees with access to the top drawer of the safe. *Id.* at 9:10-14. At Trepp's request, Venables reviewed all of the video surveillance cameras and found that none was recording video, and he also discovered that all stored video had been deleted. *Id.* at 9:15-18.

Despite Montgomery's assurances that the source code was stored on hard drives in the building, the hard drives were never located, and on his last day at eTreppid, Montgomery was reported to have said that if Trepp wanted the source code, "he [Trepp] needs to give me big money if he wants it." *Id.* at 9:19-24. Montgomery never returned to eTreppid and he was terminated on January 18, 2006. *Id.* at 10:14-16. Warren Trepp told SA West that Montgomery had devoted eight years of his life to developing software products at eTreppid, that Montgomery worked on these products every day and on weekends, that Montgomery would never delegate these projects to anyone else, and that in order to continue this work, Montgomery would require substantial computing power, similar to the workstation and RAID unit removed from the warehouse, and have access to the nine secret hard drive video images. *Id.* at 10:4-13.

<div style="text-align:center">

**6.    Montgomery's Conversations with Neil Azzinaro and Special Agent Paul Haraldsen ("SA Haraldsen") – p. 10:17-24; 11:1-26; 12:1-7**

</div>

Apart from the information provided SA West from Trepp and eTreppid employees, SA West also relied on two other individuals who had conversations with Montgomery during this same time period. The first is Neil Azzinaro, a casino host and Montgomery's friend. In a January 2006 conversation, Montgomery recounted the business dealings of Trepp, Montgomery's unhappiness that he had not received a raise, and Montgomery's interest in looking for individuals who would invest several million dollars. *Id.* at 10:17-23. Montgomery specified the investor would have to be an individual with United States citizenship. *Id.* at 10:23-24. SA West stated that based on this conversation with Azzinaro, and possibly others, it appeared that Montgomery may have provided source code to others and was looking for investors for the source code. *Id.* at 11:1-3.

In mid-February 2006, SA West was contacted by SA Haraldsen, Air Force Office of Special Investigations, Pentagon. During this period SA Haraldsen placed consensual, recorded telephone calls

<div style="text-align:center">7</div>

1 | with Montgomery.  During these calls, Montgomery made several representations to SA Haraldsen: 1)

2 | that Trepp did not have the capability to continue the work; 2) that Montgomery had made certain that

3 | the assets of the U.S. Government were protected; 3) that if the work is to continue, it must be through

4 | Montgomery; and, 4) that the capability to do the work continued to exist. *Id.* at 11:4-10.  SA Haraldsen

5 | and Montgomery had two additional telephone calls on February 24, 2006, during which Montgomery

6 | indicated he might just give the technology to the government, and when SA Haraldsen asked for proof

7 | that the technology still exists, Montgomery became agitated.  *Id.* at 11:11-17.  Later that same day,

8 | Montgomery purchased computer disks, and business card stock. *Id.* at 11:18-21.

9 | Finally, on February 26, 2006, Montgomery telephoned SA Haraldsen again and expressed

10 | concerns about supplying SA Haraldsen with information about anomaly detection and pattern

11 | recognition technical capabilities, as to do so might violate a temporary restraining order filed against

12 | him by eTreppid. *Id.* at 12:1-7.

13 | Based upon SA West's affidavit, the court found probable cause existed that Montogmery may

14 | have unlawfully retained classified material and stolen trade secrets, and it issued the search warrant.

15 | The court also granted the Government's motion to seal the affidavit (#3).

16 | **B.    The Search Warrants for the Storage Units**

17 | With respect to the search of the storage units, SA West's affidavit sets forth the following basis

18 | for probable cause: the CPU and RAID storage unit used by Montgomery and the nine original secret

19 | hard drives were not located during the search of the residence of Buckthorne Lane (#4, 6, 8, 10, 12).

20 | Montgomery rented five storage units at Double R Storage in Reno, Nevada. *Id.*  The storage units were

21 | accessed a total of ninety-two times between November 1, 2005 and March 3, 2006. *Id.*  Double R

22 | Storage's video surveillance showed that a truck registered to Brenda Montgomery entered the facility

23 | on March 3, 2006, an individual walked between the storage unit and the truck, but no observable items

24 | were taken from or transported to the truck. *Id.*  SA West stated that this constituted probable cause to

25 | believe that the storage units contained the evidence of theft of trade secrets and unlawful retention of

26 | national defense information. *Id.*  Based upon SA West's affidavit, the court found probable cause

27 |

28 |

1   existed for issuance of these search warrants, and the court also ordered these search warrant affidavits

2   sealed (#14).

3         The court granted the Government's motion to seal the search warrants and affidavits because

4   the Government argued that the information contained therein related to proprietary intellectual property

5   and national security classified materials (#3, 14).

6   **C. Search Warrant Returns**

7         The following items were seized from the Montgomery residence:

8         HP Pavilion laptop
          6 SanDisk compact flash cards
9         letter on white paper and yellow pages of ripped up paper
          rolodex
10        15 computer CDs
          white shredded paper
11        miscellaneous post-it notes
          Network Solutions account paperwork 4 pages
12        check stubs – Montgomery Family Trust
          Western Digital hard drive serial number WEAL 71844911
13        Grante digital devserver labeled 12/17/2005 serial number F05090650042-A
          silver CPV (tower) labeled ATI 3
14        16 computer CDs
          3 pieces of paper containing phone numbers
15        Grante digital server labeled DEO 1/2/06 PROG
          8 containers of medicine, each with 40-168 tablets
16   (#15).

17        The following items were seized from storage unit 140:

18        1 yellow/gray case containing eTreppid disks
          7 compact disks
19        9 mini DV cassettes
          1 Sony Hi8 video cassette
20        1 USB (black 2.0 flashback)
          1 256MB SanDisk compact flash card
21        1 IBM travel star hard drive serial number V29CH7080N5
          11 sealed Western Digital hard drives
22        1 TDK mini DV video cassette
          10 various manufacturer hard drives
23        1 box containing 78 compact disks
          bank statements 12/2005 through 1/2006
24        financial documents and phone bills
          1 removable hard drive labeled "Dennis Eyes Only" and 1 compact disk labeled
25        eTreppid
     (#17).

26        No items were seized from the other four storage units searched (#16, 18, 19, 20).

27

28                                                      9

**D. Chronology of Motions**

On March 10, 2006, Montgomery filed a motion to unseal the search warrants and affidavits and for the return of property pursuant to Fed. R. Crim. P. 41(g) and for the segregation and sealing of all attorney-client privileged materials seized (#21). Montgomery argued that he has a Fourth Amendment right to view the search warrant affidavits and that the Government cannot show a compelling governmental interest that cannot be served by a less restrictive means than withholding the entire affidavits. *Id.* Next, he contended that the warrants are facially invalid because they lack specificity and are overbroad. *Id.* Therefore, Montgomery asserted that he is entitled to the return of his property. *Id.* Finally, Montgomery also sought to have attorney-client privileged information segregated prior to any inspection by the Government. *Id.* Montgomery's overarching argument is that the entire investigation stems from Trepp having convinced the United States Attorney to use the power of the federal government to achieve what Trepp could not accomplish through a civil action – a search of Montgomery's property in an effort to obtain certain technology. *Id.*

The Government filed three separate responses (#23, 24, 25). In its response to the Rule 41(g) motion, the Government first argued that because the balance of the equities favored the Government, the court should decline to consider the merits of this pre-indictment Rule 41(g) motion (#23). The Government further asserted that it would produce evidence at an evidentiary hearing to demonstrate that probable cause for the searches existed, that the warrants were valid, and to refute Montgomery's assertions regarding how the searches were executed. *Id.* In its response to the motion to unseal the search warrant affidavits, the Government contended that Montgomery failed to support his position that he has a constitutional right for pre-indictment review of the affidavits (#24). The Government also asserted that its interests in maintaining the secrecy of the information in the affidavits including: (1) the premature identification of possible witnesses; (2) the possibility that such witnesses could be compromised or influenced; (3) the possibility that potential subjects could alter, remove, or destroy information sought by the Government; and, (4) that the affidavits identify specific, sensitive information. *Id.* Finally, the Government opposed the motion to seal and segregate all attorney-client privileged information and trade secrets prior to the DOD conducting an analysis of the seized electronic

10

storage media and documents for classified information and information relating to the national defense (#25). Montgomery replied to the government's oppositions (#26).

