ORIGINAL

1  RONALD J. LOGAR, ESQ., Nevada Bar No.: 0303
2  ERIC A. PULVER, ESQ., Nevada Bar No.: 7874
   Law Office of Logar & Pulver, PC

**FILED**

3  225 S. Arlington Ave., Ste A
   Reno, NV 89501
4  Phone: 775-786-5040;Fax: 775-786-7544

FEB 2  2007

U.S. MAGIS .         ..GE
DISTRICT OF NEVADA
BY_____
                    _DEPU~

5  MICHAEL J. FLYNN, ESQ., Mass. State Bar No.: 172780
6  P.O. Box 690, 6125 El Tordo
   Rancho Santa Fe, CA  92067
7  Phone: 858-775-7624; or 858-759-7000; Fax: 858-759-0711
   *Admitted Pro Hac Vice* in related cases
8  No. 3:06-cv-00056-PMP-VPC & 3:06 cv-00145-PMP-VPC

9

10

11              **UNITED STATES DISTRICT COURT**

12          **FOR THE DISTRICT OF NEVADA (RENO)**

13

14  In the Matter of the Search of:          )   CASE NO.: 3:06–CV-0263-PMP-VPC
                                             )
    12720 BUCKTHORN LANE, RENO, NV           )
15                                           )   **MONTGOMERY'S OPPOSITION TO THE**
    and                                      )   **GOVERNMENT'S MOTION TO STRIKE**
16                                           )   **PLEADINGS FILED BY MICHAEL J. FLYNN,**
    888 MASTRO DRIVE, RENO, NV, STORAGE      )   **ESQ. AND TO PRECLUDE HIS PRO HAC VICE**
17  UNIT NUMBERS 136, 140 , 141, 142, AND    )   **APPLICATION.**
    143                                      )
18  _____      )   ***FILED UNDER SEAL***

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

The Government's motion to strike and preclude attorney Michael Flynn from representing Dennis Montgomery can be summed up in five words: irrelevant, false, frivolous, harassing retaliation. As in the case of *United States v. Weatherspoon*, 410 F.3d 1142 (9th Cir. 2005), this motion represents another serious "management failure" by Nevada's U.S. Attorney, and a "brutal waste of time and valuable resources." *Id.* at 1173. Stripping the motion of it's irrelevant, bombastic harangue against Mr. Flynn, the issue is simple: Did the Department of Justice order Mr. Bogden to "stand down"? The Court and Mr. Montgomery deserve an answer.

Former Nevada U.S. Attorney Daniel Bogden appears to be retaliating against Mr. Flynn as Montgomery's counsel of choice,  because Mr. Flynn and Mr. Montgomery have established a *record* of a patently unconstitutional search; and a *record* exposing a *pattern* of "sham" pleadings and "gestapo" like tactics; and they have blown the whistle on the Nevada U.S. Attorneys Office ("USAO") by filing with the Department of Justice ("DOJ") Public Integrity Section information and evidence  relating to the foregoing, as well as evidence of corruption between Governor James Gibbons and his "close friend," Warren Trepp. The DOJ already has some of the evidence relating to the foregoing which it obviously is not sharing with Mr. Bogden.  Mr. Montgomery has  more of the corruption evidence, together with specific, detailed knowledge of the national security issues at stake in these cases, which he will not give to the USAO for national security reasons, absent a Court order. See attached sealed declaration of Dennis Montgomery.

Mr. Bogden and the USAO now claim to have  no knowledge of either the national security

matters internally "raging" within the Government, or the corruption evidence, and now want it.[1]  In this motion they have combined a frivolous rampage against Mr. Flynn with a transparent effort to get what they are not entitled to in this proceeding.  Moreover, this Court is entitled to know now if Mr. Bogden was ordered to "stand down" in his continued and abusive investigation of Mr. Montgomery.  If so, then the USAO must withdraw its Opposition to the Motion to Unseal on the grounds that its investigation is "on-going," as well as this motion.

Plainly, Mr. Bogden's direct and personal conduct in authorizing the unconstitutional search of Mr. Montgomery's home and storage units based on false search affidavits, which "misled" the Magistrate-Judge into issuing unconstitutional warrants, which she never would have done had she known the true facts, form the core foundation of this entire matter.  That *record* is established and Mr. Bogden cannot refute it with this irrelevant, untruthful pleading.  The only response the USAO can now muster is to attack the messenger - or in this case, the attorney who worked on creating the record - Mr. Flynn.  (Declaration of Michael J. Flynn, Esq., hereinafter "Flynn Decl.," filed herewith). As Mr. Flynn's attached declaration shows, these tactics appear to be characteristic of both this case and the tenure of Mr. Bogden in the USAO.  It is a desperate attempt by a desperate and deposed lame duck U.S. Attorney,  relying on disparate, irrelevant and false scraps of information from Mr. Flynn's 35 years of litigating hundreds of cases *with distinction*, to deflect the Court away from the *record* upon which Judge Cooke found "callous disregard" of Mr. Montgomery's rights.

Moreover, the *documentary foundation* of the motion is primarily based on *private letters* between Mr. Flynn and various Government officials - not even public statements or court filings.

---

[1]  The term "raging" does not overstate the internal conflict where Mr. Pugliese, Mr. Bogden and Mr. Negroponte have all been fired; and the national security matters at issue cannot be of more sensitive and dire consequence. (*See* Montgomery sealed declarations).

The few court filings the USAO attempts to weave into its motion are on their face either

inaccurately referenced, irrelevant, and/or provide no foundation for the arguments in the motion.

But Mr. Bogden must have correctly discerned from the letters that the Public Integrity Section is

reviewing this matter and hopes to obtain free discovery as he leaves office. He may also be aware

that a False Claims Act Complaint is also on file with this Court, and has been served on Attorney

General Gonzalez, but has not yet been served on the Nevada USAO.

Transparently, the USAO's motion is so frivolous and harassing that Mr. Flynn leaves it to

the Court to decide whether to sanction the USAO pursuant to F.R.Civ.P. 11. This Court should not

condone the USAO's frivolous scare tactic, particularly where it is indisputable that the DOJ is

actively investigating whether Nevada Gov. Gibbons accepted unreported bribes from Trepp, as

printed in almost every major newspaper in the United States, (Sample of Articles, Exh. 2), Mr.

Bogden and Mr. Pugliese have both been fired, the USAO has evaded the accuracy of the "stand

down" order, and while this Court is reviewing Judge Cooke's Order.

The Government's motion must also be denied because:

(A) it is insufficient as a matter of law, procedurally defective, and untrue;

(B) Mr. Flynn's pro hac vice application was allowed in the two related civil cases, in which

the USAO is appearing on behalf of the Government. The Court and the Government knew from the

face of the pleadings as of March 10, 2006, a year ago, that Mr. Flynn had not filed a third pro hac

vice in the related search matter; and the Government has now litigated the matter for a year

knowing throughout this time that two pro hac vice applications were allowed in the related matters.

(C) Mr. Montgomery cannot be denied his right to counsel, particularly where there is no

conduct warranting this drastic move, and the time line of events strongly indicates Nevada's U.S.

Attorney is retaliating because the *record* exposes his office's misconduct; and

-4-

(D) Mr. Flynn has <u>not</u> filed scandalous or false materials in this "scandalous" case, and there are no Court orders remotely supporting the Government's false and malicious accusations.  Stating the truth about scandalous behavior by Gov. Gibbons  in taking money from Warren Trepp, the notorious Head Trader in the junk band "scandal," is just fact.  It may have been "scandalous" to engage in such behavior, but it is hardly "scandalous" to report such conduct in private letters to Government officials charged with investigating such crimes.

### PERTINENT FACTUAL HISTORY.

Two civil cases involving Dennis Montgomery and Warren Trepp, (former Chief Trader who sat to the right of Junk Bond King Michael Milken while Milken was stealing **B**illions of dollars), are: *eTreppid v. Montgomery*, which was filed in Nevada state court on January 19, 2006 and removed to this federal court on March 20, 2006 by the Government, (Docket 1, 3:06-cv-00145); *and Montgomery v. eTreppid*, filed in this federal court on January 31, 2006.  (Docket 1, in 3:06-cv-00056).  This related search warrant case, 3:06-cv-0263, began March 10, 2006, when Mr. Montgomery filed a F.R.Crim.P 41g motion, signed by attorney Stillman, (not by Mr. Flynn as the USAO motion incorrectly states) and asked to unseal these proceedings.  The unconstitutional searches occurred on March 1-3, 2006.

