Original

1   RONALD J. LOGAR, ESQ., Nevada Bar No.: 0303
2   ERIC A. PULVER, ESQ., Nevada Bar No.: 7874
   Law Office of Logar & Pulver, PC
3   225 S. Arlington Ave., Ste A
   Reno, NV 89501
4   Phone: 775-786-5040
   Fax: 775-786-7544
5

6   MICHAEL J. FLYNN, ESQ., Mass. Bar No.: 172780
   P.O. Box 690, 6125 El Tordo
7   Rancho Santa Fe, CA 92067
   Phone: 858-775-7624; 858-759-7000;
8   Fax: 888-235-4279
   *Admitted Pro Hac Vice in related Nevada Cases*
9   *No. 3:06-cv-0056-LRH-VPC; 3:06-CV-00145-LRH-VPC*

**FILED**

FEB 2 3 2007

U.S. MAGIS...... ...JGE
DISTRICT OF NEVADA
BY_____DEPU'..

10            **UNITED STATES DISTRICT COURT**

11           **FOR THE DISTRICT OF NEVADA**

12

13                       )   CASE NO.:  3:06-0263-PMP-VPC
   In the Matter of the Search of:      )
14   12720 BUCKTHORN LANE, RENO, NV   )
                           )   **SEALED DECLARATION OF DENNIS**
15   and                         )   **MONTGOMERY IN SUPPORT OF**
                           )   **MONTGOMERY'S OPPOSITION TO**
16                          )   **GOVERNMENT'S MOTION TO STRIKE**
   888 MASTRO DRIVE, RENO, NV, STORAGE )   **PLEADINGS AND PRECLUDE PRO HAC**
17   UNIT NUMBERS 136, 140 , 141, 142, AND 143 )   **VICE MOTION OF ATTORNEY FLYNN.**
   _____ )

18

19                    **FILED UNDER SEAL**

20

21

22          **IN CAMERA FILING FOR DELIVERY TO**

23            **JUDGE PRO AND/OR JUDGE COOKE**

24

25

26

27

28

Atty. Decl., 3:06-CV-0263/3:06-MJ-0023

115

## DECLARATION OF DENNIS MONTGOMERY

I, Dennis Montgomery, declare:

I am over 18 and a party to this proceeding involving the FBI raid on my home and storage facility on March 1 and 3, 2006. I have personal knowledge of the facts stated herein, and/or information and belief of said facts, and if called as a witness, I could and would testify competently to them.

1.      On or about January 5, 2007, I began to receive phone calls from the following number: 999 999 9999. Based on my experience in working with various individuals inside ▮▮▮▮▮ and other federal agencies, I know that the calls originated from a federal agency. The calls have continued to the present, sometimes as frequently as twice a day. The caller is intimately knowledgable about these matters involving Warren Trepp, Daniel Bogden, James Gibbons, Ronald Bath and the illegal raid on my home. By mid-January, 2007, the caller had informed me of the following:

● The Washington FBI and the Washington US Attorney's were working in two groups, "Group A" and "Group B." They were in the process of conducting an investigation into: (i) the relationship between James Gibbons, Warren Trepp, Daniel Bogden and Ronald Bath, the payment of monies by Trepp to Gibbons, and the illegal raid on my home - Group A; and (ii) filings by the Nevada U.S. Attorney's Office which had been prepared by Attorneys for Warren Trepp and which violated various laws and policies of the Department of Justice - Group B.

● The caller sometimes gave me very detailed information, much of which I corroborated from an entirely independent source, including (i) an order from the Attorney General's Office for Mr. Bogden and the Reno FBI to "stand down" in connection with their investigation of me, (corroborated); (ii) the firing of Mr. Pugliese and Bogden based on their filing of papers and materials in the search matter that had been prepared by Warren Trepp's attorneys, and in some instances, copied

1    verbatim into filed court papers (uncorroborated); (iii) A complaint relating to the foregoing filings

2    (uncorroborated); (iv) FBI visits to specific individuals by agents investigating specific matters

3    including the improper filings, (corroborated); (iv) specific matters relating to the investigation into

4    payments of money by Trepp to Gibbons, (corroborated). Sometimes, we shared information. Based

5    on these conversations, I do not believe that the Nevada USAO has been privy to the Washington

6    based investigation.

7

8        2.        As recited in my previous sealed declaration, I have worked with ███████████

9    ███████ in Special Access Programs, ("SAP") black budget programs in connection with my work

10   on national security matters, much of which I disclosed in summary form in my prior declaration,

11   some of which I did not, such as ████████████ which I disclose in summary form here. I make

12   these disclosure to this Court in the context of the compelling national security concerns at issue in

13   these cases.

14

15       3.        Neither Warren Trepp, nor Sloan Venables, nor Patty Gray, nor anyone working at

16   eTreppid, nor any official of any federal agency, including███████ USSOCOM, nor the Air Force,

17   nor Paul Haraldsen, ever had access or the means to access, any of the software programs I

18   worked on in connection with certain Special Access Programs. Please see my prior sealed

19   declaration originally delivered to Judge Sandoval; and subsequently delivered to Judge Hicks.

20

21       4.        Having now read the motion to disqualify my attorney, I conclude that the Nevada

22   USAO has almost no knowledge or understanding of the work I did on SAP, black budgeted

23   programs; nor any realistic understanding of the conflict now occurring, at times "raging," within the

24   Bush Administration over my technology, and/or the corrupt influence of Warren Trepp in Nevada in

25   the illegal raid on my home, and/or the resulting failure of the Administration to fully utilize the

26   technology, all of which has caused my attorney to write letters to the appropriate officials involved

27   beginning last March 1, 2006, the day of the raid on my home, ( a copy of which is attached hereto

28

1   as Exhibit 1) and concluding with his recent letters dated February 7, 2007. Having read its Motion,

2   I do not believe that the Nevada USAO is privy to the Washington based investigation.

3          5.      As I understand the Motion of the USAO, it claims that the statements in these recent

4   letters are "uniformly false" and, on that basis, seeks to remove Mr. Flynn as my chosen counsel.