The court set a sealed evidentiary hearing for May 3, 2006, on the motion to unseal the affidavits, return the property pursuant to Rule 41(g) and segregate attorney-client privileged information and trade secrets (#27). On April 19, 2006, the court further ordered that the parties file simultaneous supplemental briefs concerning certain specific issues identified by the court (#28). On April 28, 2006, the Government filed a partial compliance with court order of April 19, 2006 (#31). The Government explained that it had provided redacted affidavits to Montgomery and did not oppose supplemental filings by Montgomery subsequent to his review of the affidavits. *Id.* The Government argued that the redacted information could (1) expose witnesses; (2) identify investigative techniques prior to completion of the investigation; (3) interfere with the identification of other suspects; and (4) interfere with the recovery of equipment that may contain evidence of criminal violations. *Id.* Also on April 28, 2006, the court vacated the hearing set for May 3, 2006 and vacated the order for supplemental briefing (#32). The court stated that there appeared to be serious concerns about the search warrants issued by the court as they relate to certain classified information. *Id.*

On May 8, 2006, the Government moved for a protective order prohibiting disclosure of classified information (#34). Montgomery opposed (#36, 39), and the Government replied (#38). The court held a hearing and denied the motion (#42). At the hearing, the Government provided Montgomery with redacted versions of the applications and affidavits for the search warrants,[4] which were supplemented on June 1, 2006 (#40, 41, 43, 44). The only portions of the affidavits that remain redacted, after the supplements, are the conversation between Montgomery and a business friend about finding investors for the source code, and Montgomery's telephone conversations with SA Haraldsen. *Id.*; *compare* #40 at 10-12 to #1 at 10-12.

---

[4]It is unclear whether this is the second redacted version of affidavits provided by the Government, or the same version referred to in Government's partial compliance with court order of April 19, 2006 (#31).

11

On June 2, 2006, Montgomery filed a supplemental memorandum in support of his motion to unseal the affidavits, return the property, and seal attorney-client communications (#45). Montgomery again stated that the court need not hold an evidentiary hearing on the Rule 41(g) issues. *Id.* The Government filed a response to issues identified in court minute order of April 19, 2006 (#46). The Government noted in parentheses that recent information provided by the DOD indicated that the information was not classified. *Id.* at 2. The Government argued that the search warrants set forth probable cause and described the items sought as specifically as possible. *Id.* The Government did not explain whether the determination that the information was improperly classified affects whether probable cause for the search existed, and thus apparently took the position that probable cause existed independent of the belief that classified information was sought. *Id.* The Government provided a declaration by SA West which describes the execution of the searches in detail (#47). The Government still sought to establish a protocol to screen attorney-client privileged material and suggested two alternatives (#46*)*.

Upon receipt of the redacted affidavits and the supplements, Montgomery filed a second supplemental memorandum in support of its motion to unseal the search warrant affidavits, for the return of property pursuant to Rule 41(g), and to segregate privileged material (#48, 49, 50). Montgomery then requested an evidentiary hearing, arguing that a hearing is the only way to pin down the Government's shifting positions (#50). He asserted: "The Government has essentially admitted that it did not raid Mr. Montgomery's property to retrieve 'classified information being in a place it shouldn't be;' but rather to do the bidding of wealthy Warren Trepp and thrust itself into a private, civil dispute between the two owners and founders of eTreppid Technologies. The search for 'classified information' was obviously only the cover story seeking to justify the search." *Id.* Montgomery also stated that Assistant United States Attorney Pugliese informed Montgomery's counsel that the "classified information thought to be in Mr. Montgomery's possession had been found." *Id.* at 3. Montgomery's counsel included his declaration that he had conversations with AUSA Pugliese and SA West, during which they discussed approximately ten compact discs, which were the only materials marked "classified" and the only

1  material sought in the search (#49).  Montgomery questioned why the Government did not list that
2  information or the storage media containing it in the search warrants (#50).

3      The court held an evidentiary hearing over the course of three days, which concluded on August
4  17, 2006. At the conclusion of the final day of the hearing, the court directed the parties to file post-
5  hearing briefs (#67). The Government filed three separate post-hearing briefs addressing Montgomery's
6  motion to unseal search warrant affidavits (#74), the motion to seal and segregate all attorney-client and
7  trade secret information (#76), and the motion for return of the seized property (#77). Montgomery filed
8  a consolidated brief regarding all three issues (#80).

9                    **II.   DISCUSSION AND ANALYSIS**

10  **A.      Equitable Jurisdiction over Rule 41(g) Motion to Return Property**

11      Federal Rule of Criminal Procedure 41(g) generally is used to seek the return of property after
12  an indictment is issued; however, "district courts have the power to entertain motions to return property
13  seized by the government when there are no criminal proceedings pending against the movant."
14  *Ramsden v. United States,* 2 F.3d 322, 324 (9th Cir. 1993). "These motions are treated as civil equitable
15  proceedings, and, therefore, a district court must exercise 'caution and restraint' before assuming
16  jurisdiction." *Id.*

17      Before the court can reach the merits of a pre-indictment motion pursuant to Rule 41(g), the court
18  must consider whether: (1) "the Government displayed callous disregard for the constitutional rights of
19  the movant; (2) the movant has an individual interest in and need for the property he wants returned; (3)
20  the movant would be irreparably injured by denying return of the property; and (4) the movant has no
21  adequate remedy at law for the redress of his grievance." *U.S. v. Kama,* 394 F.3d 1236, 1238 (9th Cir.
22  2005) (internal citations omitted).  If the balance of equities favors reaching the merits, the court should
23  exercise its equitable jurisdiction to entertain the Rule 41(g) motion. *Ramsden,* 2 F.3d at 326.

24                    **1.      Callous Disregard**

25      Here, the Government has conceded that *none* of the seized material is classified; therefore, there
26  is a question whether the Government displayed callous disregard for Montgomery's constitutional
27  rights. SA West testified that the central focus of the search was classified information: ". . . [The search

28                                      13

1   warrant] was based on the possession of classified information. Obviously there's a lot of things going

2   on at eTreppid, but nothing was more influential than the information that [Montgomery] may have been

3   in possession of secret information." Tr. II, 144:17-19.[5]  As will be more fully discussed herein, the

4   court concludes that the Government acted in callous disregard of Montgomery's rights.

5                **2.    Individual's Interest in and Need for the Property**

6       Montgomery has established that the seized property includes items covering many years of his

7   work as a computer programmer, an inventor, as well as items of personal family property (#21, 26; Tr.

8   Ex. 38). Many of the items seized are also integral to the two civil actions pending between Montgomery

9   and Trepp/eTreppid. *Id.  See In re Singh*, 892, F.Supp. 1, 3 (D.D.C. 1995).

10               **3.    Irreparable Harm**

11       In addition to the concerns identified above regarding Montgomery's interest in and need for

12  the property, he contends that some of the seized information includes attorney-client privileged

13  information, which will be compromised if a third party reviews it. *See id.* at 3-4.