Local counsel, Logar & Pulver, filed Mr. Flynn's pro hac vice application on February 16, 2006, in the aforementioned civil case while it was in state court, and the said application was filed and granted for both civil cases.

On February 28, and March 2, 2006, Mr. Bogden and the USAO applied for search warrants to raid Mr. Montgomery's home and storage allegedly based on "probable cause" to believe that Mr. Montgomery was then engaged in two alleged crimes: unlawful retention of "classified information"; and theft of trade secrets in the form of "eTreppid Source Code."  The "classified information" crime

was simply fabricated out of whole cloth. (AUSA Faxes, Exh. 4 to 41g motion).  The theft of trade secrets crime was likewise fabricated, devoid of factual and/or legal foundation, based on documents altered by the USAO and the FBI, and contrary to DOJ policy. (*See* Order, Nov. 28, 2006).

On March 1 and 3, 2006, Mr. Bogden and the USAO authorized the  FBI to raid Mr. Montgomery's home and storage based on search affidavits that "misled" the issuing Magistrate who would not have issued the warrants if she knew the true facts.  (*Id.*, 18-31).

On March 10, 2006, Mr. Montgomery filed a Rule 41 (g) motion seeking the return of his seized property and the unsealing of the search affidavits. In said motion and the accompanying declarations, Mr. Montgomery challenged the lack of probable cause to conduct the search, the facial invalidity of the warrants, the validity of any "classified information," the ownership rights to "eTreppid source code," the "gestapo" like tactics used by the USAO into thrusting the power and prestige of the USAO into a civil dispute between two competing owners,  and he asserted his exclusive right to possess any  "classified information" based on his Top Secret SIC security clearances.

On April 17, 2006, the Magistrate-Judge scheduled an evidentiary hearing for May, 3, 2006.

Confronted by the foregoing  challenges, and the looming May 3, 2006 hearing, between April 17, 2006, and May 26, 2006, in a series of obfuscating pleadings, secret declarations and memos, requests for extensions,  telephone threats to Mr. Montgomery's counsel by the FBI ordered by the USAO threatening utterly baseless criminal charges, a motion to gag Mr. Montgomery and counsel, all based on illusory "state secrets,"    The USAO dodged, evaded, avoided, and created a *record* establishing a *pattern* of untruths, sham pleadings, and "gestapo" like tactics similar to the raid itself. (Flynn Decl., ¶ 19).

Throughout three days of evidentiary hearings on June 29, July 31, and August 17, 2006,

-6-

surrounded by pleadings, memos, declarations, secret filings etc, knowing  from the face of the

pleadings that Mr. Flynn's pro hac vice applications had only been made in the related cases, the

USAO never objected.

On September 26, 2006, regarding these three cases, Judge Cooke said,  " . . . there is a

crossover concerning . . . that [search warrant] case . . .  that may have some bearing on the civil

litigation." (Transcript, 28-29, Exh. 1).

On November 1, 2006, the *Wall Street Journal* printed a page one article exposing  the

relationship between Trepp and Congressman Gibbons; and reporting gifts by Trepp to Gibbons who

helped Trepp obtain black budget national security related federal contracts. (Articles, Exh. 2). Days

later, *after* being exposed in the press, Congressman Gibbons belatedly reported a lavish cruise

worth $60,000, paid for by Trepp, to the Congressional Ethics Committee.  Thus,  this case has

already exposed "scandalous" and "incontrovertible" misconduct by Trepp and Gibbons. (Id.) [2]

On November 28, 2006, after the three days of hearings, and ten months of extensive

pleadings, declarations, memos, motions, briefings, and  in camera filings by the Government, this

Court granted Mr. Montgomery's F.R.Crim.P. 41g motion and found in pertinent part:

> "SA West acted with callous disregard of Montgomery's fundamental Fourth Amendment
> rights.  The overarching concern in this proceeding is that SA West became an unwitting
> pawn in a civil dispute and as a result of his inexperience and lack of training, he prepared
> search warrant affidavits that are riddled with incorrect statements, edited documents, and
> uncorroborated conclusions, which caused this court to exercise its formidable power to

---

[2] The "incontrovertible" role of Mr. Bogden in this matter will emerge as the cases
proceed—but this search matter will be moot if this Court affirms Judge Cooke's Order.  Thus, it is
not the forum for the Nevada USAO to conduct yet another witch hunt based on private letters to
Washington to officials investigating their conduct.  If the Court does not affirm, the evidentiary
portion of the matter is closed and only appellate remedies exist, unless the Court reopens the
evidence, in which case, it is  unlikely that the USAO will allow Mr. Bogden and Pugliese's conduct
to be at issue.  If so, the burden will be on them to make *Brady* disclosures as to Gibbons' role in
initiating the original investigation—something they previously and successfully *opposed.*

authorize the government to search Montgomery's home and storage units." (Order, Nov. 28, 2006).

The Court also ruled there was no basis to continue to keep this case sealed, or to keep the redacted portions of SA West's declarations sealed, and it struck SA West's late filed declaration. The Court's Order also stated, "pursuant to LR 1B 3-1, any party wishing to object to this order shall, on or before . . . December 12, 2006, file . . . objections . . . ." (Id.)

On November 30, 2006, the Government filed ex parte under seal a "motion for clarification" of the Court's November 28, 2006 Order. The Government did not serve its ex parte sealed motion on Montgomery, so Montgomery is in the dark about its contents.

On December 1, 2006, the Court issued an unambiguous "Minute Order" finding the Government had "no basis" to submit its motion ex parte, and ordered the Government to "serve the motion for clarification on counsel for Dennis Montgomery . . . via facsimile, by noon today . . . ." Shortly after noontime on December 1, 2006, the Government specifically stated it was "not" going to serve its ex parte papers on Montgomery—in other words it refused to comply with the Court's December 1, 2006 Order. After the Government refused to comply, the Court issued an OSC to hold the Government in contempt ordering the Government to show cause why it had failed to comply with the Court's Order. Contrary to the Government's contention in its motion, Mr. Montgomery then echoed the Court's issuance of the OSC to hold the Government in contempt. On December 4, 2006, the Court held a contempt hearing, and when the Government withdrew its filing, the Court withdrew its contempt power.

On December 1, 2006, unrelated to the Court's Order of the same date, Mr. Montgomery through Mr. Flynn, filed a complaint with exhibits with the Public Integrity Section of the DOJ, relating to the conduct of Messrs. Trepp, Gibbons, Bogden and others.

On December 12, 2006, minutes before midnight, the Government filed a nine-page Objection to the Court's November 28, 2006 Order, which is now pending. In its objections, the Government claimed the "investigation" of Mr. Montgomery was continuing, even though the Court had ruled that the Government had acted with "callous disregard" of Mr. Montgomery's rights in conducting the illegal search, and that it was contrary to DOJ policy. (Gov. Objections, 5:9-10).

On December 14, 2006, Mr. Montgomery filed a sealed False Claims Act complaint. As of this date, only Attorney General Gonzalez has been served.

In the context of the Government's claim on December 12, 2006 that it was still investigating Mr. Montgomery, on December 15, 2006, Mr. Flynn sent Mr. Bogden a letter putting him on notice of the facts and his "conflict of interest" due to his personal and direct involvement in the unconstitutional raids. (Letter, Exh. 3). In that letter, Mr. Flynn set forth Mr. Bogden's role and stated, "*it is apparent that you, personally, outside of your role as U.S. Attorney are continuing to investigate and hunt down Mr. Montgomery because he has blown the whistle on the illegal conduct of wealthy Warren Trepp, Congressman Gibbons . . . [t]he fact that Trepp paid off your friend Congressman Gibbons, who spawned your investigation, in and of itself, should give you sufficient pause before continuing this retaliatory and vicious attack on Mr. Montgomery in order to cover your and Gibbons' highly provable tracks.*" (Id., 4, Exh. 3).

Between January 5, 2007 and the present, Mr. Montgomery has received repeated phone calls from a federal agency in Washington in connection with the ongoing investigations into all of these matters in which he received precise and substantial information that Mr. Bogden had been fired and ordered to "stand down" in connection with his year long investigation of Mr. Montgomery. (*See* Montgomery sealed decl., filed herewith).

On January 11, 2007, the media correctly reported that Mr. Bogden had been fired

-9-

confirming information that both Mr. Montgomery and Mr. Flynn had previously received.  His job ends on February 28, 2007.