5
    The USAO is either acting out of substantial ignorance or intentionally distorting the truth. The
6
7   statements and characterizations cited by the USAO in its Motion, are "uniformly" unfounded and

8   false. The statements of my Attorney are true, including the allegation that "*given the national*

9   *security issues at stake, ... someone* responsible in our Government" should have responded to his

10  letters over this past year, and the failure to do so does suggest either "unwarranted complacency,

11
    ineptitude or worse" by "*someone*." I have personal knowledge as stated herein that national
12
13  security matters of dire consequence to the United States have been subjected to the political and/or

14  financial motives and actions and/or inactions of individuals within our Government.

15         6.      As stated in my previous sealed declaration, the "output" from certain SAP was

16  included in "regular briefings to the President," (p. 8 lines 20-23); and involved extremely vital

17  national security concerns in the war on terror, (pages 9-14). For those reasons, since my departure

18
    from eTreppid, I have in good faith protected those national security concerns and I have worked as
19
20  long as 18 hours a day to improve on my prior technology with the financial assistance of my new

21  employers. For those reasons and as stated below involving the Vice-President, I recently

22  instructed my attorney to copy the President and Vice-President on the February 7, 2007 letter,

23  specifically because of the *filmed* killing of American soldiers, and because my technology has

24  substantially improved just within the past nine months in connection with this precise issue. My

25  current employers also have direct connections inside the highest levels of the Bush Administration.
26
    On that basis, and because of the failure of our Government to utilize my technology after my
27
28  departure from eTreppid, and because of Warren Trepp's attempt to steal it with the raid on my

Atty. Decl., 3:06-CV-0263/3:06-MJ-0023                    -3-

home, my current employers engaged in multiple meetings and conferences with high level Bush Administration officials beginning in May, 2006 and continuing to December, 2006.

7.      In July, 2006, they arranged a meeting in Vice-President Cheney's Office which I attended with several individuals for the purpose of educating and explaining to the Vice-President that much of my work was so highly compartmentalized within ███████ it was likely that some high level officials in the administration and even within the intelligence community, including certain Air Force officials aligned with Warren Trepp, and potentially even the Director of National Intelligence, John Negroponte (whom certain ███████ distrusted) did not know or understand the full scope of its utilization in the war on terror; and/or had competing financial interests aligned with Trepp, Gibbons and Bath. My attorney derives his knowledge of these facts from me based on my three years of involvement on these matters, which, in turn, is based upon hundreds of meetings and discussions with administration and military officials, including my meetings with the former Secretaries of the Navy and Air Force, and numerous Generals.

8.      In the context of my three plus years of involvement in these matters, in the July meeting in the Vice-President's office, I met for several hours with Samantha Ravich, Deputy Assistant to the Vice-President in charge of National Security.   I was later told by other individuals who attended the meeting with Ms. Ravich, that they thereafter met directly with Vice-President Cheney, and that the whole matter was under his review; would be reported directly to the President, and that progress in the immediate utilization of the technology was being made. During the meeting with Ms. Ravich, after she represented that she held the necessary clearances to discuss these matters, I explained to her some of what is recited in my previous declaration, as well as my more immediate concerns hereinafter stated..

7.      In that meeting, I explained two particularly urgent concerns: (i) the continued,

███████████████████████████████████████████████████████

1  which I had been accomplishing privately; and the need for "blade servers" to accelerate that

2  processing and decoding; given the huge volume of digital streaming involved; and (ii) the utilization

3  of my technology in connection with ███████████ which was used in a highly compartmentalized

4  ████████████████████████████████████████████████████████████████

5

6  ████████████████████████████ including the assassination of U.S. soldiers.

7  My technology can ████████████████████████████████████████

8  ████████████████████████████████████████████████████████████

9  ████████████████████████████ We effectively tracked

10  several of them. It was apparent that Ms. Ravich had either a very limited understanding of my work

11  for ██████; and/or that her knowledge on these issues was either compartmentalized; and/or that

12  she had never been briefed.

13

14      9.      Shortly after the meeting in Vice-President Cheney's office, I provided specific

15  "output" containing target coordinates and flight numbers to specific individuals who met directly with

16  the Vice President. This "output" related to the London liquid bomb flights, which were subsequently

17  used in the disruption of that threat. I was told that my technology had again been validated and

18  progress would be made.

19

20      10.     As with all of these matters, my concern has always been that the politicians who

21  are seemingly in control either have not been fully briefed because of the compartmentalized

22  classification process; and/or because ██████ as their operatives repeatedly told me, do not

23  disclose to anyone "outside" ██████ including Justice, the FBI, "political appointments" etc the

24  details of any highly compartmentalized projects. As several operatives said on several occasions,

25  "we have our own means of funding."

26

27      11.     Thereafter, Mr. Negroponte filed his declaration resulting in his full assertion of the

28  state secrets privilege, which I understand has been diluted by DOJ lawyers seeking a protective

order. Later, I was informed that Mr. Negroponte's lack of knowledge about my technology and work within ▇▇▇ was part of the problem and that he was being fired. I have recently cooperated with the Senate Intelligence Committee investigating these matters as reflected in the attached questions, marked as Exhibit 2 hereto, submitted to the Committee based upon my knowledge of specific events and interactions with ▇▇ and other officials. As with my other sealed declaration, I am submitting this material under seal, in camera, to the Court in order to more fully supplement the record, protect myself, and to inform the Court of the nature of the issues confronting it. I have offered access to my prior declaration to *any* Government official with the appropriate clearances, but I do not believe anyone but certain ▇▇▇▇▇ have the necessary clearances to review it; and that they probably will not permit it based upon the compartmentalization process. I make the same offer with this declaration, but the gridlock and secrecy that impedes the utilization of the technology appears to be operating within the DOJ, while enabling Warren Trepp and his accomplices.