14               **4.    No Adequate Remedy at Law**

15       The Government has denied Montgomery is a target, and there has never been any indication that

16  either Ms. Montgomery or the Montgomery Family Trust is a search warrant target. Nine months have

17  passed since the Government executed the search warrants, and it appears there are no current plans to

18  prosecute any of the movants. *See Ramsden*, 2 F.3d at 326 (movant does not have the opportunity to

19  challenge the seizure of the documents and request their return at a later date, without a current plan to

20  prosecute). Mindful that Montgomery has not been indicted, the balance of equities favors reaching the

21  merits of his 41(g) motion. *Id.* at 4.

22       The court now considers Montgomery's requested relief: (1) the unsealing of the redacted

23  portions of the search warrants affidavits, and (2) the return of the seized property.

24       **B.    Right to View Affidavits**

25  _____

26      [5]Transcript I is the transcript of the June 29, 2006 evidentiary hearing.
        Transcript II is the transcript of the July 31, 2006 continued evidentiary hearing.

27      Transcript III is the transcript of the August 17, 2006 continued evidentiary hearing.

28                                        14

1        Some courts have held that no right to inspect sealed affidavits for search warrants exists under

2  the Constitution or the Federal Rules of Criminal Procedure prior to the initiation of a criminal

3  proceeding against the movant. *See Matter of Eyecare Physicians of America*, 100 F.3d 514, 517 (7th

4  Cir. 1996); *Matter of the Search of S & S Custom Cycle Shop*, 372 F.Supp.2d. 1048, 1051-52 (S.D. Ohio

5  2003).[6] The court in *Eyecare Physicians* applied a "right of access committed to the sound discretion

6  of the court." *Eyecare Physicians*, 100 F.3d at 517.

7        Other courts have held that a search target has a pre-indictment Fourth Amendment right to

8  examine the search warrant affidavit. *In re Search Warrants Issued on April 26, 2004*, 353 F.Supp. 2d

9  584, 585 (D. Md. 2004), *see also United States v. Oliver*, 208 F.3d 211, 2000 WL 263954 (4th Cir.

10 2000) (unpublished opinion); *In re Search Warrants Issued Aug. 29, 1994*, 889 F.Supp. 296, 299 (S.D.

11 Ohio 1995); *In re the Search of Up North Plastics, Inc.*, 940 F.Supp. 229, 232 (D. Minn. 1996). The

12 right is not unqualified; the Government bears the burden to "demonstrate compelling government

13 interests in keeping the affidavit under seal and . . . that no less restrictive means, such as redaction, is

14 available to prevent disclosure." *In re Search Warrants Issued on Apr. 26, 2004*, 353 F.Supp. 2d at 587.

15 The United States District Court for the District of Maryland emphasized that the plain words of the

16 Fourth Amendment protect the public from unreasonable intrusions and specifically require that

17 probable cause support search warrants. *Id.* at 588. The Court reasoned that "implicit in that language

18 is the public's right to challenge both the reasonableness of the search and the degree to which the

19 warrant was supported by probable cause." *Id.*  The Court invoked Justice Harlan's statement that

20 "constitutional provisions for the security of person and property should be liberally construed" and

21 concluded that without a right to access the affidavit upon which a search warrant is based, a search

22 target could never challenge the warrant for probable cause. *Id.*  "More than a conclusory allegation

23

24

25       [6]In *Search of S&S Custom Cycle Shop*, the court stated that "Absent the existence of a criminal action, an individual simply has no basis for bringing a motion to unseal an affidavit under the Criminal

26 Rules.  If it is a constitutional right, such as the Fourth Amendment right to be free from unreasonable search and seizures, that has been violated by federal authorities, vindication is civil in nature and can

27 be achieved through a *Bivens* action."  372 F. Supp. 2d at 1051.

28

1   about the need to protect a continuing investigation is necessary to meet the Government's burden of

2   showing compelling need" to keep the affidavits sealed. *Up North Plastics*, 940 F.Supp. at 232.

3          Apart from the arguments it advanced initially to seal the entire affidavit – generalized concerns

4   that unsealing will reveal witnesses, investigative techniques, or compromise on ongoing criminal

5   investigation – the Government has not explained why remaining portions of the affidavit should still

6   remain redacted (#74). The Government contends the standard in the Ninth Circuit for unsealing such

7   information is the balancing test established in *United States v. Napier*, 436 F.3d 1133, 1137 (9th Cir.

8   2006). However, *Napier* had nothing to do with a search target's pre-indictment Fourth Amendment

9   right to review a search warrant affidavit; rather, it concerned a post-indictment challenge to a search

10  warrant that the defendant sought to unseal in order to make the "substantial preliminary showing"

11  required by *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). In that instance, the court rejected the

12  view that *Franks* creates an unlimited right to all information possibly needed to meet the preliminary

13  showing requirement and held that the court must balance the defendant's interests against those of the

14  government. *Napier* at 1133.

15         The court has considered the authorities addressing a search target's pre-indictment Fourth

16  Amendment right to review the search warrant and concurs with those courts that have required the

17  Government to "demonstrate compelling government interests in keeping the affidavit under seal and

18  . . . that no less restrictive means, such as redaction, is available to prevent disclosure." *In re Search*

19  *Warrants Issued Apr. 26, 2004*, 353 F.Supp. 2d at 587.

20         Turning to the evidence in this proceeding, the redactions involve direct and recent contacts

21  Montgomery had with other individuals, and it is difficult to imagine that the Government is concerned

22  about revealing identities of witnesses or protecting an ongoing investigation. In fact, Montgomery has

23  already surmised that part of the redaction relates to seeking investors for the source code (#50).

24  Moreover, at the June 29, 2006 evidentiary hearing, SA West revealed the identity and involvement of

25  SA Haraldsen during his testimony. Tr. I, 15. Accordingly, the court finds that the Government has not

26  met its burden to establish a compelling government interest in keeping the remaining portions of the

27  affidavits sealed, and it further finds that Montgomery has a right to view the affidavits in their entirety.

28                                                          16

1

2   **C.    Return of Montgomery's Seized Property Based Upon Lack of
        Probable Cause**

3

4        The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause,

5   supported by Oath or affirmation, and particularly describing the place to be searched, and the persons

6   or things to be seized." U.S. Const. Amend. IV. "A search warrant . . . is issued upon a showing of

7   probable cause to believe that the legitimate object of a search is located in a particular place, and

8   therefore safeguards an individual's interest in the privacy of his home and possessions against the

9   unjustified intrusion of the police." *U.S. v. Adjani*, 452 F.3d 1140, 1145 (9th Cir. 2006) quoting

10  *Steagald v. United States*, 451 U.S. 204, 213 (1981). The United States Supreme Court has

11              reaffirm[ed] the totality-of-the-circumstances analysis that traditionally
                has informed probable-cause determinations.  The task of the issuing
12              magistrate is simply to make a practical, common-sense decision
                whether, given all the circumstances set forth in the affidavit before him,
13              . . . there is a fair probability that contraband or evidence of a crime will
                be found in a particular place.  And the duty of a reviewing court is
14              simply to ensure that the magistrate had a substantial basis for
                conclu[ding] that probable cause existed.

15  *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). The Supreme Court also explained that the "probable

16  cause standard . . . is a practical, nontechnical conception." *Id.* at 231. Further, "probable cause is a

17  fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or

18  even usefully, reduced to a neat set of legal rules. *Id.* at 232. "[A]n affidavit may be based on hearsay

19  information and need not reflect the direct personal observations of the affiant, so long as the magistrate

20  is informed of some of the underlying circumstances supporting the affiant's conclusions . . . ." *United*

21  *States v. Ventresca*, 380 U.S. 102, 108 (1965).