On January 25, 2007, the Government filed its one page Opposition to the Motion to Unseal *again claiming they were still investigating Mr. Montgomery*, and *again* opposed any unsealing of this matter *based on this ongoing investigation* as previously recited in its "Objections" filed on December 12, 2006,  even though they have not asserted one legitimate or credible reason to keep it sealed. (Gov. Opp. to Montgomery Motion to Unseal, in 3:06-cv-0263). In response, on February 5, 2007, Mr. Flynn filed on behalf of Mr. Montgomery a three page Reply stating in a footnote that we had received *"indirect and informal  information"* that Mr. Bogden had been ordered to "stand down" in his investigation, thus raising the issue with the Court if the one page USAO Opposition was accurate, particularly in light of the serious issues at stake in keeping the matter sealed. **The USAO did not respond to this issue.**

In order to confirm what was described to the Court as *"indirect and informal information,"* just two days later, on February 7, 2007, Mr. Flynn sent *two* letters, one to all of the Government officials involved, including Mr. Bogden,  with copies to the President and Vice President given the national security issues involved and previous meetings in the White House, and the other to Mr. Bogden and Mr. Rachow, who had filed the one page Opposition claiming that the investigation was still ongoing. (Gov. Exh. 1-2). In the first letter, Mr. Flynn gives Notice to every official involved that he has received no response to his March 1, 2006 letter sent almost one year before, no response to his complaint filed with the Public Integrity Section on December 1, and no response to his December 15, 2006 letter copied to Attorney General Gonzalez, *notwithstanding the vital national security issues involved, including the filmed assassination of American soldiers.* The copies were sent to the President and Vice-President because of meetings in the White House in the summer of

2006 and the urgency involved *on this precise issue, ie the filmed assassination of American soldiers. (See* Montgomery sealed decl., filed herewith).

Neither letter constitutes a pleading and they were not filed with the Court until the Government did so with this motion. More importantly, neither the letters, nor the February 5th Reply to the USAO Opposition discuss or reveal the <u>source</u> of the "indirect and informal information" cited in the Reply footnote, and, thus the letters do not contradict the Reply, as asserted by the USAO, but the second letter to Messrs. Bogden, Ellman and Rachow explicitly requests confirmation of the "indirect and informal information."

Instead of courteously replying and affirming or denying the truth of the information, the USAO chose to file this broadside *without denying the truth or accuracy of the "stand down" order.* Thus, the USAO has now inundated the Court with these frivolous issues, compelling a full response by Mr. Montgomery, and implicating Sixth Amendment issues - a substantial waste of USAO and judicial resources reminiscent of the raid itself, where the USAO used the might and weight of its office to "vouch for" Warren Trepp in a civil dispute between two competing owners [3]

Wasting judicial and USAO resources and improperly "vouching for" parties and witnesses in litigation is something that Nevada U.S. Attorney Bogden has already been chastised for by the Ninth Circuit. In *U.S. v Weatherspoon,* 410 F.3d 1142 (9th Cir. 2005), the Court reversed a conviction for felony firearm possession because of prosecutorial conduct in the form of "vouching for" witnesses by the USAO. Justice Trott in a concurring and dissenting opinion recognized the "management failure" and a "lapse of supervision" by Mr. Bogden in connection with the closing

---

[3] The February 7, 2007, letter explicitly states, *"If our information is incorrect, Mr. Montgomery hereby requests that you provide written notice to us forthwith."* (Gov. Exh. 2, p.1). The letter also requests the USAO to stop "threatening" Mr. Montgomery's attorneys, as it had previously done. (*Id.; see* Flynn Decl., ¶10, 19).

argument of one of his assistants and stated: "[r]eversals on appeal because of prosecutorial missteps and resulting trials are a brutal waste of time and valuable resources . . . The issues in this case were easily avoidable." *Id.* at 1173.

Similarly, here the filing of this motion after a year of extensive litigation when the USAO knew as of March 10, **2006** that pro hac vice applications had only been made in the related cases in which it was also appearing, is strongly suggestive of a "brutal waste of time and valuable resources." (*Id.*). Additionally, the "vouching for" conduct of the USAO in raiding Mr. Montgomery's home in a plainly *civil dispute* compels an inference of corruption. Such misconduct outweighs the misconduct in *Weatherspoon* because here the Congressman—Gibbons—who backed Bogden for his job, is taking gifts and money from the competing owner of the property sought to be seized, ( in violation of DOJ policy), and using the USAO to seize for Trepp what he didn't own!

On February 15, 2007, two weeks before his termination, and the day a second *Wall Street Journal* broke with another damaging story, (Articles, Exh. 2), the USAO filed this retaliatory motion to preclude Mr. Flynn from appearing in this case and to deflect attention from his own misconduct and the investigation into himself now on-going in Washington.

The Government's contention that statements contained in the letters and the Reply have been "false" is in itself false; that statements have been "scandalous" only describes what is, in fact, a "scandal" by public officials. [4] (Flynn Decl., ¶ 12-18). The Government's motion contains a

---

[4] The Government erroneously alleged the following documents contained false or scandalous statements:
o Montgomery's Objection to the Government's Motion for Clarification and Request to Hold the Government in Contempt;
o Decl. of Atty. Flynn in Support of Ex Parte Motion to Shorten time and Motion to Unseal;
o Montgomery's Reply to His Motion to Unseal these Proceedings;
o Attorney Flynn Letter dated February 7, 2007; and
o Attorney Flynn Letter dated February 7, 2007. (Gov. Motion, 4-8).

hodgepodge of irrelevant, erroneous, misleading and disingenuous accusations and is remarkably shoddy.  For example, the Government claims  it is not a party in the "related civil case." (Gov. Motion, 8:13-16).  **However, it is a defendant**. (Am. Complaint, Feb. 21, 2006, Docket No. 7 in 3:06-cv-00056). It also claims that Mr. Flynn filed the Rule 41 (g) motion when it was signed by Mr. Stillman.  The Government's motion should be denied.

## ARGUMENT.

1. **Attorney Flynn's Pro Hac Vice Applications in the Related Civil Matters Are Controlling and the USAO's Objection is Too Late and Legally Unfounded**

As reflected in pleadings he filed this past year, Mr. Flynn openly and properly relied upon his pro hac vice applications in the two civil cases, filed before this case began.  Both the Court and the USAO openly accepted the related approvals in the related cases, and there was never any challenge by the USAO  on any ground to proceeding with the search matters based on the related  pro hac vice approvals.  In fact and in law, the cases are related and the facts are inextricably intertwined. Mr. Flynn's  belief and reliance that these cases were related is supported by the record.  Judge Cooke stated that she believed there was a "crossover" between the civil cases and search warrant matter, even though she had not made a ruling. (Transcript, 28-29, Exh. 1; see also Montgomery Mot. to Consolidate, Docket No. 50 & 55 in 3:06-cv-00056, and Docket No. 23 & 29 in 3:06:-cv-00145). The evidentiary hearings, the pleadings throughout the search matter, the evidence and exhibits and Judge Cooke's November 28, 2006 Order are inextricably intertwined with all of the foundational issues in the two civil cases. Judge Cooke's Order itself is  replete with the identical facts and documents in the civil cases including the "Contribution Agreement," the "Operating Agreement," the " Ten Patents" etc. Significantly, Judge Cooke explicitly finds that if at the time she issued the warrants on February 28, 2006, she had "been apprised of the civil litigation between Trepp and

-13-

Montgomery *and the disputed facts summarized herein" (italics supplied)* she would not have issued

them. (Order, Nov. 28, 2006, p.29 L.9-10.) The *"disputed facts"* are the identical facts underpinning

the civil cases. Plainly the cases are related and both Mr. Flynn and the USAO (also appearing in the

civil cases) similarly treated his pro hac vice applications as related. Finally,  the court's online filing

system states that the civil cases are "related." The search case is sealed and thus not available

online.

Even though the USAO knew Mr. Flynn had an application in the civil cases and not the

search warrant matter, (since he wrote this on his filed pleadings), for almost a year the Government

never complained, until it filed its untimely, untruthful, prejudicial and frivolous motion several

weeks ago.  All the Government had to do was write to Mr. Flynn, request a separate application,

and this matter would have been resolved.   However, the Government never uttered a word until

almost one year *after* the fact, *after* the record was established, and *after* allegations and facts relating

to Mr. Gibbons and Mr. Bogden's conduct emerged, and *after* Mr. Bogden was fired and ordered to

"stand down."  (Dec. 15, 2006, Letter, <u>Exh. 3</u>; Gov. Exh. 1-2).

The comments of Justice Trott in the *Weatherspoon* case relating to prosecutorial misconduct

resulting from "management failure" in using the awesome power of the Nevada U.S. Attorney's

Office to "vouch for" a witness and causing a *"brutal waste of time and valuable resources"* are

poignantly applicable here.  Waiting a year then mounting a frivolous challenge because the DOJ is

now investigating the USAO's conduct in this case constitutes both waste and "management failure."