12.      Throughout the summer and fall of 2006, up to and including the present, I have worked with my current employers to improve my ▇▇▇▇▇▇ technology. It is significantly improved and we have voluntarily used it within the last 60 days to voluntarily provide intelligence information to the appropriate officials in order to save American lives. Even with its current limited use, it has specifically averted specific terrorist threats.

13.      Since last March, 2006, the U.S. Government has been unable to resolve these matters to protect our country and, more specifically, to protect our soldiers for any one of the following reasons and/or a combination of them: (1) the compartmentalized process within ▇▇▇ precludes *any* outside disclosures; and/or (2), the corrupt influence of Trepp (which initiated these problems as he repeatedly threatened me) is effective in an atmosphere of secrecy and concealment; and/or (3) the ignorance, ineptitude, and/or inability of Administration officials because of their political and/or financial motives, exacerbated by the secrecy in the compartmentalization

process, persists within our Government, and the political appointees are not trusted by high level military officials - hence the frustration and the letters of my attorney sent at my request. *I personally do not believe that anyone within the Department of Justice, including the Attorney General, has been sufficiently briefed by anyone from* ▇▇▇▇ *about these matters.* I personally question whether ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ who *is* knowledgeable of these issues, has shared *full* information with anyone outside ▇▇▇, including the Senate Intelligence Committee.

14.    Within the last several weeks I have watched the killing of some of our soldiers filmed *for* Arabic television, including the filming of the shooting down of our helicopters. I am just completely dumbfounded as to the Government's apparent incompetence in dealing with these matters, and why my technology is not being fully used, other than the sporadic use I am voluntarily providing. Its accuracy and reliability are beyond dispute. For that reason, One Hundred Million Dollars was appropriated through USSOCOM and Dr. Burkel in January, 2006 for its utilization. My employers and I have never even asked for payment, but I have received very specific information as to how Trepp and General Bath have blocked its use within the Air Force. I subsequently demanded that my attorney file an emergency motion to unseal the search matter, including as much unclassified data as possible, and to write again to our Government officials, as he initially did last March 1, 2006, a copy of which is attached hereto. My belief is that if the illegality of the search is exposed, it will unveil the secrecy under which the Nevada USAO has operated, and cause the Bush administration officials to do something, other than firing Daniel Bogden and John Negroponte , to protect our soldiers.

12.    I am a scientist. I am at a loss as to what to do next. It is just about a year since my home was illegally raided under completely false pretenses. It is very difficult to watch our soldiers being assassinated for propaganda purposes on Arabic television when remedies exist to prevent it, and the Government I am trying to help, seems stuck in delay and dysfunction. The First

1   Amendment, due process,  and the transparency needed for court proceedings, while protecting vital

2   national security information, even though it is not classified in my hands because I created it, seems

3   to be my only protection.

4       13.     This recent attempt to disqualify my attorney would gravely damage my constitutional

5   protections. It is borne out of ignorance of the facts by the USAO, an agenda to attack me, and

6   

7   disregard for not only my rights, but the security of our Country.

8       14.     I specifically and respectfully request that the motion to disqualify my attorney be denied.

9   Given his experience, integrity,  and litigation expertise, he is my counsel of choice, I strongly believe

10  that he will stand up to the corrupting influences of Warren Trepp, vigorously protect my rights, and

11  achieve justice in this matter.

12  

13  

14  

15      I declare under the penalty of perjury under the laws of the United States and the

16  State of Washington that the foregoing is true and correct.  Signed this ___ day of February,

17  2007, in Seattle, Washington.

18  

19  _____

20              Dennis Montgomery

21  

22  

23  

24  

25  

26  

27  

28

1   Given his experience, integrity, and litigation expertise, he is my counsel of choice, I strongly believe

2   that he will stand up to the corrupting influences of Warren Trepp, vigorously protect my rights, and

3   achieve justice in this matter.

4

5

6

7          I declare under the penalty of perjury under the laws of the United States and the State

8   of Washington that the foregoing is true and correct.  Signed this ___ day of February, 2007, in

9   Seattle, Washington.

10

11                                        Dennis Montgomery

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# SEALED

# EXHIBIT 1

# MONTGOMERY DECLARATION

## FLYNN & STILLMAN

224 BIRMINGHAM DRIVE, SUITE 1A4
CARDIFF, CALIFORNIA 92007

TELEPHONE (888) 235-4279
FACSIMILE (888) 235-4279
e-mail patillman@flynnstillman.com

MICHAEL J. FLYNN
ONLY ADMITTED IN MASSACHUSETTS

SPECIALIZING IN
COMPLEX LITIGATION

ONE CENTER PLAZA, SUITE 240
BOSTON, MASSACHUSETTS 02108
TELEPHONE (67) 720-2700
FACSIMILE (67) 720-2709

**CONFIDENTIAL**

March 1, 2006

*VIA FAX*

Donald H. Rumsfeld, Secretary
Department of Defense
1000 Defense Pentagon
Washington, D.C. 20301 - 1000

Michael Chertoff, Secretary
U.S. Dept. of Homeland Security
Washington, D.C. 20528

Alberto R. Gonzales, Attorney General
U.S. Dept. of Justice
950 Pennsylvania Ave. N.W.
Washington, D.C. 20530 - 0001



Re: *Dennis Montgomery, eTreppid Technologies & Warren Trepp*

Gentlemen:

I represent Dennis Montgomery, the owner of certain software technology utilized by various departments of the U S government, including ▮▮▮▮▮, So-Com, the Air Force and the Navy over the past three years pursuant to licenses with eTreppid Technologies of Reno, Nevada. eTreppid Technologies used the software programs of Mr. Montgomery pursuant to an oral, non-exclusive license between himself and Warren Trepp. Trepp and Montgomery are the equal co-founders of eTreppid. This matter is currently in civil litigation in the state and federal courts of Reno between Mr. Montgomery and Warren Trepp.