22        "In assessing whether a warrant passes constitutional muster, a court is therefore obliged to make

23  two inquiries: first, whether the scope of the search authorized by the warrant was justified by probable

24  cause and, second, whether the warrant was sufficiently particular to limit the discretion of the officers."

25  *In re Grand Jury Investigation Concerning Solid State Devices, Inc.*, 130 F.3d 853, 856 (9th Cir. 1997).

26  If the court finds that a search warrant lacked probable cause and, thus, that movant was aggrieved by

27  the unlawful search and seizure of his property, Rule 41(g) dictates the remedy: "the court must return

28

1    property to the movant, but may impose reasonable conditions to protect access to the property and its

2    use in later proceedings." Since this court finds that the Government lacked probable cause, as more

3    fully explained below, the court does not reach the particularity analysis.

4         Montgomery argues that no probable cause supports SA West's affidavits in support of the

5    search warrants (#21). The Government responds that SA West properly investigated Trepp's

6    allegations, including interviewing Trepp and other employees and compiling information SA Haraldsen

7    provided (#23). It is now clear that no probable cause existed to believe that Montgomery had removed

8    classified information from eTreppid and improperly stored it at his home because after the warrants

9    issued, it was determined that the material was, in fact, not classified (#46; Tr. Ex. 4). As noted earlier,

10   SA West testified that the central focus of the search was classified information: ". . . [the search

11   warrant] was based on the possession of classified information. Obviously there's a lot of things going

12   on at eTreppid, but none was more influential than the information that [Montgomery] may have been

13   in possession of secret information." Tr. II, 144. Three months after the search was executed, the

14   Government determined that the information sought was not classified. Tr. I, 123.

15        In light of this very critical fact, the court now examines SA West's affidavit and testimony at

16   the evidentiary hearing to determine whether probable cause exists to support the search warrants.[7]

17              **1.    Documents Offered in Support of the Affidavit**

18        SA West relied on three documents discussed below to support a finding that there was probable

19   cause to believe Montgomery had stolen eTreppid's trade secrets.

20                   **a.    The Contribution Agreement**

21        As noted earlier, SA West referred to the 1998 contribution agreement, and he quoted an excerpt

22   from the agreement which stated that Montgomery contributed *all* of his intellectual property, software

23   programs, and source codes to eTreppid; therefore, this court inferred that eTreppid owned *all* of the

24   assets described in the balance of SA West's affidavit. This inference was incorrect. At the evidentiary

25

26        [7]For ease of reference, the court considers SA West's affidavit in the same order set forth in the
     section of this order entitled "procedural history," *supra*, at pages 3-8.
27

28                                          18

1   hearing, the entire contribution agreement was admitted into evidence, and the relevant portions state

2   as follows:

3            1.2  Contributed Assets.   As used in this Agreement, the term
             "Contributed Assets" shall mean and include, collectively, all the
4            following assets, together with all of Contributor's rights, title and
             interest therein, tangible and intangible, present or future, including, but
5            not limited to, all development, distribution and exploitation rights, or to
             any proceeds derived therefrom:
6
             1.2.1   All of Contributor's know-how; trade secrets; patent rights,
7            copyrights, trademarks, licenses and permits, registered or unregistered,
             pending or approved; software programs and all programming and source
8            codes used in connection therewith or otherwise required to operate any
             component thereof; and all programming documentation, designs,
9            materials and other information, all in whatever form and wherever
             located, relating to or used in connection with, or otherwise describing or
10           consisting of any part of, the software compression technology *contained*
             *on that certain Software Compression Engine Development Program*
11           *contained on CD No. 1, all of which is being contributed by Contributor*
             *hereunder (collectively, the "Technology").*
12
             1.2.2   Certain of Contributor's tangible personal property used in
13           connection [sic] the Technology as more particularly described on
             SCHEDULE 1.2.2 attached hereto and made part of this Agreement.
14
             1.2.3 All of Contributor's books and records relating to the Contributed
15           Assets.

16           *1.3   Excluded Assets and Liabilities.   Notwithstanding any of the*
             *foregoing, Contributor is specifically not contributing, transferring or*
17           *conveying to INTREPID under this Agreement or by any other means,*
             *nor is INTREPID acquiring from Contributor, any other tangible or*
18           *intangible assets of Contributor not specified herein, and expressly is not*
             *assuming any claims, liabilities or obligations of Contributor of any kind*
19           *or nature, whether existing as of the Closing Date or arising thereafter,*
             *on account of Contributor's ownership, development, exploitation or*
20           *operation of the Contributed Assets at any time prior to the Closing Date.*

21  Tr. Ex. 7 (emphasis supplied).[8]

22          Had this court been provided the entire contribution agreement, it would have concluded that

23  whatever is on CD No. 1 – nothing more and nothing less – belonged to eTreppid.  The court would have

24  expected the Government to demonstrate there was probable cause to believe that CD No. 1 contained

25  the disputed trade secrets.  However, SA West testified that he does not know what CD 1 contains, and

26  _____

27          [8]INTREPID was the predecessor of eTreppid.

28                                              19

he never inquired as to how long Montgomery has been creating software technologies. Tr. I, 51, 53, 60. SA West did not investigate whether Montgomery had created software that was not contributed under the contribution agreement or ask what assets Montgomery had not contributed. Tr. I, 60. SA West stated that the fact that his affidavit does not refer to CD No.1 was not intended to mislead the court. Tr. II 124. His impression was that any work that Montgomery performed while at eTreppid was also part of what eTreppid owned; he did not believe that it was limited to CD No. 1. Tr. II, 124. Montgomery's counsel and SA West had the following exchange:

> Counsel: . . . as I understand your testimony today you're saying that notwithstanding paragraph 1.3 [of the Contribution Agreement], excluding everything if it's not specified, you thought that [Montgomery] conveyed everything, patents, trademarks, copyrights, didn't limit it to CD No. 1.

> SA West: No, I think what the – my thought at the time was that that agreement was in 1998 and that the CD and the particular CD 1 was conveyed. We're in 2005. He has worked there for eight years working on various projects for eTreppid, one as the chief technology officer. They've employed ten other programmers to do the programming, and what he took wasn't just his.

Tr. II, 124. This interchange conveys SA West's fundamental misunderstanding of the operating agreement and the business relationship between Montgomery and eTreppid.

On the final day of the evidentiary hearing SA West was once again asked about CD No. 1 and the discrepancy between the entire contribution agreement and the excerpt quoted in his affidavit. SA West testified that he received an incomplete copy of the contribution agreement from SA Haraldsen, who had sent it to him in a different "landscape format;" therefore, the crucial reference to CD No. 1 was cut off. *See* Tr. Ex. 31; Tr. III, 47-54. SA West testified that he did not realize the tops of each page were missing until Government's counsel pointed it out to him. Tr. III, 52:17-53:6. The court finds SA West's explanation difficult to comprehend, since one has only to read Exhibit 31 to realize that it is quite obviously an incomplete document with missing sentences and paragraphs. Yet, it is this fatally incomplete document that SA West relied on to obtain the warrants to search Montgomery's home and the storage units for stolen trade secrets.