The fact that Mr. Bogden and Mr. Pugliese have been fired, and their conduct under investigation,

may be "scandalous," but in the context of the record in this matter, it is justified. This motion is just

more of the same pattern of filing false, shoddy, "sham" pleadings that when challenged in the light

of day dissolve into untruths and abusive "gestapo" like tactics. (Flynn Decl., ¶18-19).  Moreover, the

-14-

USAO strenuously fought to exclude all evidence in this matter relating to Mr. Gibbons and Trepp's scandalous behavior, and the role of the USAO in it.  Now that the DOJ in Washington is investigating all of these matters, it is hypocritical and unfounded to claim that Mr. Montgomery has the burden to support comments in private letters; and/or to seek discovery with a shoddy attack on opposing counsel who exposed their behavior when they previously objected to it.

2.     **Attorney Flynn Has Not Made Any Misleading Statements About His Bar Status, as the Government Falsely Claimed.**

Mr. Flynn has not made any misleading statements about his bar status.  (Flynn  Decl., ¶ 1-11).  He is licensed  to practice in Massachusetts, he has represented that he is "only" licensed in Massachusetts, (see Gov. Exh. 1 ["*Admitted only in Massachusetts*"]), and he properly submitted a pro hac vice application because he is not licensed in Nevada that was granted.   (Flynn Decl., ¶1-11).  Accordingly, the Government's untrue, harassing, misleading and irrelevant accusations, (Gov. Motion, 2-4), should be stricken.

The USAO claims that Mr. Flynn does not "regularly practice" in Massachusetts because he did "not show up on" any recent Westlaw cites. (Gov. Motion, 2:19-3:3).  That argument is absurd because it is common knowledge that many cases never make it to Westlaw, and the Court can take judicial notice of this fact pursuant to Federal Rule of Evidence 201.  He has "regularly practiced" in Massachusetts since he finished his clerkship with the Massachusetts Supreme Judicial Court in 1971. (Flynn Decl., ¶1-11). After thirty-five years of high profile litigation, he chooses cases on a selective multi-state basis, routinely assesses and refers Massachusetts matters to Massachusetts counsel, and has litigated matters in Massachusetts within the last two years, notwithstanding the USAO's ridiculous assertion that he has not "regularly practiced" there since 1991. (Id).

The Government's claim that attorney Flynn appeared in a California case, and its citation to a

case where he was a *plaintiff*, because he sued an immoral private investigator who later admitted to

stealing his trash, is likewise meritless and irrelevant. (Gov. Motion, 3:3-4).  Attorney Flynn has a

multi-state and multi-district practice and has filed pro hac vice applications in numerous states,

which  are irrelevant here. (Flynn Decl., ¶ 1, 6).  The fact that Mr. Stillman has a Cardiff address,

(Gov. Motion, 8:23-24), is likewise irrelevant. (*See, e.g.*, Notice of Change of Out of State Counsel

Address, Docket No. 67-1, in 3:06-cv-00145, and Docket No. 114, in 3:06-cv-00056).

    With regard to Mr. Flynn's Boston office, which is listed on his letterhead, (see Gov. Motion,

3:5-15; Gov. Exh. 1), Mr. Flynn has a Boston residence and retains an office address with his former

partner. (Flynn Decl., ¶ 6-8).  This is also irrelevant.  Both the Court and the USAO know how to

reach him.

    The Government's contention that Mr. Flynn has used a P.O. Box in this case that is

insufficient under LR IA 10-1(b)(1) is equally misleading. (Gov. Motion, 3:16-4:1).  While attorney

Flynn did list a P.O. Box, he did so because it is <u>required</u> by the U.S. Post Office in the town for all

<u>mailings</u>, *and* he also listed his street address. (*See* Gov. Exh. 1 ["6125 El Tordo"]).

**3.    <u>This Court Should Not Deny Mr. Montgomery His Sixth Amendment Right to Counsel</u>.**

    The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the

right . . . to have the assistance of counsel for his defense. *U.S.* v. *Cuautemoc Gonzalez-Lopez*, 126

S. Ct. 2557, 2561 (2006).  " We have previously held that an element of this right is the right of a

defendant who does not require appointed counsel to choose who will represent him. *Id.*, *citing*

*Wheat* v. *United States*, 486 U.S. 153, 159 (1988); *cf. Powell* v. *Alabama*, 287 U.S. 45, 53, 53 S. Ct.

55 (1932) ("It is hardly necessary to say that . . . a defendant should be afforded a fair opportunity to

secure counsel of his own choice").   The Sixth Amendment right to counsel of choice "commands,

not that a trial be fair, but that a particular guarantee of fairness be provided—to wit, that the accused

be defended by the counsel he believes to be best." *U.S. v. Cuautemoc Gonzalez-Lopez*, 126 S.Ct. 2557, 2561 (2006).

Denial of admission pro hac vice in criminal cases implicates the constitutional right to counsel of choice, and courts may deny pro hac vice to a defendant's counsel of choice when that attorney is unable to provide competent representation, which is clearly not the case here, and the court can consider the attorney's ethical fitness. *See Panzardi-Alvarez v. U.S.*, 879 F.2d 975, 980 (1st Cir. 1989). The Court must articulate reasonable grounds for denying pro hac vice admission to a defendant's counsel of choice. *Id.* at 817.

"Because of the potential for abuse by opposing counsel, 'disqualification motions should be subjected to particularly strict scrutiny.'" *Macheca Transport Co. v. Philadelphia Indemnity Insurance Co.*, 463 F.3d 827, 833 (8th Cir. 2006), *citing Harker v. Commissioner*, 82 F.3d 806, 808 (8th Cir. 1996) (quoting *Optyl Eyewear Fashion Int'l Corp. v. Style Cos.*, 760 F.2d 1045, 1050 (9th Cir. 1985)). "A party's right to select its own counsel is an important public right and a vital freedom that should be preserved; the extreme measure of disqualifying a party's counsel of choice should be imposed only when absolutely necessary." *Banque Arabe Et Internationale D'Investissement v. Ameritrust Corp.*, 690 F. Supp. 607, 613 (S.D. Ohio 1988), *citing Melamed v. ITT Cont'l Banking Co.*, 592 F.2d 290, 293 (6th Cir. 1979).

The Government's motion smacks squarely against the above standards and therefore must be denied. The motion is "abusive," "not absolutely necessary," and designed to deprive Mr. Montgomery of his right to counsel. (Montgomery Sealed Decl., filed herewith). It is also untimely—Mr. Flynn has been Mr. Montgomery's lead counsel since these cases began, he is intimately familiar with all of the issues, and it would be grossly prejudicial to Mr. Montgomery to exclude Mr. Flynn on the frivolous, false and baseless grounds advanced by the Government. The

-17-

time line in this case clearly shows that the Government's motion is retaliatory. (*Supra*, Argument, §1). Also, the Government did not submit any declarations or any evidence to support its untruthful accusations, so its motion is insufficient as a matter of law. (*Infra*, Argument §4). Also, it is unclear whether another pro hac vice application was necessary due to the relatedness of these cases, and the Government cited no law to support its position.

The Government's citation to *U.S. v. Collins*, 920 F.2d 619 (10th Cir. 1990) is inapposite. In *Collins*, the attorney whose pro hac vice was revoked was a loose cannon tax protester. That Court goes on for pages about crazy and frivolous things the attorney did and wrote, and there is obviously no resemblance to the Government's baseless and untrue accusations here. In fact, despite numerous filings, there have hardly been any rulings in this case in a year. As such, Mr. Montgomery is entitled to counsel of his choice—attorney Flynn. (Montgomery Sealed Decl., filed herewith).

**4.    The Government's Motion to Strike is Procedurally Defective for Numerous Reasons.**

The Government claims it is moving to strike but they never cite the Federal Rule for a motion to strike, i.e., 12(f), its standards, or even a case.

Next, only pleadings are subject to a motion to strike under F.R.Civ.P. 12(f). *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 800, 885 (9th Cir. 1983). As such the Government can't strike attorney Flynn's letters, (which are the Government's sole exhibits). (Gov. Exh. 1-2).

Next, motions to strike are regarded with "disfavor" because they are often used as delaying tactics, and because of the limited importance of pleadings in federal practice. *Colaprico v. Sun Microsystems, Inc.*, 758 F.Supp.2335, 1339 (ND CA 1991); *U.S. v. 729.773 Acres of Land*, 531 F.Supp. 967, 971 (D HI 1982); *Bureerong v. Uvawas*, 922 F.Supp. 1450, 1478 (CD CA 1996). As set forth above, the Government motives for filing this motion are not only to delay, but to retaliate.