Secretary Donald Rumsfeld, e
Re: *Montgomery v. eTreppid Technologies*
March 1, 2006
Page 2 of 7

## DENNIS MONTGOMERY AND HIS SOFTWARE

Initially, it must be understood that the only person in the world with the knowledge and capability of implementing the software technology used by the agencies cited above is Mr. Montgomery. eTreppid does not currently have the technology.

Presently, Mr. Montgomery is able to reconstruct newer and more advanced versions of the software with broader and more capable application to specific, and current, national security concerns, particularly in connection with the war on terror.

The software and its utilization, including anomaly detection, facial recognition and pattern recognition are all classified. The subject software is derived from copyrights owned by Mr. Montgomery.

Mr. Montgomery has a top secret security clearance. Mr. Montgomery processed data with the subject software involving the most secret and sensitive matters of the war on terror. Former Secretaries of the Air Force and Navy, as well as ▮▮▮▮▮▮, observed and approved the testing of Mr. Montgomery's software in military applications. No other individuals at eTreppid, as specific ▮▮▮▮▮▮ are aware, are capable of utilizing the subject software.

## WARREN TREPP, HIS BACKGROUND, AND INFLUENCE

Warren Trepp, from Incline Village, Nevada, was formerly the Head Trader at Drexel, Burnham, Lambert during the "junk bond" era of Michael Milken (also now residing in Incline Village) in the 1980's. Trepp was Milken's partner in the "junk bond" scam, in which the U.S. government alleged that Milken and his henchmen essentially stole over three billion dollars by fraud, mostly through off-shore accounts, many of which were never found by the U.S. government. Milken went to jail and paid back about $600 million dollars. Mr. Trepp paid thirty million dollars.

Mr. Milken had in the past tried to invest in eTreppid which Mr. Montgomery disapproved of. Later, Mr. Trepp informed Montgomery that Milken had invested $12 million in eTreppid in a "round about way". Montgomery questioned Trepp regarding the propriety and legality of having a convicted felon substantially invested in a company performing government contracts involving highly classified information.

Mr. Trepp is wealthy and is a major contributor to the Nevada gubernatorial bid of James Gibbons, Republican U.S. Congressman; and to Dawn Gibbons who is running for her husband's seat in Congress. Mr. Gibbons is from Reno and a former Air Force Colonel and member of the Nevada Air National Guard. Mr. Montgomery has participated in many meetings with Trepp and Mr. Gibbons (including a cruise), and Mr. Montgomery has observed Trepp's influence with Mr. Gibbons. Mr. Montgomery observed Trepp give $100,000 in cash to Mr. Gibbons. Mr. Montgomery is concerned about that local influence in Nevada.

Secretary Donald Rumsfeld,   al.
Re: *Montgomery v. eTreppid Technologies*
March 1, 2006
Page 3 of 7

Mr. Trepp and one of his stock transactions have recently been cited in The Toledo Blade relating to an investigation by state and federal authorities in Ohio in connection with the sale of stock to an Ohio man currently under indictment for money laundering, insider trading, larceny and fraud – the same types of activity that took place at Drexel when Trepp and Milken operated their junk bond program. For more information regarding the current investigation of Trepp please contact the undersigned.

Trepp negotiated the actual contracts/licenses with the above mentioned U.S. governmental agencies. Trepp told Mr. Montgomery that he had demanded $500 million and a $1 billion bond from the U S government to sell Montgomery's software technology to it. Trepp said that offer had been rejected but he thought he could sell it to the "US for $100 million or get far more from the Chinese". Montgomery said he wanted no part of any such "deal", and that he wanted to continue to "license it to █████ and the Air Force, Navy, etc. in order to keep the data processing going in order to save American lives." Trepp said he was discontinuing the licensing arrangements with the US in order "to make them buy it."

Fortunately, Trepp does not have access to Mr. Montgomery's software to sell to anyone. But he is trying to gain ownership and possession of it by any means possible. If he succeeds, he will sell it to the highest bidder.

On Saturday, Feb. 25, 2006, Mr. Montgomery was informed by Peter Wiederman, a technical consultant for █████ that he received an email from Warren Trepp wherein Trepp implied that Mr. Montgomery was going to be arrested and put in jail by Feb. 28, 2006. Trepp's email to Wiederman stated that he would only negotiate with Montgomery "if Montgomery was still on the street after Tuesday." Mr. Montgomery has never been informed that he is a target of any state or federal criminal investigation, but he has heard of numerous statements by Trepp that Trepp was going to use his influence with Gibbons and the Nevada US Attorney, Daniel Bogden to get Montgomery indicted. Mr. Bogden is also a resident of Reno, also served in the Air Force, and Trepp told Montgomery that "he and Gibbons got Bogden his job."

Today, Mr. Montgomery's house was searched by the FBI pursuant to a search warrant. Mr. Montgomery has grave concerns that Trepp's influence with Gibbons and Gibbons' influence with the local FBI and US Attorney in Reno caused this search.