20

### b.    The eTreppid Operating Agreement

SA West quoted an excerpt from the operating agreement in his affidavit, which led this court to conclude that Montgomery was contractually bound by a non-compete agreement; therefore, Montgomery was prohibited from developing or purchasing any software programs or technology competitive with eTreppid, or in engaging in any similar business to that of eTreppid. However, at the evidentiary hearing the entire operating agreement was admitted, and it, too, revealed that SA West omitted a critical phrase from the sentence he quoted in his affidavit:

> 6.6.   **Restriction on Independent Activities; Agreement not to Compete.** *So long as MONTGOMERY is appointed a Committee Member and/or as Chief Technology Officer pursuant to this Agreement,* MONTGOMERY and his Affiliates agree that, during the terms of this Agreement, non of them shall compete with the LLC, whether for their own account and/or for the account of others, individually, jointly with others, or as a part of any other limited liability company, limited partnership, general partnership, joint venture, corporation, or other entity, by: (i) developing, licensing or exploiting in any manner any software programs or other technology which is competitive with the Technology or the Business of the LLC, or providing any services or supplies which are encompassed within the definition of the "Business" of the LLC as set forth in this Agreement; (ii) purchasing or otherwise acquiring, owning, holding, operating, managing, investing in or otherwise disposing of a like business of the LLC's Business and interests therein of any kind or nature; or (iii) otherwise engaging in any or all aspects of a like business of the LLC's Business. MONTGOMERY's or his Affiliates' participation in any of the activities restricted by this paragraph shall be deemed a breach of his duties and obligations as a Committee Member hereunder.

Tr. Ex. 30 (emphasis in italics supplied). SA West omitted the beginning phrase of paragraph 6.6, which expressly limits the non-compete to Montgomery's tenure as a committee member or chief technology officer. Based on SA West's omission, this court drew the incorrect inference that in addition to giving all of his intellectual property to eTreppid, Montgomery had also agreed not to compete with eTreppid. This is not true.

SA West testified that he had in his possession the entire operating agreement prior to preparing his affidavit. Tr. III, 34-35 and stated:

> No. It was not an intentional - - as I said before, I tried to capture the pertinent parts out of these voluminous documents like you've done, giving me three pages of probably a fifty-page document, and to try to capture those parts that were relevant to the investigation.

21

1    Tr. I, 173. SA West admitted that he included this excerpt of the operating agreement in his affidavit

2    to demonstrate that Montgomery had a covenant not to compete, and he also testified that the evidence

3    of Montgomery's efforts to sell to potential investors in violation of the operating agreement concerned

4    the redacted portion of his affidavit, which was the single conversation Montgomery had with Azzinaro

5    in late December or early January. Tr. I, 174-175. The affidavit states that Montgomery talked with

6    Azzinaro about his problems at eTreppid and inquired whether Azzinaro might know of anyone willing

7    "to invest" – nothing more (#1 at 10:17-24). Based upon the incomplete provision of the operating

8    agreement, followed by the conversation between Montgomery and Azzinaro, the court concluded that

9    in violation of the operating agreement, Montgomery solicited Azzinaro for new investors and intended

10   to use stolen trade secrets as a new competitor of eTreppid. This is not true.

11                          c.      **The Ten Patent Assignments**

12          SA West identified ten patent assignments provided by SA Haraldsen, which he also referred to

13   in his affdavit. Tr. III, 5. SA West testified that he referred to these patent assignments to "illustrate that

14   Dennis Montgomery is employed by eTreppid and has done work at eTreppid, that he is assigned to

15   eTreppid." Tr. III, 6. SA West believed that these documents also confirmed that Montgomery was not

16   only an assignor of the patents, but also an "employee" of eTreppid, Tr. III, 7, and this is what SA West

17   stated in his affidavit (#1 at 3:5-9). However, Montgomery was not an employee of eTreppid when he

18   made these assignments; he was an independent contractor as evidenced by Montgomery's form K-1s

19   for the period 1999-2001. Tr. Ex. 29. SA West testified that he was unaware that Montgomery had

20   received 1099 independent contractor forms from eTreppid during the period November 2000 to

21   November 2001. Tr. II, 174.

22          The patent assignments concern various items, ranging from "method and apparatus for

23   streaming data using rotating cryptographic keys," to "system and method for generating alert conditions

24   in a surveillance system," to "method and apparatus for encoding information using multiple passes and

25   decoding in a single pass." Tr. Ex. 26. SA West did not ask Trepp whether Montgomery had assigned

26   patents to eTreppid for the source code that SA West sought. Tr. II, 174-175.

27

28                                              22

1    Although SA West referred to the patent assignments to illustrate Montgomery's employment

2    relationship with eTreppid, this is what the reference conveyed to this court: that since Montgomery had

3    conveyed all of his technological know-how to eTreppid, the ten patents bore an integral relationship

4    to the trade secrets that Montgomery allegedly stole.  One has only to review SA West's affidavit to see

5    how the juxtaposition of his reference to the ten patent assignments to eTreppid's trade secrets –

6    software programs relating to "data compression, pattern recognition, change and anomaly detection"

7    – led the court to draw this conclusion. (#1 at 3:5-16). It is now evident that these patents had nothing

8    to do with the trade secrets alleged to have been stolen.

9    <center>**2.     The SOCOM Contract and eTreppid's Security Clearance**</center>

10    SA West's affidavit states that a government contract from SOCOM in March 2003 required

11    eTreppid to have access to secret material; therefore, eTreppid received government authorization to

12    store secret material at its facility (#1 at 4:13-18).  The court inferred from this portion of SA West's

13    affidavit that eTreppid was engaged in work for the United States involving secret materials, and that

14    eTreppid had the proper facility clearance to conduct this work.  It appears eTreppid never had a facility

15    clearance.

16    SA West first stated that his understanding is that eTreppid had not received approval to store

17    certain classified material at eTreppid facilities.  Tr. I, 145.  Subsequently, SA West testified that, as

18    stated in his affidavit, eTreppid was permitted to store secret material at least since August 2005.  Tr.

19    II, 156-62.  To the query, "And to your knowledge despite the three years of government contracts,

20    Trepp's facility never got a facility clearance?" SA West responded, "I don't know what the reasoning

21    was. It could have been Montgomery that held it up." Tr. II, 186.

22    However, SA West testified later that SA Haraldsen told him that eTreppid had a facility

23    clearance to store secret material, which is based upon a DOD form DD 254.  Tr. III, 141-142; Tr. Ex.

24    34. SA West relied on this information in preparing his affidavit, but he never saw the form. Instead,

25    he relied on SA Haraldsen's statements to him.  Tr. III at 141-143.  SA West included this information

26    in his affidavit "[t]o show that eTreppid had access, had permission by the U.S. Government or the

27    author of that form to possess secret information." Tr. III, 142.  SA West only saw a copy of the actual

28                                           23

1  DD 254 form just days prior to the final August 17, 2006 evidentiary hearing when Venables faxed it

2  to him. Tr. III, 103-104. Although a signature line is provided on form DD 254, presumably to signify

3  certification for a facility clearance, there is no signature. Tr. Ex. 34. Therefore, the court now

4  concludes that although SA Haraldsen and Venables represented to SA West that eTreppid possessed

5  a facility clearance to store secret material, eTreppid did not have one.

6              **3.    Montgomery's Security Clearance**

7       SA West attested that Montgomery received and signed two security briefings in 2003, which

8  outlined his duty to protect classified material and to protect it from unauthorized disclosure (#1 at 4:19-

9  26;5:1-4). Later in the affidavit, SA West recounted a conversation between Montgomery and Gray

10  during which Gray warned Montgomery that his improper storage of classified material could result in

11  the loss of Montgomery's security clearance. *Id.* at 6:8-17. Montgomery allegedly replied, "I don't care

12  about my clearance. They'll always give me my clearance because they want me to do the work." *Id.*

13  at 6:12-13. The affidavit then recites continued problems with Montgomery's storage and handling of

14  classified material and, ultimately, the allegation that he removed it from eTreppid. *Id.* at 6:13-26-7:10.