Next, before a motion to strike can be granted, "the court must be convinced that there are no

-18-

questions of fact, that any questions of law are clear and not in dispute, and that under no set of circumstances could a defense succeed." *Systems Corp. v. American Telephone & Telegraph*, 60 F.R.D. 692, 694 (SD NY 1973); *SEC v. Sands*, 902 F.Supp. 1149, 1165 (CD CA 1995).   Putting aside the Government's problem that they are not contesting a defense, clearly the Government has not met its burden of proof.  The Government did not submit any declarations or admissible evidence. *See Hung You Hong v. U.S.*, 68 F.2d 67, 69 (9th Cir. 1933) ["The doctrine that the production of weaker evidence, when stronger might have been produced, lays the producer open to the suspicion that the stronger evidence would have been to his prejudice . . . Silence is often evidence of the most persuasive character."].  Also, the Government has no personal knowledge of what attorney Flynn has done on a day to day basis in Boston, California, or anywhere else the past sixteen years, as it tries to allege; and its motion is not rationally based on anyone's perceptions, but rather it is based solely on the Government's vindictive, inaccurate and disingenuous opinion, and should be stricken as inadmissible opinion.  (F.R.Evid.701 [witness needs personal knowledge]).

## 5.   Attorney Flynn has Not Made any "Scandalous" or False Accusations in this Scandalous Case.

*The position of the Nevada U.S. Attorney that attorney Flynn cannot report factual underpinnings of apparent corruption is breathtaking.*  Is attorney Bogden also saying the media shouldn't be allowed to report "political corruption," "bribery," "Trepp was allegedly paying off Gov. Gibbons," "bribe probe," "something dirty is afoot," "Bogden [was] abruptly fired," etcetera? (Articles, Exh. 2).  The Nevada U.S. Attorney's position that Mr. Flynn should not be allowed to report "scandalous" evidence in a "scandalous" case, (Gov. Motion, 4-8), is untenable. (Articles, Exh. 2).

The Government's position that there is a "conflict" in Mr. Flynn's letters on the issue of

whether the Government was told to "stand down," and that both statements "cannot be true" is absurdly illogical  and typical of the Government's misunderstanding and shoddy investigation. **Both statements are logically and factually true**. (Flynn Decl., ¶13). Mr. Flynn has never received responses to his letters, but he does have "indirect and informal information" not provided by any of the addressee's to any of the letters.  There is no contradiction.  To nail the coffin shut, it is revealing that the Nevada U.S. Attorney *did <u>not</u> submit a declaration denying that he was ordered by the DOJ in Washington, D.C. to "stand down"* or back off his frivolous attempt to pin something, anything, on Mr. Montgomery to cover his (Bogden's) unconstitutional tracks.

In summary, Mr. Flynn did not make any false or scandalous statements, *(supra;* Flynn. Decl., ¶12-18), and therefore he has not violated Nevada Rules of Professional Conduct 3.3(a)(1) or 3.1 or anything else.  However, the Government violated the aforementioned rules of professional conduct because it made intentionally false statements when it claimed it had "probable cause to believe" Mr. Montgomery stole eTreppid/Trepp's  trade secrets under 18 U.S.C. §1832, and unlawfully retained national defense information under 18 U.S.C. §793(e).   (Order, Nov. 28, 2006 [Government acted with "callous disregard of Montgomery's fundamental 4th amendment rights."]). It has now compounded its misconduct with equally false and frivolous accusations to deprive Mr. Montgomery of counsel while imposing on the Court and Mr. Montgomery a "brutal waste of time and valuable resources." *U.S. v Weatherspoon, supra.*

### CONCLUSION.

For all of the above reasons, the Government's motion should  be denied.

Respectfully submitted,

/s/
_____

Feb. 27,  2007                                    Michael J. Flynn, Attorney for Dennis Montgomery

# CERTIFICATE OF SERVICE

Pursuant to NRCP 5(b), I certify that I am an employee of the LAW OFFICE OF LOGAR & PULVER, PC, and that on the 28th day of February 2007, I

✓    deposited for mailing in the U.S. Mail, with sufficient postage affixed thereto.

☐    sent via Federal Express or other overnight delivery service.

☐    delivered via facsimile machine to fax number:

☐    personally delivered.

☐    caused to be delivered via Reno-Carson Messenger Service.

the foregoing document consisting of Montgomery's Opposition to the Government's Motion to Strike Pleadings Filed by Michael J. Flynn, Esq. And to Preclude His Pro Hac Vice Application and the Declaration of Michael Flynn in Support of Montgomery Opposition to Government's Motion to Stike Pleadings and Preclude Pro Hac Vice Motion of Attorney Flynn addressed to:

> Ronald C. Rachow
> U.S. Attorney
> 100 West Liberty St.
> Suite 600
> Reno, NV 89501

The Sealed Declaration of Dennis Montgomery in Support of Montgomery's Opposition to Government's Motion to Strike Pleadings and Preclude Pro Hac Vice Motion of Attorney Flynn was served on the court only.

ZACHARY DRAPER
for the Law Office of Logar & Pulver, PC

-21-

**EXHIBIT 1** TO MONTGOMERY OPPOSITION TO GOV. MOTION TO
STRIKE PLEADINGS FILED BY ATTORNEY FLYNN AND PRECLUDE
PRO HAC VICE

1

```
 1                    UNITED STATES DISTRICT COURT
                           DISTRICT OF NEVADA
 2          BEFORE THE HONORABLE VALERIE P. COOKE, MAGISTRATE JUDGE
                               ---o0o---
 3

 4    Dennis Montgomery, et al.,      :  No.
                                      :  CV-N-3:06-cv-056-BES-VPC
 5                    Plaintiff,      :
                                      :  September 26, 2006
 6          -vs-                      :
                                      :  United States District Court
 7    ETreppid Technologies, LLC,     :  400 S. Virginia Street
                                      :  Reno, Nevada  89501
 8                    Defendant.      :
                                      :
 9    _____:        ORIGINAL

10

11                      TRANSCRIPT OF STATUS CONFERENCE
12

13    A P P E A R A N C E S:

14    FOR THE PLAINTIFF:              Michael Flynn
                                      Attorney at Law
15

16    FOR DEFENDANT ETREPPID:         Jerry Snyder
                                      Attorney at Law
17
      FOR DEFENDANT UNITED STATES:    Carlotta Wells
18                                    Assist. United States Attorney

19

20
      FTR-VPC 9-26-06 @ 2:10 p.m.
21

22    Proceedings recorded by digital recording produced by
      computer-aided transcript
23

24    Reported by:              KATHRYN M. FRENCH, RPR, CCR
                                NEVADA LICENSE NO. 392
25                              CALIFORNIA LICENSE NO. 8536
```

2

```
 1        Reno, Nevada, Tuesday, September 26, 2006, 2:10 p.m.
 2                           --oOo--
 3             THE CLERK:  This is the date and time set
 4    for a status conference in case number 06-056-BES-VPC,
 5    Dennis Montgomery, et al, versus eTreppid Technologies, LLC.
 6             Present on behalf of plaintiff, Michael Flynn.
 7    Present on behalf of defendant, Jerry Snyder.  Present
 8    telephonically on behalf of defendant, Carlotta Wells.
 9             THE COURT:  Thank you very much.  And good
10    afternoon everyone.
11             MR. FLYNN:  Good afternoon, Your Honor.
12             THE COURT:  We are having this status conference
13    because, well, it was hoped, I think at our last status
14    conference or discovery hearing, the issue in these cases
15    which are not yet consolidated as I review the record, but
16    I've sort of informally consolidated them for purposes of
17    discovery hearings, just seem to make sense to me, at least at
18    this point in the litigation.
19             In any case, the issue then was, I think, a
20    protective order and trying to see about how best to protect
21    the respective party's interests in maintaining privacy, while
22    at the same time, being able to proceed with the litigation.
23    And what I understand counsel have to report is found in
24    docket numbers 74 in the 56 action, that's the Montgomery
25    case.  And in the eTreppid, the 145 case, there is also both
```

1   three proposed drafts to see about some changes, to both

2   Mr. Flynn and Mr. Snyder.

3            THE COURT:  All right.

4            MS. WELLS:  They have seen this.  But, we were

5   not able to come to an agreement.

6            I also agree with Mr. Snyder in terms of the draft

7   protective order that I believe Mr. Flynn has circulated

8   sometime over the summer, where he asked us to designate

9   information that would be subject to a protective order.