Mr. Montgomery has concerns that Trepp also has considerable influence with at least one Air Force General and that that influence is being used at the present time within certain offices of the Air Force.

## SIMPLE PROOF OF MONTGOMERY'S OWNERSHIP OF THE SOFTWARE

The ownership issues, the utilization, and the future rights to Montgomery's software technology are actually simple:

Secretary Donald Rumsfeld, et al.
Re: *Montgomery v. eTreppid Technologies*
March 1, 2006
Page 4 of 7

    1.    Montgomery developed and copyrighted the basic technology to do anomaly detection, facial recognition and pattern recognition with the U.S. Copyright Office in the 1980's. This fact is not only indisputable, the only person in the world with the technological know-how to prove it, or disprove it, is Montgomery. Thus, neither the government, nor Trepp, nor any of his numerous technical employees, consultants etc can even proffer technological evidence to disprove it. They cannot even create the technology. Thus, under existing copyright precedent, Montgomery is the presumed owner, and there is simply no possibility of defeating his ownership by any legitimate judicial means.

    2.    On September 28, 1998, Montgomery and Trepp entered into a written "Contribution Agreement", drafted by Trepp's lawyers, which explicitly stated in par. 1.2.1 that the only software Montgomery was contributing to eTreppid Technologies was "compression technology" specifically identified as *the software compression technology contained on that certain software Compression Engine Development Program contained on CD No. 1.*"

    3.    In par. 1.3 of the "Contribution Agreement", Trepp explicitly agreed that Montgomery is not *"contributing, transferring, or conveying to Intrepid [now "eTreppid"] under this agreement or by any other means, nor is Intrepid acquiring from [Montgomery] any other tangible and intangible assets of"* Montgomery."

    4.    Under oath, Trepp has admitted that he does not even have "CD No. 1".  Thus, he cannot even prove ownership of the compression technology that he does claim to have, let alone prove ownership of the software at issue. Of course, notwithstanding Trepp's sworn testimony designed to avoid any proven comparison of the different technologies during the preliminary injunction hearing, it would surprise no one for Trepp to "find" CD No. 1 when it suits his purposes.

    5.    The software created and copyrighted by Montgomery and used in the military applications tested and used by the U. S. Government is not related or derived in any manner to the "compression technology" transferred to eTreppid.

    6.    Of course, the obvious proof that only Mr. Montgomery owns the software is that he is the only person or entity that can use it. If eTrepped owned it, as they allege, why can't the numerous scientists on their payroll duplicate or use it? The obvious answer is that it was never conveyed to eTreppid.

## IMMEDIATE LICENSING OF THE SOFTWARE TO THE U.S.

    Mr. Montgomery is a patriotic American. He has taken the necessary steps as requested by ▉ personnel to protect classified secrets, including limiting the access of Mr. Trepp to the source codes for the subject software.

    Mr. Montgomery desires to enter into an exclusive licensing agreement with the U.S.

Secretary Donald Rumsfeld,    al.
Re: *Montgomery v. eTreppid Technologies*
March 1, 2006
Page 5 of 7

Government as soon as possible. In order to do so, he must be able to defend himself in the civil litigation with Trepp, but he is unable to do so because of the potential violation of the National Espionage Act, 18 U.S.C. § 793(d).  Montgomery's defense requires him to disclose the  nature of the software, who had access to it, who was using it and the protection program to protect it, as it was used in specific military applications, all of which is classified. However, the Department of Defense is capable of dismissing the civil litigation pursuant to what is commonly known as the military secrets privilege. Such dismissal will enable Montgomery to immediately implement the application of the software in the various national security programs sought by the ███ the Navy and the Air Force.

On the other hand, Montgomery is concerned that Trepp has enough influence over local prosecutors in Reno who will use their power to indict Montgomery on trumped up charges in order to get him to capitulate ownership to Trepp with the intention of selling the technology for sums in excess of one hundred million dollars. Trepp's greed and influence, well documented in his past conduct, suggests a substantial possibility of a corrupt criminal prosecution against Montgomery.

Montgomery will never capitulate to such corruption and will fight such an indictment with every possible defense available to him including  freedom of speech and freedom of the press. And he will *assuredly* be acquitted. Unfortunately, my firm has seen such corrupt use of the criminal justice system in the past 35 years of my litigation practice. *See e.g., United States v Braunstein*, 281 F.3d 982 (9th Cir. 2002) wherein the U.S. Attorney in Phoenix brought a frivolous, politically corrupt indictment against one of my clients, hoping to have him plead to some lesser charge. Just before trial, the U.S. attorney was forced to dismiss the indictment or risk total embarrassment.

## THE SPECIFIC MILITARY SECRETS PROBLEM AT ISSUE NOW INVOLVES THE IDENTITY OF ███ PERSONNEL

Unfortunately, there is presently pending a substantial problem involving the current litigation.  A "Declaration" was given to Trepp's attorneys by a high level  Air Force official (the "Declarant") who stated in pertinent part that he is a "Director" of an Air Force "Special Program Oversight" Department,  "with oversight of protecting sensitive national security information" and that he has "first hand knowledge of the matters set forth in this Declaration" who has "directed the counterintelligence and security support for Air Force Programs that eTreppid has contracted with."  The Declaration then stated:

I understand that Mr. Montgomery has stated that certain government officials required that eTreppid put into place a security protocol that would cause eTreppid's source code to be automatically deleted if anyone attempted to access it improperly. To the best of my knowledge, no Air Force  official required such a security protocol.