15       The court concluded there was probable cause to believe that Montgomery breached his security

16  clearance and took classified materials in violation of the law. Although SA West's affidavit never

17  specifically states the level of Montgomery's security clearance, the inference was that it was tied to his

18  work at eTreppid and that he lost it. However, SA West's testimony conflicts as to whether he knew

19  what, if any, security clearance Montgomery possessed at the time of the search. SA West testified that

20  he knew Montgomery had a top secret clearance in the fall of 2005. Tr. I, 115. SA West stated that he

21  did not look into who at eTreppid had what level security clearance prior to November 2005. Tr. I, 114

22  at 9-13. SA West initially stated that he did not remember whether he contacted Defense Security

23  Services ("DSS"), the determining agency, regarding Montgomery's security clearance before or after

24  the search. Tr. I, 112-113. SA West subsequently testified that Jay Dixon of DSS and Venables both

25  told him that Montgomery's security clearance was suspended, and SA West said that he believed that

26  he learned that information prior to the search. Tr. I, 116-117. SA West later testified that Dixon told

27  him Montgomery's clearance was suspended, but only after the search. Tr. III, 92. In any event, SA

28                                        24

1   West made no reference to Dixon in his affidavit, and the court finds that SA West did not rely on
2   Dixon.

3       SA West testified that, as he understood it, Montgomery's clearance was contingent on his
4   employment with eTreppid. Tr. II, 113. SA West stated that he is unfamiliar with Jpass, the electronic
5   system that governs security clearance, but that Venables provided him with a computer printout
6   indicating that Montgomery's clearance had been suspended. Tr. II, 129-132. To the question "[s]o this
7   was an issue to you before you raided his home whether he still had his security clearance?" SA West
8   responded: *"Yes. I mean it would be significant if he had legitimate access to classified information
9   or not."* Tr. II, 132 at 6-9 (emphasis supplied).

10      SA West stated that he did not know whether Montgomery had notice that his security clearance
11  had been suspended. Tr. II, 156-157. He testified that eTreppid tried to provide Montgomery with
12  termination documents and that he did not know if those documents informed Montgomery that his
13  security clearance had been suspended. Tr. II, 156. Montgomery's counsel questioned SA West about
14  DOD directives, which movant's counsel represented governed the revocation or suspension of security
15  clearance. Tr. II, 155-156. The DOD directive outlines steps that must be taken, including providing
16  notice and an opportunity to be heard to the applicant, before an "unfavorable clearance decision" is
17  made. Tr. II, 159-160. SA West had no knowledge of the directive or whether the procedures were
18  followed prior to suspending Montgomery's security clearance. Tr. II, 160. SA West testified that the
19  basis for searching Montgomery's home was the unlawful retention of national security information and
20  that Montgomery did not have permission to store it at home. Tr. II, 160-161. Contrary to SA West's
21  understanding, Montgomery attests that the Government has never revoked his security clearance. Tr.
22  Ex. 38, para. 21.

23      **4.    The November 2005 Visit to Nellis Air Force Base and Nine Secret
               Hard Drives**
24

25      The evidentiary centerpiece of SA West's affidavit insofar as it concerns unlawful retention of
26  classified material are the "nine Secret hard drives," which Gray recorded at Nellis Air Force Base and
27  "marked with red standard U.S. Government Secret labels as instructed by contractor personnel" and

28                                                    25

1    which were "stored [at eTreppid] in a GSA approved safe as required by DOD" (#1 at 5:5-12). These

2    are the "Secret hard drives" that metamorphosized into "classified material" three paragraphs later in

3    the affidavit. As is now clear, there was no secret material and there was no classified material;

4    therefore, no probable cause existed that Montgomery unlawfully retained national defense information

5    in violation of 18 U.S.C. § 793(e). The court agrees with SA West's testimony on one fact: *Nothing*

6    was more influential to this court in the issuance of these search warrants than the information that

7    Montgomery might unlawfully be in possession of secret material belonging to the United States. *See*

8    Tr. II, 144.

9         SA West testified that in mid-February, Gray provided him with an inventory of classified

10   material that was either missing or destroyed. Tr. III, 27-28.[9] The inventory itemizes hard disk drives,

11   dated November 4, 2005, "Nellis, SOCOM." Tr. Ex. 40. SA West testified that when Gray provided

12   him with the inventory, he did not inquire about the original classification authority, although Gray did

13   tell him that an unnamed contract employee from Nellis provided the information concerning

14   classification. Tr. III, 30-31. SA West never contacted Nellis Air Force Base or checked its logs to

15   verify whether the material was, in fact, classified. Tr. I, 96, 100, 124-126; Tr. III, 30-31. Venables and

16   Gray did tell him that the classified information was on "nine hard drives" and two digital videotapes,

17   but SA West did not include detailed descriptions in his affidavit. Tr. I, 39, 92-93, 103-104, 119-120;

18   #1. SA West testified that in addition to relying on interviews with Venables and Gray, as well as

19   Gray's inventory, he also "relied on Mr. Haraldsen, who had been working – who is an Air Force

20   official who is familiar with the project that eTreppid was working on, who said they were handling

21   classified information, and then the other, you know, disclosure documents that they – that eTreppid

22   employees had signed to take possession of classified information." Tr. II, 86-87; *see also* Tr. II, 104.

23

24

25        [9]The Government never provided the court with the actual inventory Gray provided to SA West.
     Instead, the court was provided with a copy of an August 11, 2006 memo from the Government's
26   counsel to Montgomery's counsel, which states that on February 14, 2006, Gray provided an inventory
     of classified material to SA West. Tr. Ex. 40. That memo summarizes missing or destroyed classified
27   material.

28                                            26

1    Based upon this section of SA West's affidavit, the court concluded that probable cause existed

2    that the nine eTreppid hard drives were classified as secret by the appropriate government agency, that

3    they contained information of importance of the United States government, and that the Department of

4    Defense had provided instructions concerning their classification, access, and storage. It is now

5    abundantly clear that this conclusion was incorrect because there was no classified material.

6              **5.    December 2005: Montgomery's Breaches of Protocol, Deletion of**
                        **Classified Material, and Removal of Classified Material and Trade**
7                       **Secrets from eTreppid**

8    Since it is now evident that there was no classified material, the court will only note that the

9    chronology of events in December 2005, which SA West described in his affidavit, led the court to

10   conclude  that there was probable cause to believe that in breach of his security clearance, Montgomery

11   had unlawfully removed classified information from eTreppid. The court now turns to the theft of trade

12   secrets.

13   As a preliminary observation, the court notes that SA West never disclosed in his affidavit that

14   Trepp and Montgomery were engaged in civil litigation concerning ownership of the trade secrets, which

15   are intertwined with the allegation in the affidavit that Montgomery engaged in the criminal theft of trade

16   secrets.[10] Over the course of SA West's meetings with Trepp prior to the search warrant applications,

17   he knew that Trepp was engaged in trade secret litigation against Montgomery and that Trepp was

18   attempting to obtain a temporary restraining order against Montgomery . Tr. I. 20-22, 47.  Trepp and

19   SA Haraldsen also provided SA West with declarations of eTreppid employees and other court

---

20          [10]In fact, two civil cases are pending in federal court: *Montgomery v. eTreppid Technologies,*
21   *LLC, et al.*, 3:06-CV-0056-LRH (VPC); *eTreppid Technologies, LLC v. Montgomery, et al.*, 3:06-CV-
     0145-LRH (VPC).  In Case No. 3:06-CV-00056 LRH (VPC), the complaint was filed on January 31,
22   2006 (#1), and as of the dates this court issued the search warrants, February 28 and March 3, 2006,
     there were no matters under submission to this court; therefore, the court was unaware of this pending
23   action. On January 25, 2006, Montgomery filed a petition to remove the state court proceeding initiated
     by eTreppid against Montgomery to the United States District Court in Case No. 3:06-CV-00041-HDM
24   (RAM); however, that matter was remanded to the state district court on January 31, 2006 (#14).
     Thereafter, the United States Department of Defense filed its notice of removal to the United States
25   District Court on March 20, 2006, in Case No. 3:06-CV-00145-LRH (VPC).  Thus, this second civil
     action between Montgomery and eTreppid was not pending in this court at the time the search warrants
26   were issued.