10  I mean, we can't be in a position of designating what's

11  classified because that in fact may, in and of itself --

12           THE COURT:  Be a violation.  Right.

13           MS. WELLS:  Right.  It may reveal classified

14  information.

15           THE COURT:  Well, here is my dilemma.  Let me --

16  because I happen to be the magistrate judge who signed the

17  search warrant, I am the magistrate judge dealing with that

18  issue.  And so of course I have to make some determinations

19  about the motions pending in the sealed proceeding.  And of

20  course what would end up occurring is I would prepare a report

21  and recommendation, and it would be up to Judge Sandoval to

22  make an ultimate decision about that issue.

23           Having been in the position of having heard the

24  evidence in the matter, arguments in that hearing, I have a

25  concern that there is a crossover concerning some of the

1    legal issues or fact issues, evidentiary issues in that case,

2    that matter, that may have some bearing on the civil

3    litigation.

4            So, my sense is that the first thing that I need

5    to do to, one way or another, to move this litigation

6    along, one of my priorities is to prepare that report and

7    recommendation, so I can move that along.  And then the

8    parties can object if they wish and proceed in that regard.

9            So, I've got that concern.  And then I've got, in

10   this case my interest is, as counsel have known, has been

11   just to try while this case is pending in front of this, the

12   district court here in the District of Nevada, to figure out

13   how all of you can proceed with discovery.  And we've run

14   into some pretty severe roadblocks, some of which may not

15   be insurmountable.  But, one, namely state secrets and the

16   issues implicated by that, may be an insurmountable road block

17   for this litigation.  I have, of course, no way of knowing

18   that and probably am not going to know that.

19           So, what -- I've also got all of these dispositive

20   motions pending in front of Judge Sandoval, and I'm not sure

21   when those will be decided.  I have no way of predicting that.

22   All I know is there are a lot of them, and they -- this is a

23   very complicated case and there are many, many important

24   issues to be decided.  So, there is that issue.

25           And then there's this issue of whether, ultimately,

1   some of these discovery issues ought to be decided, if they

2   are intertwined in such a way that deciding one is going to

3   jeopardize something that maybe is not within the jurisdiction

4   of this court.  I'm very concerned about that.  Maybe Judge

5   Sandoval is going to have to decide those issues.

6          I will tell you, I -- Mr. Snyder is correct in

7   that at the May hearing it was my hope, although apparently

8   futile, that the parties would be able to get together

9   and really study this problem and see a way to fashion a

10  protective order that addressed the party's competing

11  concerns.  And you've not been able to do that.

12         I'm not prepared to rule today on these issues.  I

13  think what makes sense to me is to review what has been filed.

14  And I will say, although Mr. Snyder is correct about the

15  May 11 hearing, everybody was going to submit protective

16  orders and so on, these are -- the motion by eTreppid is, as

17  evidenced by its title, a motion, as is the motion of the

18  United States.  And I think maybe those ought to be briefed so

19  that I have an opportunity to review this matter.

20         It may be, as I say, that I may end up suggesting

21  to the district court that it be referred to him.  I just

22  don't know at this time.  I think it probably is premature to

23  make that leap and take everything up there.

24         It may be that Mr. Snyder is correct with respect to

25  some aspects of this litigation, that maybe some discovery can

1   go forward, and maybe the issues not dealing with national

2   security issues can be dealt with separately.  I mean, it may

3   be that we'll be able to do something like that.  I just don't

4   know.  And I certainly don't want to do anything in a cavalier

5   fashion that would create more problems for the problems or

6   the parties down the road.

7           So what I think makes sense is the parties -- well,

8   let me ask you.  Mr. Flynn, did you have a proposed protective

9   order that you had advanced to the parties in this case?

10          MR. FLYNN:  What I gave Your Honor is a guide

11  to create two protective orders or, to be more precise,

12  protective order for eTreppid and Montgomery, and basically

13  a position that I don't believe a protective order can be

14  entered with regard to the government.  Either you have to

15  assert state secrets privilege or not assert it.  A protective

16  order will just get everybody in trouble.  And I certainly

17  don't want to be in trouble in connection -- for example, even

18  to respond to the government -- to the eTreppid motion for

19  protective order -- and we're going to request an additional

20  ten days -- even to respond to that, we would have to, to

21  really protect Mr. Montgomery's rights, if you read, for

22  example, their -- they submitted 11 or 12 interrogatories to

23  us.  If you read our answers to the interrogatories, it just

24  becomes abundantly clear what the problem is.

25          We would have to identify, for example, they even

1   ask us, to explain what our copyright infringement claim is.

2   We'd have to identify the government contracts, and we would

3   have to say what the government contracts -- we say it right

4   in our response -- we would have to say what the government

5   contracts were about, what they involve, how the technology

6   was used, how that technology was copyrighted.

7          So even when we respond to the eTreppid motion

8   for protective order, as we've been doing, we're dancing

9   on the head of a pin.  We're going to have to half inform

10  the Court in our response in order not to run afoul of

11  Mr. Pugliese's positions.

12         So to answer the Court's precise question, we said

13  to the government we want to deal with this separately.  We

14  want to deal with you separately.  We want to deal with

15  eTreppid separately.

16         With regard to eTreppid, we submitted a proposal

17  with the caveat that we had this problem.  And with regard to

18  the government, we said, for example, that when the government

19  submitted its protective order, which basically says you can

20  talk about Big Safari.  Well, I'll reiterate talking -- and I

21  don't even believe Ms. Wells knows -- talking about Big Safari

22  is like saying there's a federal court in Reno, but there are

23  also federal courts elsewhere in the United States.

24         I mean the Big Safari contract is almost

25  meaningless.  And it's like the palm trees.  It's virtually

33

1    meaningless.  And so for the government to come forward and

2    say, okay, well, you can talk about Big Safari, but you can't

3    talk about anything else, it's just -- it's a can of worms

4    that would jeopardize my position, my client's position, if

5    the government decided to take an aggressive position against

6    us.  And it's not going to happen.

7              THE COURT:  So what do you suggest?

8              MR. FLYNN:  I think the only thing to do at

9    this juncture is either we -- everybody gets in chambers, and

10   simply so the Court is fully informed.  I mean the bottom line

11   to all of this dancing around is either you or Judge Sandoval

12   have to be fully informed of the implications of these

13   problems.

14             So how do you get fully informed?  You either do it

15   in chambers in some type of a sealed proceeding, or we do the

16   briefing.  If we do the briefing, we do what we -- the problem

17   we're running into right now in this proceeding and with the

18   search proceeding -- and we haven't submitted any in camera

19   affidavits because I don't believe in in camera, but we

20   could submit an in camera affidavit that would explain every

21   government contract, exactly what was done, what the output

22   was, how the government used the output.  And I'm sure the

23   government doesn't want that.

24             So either we brief it -- and I'd request an

25   extension of ten days to respond to both motions -- or we

**EXHIBIT 2** TO MONTGOMERY OPPOSITION TO GOV. MOTION TO STRIKE PLEADINGS FILED BY ATTORNEY FLYNN AND PRECLUDE PRO HAC VICE



**Jim Gibbons**

*Under Cover*

# Congressman's Favors for Friend Include Help in Secret Budget

With Rep. Gibbons's Blessings,
An Ex-Trader for Milken
Wins Millions in Contracts;
A Lawsuit's Scandalous Allegation

By JOHN R. WILKE
*November 1, 2006*

On a lavish, weeklong Caribbean cruise last year, software entrepreneur Warren Trepp wined and dined friends and business partners aboard the 560-foot Seven Seas Navigator.

Among Mr. Trepp's guests on the cruise ship: Rep. Jim Gibbons of Nevada and his family. The two men have enjoyed a long friendship that has been good for both. Mr. Trepp has been a big contributor to Mr. Gibbons's campaigns, and the congressman has used his clout to intervene on behalf of Mr. Trepp's company, according to congressional records, court documents and interviews. The tiny Reno, Nev., company, eTreppid Technologies, has won millions of dollars in classified federal software contracts from the Air Force, U.S. Special Operations Command and the Central Intelligence Agency.

At a time of rising concern over lawmakers who direct or "earmark" federal spending to their supporters and business partners, a growing part of the budget is shielded from scrutiny. This is the "black budget," mostly for defense and intelligence, which is disclosed only in the vaguest terms. The ties between Mr. Trepp and Mr. Gibbons raise questions about an influential politician in America's fastest-growing state, and also offer a rare glimpse of contracts in this secret budget being awarded to a politically connected businessman without competitive bidding.