Secretary Donald Rumsfeld,    al.
Re: *Montgomery v. eTreppid Technologies*
March 1, 2006
Page 6 of 7

Although that statement, *by itself*, is true, this official was apparently unaware that that request had been explicitly made by two individuals from ▮▮▮▮ Trepp's attorneys then used the Declaration in the context of an injunction hearing representing that the Declarant was in a position to know if any other "government official" had requested the protocol. In that hearing the Declaration was extremely damaging to Mr. Montgomery because the Declaration, at least implied that the Air Force official involved was thoroughly knowledgeable about the entire project. Nor had the Declaration ever been given to Montgomery. In fact, the Declarant had no knowledge of Mr. Montgomery's work with ▮▮▮▮ *and even more importantly, with regard to the Navy and the application of the software to underwater detection by satellite.*

Trepp's lawyers used the Declaration to make the broad claim that no one in the government requested insertion of the intrusion devices in order to claim that Montgomery had destroyed or stolen the technology; and more importantly, to create the issue, *buttressed by the declaration, that there was no such security protocol in place.* Now, Mr. Montgomery must undo this damage and falsely portrayed evidence. But in order to do so, he must obtain declarations from ▮▮▮▮ personnel who instructed him to do it.

In fact, Mr. Montgomery possesses a list given to him by ▮▮▮▮ of sixteen names, addresses and phone numbers of ▮▮▮▮ involved in this project, including the two individuals who requested the insertion of the intrusion devices. But he does not want to violate his secrecy oath or jeopardize the individuals. But how can he undo the damage without disclosing the names of the two individuals who explicitly requested insertion of the intrusion devices?

This issue constitutes one of the most significant issues in the case, along with Mr. Montgomery's proof of ownership. That proof can only be met with either waiver of the military secrets privilege by the Department of Defense or its dismissal of the case. Mr. Montgomery has accordingly made the United States a party to the case.

## REQUEST

Mr. Montgomery remains hopeful that responsible representatives of the U S Government will involve themselves and their departments in this matter to prevent the local corruption of the judicial process, assert the military secrets privilege, dismiss the pending litigation, and/or waive the privilege, and license the software technology of Mr. Montgomery in order to preserve the lives of innocent Americans and destroy al Qaida.

Very Truly Yours,

Michael J. Flynn

Secretary Donald Rumsfeld, al.
Re: *Montgomery v. eTreppid Technologies*
March 1, 2006
Page 7 of 7

cc:    W. Kipling  "Kip" At Lee, Jr., Deputy General Counsel, U.S.A.F.
       William Cohen, former Secretary of Defense
       Colin Powell, former Secretary of State

# SEALED

# EXHIBIT   2

# MONTGOMERY DECLARATION

John Negroponte

Q. On September 19, 2006, you signed a "DECLARATION AND FORMAL CLAIM OF STATE SECRETS AND STATUTORY PRIVILEGES" in your capacity as "Director of National Intelligence," which was publicly filed in the two civil cases captioned in your declaration, is that correct?

Q. Did you also execute an additional "sealed" declaration, which was placed in a secure vault in Reno, Nevada for review by the District Judge (who was Judge Brian Sandoval at that time) in the same cases? If not, who did?

Q. What was in the "sealed" declaration that wasn't or couldn't be disclosed in your public declaration?

Q. Who brought this matter to your attention?

Q. When was it brought to your attention?

Q. How was it brought to your attention? Meetings? Memos?

Q. Who have you communicated with, when, and how concerning this matter?

Q. What records do you have, if any, relating to this matter? Did you keep copies? Do you currently have any records?

Q. What information did you have that led you to state in your declaration that the issues in the two civil cases involving Dennis Montgomery might pose an "exceptionally grave danger" to the national security of the United States?

Q. Were you informed / advised / briefed of the nature of Mr. Montgomery's software technology as it was used in the war on terror? How? When? By whom?

Q. Describe fully what you were briefed on? What documents, if any you reviewed?

Q. What was your specific understanding as to the effectiveness of Mr. Montgomery's technology? Who told you? What documents, if any, were you given concerning effectiveness?

Q. Were you advised of specific "forecasts" of terrorist threats generated by the technology? What "forecasts", if any? What documents did you review? What verification procedures/efforts did you use to verify the accuracy of the "forecasts"? By whom?

Q. What were you briefed on / advised of concerning defense appropriations / payments for the use of the technology? What documents did you review, if any? By whom?

Q. Were you aware of a $100 Million Dollar appropriation in January, 06 coming from the Secretary of Defense's Office, approved by Doctor Burkel? Were any portion of those funds paid? What documents? By Whom?

Q. Wasn't the effectiveness of Mr. Montgomery's technology established in the six month independent study before the appropriation was made?

Q. Was the same done with eTreppid's alleged technology after Mr. Montgomery left in mid January, 2006?

Q. What were you advised / briefed as to the ownership of the technology? By whom? What documents? What investigation, if any, did you conduct into the ownership issue?

Q. When did you first draw any conclusions as to who owned the technology: January - February, 2006? February 24 - 28, 2006? Between March 1 and June 1, 2006? After June 1, 2006, after Mr. Montgomery's representatives had contacted Vice-President Cheney? After August 7, 2006 when Mr. Montgomery's technology "forecast" the London liquid bomb flights?

Q. What is your understanding as to Mr. Montgomery's relationship with Tim or Edra Blixseth and/or Jack Kemp? Did you meet or talk with any of them? What did they tell you? What did you tell them? Did they tell you that Mr. Montgomery's "forecasts" were being freely and gratuitously given to protect our Country? Were any documents exchanged? What records do you have of those meetings? What, if anything, were you told of subsequent meetings by Mr. Montgomery's representatives with any Government official?