27

28                                                   27

1    documents. Tr. I, 22-23, 74-75; Vol. II, 199-200; Tr. Ex. 10. SA West was aware that the trade secrets

2    at issue are valued in millions of dollars, but he did nothing during his pre-search warrant investigation

3    to determine the extent of Montgomery's claim to ownership. Tr. I, 60-62, 141; Tr. II, 176, #1 at 3:10-16.

4    Had this court had even the slightest inkling that Trepp and Montgomery were engaged in civil litigation,

5    it is an understatement to say that the court would have scrutinized the theft of trade secrets allegation

6    very, very carefully.

7          As discussed earlier, SA West omitted critical portions of the contribution agreement and the

8    operating agreement, which stated that whatever Montgomery contributed to eTreppid could be found

9    on CD No. 1. However, SA West testified that he did not know what CD No. 1 contained. Tr. I, 51-53.

10   He never inquired as to how long Montgomery had been creating software technologies, Tr. I, 60. SA

11   West did not investigate whether Montgomery had created software that was not included under the

12   contribution agreement or ask anyone what assets Montgomery had not contributed. Tr. I, 62; Tr. II, 123,

13   128, 214. SA West testified that his impression was that any work Montgomery performed while at

14   eTreppid was also part of what eTreppid owned; he did not believe that it was limited to CD No. 1.

15         Putting aside the questions concerning SA West's investigation, the court understood that the

16   trade secret Montgomery had allegedly stolen was "source code" (#1 at 1:16-23). However, to this day,

17   it is unclear to the court exactly how "source code" is a trade secret that Montgomery allegedly stole.

18   SA West was unable to describe the allegedly stolen trade secret because no one at eTreppid was

19   adequately able to identify it. Tr. I, 84-85, 87, 131-132, 136, 152; Tr. II., 78-79, 192. SA West never

20   checked eTreppid's computers for the missing source code, and it appears that Trepp referred SA West

21   to Venables for source code questions. Tr. I, 84-87. However, Venables admitted that he did not know

22   what source code was "ever there" at eTreppid; therefore, Venables had no way of knowing what to look

23   for to confirm missing source code (Tr.I, 136; 152-154; Tr. Ex. 33, Vol. 1:11-120). Venables's

24   testimony at the preliminary injunction hearing appears to contradict the assertions SA West made in

25   his affidavit that the source codes at issue were located on the "source code server," using the "RAID

26   Unit" and "back-up ISA" on the premises at eTreppid, and that Venables had access to them (#1 at 3:17-

27   26; 18:1-2).

28
                                            28

1    Montgomery asserts that the term "source code" is meaningless and that the Montgomery Family

2    Trust owned the software pursuant to copyrights filed years before Montgomery's involvement with

3    Trepp (#21). Montgomery also states:

4            The source codes used on military contracts are derived from my
        copyrighted source codes on file in the Copyright Office. None of those

5            source codes are on CD No. 1 or in the patents I assigned to eTreppid.
        They were all created by me with no other input from anyone and none

6            of them were created as part of my work at eTreppid. Approximately 90%
        of the codes were developed before September 28, 1998, and 99% were

7            developed prior to November 2002, when even eTreppid treated me as an
        independent contractor.

8
9    Tr. Ex. 38, ¶ 16.

10    Had the court been apprised of the civil litigation between Trepp and Montgomery and the

11    disputed facts summarized herein, it would have concluded – as the court does now – that there was no

12    probable cause to issue a search warrant based upon the allegation of theft of trade secrets.[11]

13    **6.    Callous Disregard of Montgomery's Constitutional Rights**

14    The court has reviewed the record in this proceeding in great detail, since the power of the

15    Government to safeguard a citizen's privacy in his or her home and possessions against unjustified

16    intrusions by government officials is a "basic purpose" of the Fourth Amendment. *Camara v. Municipal*

17    *Court of City and County of San Francisco*, 387 U.S. 523, 528 (1967). In this proceeding, SA West was

18    charged with the investigation of two very serious and two potentially very complex criminal violations.

19    After examination of his affidavit, his testimony concerning his investigation, and the protocols the

20    Department of Justice has implemented for these crimes, this court can only conclude that SA West

21    acted with callous disregard of Montgomery's fundamental Fourth Amendment rights. The over-arching

22    concern in this proceeding is that SA West became an unwitting pawn in a civil dispute, and as a result

23    of his inexperience and lack of training, he prepared search warrant affidavits that are riddled with

24    incorrect statements, edited documents, and uncorroborated conclusions, which caused this court to

25
26    [11]Because the court has concluded that there is no probable cause as to the trade secret allegation,
27    the court notes that the conversations Montgomery had with Azzinaro and SA Harraldsen do not change
the court's finding of lack of probable cause, and they need not be addressed.

28

1    exercise its formidable power to authorize the government to search Montgomery's home and storage

2    units.

3        In 2000, the Department of Justice's Computer Crime and Intellectual Property Section

4    ("CCIPS") published the *Prosecuting Intellectual Property Crimes Manual.* Tr. Ex. 12.  With respect

5    to theft of commercial trade secrets, it states:

> The EEA [Economic Espionage Act of 1996] is violated only where
> someone acts knowingly without authorization. Under certain
> circumstances, however, two individuals or companies may have a
> legitimate dispute over ownership rights in a trade secret. This type of
> dispute is likely to arise where the two potential owners previously
> worked together to develop the disputed technology and where the
> contractual arrangements governing each party's respective ownership
> interests are unclear or entirely absent. In these circumstances, unilateral
> action with regard to the trade secret by one of the owners may precipitate
> an EEA referral. *Such cases are rarely appropriate for criminal
> prosecution, especially where the party taking unilateral action has
> obtained advice of counsel.* Notwithstanding the passage of the EEA,
> many disputes regarding ownership of intellectual property, including
> trade secrets, continue to be best resolved in a civil forum.

*Id.* at 17, section VIII.B.6.e (emphasis supplied). Prior to this case, SA West had never investigated a

trade secrets case, he was unfamiliar with Department of Justice manuals relating to intellectual property

crimes, and he did not consult with anyone within the Department of Justice for guidance, such as the

Department of Justice's Computer Hacking and Intellectual Property Unit ("CHIPS Unit"). Tr. I, 14,

18, 23-24; Tr. II, 187-188; 216-218; Tr. Ex. 12, 14, 21, 25. Like SA West, SA Haraldsen had no training

in investigating intellectual property crimes, and  his role was to act as a liason between eTreppid and

the U.S. Air Force and Department of Defense on contracts eTreppid had with these government

agencies. Tr. I, 17-18.  SA West was aware that Trepp and Montgomery were engaged in civil trade

secret litigation, and he relied on one side of that dispute – Trepp's – for critical evidence concerning

potential criminal prosecution for theft of trade secrets against the adverse party, Montgomery. SA West

relied on Trepp's representation that court records were sealed, but he never confirmed this

representation. Tr. I, 74-76; 136-138. In fact, although certain portions of eTreppid's lawsuit were

sealed, the parallel lawsuit filed by Montgomery was not. SA West blindly relied on the documents,

sworn statements, and evidence supplied by eTreppid, and he never appeared to question whether he had

30

become an agent, not for the Government, but for private interests engaged in litigation valued in millions of dollars. The litigation that has ensued based upon the seizure of Montgomery's property is a cautionary tale to heed the admonition that trade secrets litigation is best left to the civil forum.