Mr. Gibbons, a 61-year-old Republican, has been elected to five terms in the House and has served on the Intelligence and Armed Services committees. A former combat pilot and decorated Vietnam veteran, he is stepping down at the end of this term and is running for governor of Nevada in next week's election. His wife, Dawn, ran unsuccessfully in the Republican primary for the House seat being vacated by her husband.

Mr. Gibbons is in a tight and bitterly fought race. He held a double-digit lead until two weeks ago, when a cocktail waitress said he accosted her after a night of drinking. Mr. Gibbons has forcefully denied the claim, which is unproven, but details of the case have been page-one news in Nevada, and his lead slipped to six points in a weekend poll.

Mr. Trepp, 56, is known on Wall Street as the one-time chief trader for Michael Milken at Drexel Burnham Lambert, which collapsed in 1990 following a criminal investigation of junk-bond abuses.

In an interview Sunday, Mr. Gibbons said he helped open doors in Washington for his friend but did nothing improper. He said eTreppid won its business on the merits. "I had

## Black Box

Estimated annual Defense Department budget for classified acquisitions

$30 billion



Note: A scale of: beg of Oct. Fig gives the first adjusted for inflation. Estimate for 2004 is end of budget, not actual.

Source: Center for Strategic and Budgetary Assessments

nothing to do with any classified contracts," Mr. Gibbons said. "My connection was to get people to evaluate the technology." Of Mr. Trepp, he said: "He is like a younger brother to me, we have dinner, we play golf, we've been friends for years, and our wives are best friends."

Mr. Trepp said Mr. Gibbons acted at all times in the nation's best interests. "If a member of Congress becomes aware of a technology they believe will be beneficial to the country, don't they have a duty to bring it to the attention of the appropriate governmental agencies?" he asked in an emailed response to questions. "Given my longstanding personal relationship with Jim and his position on the Intelligence Committee, it was natural for me to show him our technology."

Public records show that Mr. Trepp has been a generous supporter of Mr. Gibbons's campaigns. Nevada law prohibits individuals or corporations from giving more than $10,000 to a candidate in a single election cycle. Companies and partnerships that Mr. Trepp incorporated or controls have given almost $100,000 to Mr. Gibbons. These entities, many of which list the same mailing address, gave the maximum amount on the same day last year. Mr. Gibbons said the campaign contributions didn't violate Nevada law because they came through different corporate entities.

Mr. Trepp said he believes all the contributions complied with state law. "Whatever contributions I made for Jim's gubernatorial candidacy have nothing to do at all with any federal contracts," he said, adding that the company has no new federal contracts on the way.

### Suit's 'Outrageous' Claims

Mr. Gibbons also got other, unreported gifts of cash and casino chips from Mr. Trepp, according to sworn testimony in a civil lawsuit brought by a former executive at eTreppid, Dennis Montgomery. The suit, filed in February in federal court in Reno, involves a dispute between Messrs. Trepp and Montgomery over the rights to certain software code. Both Mr. Gibbons and Mr. Trepp deny unreported payments. Mr. Gibbons called the claims "outrageous," adding, "I am not hiding a damn thing, and Warren is not the kind of person who'd do anything like that."

The suit has raised alarms in Washington because of concern that national secrets will be revealed if it goes to trial. For example, one of the entities that funded eTreppid is code-named Big Safari and is a classified program, documents in the case show. The nation's top intelligence official, John D. Negroponte, recently filed a statement with the court seeking to seal the case. He wrote that after personally reviewing the matter, he has concluded that disclosure of some information connected with the case could do "exceptionally grave damage" to national security.

The legal dispute, which hasn't been previously reported, sheds light on the shadowy world of black-budget contracting and on Mr. Gibbons's efforts to help fund programs in which eTreppid was involved.

Mr. Gibbons himself touted one earmark in a June 2004 news release. In the release, Mr. Gibbons's office said he "specifically requested" a program that would pay $3 million for eTreppid's automatic target-recognition technology, a computerized technique for picking out objects from a stream of video images. The release also said the technology had "great potential" for other federal applications, including satellite intelligence gathering.



In the following year, an email from an eTreppid executive to Mr. Trepp and others at the company described a $1.5 million "plus-up," or earmark, that the company's Washington lobbyist "helped us get through Jim Gibbons." The money was for a subcontract on a secret program, code-named "Eaglevision," involving satellite transmission of high-resolution video images. Mr. Trepp acknowledged getting help from Mr. Gibbons on this contract but added, "The specific contract which resulted from Jim's introduction was for approximately $1.17 million."

Earmarks have attracted intense scrutiny this year and figured in a series of public-corruption probes. Traditionally, programs are funded based on requests from departments and agencies to Congress, which then appropriates money. Earmarks are different because lawmakers can directly insert them into spending bills.

Nevada Rep. Jim Gibbons, circled at top, and Warren Trepp, circled at bottom, with families, business partners and friends on a Caribbean cruise last year. To the right of Mr. Trepp is actor Patrick Swayze and, behind him, actor John O'Hurley of 'Seinfeld' fame.

The eTreppid story adds a twist because, as with the Eaglevision contract, some programs that got funded with Mr. Gibbons's help are classified. The U.S. Constitution says "a regular statement and account of receipts and expenditures of all public money shall be published," but since the Cold War era a growing number of programs for national defense or intelligence have been listed in the federal budget with only vague descriptions. This black-budget spending has more than doubled in inflation-adjusted dollars since 1995, to more than $30.1 billion in the current fiscal year, according to the Center for Strategic and Budgetary Assessments, a nonpartisan Washington policy group.

"The problem with earmarks is that they don't go through the normal oversight process -- a problem that is much worse in black programs, which have less congressional oversight and obviously no public scrutiny," says Steven Kosiak, a researcher at the center.

**Source of Secret Funds**

One source of secret funds for eTreppid and other companies is the Special Operations Command. Based in Tampa, Fla., the command fields special-operations military and intelligence forces around the globe and is at the forefront of the fight in Iraq and Afghanistan. It has also been rocked by a criminal investigation of a former contracting officer. The investigation is continuing, according to a spokesman for the U.S. attorney in Tampa.

In a separate inquiry, Pentagon investigators last year found evidence that the command kept special accounts for "unrequested congressional plus-ups," or earmarks. The plus-ups were used to reward lawmakers with projects in their districts, according to declassified investigators' notes reviewed by The Wall Street Journal. The Pentagon's inspector general closed the inquiry after finding that the accounts weren't illegal.

Mr. Trepp said eTreppid won classified work on its merits and already had a number of government contracts before Mr. Gibbons starting making introductions on the company's behalf. Mr. Gibbons's campaign manager, Robert Uithoven, said the congressman has been a strong supporter of new defense technology, particularly after 9/11. But he said there was "no quid pro quo whatsoever" for contributions from contractors. And while some funding was secret, "it was because of the sensitive nature of the work," Mr. Uithoven said, not to avoid public scrutiny.

For Mr. Trepp, eTreppid's success at winning multimillion-dollar federal contracts marks a comeback from his Drexel days. He sat at Mr. Milken's right arm on the firm's famous X-shaped trading desk in Beverly Hills, sometimes trading as much as $2 billion in securities a day. Federal regulators filed a civil securities-fraud claim against him in 1995, and a Securities and Exchange Commission administrative judge found that his violations had been "egregious, recurring and intentional." But she dismissed the proceeding against him, noting that the allegations were old and he had left the securities business years earlier.

Mr. Trepp, a Drexel partner, later paid an estimated $19 million to help settle civil claims against the firm, without admitting culpability in the case. But he emerged with most of his fortune intact, and landed on the shores of Lake Tahoe, in Nevada, where he played high-stakes baccarat, started a family and lived in a waterfront compound he later sold for $32 million. He funded a community-philanthropy foundation in Lake Tahoe and invested in films and Broadway plays. Mr. Trepp's latest show, "The Times They Are A-Changin'," choreographed by Twyla Tharp with music by Bob Dylan, opened last week on Broadway.

Mr. Trepp jumped into the technology boom in 1998, founding eTreppid in Reno with Mr. Montgomery, a software developer who served as chief technology officer, according to court papers. Its first product converted casino-surveillance tapes into digital data that could be stored and searched, based on data-compression and pattern-recognition

software written by Mr. Montgomery. It was tested in casinos in Reno and Las Vegas and was eventually licensed to a unit of General Electric Co., in 2002.

By the following year, eTreppid shifted its focus to winning federal contracts for its data-compression technology. At the time, military and intelligence officials were looking for software that could store and search video taken by unmanned aircraft such as the Predator. In early 2003, Mr. Montgomery was granted a security clearance and asked to search for specific people, vehicles and other objects in battlefield video images, court documents show.

The largest publicly known contract award to eTreppid was noted in a routine announcement in 2004 by the Special Operations Command. The command described it as an "indefinite-delivery/indefinite quantity...sole source," or no-bid, contract, with a value of as much as $30 million.

## Arranging Meetings

Between 2003 and 2005, Mr. Gibbons repeatedly arranged meetings and demonstrations for eTreppid executives with top Air Force generals, both in Washington and Reno, according to congressional staff and company documents.

On Sept. 25, 2003, the congressman had breakfast with the Air Force vice chief of staff, where he pitched the promise of eTreppid's technology, according to a memo from a Gibbons staff member to an eTreppid executive. Also in September, Mr. Gibbons, in an email to an eTreppid executive, offered to try to set up a meeting with the National Security Agency. It isn't known if the meeting took place.

In May 2004, a lobbyist acting for eTreppid in Washington reported in another email, "Congressman Gibbons certainly came through for eTreppid!" She said Mr. Gibbons secured a $7 million appropriation for the company, although she warned in the email that the amount might be reduced as the legislation moved along. The next month Mr. Gibbons publicly announced the $3 million appropriation, which was directed to eTreppid for its video compression and target-recognition technology. The project was among several in Nevada that Mr. Gibbons said that he had specifically requested.

House records show that in 2004, the lobbyist pushed for eTreppid's interests in the defense-authorization and intelligence bills. Mr. Gibbons served on both of those committees. Mr. Trepp says eTreppid never paid for a lobbyist in Washington.

ETreppid executives even sought help from Mr. Gibbons on routine problems. In 2004, they asked for his help in getting a top official at the Department of Homeland Security to return their phone calls, according to company emails reviewed by The Wall Street Journal. And last year, an eTreppid executive, Patty Gray, wrote to Mr. Gibbons that the company hadn't yet received funds in a "congressional appropriation that you helped us with." Mr. Gibbons immediately assigned a staff member to prod the General Services Administration for the funds, according to a later email.

On the Caribbean cruise in March last year, photos taken on board and at the Atlantis casino in the Bahamas show the Gibbons and Trepp families together at dinners and parties. Also on the cruise were actors Patrick Swayze and John O'Hurley, who played the role of J. Peterman in the "Seinfeld" television series. The group flew back to Nevada after the cruise on a chartered Boeing 727 paid for by Mr. Trepp.

Mrs. Gibbons says she helped pay for the trip by giving a $1,654 check to Mr. Trepp's wife and putting $1,508 on her credit card for on-board expenses. An agent for the cruise line estimated the cost of a comparable cruise for a family of three at more than $10,000, excluding airfare.

## Required Disclosure

Federal ethics rules require a public disclosure by members of Congress when they receive gifts or make reimbursements. Mr. Gibbons says he believed the cruise was an exception because he and Mr. Trepp are longtime friends. Kenneth Gross, a former Federal Election Commission attorney now at Skadden, Arps, Slate, Meagher & Flom LLP in Washington, says there is a friendship exemption but anything valued at more than $250 must get written approval from the House ethics committee and in most cases be publicly reported.

Documents make clear that the government found some of eTreppid's work valuable. In a letter to Mr. Montgomery's lawyer earlier this summer, after the breakup with Mr. Trepp, a top Air Force lawyer asked that Mr. Montgomery urgently return to work on technology he had been developing for the military, even as the parties in the suit bitterly argued over who owned the technology.

In the civil suit, Mr. Montgomery says he was pushed out of the company by Mr. Trepp in January of this year when he refused to provide his source code to Mr. Trepp. Mr. Montgomery was using the code on highly classified government work, the suit says. Mr. Trepp, in turn, charged that Mr. Montgomery stole classified tapes from eTreppid when he left. Agents in the local office of the Federal Bureau of Investigation began to look into the matter.

On March 1, FBI agents raided Mr. Montgomery's home. They seized computers and disks, but didn't find any classified material, court records in the civil suit show. Mr. Montgomery has sought the return of his property, alleging that Mr. Trepp used his political influence in the state to get local FBI agents to intervene in what was essentially a private business and copyright dispute. Mr. Trepp denies Mr. Montgomery's claims and says he will fight the lawsuit.

Court proceedings on the theft allegation and the FBI raid have taken place in secret. The case is described in broad terms in the pending civil suit, which the government has asked to seal as well.

November 3, 2006

## DOW JONES REPRINTS

This copy is for your personal, non-commercial use only. To order presentation-ready co to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any art www.djreprints.com.

• See a sample reprint in PDF format.
• Order a reprint of this article now.

# Gibbons Asks Ethics Panel's Opinion on Cruise Gift

By a WALL STREET JOURNAL Staff Reporter
November 3, 2006; Page A8

WASHINGTON -- Nevada gubernatorial candidate Rep. Jim Gibbons asked the House Ethics Comm whether he failed to report a Caribbean cruise that was paid for by a military contractor who is also a congressman's campaign.

Mr. Gibbons sought the panel's advice after a page-one article in The Wall Street Journal raised questi ties to Warren Trepp, said Mr. Gibbons's campaign manager, Robert Uithoven.

The Journal reported Wednesday that the Nevada Republican opened doors in Washington for Mr. Tr Technologies LLC, a software maker that won millions of dollars in classified contracts from the Air Operations Command and the Central Intelligence Agency. It reported that Mr. Gibbons, who served Armed Services committees, helped the Reno, Nev., company secure federal contracts and in some ca federal money to the contracts.

Mr. Trepp and companies linked to him contributed nearly $100,000 to Mr. Gibbons's campaign for g Trepp hosted the congressman, his wife and others on a week-long Caribbean cruise in March 2005, f on a private jet.

A former eTreppid executive who is suing Mr. Trepp in federal court in Reno alleges that Mr. Gibbon

11/6/2006

gifts of cash and casino chips from Mr. Trepp.

Messrs. Gibbons and Trepp deny unreported payments and said there was nothing improper about the Trepp's campaign contributions or Mr. Gibbons's efforts to arrange meetings in Washington for eTrep insisted that eTreppid won business on its merits and that he had nothing to do with any classified con

Also yesterday, U.S. District Judge Brian Sandoval, who has been hearing the case brought by the for executive, recused himself from the case. The judge, a former Nevada attorney general, was appointed President Bush last year.

**URL for this article:**
http://online.wsj.com/article/SB116251038881011926.html



Jim Gibbons

# Nevada Governor Faces FBI Probe Into Contracts

Funds to Gibbons
Cited While in Congress;
'Black Budget' Missions

**By JOHN R. WILKE**
*February 15, 2007; Page A1*

Federal prosecutors are investigating whether Nevada Gov. Jim Gibbons accepted unreported gifts or payments from a company that was awarded secret military contracts when Mr. Gibbons served in Congress.

The Federal Bureau of Investigation is examining whether any gifts or payments violated federal contracting rules or were offered in exchange for official acts by Mr. Gibbons, people briefed on the investigation said. Mr. Gibbons, a Republican, represented Nevada for five terms in Congress, where he served on the House Intelligence and Armed Services committees. He was sworn in last month as governor of the nation's fastest-growing state.

The close ties between the congressman and the contractor, Warren Trepp, were disclosed in a Nov. 1 Wall Street Journal article, which revealed that Mr. Gibbons accepted private jet flights and a Caribbean cruise from the software-company owner. Mr. Gibbons says accepting the cruise and flight didn't violate House ethics rules.

New evidence has emerged that includes emails to Mr. Trepp -- the majority owner of eTreppid Technologies LLC and the former chief trader for convicted junk-bond dealer Michael Milken -- discussing a payment or gift to then-Rep. Gibbons. They also show Mr. Gibbons repeatedly using his congressional office to help the firm seek classified military and civilian contracts.

The emails show that since at least 2003, Mr. Trepp maintained close ties to Mr. Gibbons, who helped eTreppid get no-bid software contracts from the Air Force, U.S. Special Operations Command and Central Intelligence Agency. The software was used in video tracking of military targets and other, classified applications.

Messrs. Trepp and Gibbons have denied any wrongdoing, and no charges have been filed; indeed, such investigations sometimes end without official action.

## 'Hit the Ground Running'

In a Sept. 25, 2003, email to Mr. Trepp after Mr. Gibbons had been particularly helpful on a recent contract, eTreppid executive Len Glogauer reports that "Jim really hit the ground running on that one." He adds, "we need to take care of him like we discussed." It isn't clear what Mr. Glogauer meant, and he declined to comment.