Q. Were you advised / briefed / informed by ▮▮▮▮▮ or any Government official about any specific "forecasts" of terrorists threats generated by Mr. Montgomery's

technology concerning:
(i)   The ██████████████████████ Nov. 8, 03?
(ii)   Mosul food tent,  Dec. 22, 04?
(iii)   London Tube, July, 04?
(iv)   December,  03  testing by ██████████████████████
(v)   Port of Valdez "forecasts"?
(vi)   London liquid bomb threats,  August, 06?
(vii)   Iraqi oil fields,  September, 05 and other dates?
(viii) Al Zarqawi?
(ix)   Saddam Hussein?
(viii) Any other specific "forecasts"?
By whom? What documents? What investigation did you undertake, if any
concerning the foregoing where we failed to utilize the intelligence? (This
obviously excludes Valdez, Al Zarqawi, Hussein and successful instances).

Q.  Were you briefed / advised of "forecasts" which prevented a terrorist attack?

Q.  Were you briefed / advised / of situations involving the use of the technology
(particularly how the "filtering" process worked in specific situations - currently
known only to Mr. Montgomery and several ████ officials and/or Paul Haraldsen)
which was so highly compartmentalized, you were only advised of the results?

Q.  What tests / evaluations / or research were you advised of concerning Mr.
Montgomery's  technology, including its effectiveness, after he correctly forecast
the London liquid bomb threat in August, 06? What documents? By whom?
When?

Q.  Was that the same technology used by Mr. Montgomery before he left
eTreppid in mid-January,06? What did his representative say as to who owned the
technology that correctly forecast the London flight threat and how it differed, if at
all, from prior use of the technology? Did you compare the results of that forecast
with any alleged forecasts by eTreppid after Mr. Montgomery left?

Q. Did you take the position that the technology was "overpromised  and
underperformed"? Who told you that? When did the "overpromised and
underperformed" description of the technology begin, if you know, and who began
that description? How did you make that evaluation? Did the ████? What docs
support that position? When were those documents created?

Q. Was the assessment of "overpromised and underperformed," specifically referring to Mr. Montgomery's technology, made after he left eTreppid and used by you on the advice of specific officials who were attempting to flow government contracts to Warren Trepp?

Q. What technology did the description "overpromised and underperformed" apply to: (i) the technology tested and approved by the Air Force when Mr. Montgomery was at eTreppid? (ii) technology that was produced by eTreppid without Mr. Montgomery? (iii) technology used by Mr. Montgomery after April, 2006?

Q. Were you told that in the context of Trepp claiming that he had new and better technology?

Q. How did you reconcile either of those two positions, ie Mr. Montgomery's technology "underperforming" and/or Trepp"s allegedly new technology with all of Mr. Montgomery's correct "forecasts" including the London liquid bombs forecast?

Q. The time frames are of critical importance in this matter. When Mr. Montgomery was doing accurate "forecasting" between Oct. 28, 2003 and mid-December, 2005, and after the Air Force had done six months of testing in early 05 - then approved the technology - and after $100 Million was approved to buy the technology, did you know of that appropriation; did you object to it; did you study the tests; did you receive any specific recommendations or specific analysis of the claims of "over promised and underperformed" in the context of those tests and subsequent validation?

Q. Were you advised that the independent Air Force tests validated the ███████ ██████████████████████ but that they were ██████████████ them as Mr. Montgomery has done?

Q. Did the "overpromised and underperformed" analysis arise after Mr. Montgomery left eTreppid Technologies in mid-January, 06 when eTreppid was claiming to perform the "processing" without Mr. Montgomery's technology?

Q. Was eTreppid paid any portion of the $100 Million dollar appropriation after January 1, 2006? Was any product delivered? Has any analysis of that product been compared against Mr. Montgomery's "output"? What documents?

Q. Was eTreppid Technologies, LLC paid *any* money on *any* government contracts after Jan. 1, 2006, and if so what were the contracts, and how much?

Q. Did you know that Congressman Gibbons had worked on behalf of Warren Trepp and Air Force General Ronald Bath to obtain the $100 Million Dollar appropriation based on Mr. Montgomery's technology? Who informed you, when, how, etc.

Q. What was your understanding of the roles of Congressman Gibbons and General Bath in these matters?

Q. Were you advised of Mr. Montgomery's departure from eTreppid? When? By whom? How? What documents? What was your understanding?

Q. Were you advised in advance of the intended FBI search and seizure of Mr. Montgomery's home which took place on March 1, 2006? By whom? What documents?

Q. Did you approve it?

Q. Were you advised that the alleged justification for the search was that Mr. Montgomery: (i) was allegedly in possession of classified information? And (ii) that he had allegedly "stolen" trade secrets allegedly belonging to Trepp?

Q. Were you advised that his Top Secret Security clearance had been suspended? Who advised you? Who suspended it? What documents exist? Was it done in accordance with federal law? Was Mr. Montgomery given "Notice"? a Hearing? And informed of the results after notice, a hearing and the right of appeal?

Q. Do you know specifically how the FBI and U. S. Attorney in Reno concluded that Mr. Montgomery's security clearance had been "suspended" if he was never given "Notice", a hearing, the resulys of the hearing, and opportunity to appeal?

Q. What is the status of his clearance currently, if you know?

Q. Were you subsequently advised that neither of the two alleged bases to search Mr. Montgomery's home were true? By whom. When? What documents etc?

Q. Were you subsequently advised, *before* you signed your Declaration asserting

the state secrets privilege, that Mr. Montgomery's clearance has never been suspended in accordance with federal law, that the two bases to have raided his home were not true, and that serious questions existed as to whether the FBI had misrepresented material facts to the Court?

Q. Before you signed your Declaration, did you know that Congressman Gibbons and General Bath, and Air Force agent Paul Haraldsen, were acting on behalf of Warren Trepp to initiate the search of Mr. Montgomery's home for the specific purpose of obtaining possession of the source codes to Mr. Montgomery's technology?

Q. Have you read the March 1, 06 letter of Mr. Montgomery's attorney, Michael Flynn, faxed on the day of the raid to Secretary Rumsfeld, Attorney General Gonzalez, Mr. Chertoff, ███████████████████ and others? When: On or about March 1? Between April 1 and July 1, 2006? Before August 7, 06? Before you signed your declaration? After November 28, 06? After December 1, 06?

Q. Were you advised that a Court has ruled that the search of Mr Montgomery's home was illegal, unconstitutional, in violation of the Fourth Amendment, based on false and/or fabricated and/or concealed facts and evidence provided by the Nevada U.S. Attorney's Office and Reno FBI to the Judge issuing the search warrants? And that the Judge has ruled that she was "misled" by the FBI and U.S. Attorney? And that the entire case file should be unsealed? When? How? By whom? What documents? etc.

Q. Have you read the False Claims Act Complaint filed by Mr. Montgomery on or about December 12, 2006?

Q. Were you advised that the same Judge has ruled that the only technology conveyed by Mr. Montgomery to Warren Trepp was conveyed in September, 1998 and is specifically defined with the conveyed source codes on one CD designated "CD No. 1"? When, By Whom? How? What docs?

Q. Were you advised that the source codes on the conveyed technology on "CD No. 1" did not include any codes used on the technology used to ███████ ███████████████████████ When? By whom? How? Did you check to find out at any time?

Q. Have you undertaken any investigation to determine any evidence concerning

the "indicia of ownership" of the subject source codes, including but not limited to: chain of written title in copyrights?  chain of written title in September , 1998 Agreement?  actual possession,?  actual utilization?  actual creation/ development?  preservation and guarding of secrecy of the codes?  legal status (ie, independent contractor, employee, owner etc) at time of creation, development, utilization etc.?

Q.  Were you advised at any time before the search of Mr. Montgomery's home that Warren Trepp was notorious for his involvement in financial frauds including his position as Head Trader for Michael Milken during the Junk Bond crime wave at Drexel Burnham and Lambert?

Q.  Were you advised that Warren Trepp was a target of criminal and SEC investigations during the 1990's?

Q.  How did Warren Trepp obtain a Top Secret Clearance given his background?  How was Mr. Montgomery's security clearance "suspended" in light of his work for our Country using his technology and his three year track record of faithfully assisting this Country?

Q.  Did you personally authorize the search of Mr. Montgomery's home? Do you know who did? Based on what documents, evidence etc?

Q.  When you signed your declaration on September 19, 2006, asserting the state secrets privilege and related statutory privileges, what was your understanding regarding the future of these civil cases and the potential threat to national security?

Q.  Was it your assessment that no discovery should take place in these cases and these cases should *not* proceed?  How did you make that assessment?

Q.  Was it your assessment that the cases should proceed in a manner designed to *limit* Mr. Montgomery from using evidence of the use of his technology which was directly relevant to issues relating to ownership of the technology, ie the "indicia of ownership" described above?

Q.  Were you aware that the DOJ lawyers who filed your Declaration told the Court, that despite your assertion of the privilege, the cases could proceed on a limited basis and they would decide what evidence to produce or not produce to protect whoever and whatever they wanted, including individuals high within the

Bush Administration and their involvement in these matters?

Q. Were you aware that such a procedure after assertion of the privilege is
unprecedented, and may have been designed to protect Warren Trepp, General
Bath, Paul Haraldsen, other high level Air Force officials and administration
officials?

Q. Who are the lawyers, and/or officials who created this procedure of having you
as a "Department Head" assert the privilege, and then have DOJ lawyers pick and
choose what evidence to produce?

Q. Did Peter Keisler create this procedure for you to fully assert the privilege and
then allow the cases to go forward while he picked and chose what to produce to
protect Administration or government officials, including yourself, Mr. Cheney,
General Bath, Paul Haraldsen, Daniel Bogden, Congressman Gibbons, and others?

Q. Were you aware that on September 25, 2006, the DOJ filed your declaration
and moved for a protective order that patently and directly conflicted with and
abrogated your assertion of the privilege? (Compare DNI Negroponte Decl. ¶11-
12 with Proposed Protective Order ¶ 4(c)).

Q. Do you consider it proper for DOJ attorneys to define the scope of the state
secrets privilege? Or do you think it is limited to a "Department Head" as
established in every case involving the privilege? Are you aware of any other
published legal opinion where this procedure has been approved by a Court

Q. Why was it done differently here?

Q. Have you ever spoken to former Nevada U.S. attorney Daniel Bogden about
Montgomery or the technology? If so, when, where, what etcetera. Have you ever
spoken to DOJ attorney Peter Keisler about Montgomery or the technology? If so,
when, where, what, etcetera. Have you ever spoken to Vice-President Cheney
about Montgomery or the technology? If so, when, where, what etcetera.

Q. Were you aware that Mr. Montgomery's technology was tested and verified by
the Navy (Mike Carter) in the summer / fall of 2005, and can detect submarines
under water?

Q. Were you advised that Mr. Montgomery was specifically instructed by ███

officials to exclude Warren Trepp from certain information?

Q. Were any surveillance measures used against Mr. Montgomery required by the Fourth Amendment to be authorized by a federal Judge? Under the NSA program or otherwise? Were you aware that Mr. Montgomery is an AT&T customer? Were his records reviewed under the NSA program ?

Q. Have you received any information or documents as to the role of Air Force investigator Paul Haraldsen in this matter?

Q. Why did the Bush Administration discharge you as DNI? Who did you discuss this with? When? Documents?