The court has similar concerns about SA West's investigation of unlawful retention of national defense information. SA West took SA Haraldsen, Trepp, Venables, and Gray at their word and never confirmed basic facts they alleged. Upon learning of these serious allegations, one would presume that an FBI agent with no experience in this area would consult with Department of Justice officials or his own supervisors regarding the investigation. However, SA West never confirmed with the proper government agency whether eTreppid had a facility clearance to store classified materials; he simply relied on statements of Haraldsen and Venables. SA West did not even see the actual DD Form 254 until a few days before the final day of the evidentiary hearing – six months after the search warrants were issued. SA West never confirmed the status of Montgomery's security clearance with the appropriate government agency, and once again relied on Venables's statement. Moreover, SA West had no knowledge of government procedures for suspension or revocation of an individual's security clearance. When Gray supplied SA West with a list of so-called classified materials, he never confirmed with anyone at Nellis Air Force Base that they were, in fact, classified. He continued to rely on Venables, Gray and Haraldsen's representations concerning classification, and he never verified himself whether the allegedly classified materials were actually missing.

The evidence before this court compels the conclusion that SA West acted with callous disregard of Montgomery's constitutional rights, which resulted in the improper search of Montgomery's home and storage units, and the improper seizure of his property.

### 7.   Conclusion

Once the Government conceded that "nine Secret hard drives" were not, in fact, classified and that the material "was not properly classified by an Original Classification Authority within the U.S. Air Force," (Tr. Ex. 4), the obvious question is whether the search warrant can stand based on probable cause that Montgomery violated 18 U.S.C. § 793(e), unlawful retention of national defense information. Throughout the three days of the evidentiary hearing and in its post-hearing brief, the Government made

31

no showing whatsoever that probable cause still exists to justify keeping the seized material based on this criminal violation, notwithstanding this court's invitation that the Government do so. Tr. III, 211-212.   Likewise, the Government has also failed to demonstrate that probable cause exists to justify the issuance of the search warrants in this case based on a violation of 18 U.S.C. § 1832, theft of trade secrets. The Government's post-hearing brief is devoid of any legal or factual argument in opposition to Montgomery's motion for a return of the seized property, other than a defense of SA West's investigation prior to the issuance of the search warrants.  Having considered the evidence adduced at the hearing, and all of the papers submitted in this proceeding, the court grants Montgomery's motion for a return of the seized property (#21).[12]

### III. ORDER

Based upon the foregoing,

**IT IS ORDERED** that Montgomery's motion to unseal the search warrant affidavits (#21) is **GRANTED,** and Montgomery's motion for the return of property pursuant to Fed.R.Crim.P. 41(g) (#21) is **GRANTED**.  Montgomery's motion for the segregation and sealing of all attorney-client and trade secret material (#21) is **DENIED AS MOOT**, since the court has ordered the return of all seized property.

Pursuant to LR IB 3-1, any party wishing to object to this order shall, on or before **Tuesday, December 12, 2006**, file and serve specific a written objection to the ruling together with points and authorities in support thereof.  The opposing party shall within ten days thereafter file points and authorities opposing the objection. Points and authorities filed in support of or in opposition to the order are subject to the page limits set forth in LR 7-4. This proceeding shall remain sealed until the deadline for filing a written objection has expired.  If no objection to this order is filed by **Tuesday, December 12, 2006**, this order shall stand as the final order, and all papers filed in this proceeding shall be **UNSEALED** without further order of this court.

---

[12]Since this court concludes that the Government lacked probable cause, it does not reach the particularity analysis.

**IT IS FURTHER ORDERED** that in the event an objection is filed, this proceeding shall remain **SEALED** until such time as the District Court issues its final order. The parties shall file any written objection to this order or opposition to the objection under seal by delivering any documents to be filed in a sealed envelope addressed to Jake Herb or Lia Griffin or the U.S. District Court, District of Nevada, Reno Office.

**IT IS SO ORDERED.**

Dated this 28th day of November, 2006.

UNITED STATES MAGISTRATE JUDGE

33



# United States District Court

## District of Nevada

Bruce R. Thompson U.S. Courthouse and Federal Building
400 South Virginia Street, Room 404
Reno, Nevada 89501

Chambers of Valerie P. Cooke
United States Magistrate Judge

Telephone: (775) 686-5855
Facsimile: (775) 686-5864

# _FAX TRANSMITTAL_

DATE:       November 28, 2006

THE FOLLOWING PAGES ARE BEING FAXED TO:

NAME:      Michael J. Flynn, Esq.  (#1-888-235-4279)
              Phillip Stillman, Esq. (#1-888-235-4279)
              Ronald Logar, Esq.  (#786-7544)
              Eric A. Pulver, Esq.  (#786-7544)
              Paul Pugliese, Esq. (#784-5181)

RE:          In the Matter of the search of 12720 Buckthorn Lane

NUMBER OF PAGES INCLUDING COVER SHEET:  34

FROM:      The Honorable Valerie P. Cooke
              United States Magistrate Judge

PHONE:     (775) 686-5855

FAX NO.:    (775) 686-5864

If you do not receive all the pages indicated above or the message is poorly received, please contact our office as soon as possible at the phone number above.  If the reader of this message is not the intended recipient, please contact our office as soon as possible at the phone number listed above.

ADDITIONAL COMMENTS:

TRANSACTION REPORT
NOV/28/2005/MON 04:16 PM

BROADCAST

| # | DATE | START T. | RECEIVER | COM.TIME | PAGE | TYPE/NOTE | | FILE |
|-----|--------|----------|--------------|----------|------|-----------|-----|------|
| 001 | NOV/28 | 03:44PM | 918882354279 | 0:12:07 | 34 | OK | ECM | 0011 |
| 002 | | 03:57PM | 97867544 | 0:07:27 | 34 | OK | SG3 | 0011 |
| 003 | | 04:05PM | 97845181 | 0:11:38 | 34 | OK | SG3 | 0011 |
| TOTAL | | | | 0:31:12 | 102 | | | |



# United States District Court

### District of Nevada

Bruce R. Thompson U.S. Courthouse and Federal Building
400 South Virginia Street, Room 404
Reno, Nevada 89501

Chambers of Valerie P. Cooke
United States Magistrate Judge

Telephone: (775) 686-5855
Facsimile: (775) 686-5864

## *FAX TRANSMITTAL*

DATE:          November 28, 2006

THE FOLLOWING PAGES ARE BEING FAXED TO:

NAME:          Michael J. Flynn, Esq. (#1-888-235-4279)
               Phillip Stillman, Esq. (#1-888-235-4279)
               Ronald Logar, Esq. (#786-7544)
               Eric A. Pulver, Esq. (#786-7544)
               Paul Pugliese, Esq. (#784-5181)

RE:            In the Matter of the search of 12720 Buckthorn Lane

NUMBER OF PAGES INCLUDING COVER SHEET: 34

FROM:          The Honorable Valerie P. Cooke
               United States Magistrate Judge

PHONE:         (775) 686-5855

FAX NO.:       (775) 686-5864

If you do not receive all the pages indicated above or the message is poorly received, please contact our office as soon as possible at the phone number above. If the reader of this message is not the intended recipient, please contact our office as soon as possible at the phone number listed above.

ADDITIONAL COMMENTS: